## UNITED STATES DISTRICT COURT
### for the
### DISTRICT OF MASSACHUSETTS

-------------------------------------------------------------x

BEVERLY A. GEORGE,

                   Plaintiff,

        v.                                     Civil Action No. 05-11079-DPW

AT&T CORP.,

                   Defendant.

-------------------------------------------------------------x

## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT
## OF MOTION FOR SUMMARY JUDGMENT

Plaintiff, Beverly George, retired as an employee of defendant, AT&T Corp., after 30 years of service effective August 1, 2004.  On September 13, 2004, defendant announced a workforce reduction of 140 employees.  If plaintiff had remained in defendant's employ on that date, she would have been eligible to receive 100 weeks of termination pay if she voluntarily elected to accept the terms of defendant's Voluntary Termination Pay ("VTP") offer.  She claims that she was falsely induced to retire by the intentional (Count I) and negligent misrepresentations (Count II) of defendant.  In this memorandum, defendant will establish that plaintiff's claims are preempted by Section 301 of the Labor Management Relations Act; defendant will further establish that it made no intentional or negligent misrepresentations to plaintiff.

### FACTS

Plaintiff was an employee employed by defendant at its Fairhaven Call Center.  Plaintiff was a member of the Communication Workers of America ("CWA").  Her terms

and conditions of employment were governed by a collective bargaining agreement between defendant and the CWA. (Defendant's Statement of Undisputed Facts ("DSUF") ¶¶ 1, 7)

Plaintiff's net credited service date with defendant was July 28, 1974. Commencing in the 2000-2001 time period, plaintiff began contemplating retirement. However, if she retired prior to completing 30 years of service, her pension benefit would be discounted. (DSUF, ¶¶ 8, 10, 27-28)

In the summer of 2003, plaintiff selected a vacation for the last two weeks of July, 2004 with the possibility of retirement at the conclusion of her vacation. In her deposition, George testified to a number of factors leading her to the possibility of retirement, including her health issues, as well as those of her son. (DSUF, ¶¶ 29-31) Conversely, plaintiff carefully followed business issues involving the defendant and slower call volumes in Fairhaven which suggested to her the possibility that defendant might close or downsize at Fairhaven. (DSUF, ¶¶ 32, 35)

This issue was important to plaintiff because Article 25 of the agreement between the defendant and CWA provided for termination payments if defendant laid off employees as part of a closing or downsizing or if such payments were offered by defendant to induce employees to voluntarily leave. For an employee with 30 but less than 31 years of net credited service, the termination payment would equal 100 weeks' pay. (DSUF, ¶¶ 12-14)

Rumors of the possible closing of the Fairhaven Call Center had existed throughout the time period that Joan Gallagher Cappuccio, Group Manager, was the local person in charge of the facility. Her role in that position commenced in December of

1998.  At least three times, Cappuccio sent out written messages to Fairhaven employees informing them that rumors of the closing of the center were untrue.  (DSUF, ¶¶ 4, 33-34)

In May and June of 2004, plaintiff asked her immediate supervisor, Mary Eustace, if the Fairhaven facility was closing or downsizing.  These conversations took place in passing near plaintiff's work station.  Eustace uniformly replied in the negative.  On one such occasion, after receiving Eustace's negative reply, plaintiff suggested that Eustace might want to warm up her resume.  Eustace replied that she felt confident she would be o.k.  (DSUF, ¶¶ 36-41)

In early June, certain of defendant's managers working at locations other than Fairhaven arrived at Fairhaven as part of a sales program.  Plaintiff asked one of the managers if they were in Fairhaven under disguise to figure out what offices to close. The manager responded "no".  (DSUF, ¶¶ 44-45)

In early July of 2004[1], plaintiff spoke with Cappuccio as they were passing in the hallway.  George told Cappuccio that she was thinking she might want to stay and avail herself of a package (*i.e.,* Article 25 termination payments) rather than retire.  Cappuccio replied that the company was going to be in Fairhaven; that while they had sold the building, they had secured a five year lease; that they were still going to provide excellent customer service; and that they were not going to close or downsize.  (DSUF, ¶¶ 46-48)

After this conversation with Cappuccio, plaintiff decided to put in for retirement. She had called the pension center on June 18, 2004 requesting her retirement papers.  She returned those papers to the pension center on July 10, 2004.  Her last official day at work was July 16, 2004.  She was given a luncheon that day and left on a two week paid

---

[1]  Even before plaintiff's conversation with Cappuccio, the Fairhaven Flyer published an interview with plaintiff about her upcoming retirement.  (DSUF, ¶ 55)

vacation with her retirement to follow immediately thereafter. (DSUF, ¶¶ 29, 52-54)

## THE SALE OF THE FAIRHAVEN FACILITY

In 2003, defendant commenced efforts to sell the Fairhaven facility because it was only occupying a third of the building and it was having trouble bringing in other tenants. In 2004, defendant sold the building effective September 1, 2004. As part of the sale, defendant leased back a portion of the building under the terms of a five year lease. (DSUF, ¶¶ 58-59)

As of early 2004, defendant employed approximately 432 employees at the Fairhaven facility. As part of planning for the sale of the facility and lease back, defendant was working on plans for the build out of its leased space for 432 employees. In fact, Cappuccio was scheduled to attend a meeting on September 15, 2004 to discuss these build out plans. (DSUF, ¶¶ 60-64)

## THE SEPTEMBER, 2004 WORK FORCE REDUCTION

On September 10, 2004, Cappuccio received a telephone call advising her that defendant would be announcing a work force reduction of 140 employees at the Fairhaven facility on Monday, September 13, 2004. Neither Cappuccio nor any of the other managers in Fairhaven had been consulted about or asked for input into this decision. (DSUF, ¶¶ 11, 65-67)

As part of the workforce reduction, defendant agreed that employees could receive Article 25 termination payments if they voluntarily elected to be laid off. The VTP offer was not extended retroactively to employees who recently retired. As a result, plaintiff was not eligible for termination payments. (DSUF, ¶¶ 12, 15)

**THE GRIEVANCE FILED BY CWA LOCAL 1051**

Plaintiff became aware of the workforce reduction and offer when it happened. On November 16, 2004, she wrote to Linda Teoli, President of Local 1051, requesting that a grievance be filed on her behalf concerning her loss of 100 weeks of termination pay.  (DSUF, ¶¶ 17-18)

On December 9, 2004, CWA Local 1051 filed a grievance claiming a violation of the contract and seeking termination payments for plaintiff.  The focus of the grievance was Section 6(a) of Article 25 which provides that separation payments are not paid to "An employee leaving the Company voluntarily without inducement by the Company." In essence, the grievance alleges that plaintiff did not leave voluntarily without inducement because of the misrepresentations made to her.  (DSUF, ¶¶19-20)

Defendant replied that the grievance was untimely since it had been filed beyond the 60-day limitation period of the contract.  Defendant also replied that grievances were not generally accepted from retirees.  (DSUF, ¶ 21)

Plaintiff was dissatisfied with the defendant's reply and twice pursued efforts to convince the national office of the CWA to pursue her grievance.  Both times the CWA responded that the defendant was correct in its view that the grievance was untimely filed.  (No mention was made on either occasion of the retiree issue.)  (DSUF, ¶¶ 22-26)

**ARGUMENT**

**I.    DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT DISMISSING THE COMPLAINT IN ITS ENTIRETY.**

A.    <u>Summary Judgment Standard</u>

The Supreme Court has held that Fed. R. Civ. P. 56(c) "mandates" summary judgment "against a party who fails to make a showing sufficient to establish the

existence of an element essential to that party's case . . . ." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). The nonmoving party must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial." *Id.* at 324. In meeting this burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). That party must demonstrate that there is a "genuine issue for trial." Fed. R. Civ. P. 56(e). An action is void of a material issue for trial "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita,* 475 U.S. at 587.

As set forth below, this Court should grant summary judgment to defendant because (1) plaintiff's claims are preempted by the collective bargaining agreement; and (2) the undisputed facts demonstrate that plaintiff can not prevail on her claims of intentional and negligent misrepresentation. Plaintiff's misrepresentation claims are no more than an effort on her part to skirt the terms of the collective bargaining agreement by recasting the claim as a tort. *See e.g., Flibotte v. Penn. Truck Lines,* 131 F.3d 21 (1st Cir. 1997); *United Steelworkers v. Rawson,* 495 U.S. 362, 371-72 (1990). *See also Gibson v. AT&T Technologies,* 782 F.2d 686 (7th Cir. 1986). Assuming *arguendo* that her claims are not preempted, plaintiff's misrepresentation claims fail because there is no evidence that the statements were false at the time or that defendant could have learned of the falsity of the statements with reasonable care. *Rodowicz v. Mass. Mutual Life Ins. Co.,* 279 F.3d 36 (1st Cir. 2002).

**B.**    Plaintiff's Misrepresentation Claims Are Preempted By The Collective Bargaining Agreement.

Article 25, Section 1 of the collective bargaining agreement between defendant and the CWA provides for termination payments to an employee as an "inducement to voluntarily leave the Company."  In accordance with Section 6(a) of Article 25, an employee who leaves the defendant's employ "voluntarily without inducement" is not entitled to termination payments.  Plaintiff attempted to pursue a grievance claiming that she did not leave defendant's employ voluntarily, but was wrongfully induced to leave by misrepresentations made by the defendant.  Based on this theory, plaintiff claimed entitlement under the collective bargaining agreement to 100 weeks of termination payments.  Defendant denied the grievance on the basis of timeliness.  The CWA, notwithstanding plaintiff's entreaties to the contrary, concluded that the defendant's denial of the grievance was correct and failed/refused to pursue the grievance any further.[2]  Failing to obtain relief through the grievance procedure, plaintiff simply recast her claim in tort based on alleged misrepresentations and sought relief from the Court.

In *Allis-Chalmers Corp. v. Lueck,* 471 U.S. 202 (1985), the plaintiff sued for the tort of bad-faith failure to pay disability benefits.  In finding plaintiff's claim preempted, the Court noted that plaintiff's claim could have been pled as a contract claim under Section 301 of the Labor Management Relations Act.  The Court further found that the goal of a "unified federal body of labor-contract law would be subverted" absent a holding that federal law governed.  In this same vein, the Court observed earlier in its opinion:

---

[2]  The CWA did not mention its view on the validity of defendant's position that it generally did not accept grievances from retirees.

> …questions relating to what the parties to a labor
> agreement agreed, and what legal consequences were
> intended to flow from breaches of that agreement, must be
> resolved by reference to uniform federal law, whether such
> questions arise in the context of a suit for breach of contract
> or in a suit alleging liability in tort.  Any other result would
> elevate form over substance and allow parties to evade the
> requirements of § 301 by re-labeling their contract claims
> for tortuous breach of contract.  471 U.S. at 211.

In *Gibson v. AT&T Technologies, supra,* a case similar to the present one, the

plaintiffs voluntary left their employment with the company under the terms of an income

protection plan.  If they hadn't done so, they would have been eligible for greater benefits

a few months later when the company closed the plant.  The plaintiffs brought suit under

a state law fraud theory claiming the company wrongfully withheld information from

them about plans to close the plant.  In finding plaintiffs' claims preempted, the Court

found their claim to arise under the collective bargaining agreement and to be controlled

be federal law.

The principles of *Allis-Chalmers* and *Gibson v. AT&T Technologies* apply with

equal force herein.  Plaintiff claims that she did not voluntarily leave defendant's employ

when she retired effective August 1, 2004 because that retirement was induced by

misrepresentations made by defendant.  Accordingly, she asks by way of relief to be

awarded termination payments in an amount set forth in Article 25 of the contract.

Defendant submits that an employee's entitlement to such payments is governed by the

collective bargaining agreement and is subject to uniform federal law.

Since plaintiff's state law tort claims are preempted by Section 301, those claims

must be dismissed because plaintiff has failed to exhaust and cannot exhaust her remedies

under the collective bargaining agreement. *Vaca v. Sipes,* 386 U.S. 171, 184-88 (1967); *Soto Segarra v. Sea-Land Serv, Inc.,* 581 F.2d 291, 294 (1st Cir. 1978). *See also Doty v. Sewall,* 908 F.2d 1053, 1061 (1st Cir. 1990) (defendant bears the burden of proving an adequate remedy under the contract and the plaintiff's failure to pursue that remedy). In the instant matter, it is clear that the contract provides an adequate remedy, but plaintiff's effort to avail herself of that remedy was untimely.[3] Accordingly, plaintiff's state law claims must be dismissed.

C.    Plaintiff's Misrepresentations Claims Are Unfounded And Must Be Dismissed.

In *Rodowicz v. Massachusetts Mutual Life Insurance Company, supra*, at 42, the Court considered claims of intentional and negligent misrepresentation in the context of a jury verdict for the plaintiff. The Court stated:

> … Because the degree of culpability a plaintiff must show to establish liability for negligent misrepresentation is less than for intentional misrepresentation, we use the elements for negligent misrepresentation. *Cummings v. HPG Int'l. Inc.,* 244 F.3d 16, 24-25 (1st Cir. 2001). Under Massachusetts law,
>
> To sustain a claim of misrepresentation, a plaintiff must show a false statement of a material fact made to induce the plaintiff to act, together with reliance on the false statement by the plaintiff to the plaintiff's detriment . . . The speaker need not know 'that the statement is false if the truth is reasonably susceptible of actual knowledge, or otherwise expressed, if, through a modicum of diligence, accurate facts are available to the speaker.' *Zimmerman v. Kent,* 31 Mass. App. Ct. 72, 575 N.E.2d 70, 74 (1991) (quoting *Acushnet Fed. Credit Union v. Roderick,* 26 Mass. App. Ct. 604, 530 N.E.2d 1243, 1244 (1998). [Footnote omitted.]

---

[3]   Former employees also have an obligation to exhaust remedies before bringing suit under § 301. *Merk v. Jewel Cos., Inc.,* 848 F.2d 761, 766 (7th Cir. 1988), *cert. denied* 488 U.S. 956 (1988).

Plaintiff cannot demonstrate that either Mary Eustace or Joan Gallagher Cappuccio made a false statement of any material fact or did so with any effort to induce her to retire. Plaintiff's passing comments to Eustace were met with honest responses from Eustace based on her knowledge or opinion at the time. Similarly, Cappuccio provided an honest report consistent with her knowledge at the time. The defendant had, in fact, agreed to a five year lease with the purchaser of the building and would continue to provide customer service from Fairhaven.

Significantly, at the time she made the statement, Cappuccio was working on plans to build out the leased space for 432 employees, the approximate number of employees employed by defendant at Fairhaven <u>before</u> the workforce reduction announced in September. Indeed, Cappuccio was scheduled to attend a meeting two (2) days after the announcement of the workforce reduction to discuss build out plans for 432 employees. Thus, she was as surprised as anyone, including plaintiff, when she was informed on September 10 that there would be a workforce reduction announced on the 13th.

Plaintiff has not developed any evidence to demonstrate that the statements of Eustace and Cappuccio were false at the time they were made. The fact that defendant announced a work force reduction three months after Eustace's comments and two months after Cappuccio's comments does not demonstrate that their comments were false when made. Accordingly, plaintiff cannot establish a basic element of negligent misrepresentation, namely that there was "false information for the guidance of others." *Rodowicz, supra,* citing *Cummings,* 244 F.3d at 24.

Moreover, plaintiff cannot demonstrate that Eustace or Cappuccio could have discovered with reasonable care that their statements were false. Even if they had inquired of their superiors, there is no evidence to suggest that in June or July of 2004, Eustace or Cappuccio could have learned any information which would have caused them to change their statements. Indeed, other than the factually accurate statements made by Cappuccio concerning the five year lease, their statements were no more than their opinion as to the likely outlook for the future. The fact that their outlook ultimately proved inaccurate does not without more establish an actionable claim.

Moreover, as Cappuccio noted in her testimony, plaintiff's hallway conversation with her was no different than many other conversations Cappuccio had with other employees. She could not have possibly checked with her superiors every time she had such a conversation.

Ultimately, as with the plaintiff in *Rodowicz, supra,* it was simply plaintiff's "ill fortune" that within two months of her retirement, defendant made a decision to offer VTP as part of a workforce reduction. Still, at the time that plaintiff was told by Cappuccio and/or Eustace that there would be no workforce reduction, there is no evidence that their statements were false. Accordingly, plaintiff's claims of intentional and negligent representation must be dismissed.

## B.    CONCLUSION

For the above reasons, and based on the record as a whole, defendant respectfully submits that its motion for summary judgment must be granted and that the complaint must be dismissed in its entirety.

Dated: March 3, 2005                                    AT&T Corp.,

                                                        By its Attorneys,


                                                        ____/s/ Nathan L. Kaitz_____
                                                        Nathan L. Kaitz (BBO#256760)
                                                        Morgan, Brown & Joy, LLP
                                                        200 State Street, 11th Floor
                                                        Boston, MA 02109
                                                        (617) 523-6666

                              **Certificate of Service**

        I hereby certify that a copy this document filed through the ECF system will be
sent electronically to the registered participants as identified on the Notice of Electronic
Filing (NEF), including counsel for plaintiff, Blake J. Godbout & Associates, 33 Broad
Street, 11th Floor, Boston MA  02109 and paper copies will be sent to those indicated as
non-registered participants on 3rd day of March, 2006.



                                                        _____/s/ Nathan L. Kaitz_____
                                                        Nathan L. Kaitz

**UNITED STATES DISTRICT COURT**
**for the**
**DISTRICT OF MASSACHUSETTS**

-------------------------------------------------------------x

BEVERLY A. GEORGE,

                          Plaintiff,

         v.                                  Civil Action No. 05-11079-DPW

AT&T CORP.,

                          Defendant.

-------------------------------------------------------------x

**DEFENDANT'S STATEMENT**
**OF UNDISPUTED MATERIAL FACTS**

      NOW COMES AT&T CORP. (the "defendant") and pursuant to Rule 56 of the

Federal Rules of Civil Procedure, hereby sets forth the following statement of undisputed

facts[1]:

**I.     THE PARTIES**

      1.      Beverly George (the "plaintiff" or "George") was an employee of AT&T

Corp. working at its Fairhaven, Massachusetts Call Center at all times material herein.

(A. 2)

      2.      AT&T Corp. is a corporation engaged in the telecommunications business

with a customer service center in Fairhaven, Massachusetts (A. 68)

      3.      The Fairhaven customer service center opened in 1997.  (A. 57)

      4.      In December of 1998, Joan Gallagher Cappuccio became the group

manager for the facility; she was the local person in charge at the facility.  (A. 16, 55-56)

---

[1]   These facts are assumed true for the purpose of defendant's summary judgment motion.  Some of these facts will be contested should the case go to trial.

5.    At its peak in the early part of 2000, over 1,000 employees were employed at the Fairhaven facility.  (A. 58)

6.    By the early part of 2004, the number of employees employed at the Fairhaven facility totaled approximately 430.  (A. 69)

7.    Plaintiff's terms and conditions of employment were governed by a collective bargaining agreement in effect between defendant and the Communication Workers of America ("CWA"), of which she was a member.  (A. 4)

## II.    THE CLAIM

8.    George had a net credited service date with the defendant of July 28, 1974. (A. 2)

9.    George retired effective August 1, 2004, after having reached thirty (30) years of service.  (A. 2-3)

10.    After thirty (30) years of service, an employee is entitled to a full, undiscounted pension from defendant.  (A. 9)

11.    On September 13, 2004, defendant announced that it would be reducing the work force in Fairhaven by 140 employees.  (A. 10, 28-29)

12.    Defendant permitted employees to volunteer for layoff and be granted termination payments under the terms of a Voluntary Termination Pay ("VTP") offer. (A. 66-67, 75-88)

13.    If George had not voluntarily retired effective August 1, 2004, she would have been eligible to voluntarily leave pursuant to the VTP offer in September of 2004. (A. 11)

14.    If George had done so, she would have been eligible for 100 weeks of

termination pay pursuant to Article 25 of the collective bargaining agreement between defendant and the CWA.  (A. 39, 80)

15.    The VTP offer was not extended retroactively to employees who recently retired.  (A. 81)

16.    In her complaint, George alleges that she was wrongfully induced to retire by material and false representations that defendant would not be closing or downsizing the Fairhaven office.

## III.    THE GRIEVANCE

17.    Plaintiff learnt of the downsizing announcement around the time it happened.  (A. 3)

18.    By letter dated November 16, 2004, addressed to Linda Teoli, President of CWA Local 1051, George requested that Local 1051 file a grievance concerning her loss of 100 weeks of termination pay.  (A. 5, 30-38)

19.    On December 9, 2004, Local 1051 filed a grievance with defendant claiming a violation of the collective bargaining agreement and seeking 100 weeks of termination payments on behalf of Ms. George.  (A. 41)

20.    The grievance, in essence, alleges that Ms. George did not leave voluntarily without inducement by the company.  *See* Section 6(a) of Article 25.  (A. 39-41)

21.    Defendant responded to the grievance by stating that it would not be accepted as it had been "filed beyond the 60-day timeline as per the contract Article 9." The response also stated, "Generally, grievances are also not accepted from retired employees, however, this also did not meet the agreed upon timeline."  (A. 42)

22.    Linda Teoli, President of CWA Local 1051, wrote Ms. George to advise her of defendant's position and that, in fact, the grievance was untimely.  (A. 7, 43)

23.    On December 19, 2004, Ms. George wrote a letter to Bill Bates, CWA Representative, seeking to appeal the decision of defendant that the grievance was untimely filed.  (A. 8, 44-45)

24.    By letter dated January 19, 2005, Bates replied that defendant was correct in not accepting the grievance.  (A. 8, 46)

25.    By letter dated January 24, 2005, Ms. George wrote to CWA President Morton Bahr seeking further review of the matter.  (A. 8, 47)

26.    By letter dated February 14, 2005, Headquarters Counsel Frederick W. Cory replied that the conclusion of defendant that the grievance was untimely filed was correct.  (A. 8, 48-49)

## IV.    PLAINTIFF'S DECISION TO RETIRE AND THE ALLEGED MISREPRESENTATIONS

27.    George began to contemplate retirement in or about 2000/2001.  (A. 13)

28.    However, if she retired before reaching thirty (30) years of service, her pension benefit would be discounted.  (A. 9)

29.    In the summer of 2003, George picked a two week vacation for the last two weeks of July, 2004 with the possibility that she might retire upon reaching thirty (30) years of service.  (A. 27)

30.    In deciding whether or not to retire, plaintiff carefully considered and studied a number of factors.  (A. 11-15)

31.    There were personal issues, including her own health problems and those of her son, leading her towards retirement.  (A. 11-13)

32.    There were business issues suggesting to plaintiff that there might be a downsizing or closing of the Fairhaven facility in the future in which case she would be eligible for Article 25 termination payments if she did not retire.  (A. 17)

33.    Rumors of the closing of the Fairhaven Call Center had existed throughout Cappuccio's employment at the Fairhaven facility.  (A. 15)

34.    On three separate occasions, Cappuccio communicated with employees in writing to advise them that these rumors were false.  (A. 50-53)

35.    In or about May of 2004, the call volume at the Fairhaven facility was slowing down with George experiencing increased waiting time between calls.  (A. 18)

36.    George asked her direct supervisor, Mary Eustace, where the calls were. (A. 18-19)

37.    Eustace replied that it was just slow.  (A. 18-19)

38.    George also asked Eustace in passing a number of times whether the Fairhaven facility would close or downsize.  (A. 19-20)

39.    Eustace always answered in the negative.  (A. 19-20)

40.    One time George responded that Eustace might want to warm up her resume.  (A. 19)

41.    Eustace replied that she felt pretty confident that she would be o.k.  (A. 19)

42.    In May or June, Eustace asked George if she had turned in her retirement papers.  (A. 26)

43.    George replied that if all went well, her retirement would commence August 1 after her two week vacation.  (A. 26)

44.    In early June of 2004, a group of managers arrived at the Fairhaven facility as part of a Strategic Selling Process.  (A. 21)

45.    George asked one of the out of town managers (name unknown) if they were there under disguise to figure out what office to close; the manager replied negatively.  (A. 21-23)

46.    Sometime shortly before July 10, George spoke with Cappuccio when passing each other in the hallway.  (A. 23-24)

47.    George expressed her concerns with the lifting of the caps on the former Baby Bells and said that maybe she should stay and avail herself of a package.  (A. 24)

48.    Cappuccio replied in the negative; that the company was still going to be in Fairhaven; that while they had sold the building, they had secured a 5 year lease;[2] that they were still going to provide excellent customer service; and that they were not going to close or downsize.  (A. 24).

49    Cappuccio did not make inquiry of her supervisors relative to George's question on the status of the facility.  (A. 66)

50.    According to Cappuccio, there were frequent rumors and hallway questions regarding the possible closing of the Fairhaven facility.  (A. 60)

51.    Cappuccio testified that she could not possibly telephone someone every time she was asked a question about the possible closing of the facility.  (A. 66)

52.    George called the pension center on June 18, 2004 requesting her retirement papers.  (A. 3)

53.    George submitted her retirement papers to the pension center on July 10, 2004.  (A. 3)

---

[2]  *See* ¶¶ 56-64, *infra.*

54.     A 30th anniversary/retirement luncheon was held for plaintiff on July 16, 2004.  (A. 25, 33)

55.     In June of 2004, George was interviewed by Mary Eustace for a story on her upcoming retirement which appeared in the June issue of the company newsletter, the Fairhaven Flyer.  (A. 16, 32, 73-74)

## V.     THE SALE AND LEASE BACK OF THE FAIRHAVEN FACILITY

56.     When the Fairhaven facility was established in 1997, defendant owned the building.  (A. 58)

57.     Defendant occupied three floors on one side of the building and two floors on the other side.  (A. 58)

58.     In 2003, defendant commenced efforts to sell the building because defendant was only occupying a third of the building and was having trouble bringing in other tenants.  (A. 65)

59.     Defendant sold the building effective September 1, 2004; it leased back space from the new owner under the terms of a five (5) year lease.  (A. 14, 24, 34)

60.     Cappuccio testified that there were 400-500 employees spread out in 298,000 square feet before the sale.  (A. 65)

61.     She also testified that those 400-500 employees could fit in the space defendant occupied on January 12, 2006, the date of her deposition.  (A. 65)

62.     Defendant was working on plans for the build out of its leased space for 432 employees, the approximate number of employees working in Fairhaven at the time of plaintiff's retirement.  (A. 69, 71)

63.     Cappuccio was scheduled to meet with other employees of the defendant

on Wednesday, September 15, 2004 to work on the build out plan for 432 employees.

(A. 69)

64.    The focus of the meeting changed, however, with the announcement on

Monday, September 13, 2004 that there would be a reduction in force of 140 employees.

(A. 69-70)

## VI.    THE DECISION TO REDUCE THE WORK FORCE BY 140 EMPLOYEES

65.    Neither Joan Gallagher Cappuccio nor anyone else assigned to regularly

work at the Fairhaven site was involved in the decision to reduce the workforce by 140

employees in September of 2004.  (A. 63, 68-69)

66.    Neither Cappuccio nor anyone else at the Fairhaven site was asked for any

input into the work force reduction decision.  (A. 63, 69)

67.    On Friday, September 10, 2004, Cappuccio received a telephone call

advising her of the decision to reduce the work force at Fairhaven.  (A. 62-63, 69)


Dated: March 3, 2006                         AT&T Corp.,

                                            By its Attorneys,


                                            _____/s/ Nathan L. Kaitz_____
                                            Nathan L. Kaitz (BBO#256760)
                                            Morgan, Brown & Joy, LLP
                                            200 State Street, 11th Floor
                                            Boston, MA 02109
                                            (617) 523-6666

**<u>Certificate of Service</u>**

I hereby certify that a copy this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), including counsel for plaintiff, Blake J. Godbout & Associates, 33 Broad Street, 11th Floor, Boston MA  02109 and paper copies will be sent to those indicated as non-registered participants on the 3rd day of March, 2006.


_____/s/ Nathan L. Kaitz_____
Nathan L. Kaitz

# UNITED STATES DISTRICT COURT
### for the
## DISTRICT OF MASSACHUSETTS

------------------------------------------------------------x

BEVERLY A. GEORGE,

                  Plaintiff,

      v.                                      Civil Action No. 05-11079-DPW

AT&T CORP.,

                  Defendant.

------------------------------------------------------------x

## APPENDIX TO DEFENDANT'S STATEMENT
## OF UNDISPUTED MATERIAL FACTS

March 3, 2006

Nathan L. Kaitz
BBO #256760
Morgan, Brown & Joy, LLP
200 State Street, 11th Floor
Boston, MA  02109
T: (617) 523-6666

## TABLE OF CONTENTS

**Pages**

1. Pages from deposition of
   Beverly George ……………………………………… 1-27

2. Exhibits 1-5, 7-12, 16-18 from deposition of
   Beverly George ……………………………………… 28-53

3. Pages from deposition of
   Joan Gallagher Cappuccio ………………………… 54-67

4. Affidavit of Joan Gallagher Cappuccio,
   including Exhibit "A" …………………………………… 68-71

5. Affidavit of Nathan L. Kaitz,
   including Exhibits "A" and "B" ………………………… 72-88

1

1  UNITED STATES DISTRICT COURT FOR THE
        DISTRICT OF MASSACHUSETTS
2

3  NO. 05-11079 (DPW)

4

5  BEVERLY A. GEORGE,              )
           Plaintiff              )
                                  )
6       VS.                       )
                                  )
7  AT&T CORP.,                    )
           Defendant              )

8

9

10          DEPOSITION of BEVERLY A. GEORGE,

11  called as a witness by and on behalf of the

12  Defendant, pursuant to the Federal Rules

13  of Civil Procedure, before Teresa E.

14  Costello, Registered Professional Reporter,

15  Certified Shorthand Reporter No. 1452S98,

16  and Notary Public within and for the

17  Commonwealth of Massachusetts, at the

18  offices of Morgan, Brown & Joy, LLP,

19  200 State Street, Boston, Massachusetts,

20  on Wednesday, September 21, 2005, commencing

21  at 10:27 a.m.

22

23

24

25

1

22

1 have a sense of how long prior to the
2 closing of the Brockton office those rumors
3 were swirling about?
4 A. As I said, it's a long time back, but the
5 way the rumors would go, like I said, one
6 would say a day, a week, a month, a year,
7 two years, so.
8 Q. I'm not asking you about what the rumors
9 said. I'm asking you about what period of
10 time those rumors existed for. Did they
11 start a month before the Brockton office
12 closed, or did they start a year before the
13 Brockton or two years before the Brockton
14 office closed?
15 A. If you're asking me about the Brockton,
16 that's too far back.
17 Q. You just don't remember?
18 A. That's too far back to be precise to say
19 whether it was a month, a day, a year. It's
20 just too far back.
21 Q. But nevertheless after Brockton down-sized
22 or closed you went to Worcester?
23 A. Worcester.
24 Q. And you remained an operator in the
25 Worcester office, correct?

23

1 A. That is correct, until approximately 1993.
2 Q. And am I correct that the Worcester office
3 closed in 1993?
4 A. That is correct.
5 Q. And same types of rumors in Worcester as
6 there had been in Brockton?
7 A. Right.
8 Q. Some people saying it's going to close
9 tomorrow or a month from tomorrow, two
10 months from tomorrow?
11 A. Or a year, yes.
12 Q. And some people saying no, it wasn't going
13 to happen?
14 A. It was yes and no.
15 Q. And when the Worcester office closed in
16 1993, where did you go?
17 A. I went all the way to Peabody. I've been
18 North, South, East and West of
19 Massachusetts.
20     MR. GODBOUT: Just answer the
21 questions.
22 Q. Were you living at 7 Willow Street in
23 Foxboro at that time?
24 A. There was a lot of moving. Let me think.
25 No. 16 Hickory Road.

24

1 Q. In Norton?
2 A. That's correct. At a gambrel house. Ranch.
3 Q. So you were commuting from Norton to
4 Peabody, is that correct?
5 A. Correct.
6 Q. And how long did you remain at the Peabody
7 office?
8 A. Approximately until -- the Peabody office
9 until September of '96 approximately.
10 Q. That's when the Peabody office closed,
11 correct?
12 A. Correct.
13 Q. And the same types of rumors swirling about
14 for a period of time before that closure?
15 A. Right.
16 Q. So it's fair to say as of 1996 while working
17 for AT&T anyways, you had been in three
18 offices that closed, Brockton, Worcester and
19 Peabody?
20 A. Right.
21 Q. Now when the Peabody office closed, where
22 did you go?
23 A. I went to -- on a stipulation I went to
24 Providence.
25 Q. That's the Relay Center in Providence?

25

1 A. That's correct.
2 Q. And how long did you remain at the Relay
3 Center for?
4 A. For approximately three months.
5 Q. That's when you transferred to Fairhaven?
6 A. I transferred to Fairhaven in the first part
7 of January.
8 Q. That would have been of 1997?
9 A. That is correct.
10 Q. Now the Providence Relay Center remained
11 open after you transferred to Fairhaven,
12 correct?
13 A. That's correct.
14 Q. Did you learn at some point that the
15 Providence Relay Center closed?
16 A. Yes.
17 Q. And when did you learn that the Providence
18 Relay Center had closed?
19 A. When I was in Fairhaven.
20 Q. Was that approximately 2003 or thereabouts?
21 A. I would say approximately between 2002,
22 2003. Approximately.
23 Q. Now at some point in 2004 you retired from
24 AT&T, correct?
25 A. That is correct.

7 (Pages 22 to 25)

26

1 Q. And when did that occur?
2 A. The actual commencement date for my
3   retirement started on August 1st of 2000.
4 Q. Given the fact that you left New England
5   Telephone for a couple of years, and I know
6   you told us you started around 1970, did you
7   have an adjusted net credited service date?
8 A. They adjusted it, yes.
9 Q. For the time that you were on leave. So
10   what was your net credited service date?
11 A. July 28th, 1974.
12 Q. So with that net credited service date, it
13   meant that you reached 30 years of
14   employment with AT&T on July 28th, 27th,
15   28th of 2004, correct?
16 A. (Witness nodded.)
17 Q. Now in order for your retirement to commence
18   on August 1st, 2004, what did you have to
19   do?
20 A. I had to call the pension center and request
21   a package.
22 Q. And when did you do that?
23 A. On or about June 18th of 2000.
24 Q. And they gave you some material that you had
25   to fill out and return to them?

27

1 A. To be effective you had to fill out and
2   return it.
3 Q. Did you complete the package and return it
4   to the pension center?
5 A. I completed the package on or about
6   July 10th, and I believe they received it on
7   or about July 13th.
8 Q. Now after you put in your time and package
9   and you commenced your retirement, did you
10   learn that there was some downsizing at
11   Fairhaven?
12 A. I asked -- I'm not quite sure.
13 Q. I just want to know after you retired?
14 A. Correct.
15 Q. Commencing August 1st, 2004, did you learn
16   that there was some downsizing in Fairhaven?
17 A. Yes.
18 Q. When did you learn that?
19 A. During the summer of 2004.
20 Q. Did you learn that when you saw an article
21   in the Standard Times?
22 A. I actually got the information through phone
23   calls which brings me to dates and times,
24   number of phone calls. I'm sorry.
25 Q. You received a number of phone calls?

28

1 A. No, I made a number of phone calls.
2 Q. You made a number of phone calls. Who did
3   you make those phone calls to?
4 A. I called Sharon Perriera. She was my former
5   manager who had left the company earlier.
6 Q. And why did you call Sharon?
7 A. Well, first I wanted to thank her for the
8   pictures. She went to my retirement
9   luncheon, and she saved the day by bringing
10   her camera. She has kids and she had a
11   camera in the car, so I wanted to thank her
12   for that. We also got talking about
13   Fairhaven downsize. I heard something prior
14   to that phone call that I made to her. I
15   made a number of phone calls.
16 Q. What I'm trying to learn, if I may, is when
17   you first learned that there was downsizing
18   taking place at Fairhaven? When did you
19   first learn that?
20 A. It was in the summer. What part of the
21   summer? Wall Street Journal. There was
22   articles in there.
23 Q. There was an article in the Wall Street --
24 A. There were more than one article that was in
25   the journal.

29

1 Q. An article about the closing, the downsizing
2   in Fairhaven?
3 A. There was articles that were alarming in
4   regards to AT&T that --
5 Q. Go ahead.
6 A. -- prompted me to start calling people
7   because I was concerned what I read. I
8   called -- before I called Sharon Perriera I
9   called Fairhaven and I spoke with some
10   people that are at the ASD desk.
11 Q. The what desk?
12 A. ASD.
13 Q. What does ASD stand for?
14 A. Let's see. I don't remember the technical
15   terms of ASD, but basically it's like
16   central operations. They do the scheduling.
17   They keep the line, so on and so forth.
18 Q. When you say the line, the line of
19   operators, you mean?
20 A. How many people they need to have on line to
21   meet the customer's demand, you know? They
22   get a call from some other office -- we need
23   so many people on. I call it the central
24   unit. That's how I identify, but I call
25   people there and I ask them. I said, I've

8 (Pages 26 to 29)

38

1  Charleston office is located.
2 Q. You don't know what state that's located in?
3 A. The Charleston office is how I knew it as.
4 Q. Okay. So they closed one office, and they
5    reduced the work force at another office?
6 A. That is correct, but they didn't
7    publicize -- I'm sorry.
8 Q. Go ahead. You wanted to say something else?
9 A. You're asking about publications. When I
10   was reading in the AT&T Today, they
11   publicized in September that they were
12   closing the Charleston office, but there was
13   no omission of they were downsizing the
14   Fairhaven office in the AT&T Today that was
15   omitted. I found that in the Standard Times
16   about the AT&T Today, so I wondered why they
17   were publicizing the Charleston office
18   closing in the AT&T Today. It would be
19   newsworthy to say what was going on in
20   Fairhaven, too, because they're all part --
21   they're part of a whole -- the channel.
22   What happens in one office affects what
23   happens in another office throughout the
24   channel.
25 Q. Between 1997, when you started working in

39

1    Fairhaven and 2004, were there any other
2    reductions in force at the Fairhaven office?
3 A. When you say, reduction in force, can you be
4    more specific as to --
5 Q. Were there any other layoffs of employees?
6 A. There was constant downsizing in the sense
7    that everybody decided -- they were firing
8    people because of attendance, so I need a
9    definition what he means by downsizing
10   whether there was a big announcement or just
11   within the office.
12 Q. When I say, downsizing, I'm referring to a
13   layoff as opposed to a termination. Do you
14   know what the difference between a layoff or
15   a termination is?
16 A. The termination is that's the end. Layoff,
17   there's a chance you come back.
18 Q. Yes. Okay. Were there any layoffs between
19   1997 and 2004 at Fairhaven?
20 A. I know they let some temps go. I'm not
21   sure.
22 Q. Do you know about how many employees worked
23   at Fairhaven when you arrived in 1997?
24 A. There was supposed to have been 1,100, but I
25   believe they maxed out somewhere between

40

1    probably 700 and 800.
2 Q. When do you believe they maxed out?
3 A. They were hiring from the -- they were
4    hiring from January of '97. I don't know
5    when they maxed out, but that's the number
6    that I heard from rumors.
7 Q. In January of 2004 -- we'll take that -- do
8    you know how many employees were working in
9    Fairhaven in January of 2004?
10 A. Well, the article will help. Said they cut
11   half the force, so they cut about 140, so I
12   would say there was less than 300.
13 Q. So by the beginning of 2004 the work force
14   at Fairhaven had gone from a max of seven to
15   eight hundred to less than 300?
16 A. Approximately, yes.
17 Q. Approximately. You were a member of a union
18   while you worked at Fairhaven, correct?
19 A. That is correct.
20 Q. What union was that?
21 A. CWA.
22 Q. That's Communication Workers of America?
23 A. That is correct.
24 Q. You had been a member of the Communication
25   Workers of America throughout the period of

41

1    time that you worked for New England
2    Telephone and AT&T, is that correct?
3 A. No, that's incorrect.
4 Q. So correct me.
5 A. That's okay. When I was with New England
6    Telephone, that was IBEW.
7 Q. And so you were a member of the IBEW until
8    the divestiture?
9 A. No. Actually I would say that it was CWA
10   the fall of '96.
11 Q. In other words you remained a member of the
12   IBEW even after divestiture until the fall
13   of 1996? Okay. At that period of time, is
14   that when you moved to the Providence Relay
15   Center?
16 A. That is correct.
17 Q. That's when you became a member of the CWA?
18 A. That is correct.
19 Q. And you remained a member of the CWA until
20   you retired effective August 1st, 2004?
21 A. That is correct.
22 Q. CWA had a collective bargaining agreement
23   with AT&T, is that correct?
24 A. That is correct.
25 Q. Now when you learned there had been a

11 (Pages 38 to 41)

42

1 reduction in force in Fairhaven, you
2 communicated with the union about filing a
3 grievance on your behalf, is that correct?
4 A. When I became aware of what had happened,
5 that is correct. I believe I filed that
6 October 31st. I believe.
7 Q. What did you do October 31st?
8 A. The question -- can you repeat your question
9 again?
10 Q. I asked you whether you communicated with
11 the union to file a grievance on your
12 behalf?
13 A. When I heard that Fairhaven closed.
14 Q. Fairhaven reduction in force, right.
15 A. I believe I filed that on October 31st.
16 Q. When you say, filed that, what did you do?
17 A. Filed the grievance.
18 Q. How did you file the grievance? Let me
19 strike that. Did you write to the union and
20 ask them to file the grievance on your
21 behalf?
22 A. I filled out a grievance form and sent it to
23 them.
24 Q. You sent it to them? Did you include a
25 letter to the union that --

43

1 A. I became aware of the situation on
2 October 31st. The grievance, itself, was
3 actually signed, I believe, some time in
4 November and sent to them.
5    MR. KAITZ: Let's mark this as
6 Exhibit 2, please.
7    (Letter dated 11/16/04
8     marked Exhibit Number 2.)
9 Q. I'm showing you what's been marked as
10 Exhibit 2, and for the record it's a letter
11 dated November 16th, 2004 to Linda Teoli.
12 Appears to be six pages and also a letter of
13 that same date to Morton Bahr. Did I
14 accurately describe Exhibit 2?
15 A. I think so.
16 Q. Is that the letter that you -- Linda Teoli
17 was the president of the CWA local in
18 Fairhaven, is that correct?
19 A. That was my understanding.
20 Q. And is that the letter that you sent
21 attaching with it a grievance that you
22 wanted filed?
23 A. That appears to be correct.
24 Q. And you also sent a copy of the letter to
25 Linda Teoli to Morton Bahr who was the

44

1 president of the international union?
2 A. I cc'd a copy to the international.
3    MR. KAITZ: Let's mark this
4 document as Defendant's 3.
5    (CWA Grievance Form
6     marked Exhibit Number 3.)
7 Q. Let me show you what's been marked as
8 Defendant's Exhibit 3. Is that the
9 grievance form that you completed?
10 A. That is correct.
11 Q. And that's your signature on the second page
12 with the date of 11/16/04?
13 A. That's correct.
14 Q. And that's the date you signed this
15 grievance?
16 A. That is correct.
17 Q. And you attached it to the letter which has
18 been marked as Exhibit 2 and sent it to the
19 union president, the local union president?
20 A. And cc'd a copy to the national, that is
21 correct.
22 Q. And did you -- it appears that in the first
23 page it's under contract articles. It lists
24 a contract article that you say, See
25 attached article. I'm on the first page.

45

1    Do you see where the form says, Contract
2 articles, if any?
3 A. I see it about a third of the way down.
4 Q. Yes.
5 A. Okay.
6 Q. And you reference Article 25, number 6A, and
7 you say, See attached article, is that
8 correct?
9 A. That's correct.
10    MR. KAITZ: I'm going to have this
11 marked as Exhibit 4 and ask you if it's the
12 attachment to the grievance form.
13    (Attachment marked
14     Exhibit Number 4.)
15 A. I did make a copy of this, and I believe I
16 did send this.
17 Q. Okay. That's the article you reference in
18 the grievance, correct?
19 A. Correct.
20 Q. Now if I understand this article correctly,
21 this is what provides employees with
22 termination payments if there's a reduction
23 in force, correct?
24 A. That's correct. Based on a number of years.
25 Q. Based upon the number of years of service?

12 (Pages 42 to 45)

46

1 A.  That is correct.
2 Q.  And for somebody who had 30 years, but less
3     than 31 years of service, which would have
4     been you at the time of this reduction in
5     September of 2004, if you hadn't retired
6     that would have provided for 100 weeks of
7     pay, correct?
8 A.  That's correct.
9 Q.  And that's what you were claiming
10     entitlement to in the grievance that you
11     submitted on November 16th, 2004, Exhibit 3,
12     is that correct?
13 A.  That is correct.
14 Q.  And if I look at section 6A on page two of
15     Exhibit 4 it says, "The provisions of
16     paragraph one do not apply in case of."
17     That refers to the termination payments,
18     right?
19 A.  I'm sorry?
20 Q.  It starts, "The provisions of paragraph one
21     do not apply in case of." Paragraph one is
22     the provision talking about termination
23     payments such as a hundred weeks, do not
24     apply and A is, an employee leaving the
25     company voluntarily without inducement by

47

1     the company.  That's what it says, right?
2 A.  That is correct.
3 Q.  And weren't you claiming in the grievance
4     that you signed on November 16th that there
5     had been inducement by the company by virtue
6     of deceptive statements made to you?
7 A.  I don't understand what you're saying.
8         MR. GODBOUT:  Objection.
9 Q.  Were you claiming in the grievance that you
10     were -- you were claiming in the grievance
11     that you were entitled to termination
12     payments, correct?
13 A.  My grievance was saying that I was mislead.
14 Q.  And mislead by the company.
15 A.  Mislead by the regional director, the
16     headquarter managers and my own acting
17     manager.
18 Q.  And as a result of being mislead by them,
19     you believed you were entitled to a hundred
20     weeks of termination payments, yes or no?
21 A.  Would you restate that, please?
22 Q.  As a result of being mislead by these
23     company people who you've just identified in
24     this grievance, you allege that you were
25     entitled to a hundred weeks of termination

48

1     payments.
2 A.  I felt I was cheated out of it.
3 Q.  And you were asking the company by virtue of
4     this grievance to give you those hundred
5     weeks of termination payments.
6 A.  I was asking for what I felt I was cheated
7     out of.
8 Q.  Which was those hundred weeks?
9 A.  I was cheated out of a hundred weeks, I
10     believe.
11 Q.  And isn't it fair to say that part of, in
12     fact, being mislead, was there was an
13     allegation that you hadn't left voluntarily
14     without inducement by the company?
15 A.  The whole crux of this grievance was the
16     state that I was cheated out of a hundred
17     weeks and not to let the company use article
18     25 as a defense because they misrepresented
19     themselves and I was cheated, and I wanted
20     my hundred weeks.  I gave the 30 years
21     through sweat and tears and then they hang
22     me out to dry.
23 Q.  Did you follow up with Linda Teoli?  Am I
24     pronouncing her name correctly?
25 A.  That's the way I would say it.

49

1 Q.  Did you follow up with Linda Teoli to see
2     whether she filed the grievance with the
3     company?
4 A.  I followed up.  Bob Young was the one that
5     was supposed to file the grievance.  I
6     called ASAD.  I asked because he worked in
7     that department.  It was in the same room,
8     different title.  I called and I called and
9     I called, and he didn't return my calls.
10 Q.  Was he the union steward for that
11     department?
12 A.  He was the union steward that I gave the
13     grievance -- one of the grievances to
14     because there was one file before this one.
15 Q.  And that one file before this one had to do
16     with your pension calculation?
17 A.  Correct.
18 Q.  And am I correct that that issue ultimately
19     was resolved, the appropriate calculation?
20 A.  No.
21 Q.  No?
22         MR. KAITZ:  Let's mark this
23     document as Exhibit 5, please.
24         (CWA Form marked
25         Exhibit Number 5.)

13 (Pages 46 to 49)

50

1 Q. Let me show you what's been marked as
2    Exhibit 5. It's one page on the CWA
3    letterhead. It's bates stamped 00858. Do
4    you recognize that document?
5 A. This document was handwritten.
6 Q. The question is do you recognize it?
7 A. Not in its present form.
8 Q. Have you seen that particular document
9    before?
10 A. I have a document from Jane, but it was
11    not -- I don't believe it was in this
12    particular form.
13 Q. Who is Jane Nilsen?
14 A. She's one of my peers, I believe, who
15    happens to be a shop steward, I believe.
16    The name seems familiar. I believe she was
17    on my team.
18 Q. Team at Fairhaven?
19 A. I believe so. I got the last name right.
20    You know everybody by the first name, but --
21 Q. Yes, okay. Do you understand that to be the
22    grievance that local 1051 submitted to the
23    company on your behalf?
24 A. This is the first time I'm seeing it in this
25    form handwritten, so I really don't know how

51

1    to answer this.
2 Q. Okay, then don't answer it. That's fine.
3 A. I do have a copy, and I believe you do, too,
4    of something written by this lady, but I
5    don't believe it's in this form.
6        MR. KAITZ: Let's mark this as
7    Exhibit 6.
8        (CWA Form marked
9        Exhibit Number 6.)
10 Q. I'm going to show you what's been marked as
11    Exhibit 6. For the record it's on the
12    letterhead of Communication Workers local
13    1051. It's Bate stamped 00859 and it had a
14    heading seems to be photocopy request for
15    union related business. Have you seen that
16    document before?
17 A. Exactly the way it is?
18 Q. Yes.
19 A. I don't believe so.
20 Q. Do you see that it references local case
21    number 04RM#63?
22 A. I see the 04RM#63.
23 Q. That's the same number as on Exhibit 5? Is
24    that correct?
25 A. They do match.

52

1        MR. KAITZ: Let's mark this
2    document Exhibit Exhibit 7.
3        (Letter dated 12/14/04
4        marked Exhibit Number 7.)
5 Q. For the record Exhibit 7 is a one-page
6    document dated December 14th, 2004 to Jane
7    Nilsen from Merilee Hanley. Have you seen
8    Exhibit 7 before?
9 A. I believe this is what I have a copy of.
10    This looks more familiar to me. These look
11    foreign, although I understand the language
12    that's on there.
13 Q. These you're referring to Exhibits 5 and 6,
14    correct?
15 A. They look -- I don't remember seeing
16    anything in that form, but this does --
17    other than the print, this does look -- I
18    believe I do have a copy of this at home or
19    something close to it.
20 Q. You believe you have a copy of Exhibit 7.
21    Exhibit 7 also references #04RM63,
22    correct?
23 A. It does reference that number.
24 Q. That's the number on Exhibits 5 and 6,
25    correct?

53

1 A. They are linked with the same number. As I
2    said before, I don't recognize this format.
3 Q. I understand that. Exhibit 7, not only does
4    it have the number -- that number on it, it
5    also has your name on it, is that right?
6 A. That is correct. The date looks more
7    accurate. December 14th, 2004.
8        MR. KAITZ: Let's mark this as
9    Exhibit 8, please.
10        (Letter dated 12/17/04
11        marked Exhibit Number 8.)
12 Q. Let me show you what's been marked as
13    Exhibit 8, and for the record it's a letter
14    dated December 17th, 2004 from Linda Teoli
15    to you. Is that correct?
16 A. That is correct.
17 Q. And you received that letter shortly after
18    December 17th or on or about December 17th,
19    2004?
20 A. That is correct.
21 Q. And am I correct that you continued to
22    pursue this issue with the Communication
23    Workers of America?
24 A. I believe there was follow-up. Yes.
25 Q. Let me show you what will be marked as

14 (Pages 50 to 53)

54

1   Exhibit 9, and I'll ask you if that's a
2   follow-up letter that you wrote.
3         (Letter dated 12/19/04
4         marked Exhibit Number 9.)
5 Q.  The question is, I'm showing you what's been
6   marked as Exhibit 9, and it's a letter of
7   two pages dated December 19, 2004, from you
8   to Bill Bates, CWA representative. Is that
9   the follow-up letter you wrote after
10  receiving Exhibit 8?
11 A.  It's one of them, yes.
12 Q.  And I'm going to show you what's being
13  marked as Exhibit 10 and ask you if that's a
14  response that you received from
15  Mr. Bates?
16        (Letter dated 1/19/05
17        marked Exhibit Number 10.)
18 Q.  Again, is that Exhibit 10?  Is that
19  the response that you received from
20  Mr. Bates?
21 A.  That is correct.
22        MR. KAITZ:  Would you mark these
23  next two as 11 and then 12?
24        (Letter dated 1/24/05
25        marked Exhibit Number 11.)

55

1         (Letter dated 2/14/05
2         marked Exhibit Number 12.)
3 Q.  Showing you what's been marked Exhibit 11,
4   letter dated January 24, 2005 to Morton
5   Bahr, is that a letter you wrote in response
6   to the letter that you received from Bill
7   Bates dated January 19th?
8 A.  That is correct.
9 Q.  Is Exhibit 12 the response that you received
10  from the union based upon the letter,
11  Exhibit 11?
12 A.  It's one of the letters, I believe.  Just
13  take a look at this one.  That is the
14  letter.
15 Q.  Now the letter makes a suggestion that you
16  may want to discuss your pension calculation
17  claim with an ERISA, correct?
18 A.  That's what the letter states.
19 Q.  Did you do that?
20 A.  No.
21 Q.  It also makes statements with respect to
22  your grievance concerning the company's
23  deceiving you into retiring?
24 A.  What paragraph are you looking at?
25 Q.  I'm looking to the first full paragraph on

56

1   the second page.
2 A.  Is there a particular sentence you're
3   looking at?
4 Q.  Even the first sentence.
5 A.  And your question is?
6 Q.  The question really is the union and you
7   were alleging that the company's deception
8   had caused you to voluntarily leave the
9   company and be deprived of that hundred
10  weeks of termination payments, isn't that
11  correct?
12 A.  This is what you're extracting from the
13  first -- this paragraph here?
14 Q.  Yes.  I'm asking you if that's a fair
15  extraction from that sentence?
16 A.  Let me just read my paragraph and see.
17 Q.  Sure.
18 A.  What I'm trying to say here, this is the
19  avenue that I thought I had to travel to
20  express my concerns that I was intentionally
21  given the wrong information in which I made
22  my decision to retire.  That's what I was
23  trying to articulate, and I thought this was
24  the avenue or the course that I had to go
25  through to have my voice heard, that I was

57

1   intentionally mislead and by doing so they
2   cheated me out of the hundred weeks that I
3   would have gotten had I not relied on their
4   statements.
5       That's what I'm saying here, and
6   like I said, this is the avenue that I
7   thought I had to travel to get somebody to
8   listen to me because again I was retired.  I
9   wasn't on the premise.
10 Q.  You were saying that the company's
11  intentional misleading of you caused you to
12  voluntarily put in for retirement?
13 A.  What I'm saying --
14 Q.  Yes or no?  Is that correct or not?
15 A.  I don't understand where you're taking me.
16  I don't understand what you're asking me.
17 Q.  I don't care.  Let me put it this way.
18 A.  Rephrase it for me, please?
19 Q.  Yes, I'm going to rephrase it in a second,
20  but I'm going to make a statement first.
21  Don't worry about where I'm trying to take
22  you.  Just try to answer the question I'm
23  asking you.
24 A.  That's what I'm trying to do.
25 Q.  I know that.  I really do know that.  The

15 (Pages 54 to 57)

58

1  question I'm asking you is you were saying
2  that you were induced to voluntarily leave
3  the company by the company's misstatements?
4 A.  It was a pivotal turning point.  Take all
5  the factors in.  I relied on what they said
6  to me.  I took it as truth and then based on
7  the information I was getting from the
8  managers from headquarters that came out, my
9  immediate supervisor and Joan Cappuccio, who
10  was the regional director, based on what
11  they were telling me, I took that as being
12  factual and true, and that's what the
13  pivotal point in which I decided to retire
14  because once I -- the package does not mean
15  you're obligated to follow through.  I did a
16  lot of fact-finding.  I had a lot of
17  concerns during that time period with all
18  the talk in the newspapers and in the media
19  about the baby bells.  That was a big issue
20  and it was a big issue the latter part of
21  2003.  It was a big issue the beginning part
22  of 2004, and I was really concerned about
23  that, and based on what they had told me, I
24  trusted everything they said especially Joan
25  Cappuccio because she held herself as the

59

1  year before when rumors were flying again.
2  She was the person to go to and ask the
3  question, Are we going to downsize?  Are we
4  going to close?
5      Based on all that they told me, I
6  made my decision to retire.  I didn't have
7  to retire.  I could have stayed there, but
8  based on what they told me, based on the
9  fact she told me that they were going to
10  have a lease for five years, I didn't want
11  to do another five years -- I tried to do
12  what was good for myself, what was good for
13  my family, what was good for the company,
14  and I figured that was a good exit time
15  based on what they told me.
16 Q.  And when you exited at that time, you
17  received full retirement benefits, correct?
18 A.  At that point, the 30 years, there was no
19  discount, I got the 30 years, so my pension
20  was not discounted.  I could have taken it
21  earlier because of age and service at a
22  discount rate, but I stayed the full
23  30 years.
24 Q.  So it wasn't discounted at all, and you
25  received the full retirement benefits, fully

60

1  paid health insurance?
2 A.  Well, not fully paid health insurance.
3 Q.  You had to continue to contribute your
4  portion, right?
5 A.  They actually did away, so I didn't get
6  full.  I got what was bargained for at the
7  time, but I did get health benefits.  The
8  division was gone and I pay more now for the
9  life.
10 Q.  Whatever benefits you received, they're the
11  maximum benefits allowable to a retiree from
12  the company, is that correct?
13 A.  At that time.
14 Q.  And they continue to be the maximum?
15 A.  I don't know what they've done since.  They
16  might have increased it.  I don't know what
17  they've done, but I know I lost the vision.
18  As soon as August 1st, 2004 came I lost my
19  vision coverage, and the life insurance went
20  up.
21 Q.  But you don't believe that other retirees
22  have -- all the other retirees from the
23  company have vision coverage except for you?
24 A.  What they bargained for, so whatever they
25  bargained for.

61

1 Q.  Do you understand that the company never
2  decided the merits of your grievance?  I'm
3  talking about the grievance only.  I'm not
4  talking about this complaint.  Do you
5  understand that the company's decision to
6  deny your grievance was based upon
7  timeliness and not on the merits?
8 A.  I did everything possible when I became
9  aware of -- I kept getting the door shut in
10  my face one way or the other.  I was ongoing
11  diligent trying to get somebody to listen to
12  me.  As soon as I became aware.
13 Q.  Can you answer my -- do you -- I just want a
14  yes or no answer to my question.  Do you
15  understand that the company's decision on
16  your grievance was not a decision on the
17  merits?
18 A.  From what I understand --
19 Q.  Yes or no?
20 A.  Kind of help me through this a little bit.
21  From what I understand is what I read here
22  and in regards to the letter -- bear with me
23  just for a second -- in regards to your
24  question my response would be looking at
25  December 14th --

16 (Pages 58 to 61)

VERITEXT COURT REPORTING (800) 227-8440

62

1 Q. That's Exhibit 7, correct?
2 A. Exhibit 7 from Merilee -- the above
3    mentioned grievance was filed beyond the
4    60-day time period as per article nine;
5    therefore, would not be accepted by the
6    company, generate grievances are not
7    accepted from retired employees; however,
8    this did not meet upon the time line.
9        So what this is saying to me, even
10   if I didn't file it on time, I was retired
11   and once you're out the door, bye-bye.
12   That's devastating from what I got. When I
13   left the end of July --
14 Q. Did you understand that they never decided
15   the merits of your grievance? Yes or no?
16 A. They weren't given an opportunity to be
17   heard, so how could they decide the merits?
18 Q. So your understanding would be that they did
19   not decide the merits, correct?
20 A. They weren't going to hear from me anymore.
21   I was out the door. That's what I
22   understood from reading this letter.
23 Q. Can you give me a yes or no answer to this?
24 A. It's hard to answer yes or no is what I'm
25   trying to say to you.

63

1 Q. Well, but try. Try your best.
2 A. They wouldn't hear me, so how could they
3   hear the merits?
4 Q. So the answer would be they didn't decide
5   the merits, correct?
6 A. Because they wouldn't hear it.
7 Q. I'm not asking you why they wouldn't decide
8   the merits. I'm just simply asking you do
9   you understand that the grievance was never
10  decided on the merits? Yes or no?
11 A. It's hard for me to say yes or no because to
12  decide you have to hear the merits. I don't
13  know how to -- I'm sorry.
14 Q. We'll just press on.
15      MR. KAITZ: Let's mark these next
16  documents as Exhibits 13, 14 and 15, please.
17      (Letter dated 12/11/04
18      marked Exhibit Number 13.)
19      (Letter dated 12/6/04
20      marked Exhibit Number 14.)
21      (Letter dated 12/8/04
22      marked Exhibit Number 15.)
23      (Brief Recess.)
24 Q. We're going to go through a few documents.
25   That will be 13. Miss George, I'm going to

64

1    show you what's been marked as Exhibit 13,
2    and am I correct that's a letter you wrote
3    to Bill Bates dated December 11th, 2004?
4 A. Yes, I did write that letter. That's
5    correct.
6 Q. Okay. Let me show you what's been marked as
7    Exhibit 14. It's a letter dated December 6,
8    2004 from Morton Bahr to you. Is that
9    correct?
10 A. This is in reference to which letter?
11 Q. It's not a reference to any letter.
12 A. I'm sorry.
13 Q. I'm just asking you whether that's a letter
14   dated December 6, 2004 from Morton Bahr to
15   you?
16 A. That's correct.
17 Q. You received that letter in due course in
18   the mail?
19 A. I believe that's correct. There was a lot
20   of correspondence going back and forth.
21 Q. I'm trying to sort of mark the rest of the
22   correspondence. I'm showing you what's been
23   marked Exhibit 15, and for the record it's
24   three pages. Pages two and three seem to be
25   fax transmittal sheet, and page one is a

65

1    letter dated December 8, 2004 from Bill
2    Bates to Linda Teoli with copies to several
3    people including Beverly George.
4 A. Okay.
5 Q. Did I accurately describe Exhibit 15?
6 A. Let me take a look first.
7 Q. Okay.
8 A. Thank you. I do recognize this. I didn't
9    understand it when I got it, this part.
10 Q. This part meaning you're referring to the
11   faxed page?
12 A. That was something within their offices, but
13   I do recognize, yes, but like I said, I just
14   didn't understand what they were doing here.
15 Q. You don't understand what these fax
16   transmittal sheets are about?
17 A. I guess it's going back and forth between
18   their offices. I don't know.
19 Q. Fair enough. Fair enough. Now I just want
20   to go over one thing I think is fairly
21   obvious, but the work force reduction that
22   occurred in September of 2004, approximately
23   140 employees' jobs were reduced, correct?
24 A. From what I read, yes.
25 Q. Did you understand that those employees

17 (Pages 62 to 65)

66

1    lowest in seniority would have their jobs
2    involuntarily reduced, correct?
3 A.  I knew from the article that they were
4    cutting the force in half.  That's --
5 Q.  Okay.  Did you understand that it was the
6    employees with the least amount of seniority
7    who would be let go?
8 A.  They would start from the bottom up.
9 Q.  Bottom up, but the people up at the top like
10    yourself could voluntarily agree to leave to
11    save the job for somebody at the bottom?
12 A.  That's just the way it's always been in the
13    past.
14 Q.  That's the way you understood it would have
15    been at the time?
16 A.  That's how it's been throughout my --
17 Q.  So if you had not retired when you did and
18    had still been working in September of 2004,
19    you could have voluntarily chosen to leave
20    at that point?
21 A.  That is correct.
22 Q.  And that's how you would have been entitled
23    to this hundred weeks of termination pay?
24 A.  That would have been my exit.
25 Q.  That would have been what you were entitled

67

1    to had you voluntarily chosen to leave at
2    that time?  Okay.  You also would have had
3    the option, had you still been employed in
4    September of 2004, to continue working
5    beyond that, correct?
6 A.  That is correct.
7 Q.  But it would have been your choice?
8 A.  It would have been my choice.
9        MR. KAITZ:  This is probably a good
10    break point.  Let's go off the record.
11        (Lunch Recess.)
12 Q.  One of the things you told us this morning
13    is that your husband is retired, correct?
14 A.  That is correct.
15 Q.  Does the fact that your husband was retired
16    factor into your decision to retire?
17 A.  No.
18 Q.  Have you been working at all since your
19    retirement from AT&T?
20 A.  No.
21 Q.  What have you been doing?
22 A.  Helping my husband with the rentals.  He
23    doesn't call that work.  That's play.  Oh,
24    yes, right.
25 Q.  You been indulging in some hobbies or

68

1    anything?
2 A.  Oh, yes, I love gardening, but we are doing
3    a rehab on the property at 22, so that's
4    taking a lot of time recently.  Prior to
5    that I wasn't doing anything.  Just doing my
6    hobbies and family functions.
7 Q.  Did you travel or visit your daughters that
8    live out-of-state?
9 A.  No.  I didn't travel during that time
10    period.  I was hoping to, but I had some
11    health issues that I didn't feel comfortable
12    in traveling.
13 Q.  The health issues that you're talking about,
14    were those health issues that arose in the
15    spring of 2004?
16 A.  That is correct.
17 Q.  And they continued on even past your
18    retirement?
19 A.  That is correct.
20 Q.  And they affected your ability to travel to
21    visit your children?
22 A.  I was scared to travel by myself.  I asked
23    my doctor, Can I travel?  He said, Yes, but
24    I was scared to travel by myself.
25 Q.  So because of that you didn't travel?

69

1 A.  I didn't, no.
2 Q.  Did those health issues affect your decision
3    to retire?
4 A.  They were factored in.  There was many
5    things that were factored in.
6 Q.  Okay, but that's why I was asking you.  That
7    was one of the factors that was factored in?
8 A.  Correct.  I didn't want to be a burden.  I
9    didn't want to be a burden.
10 Q.  And I don't want to delve too deeply into
11    your private, but can you, in general,
12    describe what those health issues involve?
13 A.  Does that come under HIPAA or anything?
14 Q.  No, this is an appropriate year.
15 A.  Apparently I had some kind of bout with
16    something that affected -- I don't know --
17    I'm not medically inclined like my daughter
18    is, but something happened where my balance
19    a lesion or something, I'm not quite sure
20    what was going on there, in April, and
21    consequently in May I had vertigo or what
22    they call dizziness or feeling like I was
23    going to faint, pass out.  The room was
24    spinning, and then in a short period -- this
25    all happened in a short period of time, and

18 (Pages 66 to 69)

70

1    if you can figure it out, let the medical
2    profession know, and then I also had what
3    they called, I don't want to pronounce it
4    wrong so, you know, tomato/tomato, so bear
5    with me. Tinnitus. It's actually a ringing
6    or a hissing or a buzzing in your ear. I
7    did go for a hearing test. They said my
8    hearing was good.
9 Q. When did you go for this hearing test?
10 A. I believe it would be the May time frame.
11 Q. May of 2004?
12 A. Correct.
13 Q. Now one thing we didn't talk about this
14    morning; what was your job for the company
15    in May of 2004?
16 A. Had a headset on. Customer service rep.
17 Q. You were a customer service rep. You wore a
18    headset?
19 A. Correct.
20 Q. And you spoke to customers who called into
21    an eight hundred number or something to talk
22    about service issues?
23 A. 1-800 -- what is that? 1-800-222-0300.
24    There you go, yes.
25 Q. So you were one of the number of customer

71

1    service reps at the Fairhaven facility --
2 A. Yes.
3 Q. Let me finish the question. You were one of
4    a number of customer service reps at the
5    Fairhaven facility who handled phone calls
6    from customers?
7 A. That is correct.
8 Q. So having a problem with ringing and buzzing
9    and the like in the ear, I take it it must
10    have had some impact on your ability to
11    perform that job with the
12    headset in your ear?
13        MR. GODBOUT: Objection.
14 Q. Is that a fair statement?
15        MR. GODBOUT: Objection. Go ahead.
16    You can answer the question.
17 A. Some of the customers would come in and it
18    would be, like, piercing, and then I'd say,
19    Oh, you know, if you got a -- they probably
20    had a problem, too -- if you have a volume
21    on that phone, can you turn it up? Yes, it
22    would bother me, and it wasn't always the
23    same type of bother. Sometimes your ears
24    would be filled with fluid. Other times
25    they would be fine, but basically I had good

72

1    hearing, but they were sensitive to noise.
2        A lot happened in that short period
3    of time. Prior to getting vertigo and
4    buzzing and all that stuff I did break a
5    headset which I was kind of scared and
6    concerned about because it broke apart and
7    there was, like, metal sticking out, and
8    there was a piece of metal. I went over to
9    Mary Eustace. There was a piece of metal
10    that was missing and she's, like, "Well,
11    just go get another headset," so like I
12    said, a lot happened in that time period,
13    but yes, that was one of the factors.
14 Q. Yes. Mary Eustace was your supervisor at
15    the time, correct?
16 A. Mary Carmel Eustace, E-U-S-T-A-C-E.
17 Q. She was your acting supervisor?
18 A. Acting supervisor.
19 Q. When did she become your acting supervisor?
20    Approximately.
21 A. Approximately I would say the latter part of
22    2003.
23 Q. Okay.
24 A. I believe she did an appraisal in October of
25    2003 so that would fit the time line. Might

73

1    have been around that time.
2 Q. Did she remain your acting supervisor until
3    your retirement?
4 A. That is correct.
5 Q. Now leaving aside the deceptive statements
6    made by the company -- we'll talk about
7    those this afternoon -- but leaving those
8    aside and leaving aside your health issues,
9    you said there were other -- what other
10    factors were factored into your decision to
11    retire?
12 A. I was under a lot of stress at that time,
13    and I was looking for what would be best for
14    my family, myself and the company, and the
15    other issue was my son.
16 Q. All right. Well, let's start with the
17    stress. You said you were under a lot of
18    stress. What were the sources of that
19    stress?
20 A. Well, again, trying to balance home with
21    work and trying to make the right decision.
22    Should I stay? Should I go? What's best
23    for everybody concerned? So that's a lot of
24    stress trying to figure out what's good for
25    everybody? I like to do a win-win

19 (Pages 70 to 73)

74

1 situation. What's good for the company?
2 What's good for me? What's good for my
3 family?
4 Q. Okay. You said your son. How did your son
5 factor into your decision?
6 A. Well, he had some issues that were
7 life-threatening.
8 Q. When did those issues arise or develop?
9 A. Back when he was 17.
10 Q. So that would have been around 1999?
11 A. 16 or 17. Trying to go back in time now.
12 Q. I'm just trying to get a rough idea.
13 A. That's fine.
14 Q. Were those issues still continuing in 2004?
15 A. Ongoing.
16 Q. And from what I saw of your records, those
17 issues required you from time to time to
18 take your son to doctors and miss time from
19 work, is that a fair statement?
20 A. Yes.
21 Q. You missed time from work just to care for
22 your son?
23 A. To care for him when he was in crisis, to
24 take him to doctors' appointments, and I try
25 to keep that as a minimal amount.

75

1 Q. But it still happened?
2 A. Right, and again I tried to balance
3 everything.
4 Q. That was still happening in the spring of
5 2004?
6 A. Correct.
7 Q. That was, if I understand correctly, a
8 factor in your decision to --
9 A. One of the factors, that's correct.
10 Q. Right.
11 A. It was just picking the exit time that
12 was --
13    MR. GODBOUT: Please, listen to the
14 question and answer the questions.
15    THE WITNESS: Okay.
16 Q. And we talked about this a little bit this
17 morning, but do I understand correctly that
18 30 years was like a magic figure in
19 terms of being able to retire with a
20 non-discounted pension?
21    MR. GODBOUT: Objection.
22 A. You can retire at any age.
23 Q. I understand that. Without your pension
24 being discounted? Is that correct?
25 A. That is correct.

76

1 Q. Had you expressed to any of your co-workers
2 your intention to retire when you reached
3 30 years of service?
4 A. Actually earlier than that, too, and I had
5 an interest as far back as three years
6 before.
7 Q. So in other words your interest in retiring
8 had started to develop around 2001?
9 A. 2000, 2001.
10 Q. And then what?
11 A. Then it would have been discounted.
12 Q. But by remaining until July of -- until the
13 end of July of 2004, there would have been
14 no discount on the pension?
15 A. That is correct, yes.
16 Q. So this has been something you had been
17 mulling in your mind for three or four years
18 prior to the summer of 2004?
19 A. To me, yes. When I had the conversation
20    MR. GODBOUT: Speak up.
21    THE WITNESS: I'm sorry. Thank
22 you.
23 Q. Now I'm just going to summarize a couple of
24 things and ask you a question. We've talked
25 about your health, your son's health,

77

1 general stress and deceptive statements made
2 by the company.
3    Were there any other factors that
4 factored into your decision to retire in the
5 summer of 2004?
6 A. Yes. The fact that -- I might have
7 misunderstood you. Can you repeat the
8 question again?
9 Q. Yes. I think we've identified four factors
10 that factored into your decision to retire?
11 A. Right.
12 Q. Your health, your son's health, general
13 stress issues and, you know, allegedly
14 deceptive statements made by the company.
15 Were there any -- other than those four
16 things and I'm saying those four things in a
17 broad sense -- were there any other factors
18 that factored into your decision to retire?
19 A. To me, yes. When I had the conversation
20 with Joan and she said the office was
21 going -- they had a lease for five years, I
22 know I couldn't do another five years. I
23 didn't want to be a burden. I wanted to get
24 out at the top of my game. I didn't want
25 to -- you want to retire on a good note. I

20 (Pages 74 to 77)

78

1  wasn't sure where my health issue was going
2  to take me.
3        The fact they were open another
4  five years played into it, too. They had a
5  lease for five years.
6 Q. Now when Joan told you they had a lease for
7  five years that, in fact, was a truthful
8  statement, wasn't it, so far as you
9  understand?
10       MR. GODBOUT: Objection.
11 A. That is correct. They had a lease for five
12  years. They sold the building.
13 Q. They sold the building and had a lease for
14  five years?
15 A. That was part of --
16 Q. Part of the sale?
17 A. Right.
18 Q. And your understanding is that that
19  statement that the company had a lease for
20  five years in Fairhaven after they sold the
21  building was an accurate statement?
22 A. It was part -- it wasn't -- it was part of
23  it.
24 Q. We'll get to the whole -- but that part of
25  it was accurate?

79

1 A. Correct. The five-year lease.
2 Q. Any other factors that factored into your
3  decision to retire in the summer of 2004?
4 A. I believe we have them. Those were the main
5  ones.
6 Q. When did you first learn that the building
7  in Fairhaven was in negotiations to be sold
8  by the company?
9 A. There again, there was a lot of rumors.
10  When those rumors first popped up.
11 Q. Do you remember?
12 A. People were coming in doing construction,
13  they had a caravan coming through. I
14  believe I even asked one of the gentlemen.
15  Said we're just doing some construction, you
16  know, very -- I'm trying to remember when
17  they came through.
18 Q. Do you have any sense of when that happened
19  in relation to when you retired?
20 A. I'm trying to remember. Just give me a
21  moment.
22 Q. Yes.
23 A. I know they had construction going on when
24  they were trying to repair the steam pipe
25  and the walkways. They told us not to go

80

1  down there. In addition to doing
2  construction, they were going to do the
3  furnace or the heating system meaning either
4  replacement or repair of the steam pipe, so
5  that may give you a time line better than I
6  can give a time line of that. There might
7  have been snow on the ground, so I'm trying
8  to remember.
9 Q. Let me go back to the factors that you
10  listed as part of the decision to retire.
11  Is it your testimony that of those
12  factors -- talking about your health issues,
13  your son's health issues, the stress, the
14  deceptive statements, the statement about
15  the five-year lease.
16       Is it your testimony that the
17  deceptive statements by the company was the
18  most important factor in your decision to
19  retire?
20 A. That was the pivotal point.
21 Q. That was the pivotal point? More pivotal
22  than your health?
23 A. Again, I was trying to do what was best for
24  myself, the company. I didn't want to be a
25  burden to anybody so --

81

1 Q. That was more pivotal than your health
2  issues? Yes or no?
3 A. That was the pivotal deciding factor.
4  That's correct.
5 Q. It was more pivotal than your health issues?
6 A. I wasn't sure where my health issues was
7  going. I didn't want to be a burden.
8  That's correct.
9 Q. More pivotal than your son's health issues?
10 A. Again, I was trying to be everything to
11  everybody, so that was the pivotal point,
12  the fact that they were going to be there in
13  five years; that was the pivotal point.
14 Q. That was the pivotal point?
15 A. That's part of it. I link that together. I
16  apologize.
17 Q. You link that together with what?
18 A. With the fact that they said that they were
19  going to be there another five years. The
20  fact that they were going to be there
21  another five years, they were sure they were
22  going to be there another five years, again,
23  the pivotal point was I spoke to the
24  headquarter managers; I spoke to my
25  immediate acting supervisor and then

21 (Pages 78 to 81)

82

1  Joan Cappuccio, who actually being
2  concurring with the two previous AT&T
3  representatives that when I spoke to her in
4  early July, then she was the last one I
5  spoke to. Then I decided right then and
6  there, this is it.
7      Again it was based on all three of
8  them coming up with the same concurrent, the
9  same constant answer, so that was the
10  pivotal point, that conversation I had with
11  Joan.
12 Q. We'll come back to that in a minute.
13     MR. KAITZ: I want to have a few
14  documents marked 16, 17 and 18.
15     (Two Pages marked
16      Exhibit Number 16.)
17 Q. I'm going to show you what's been marked as
18  Exhibit 16 and it's undated. It's two pages
19  bates stamped 00864 and 00865. I'd like you
20  to take a look at that and ask you if you've
21  ever seen that document before?
22 A. Doesn't seem familiar to me. This looks
23  like it might have been 2000.
24 Q. So you don't recognize Exhibit 16?
25 A. I don't recognize. The only way I know it's

83

1  2000 is because they referenced next year
2  being 2001.
3 Q. Do you remember Nancy Pryor and Howard
4  McNally coming to Fairhaven in about the
5  latter part of 2000?
6 A. It's not unusual for executives to visit,
7  but I don't remember that.
8 Q. And you don't remember them coming and, at
9  least among other things, saying there would
10  have been no plans to close the Fairhaven
11  center at that time?
12 A. I don't remember that.
13 Q. Do you remember there being rumors in late
14  2000 or early 2001 of the Fairhaven center
15  closing?
16 A. There's always rumors.
17 Q. Have those rumors existed almost since 1997
18  when you started in Fairhaven?
19 A. There's always been rumors.
20 Q. At Fairhaven?
21 A. There's always been rumors through the AT&T.
22 Q. I'm asking about rumors specifically related
23  to Fairhaven closing? Had there been rumors
24  about Fairhaven closing?
25 A. There's been rumors that have been going on

84

1  more than one year. Is that what you're
2  asking me?
3 Q. At Fairhaven?
4 A. Yes.
5 Q. Okay. About how long have those rumors been
6  going on about Fairhaven closing?
7 A. It's hard to say, but I would say more than
8  a year.
9      (Response marked as
10      Exhibit Number 17.)
11 Q. Let me show you what's been marked as
12  Exhibit 17 and ask you if you recognize that
13  document?
14 A. I don't recognize the document.
15 Q. Would you understand that if it's indicated
16  that the person who signed it is Joan, that
17  that would be Joan Cappuccio?
18 A. That is correct.
19 Q. There's no other Joan that that could have
20  been that you know of?
21 A. Could have been Joan Gallagher. I'm not
22  sure when she got married.
23 Q. Same person, different name?
24 A. Yes.
25

85

1      (Attachment to Complaint
2       marked Exhibit Number 18.)
3 Q. Let me show you what's been marked as
4  deposition Exhibit 18 and ask you if you
5  recognize that document?
6 A. This one I do recognize.
7 Q. That document, in fact, is an attachment to
8  your complaint, isn't it?
9 A. That is correct.
10 Q. And you received that document on or about
11  April 24th of 2003?
12 A. That is correct.
13 Q. Now in 2004, let's just take from January of
14  2004 until August 1st of 2004, did you
15  receive any written documents stating that
16  rumors in regards to Fairhaven closing were
17  not true?
18 A. Any written documents?
19 Q. Written documents?
20 A. No.
21     MR. KAITZ: Let's mark this
22  document as Exhibit 19, please.
23     (Memorandum marked as
24      Exhibit Number 19.)
25 Q. For the record Exhibit 19 is a memorandum to

22 (Pages 82 to 85)

86

1  all Fairhaven employees from Joan Gallagher
2  Cappuccio and it's bates stamped 00867. Now
3  it says it's dated 5/24/05, but I'm just
4  going to represent to you that's not the
5  actual date of the document. It's probably
6  the date that it was printed from me, but
7  the question I want to ask you is if you
8  ever recall receiving that document before
9  you retired effective August 1st, 2004?
10 A. No, I don't recognize the document.
11 Q. You don't recognize ever having received
12  this document while you worked at Fairhaven?
13 A. I don't recognize the document.
14 Q. You mentioned a short time ago statements
15  made by Joan Cappuccio, your immediate
16  acting supervisor and an HQ manager?
17 A. Not a -- there was many of them.
18 Q. VHQ manager?
19 A. Right.
20 Q. Again, what was Joan Cappuccio's position
21  with AT&T?
22 A. Regional director.
23 Q. And is that, in essence, the number one
24  person at Fairhaven on behalf of AT&T?
25 A. Yes.

87

1 Q. And your immediate acting supervisor, that
2  was Mary Eustace?
3 A. Mary Carmel Eustace.
4 Q. How does the middle name or the --
5 A. C-A-R-M-E-L. Mary Carmel Eustace, but we
6  all knew her as Carmel. She preferenced
7  that word.
8 Q. Was that her maiden name, Carmel, if you
9  know? You don't know?
10 A. I don't know. I assume it was a middle
11  name.
12 Q. The HQ manager, who was that?
13 A. I don't have their names. They came with
14  that role out, the strategic selling between
15  June 1st and June 18.
16 Q. These HQ managers, you mean these were
17  managers from New Jersey?
18 A. They were all over.
19 Q. From all over the company?
20 A. They were from all over that channel, the
21  channel being the consumer channel.
22 Q. And do you know what work locations they
23  came from?
24 A. Some came from New Jersey and others came
25  from other offices. Headquarters, I

88

1  believe, was New Jersey.
2 Q. What other offices did they come from?
3 A. As I said, they came from the other offices
4  within the channel.
5 Q. And you don't know where those are?
6 A. No, but it is so noted in the Fairhaven
7  Flyer. There's an article in there, the
8  June Fairhaven Flyer.
9      MR. KAITZ: Let's mark this as
10  Exhibit 20.
11      (News Update marked
12      Exhibit Number 20.)
13 Q. I'm showing you what's been marked as
14  Exhibit 20. Is this a copy of the article
15  in the Fairhaven Flyer that you're referring
16  to?
17 A. Yes. This is June, right?
18 Q. I believe so. What is the Fairhaven Flyer?
19 A. That is a publication that is put out. The
20  main executors on that is Chris Giblin and
21  Joan Cappuccio.
22 Q. It's a publication put out by the company?
23 A. Right.
24 Q. To employees of Fairhaven?
25 A. That's correct.

89

1 Q. How often is it put out?
2 A. Comes out the first of every month.
3 Q. And this refers to strategic selling, and
4  these HQ managers who came to Fairhaven were
5  part of this strategic selling approach?
6 A. That's correct.
7 Q. It looks like at least that they came to
8  Fairhaven from some time between June 1st
9  and June 18th, is that correct?
10 A. That's correct.
11 Q. And that's of 2004?
12 A. That's correct.
13 Q. Now these conversations that you had with
14  the HQ managers, your immediate acting
15  supervisor and Joan Cappuccio, I think you
16  told us the last of these conversations was
17  with Joan in July, correct?
18 A. Just before she went on vacation. It was
19  really July, and it was down in the ASD
20  area of the hallway.
21 Q. Okay. That was the last of the
22  conversations, right?
23 A. That was the pivotal conversation, that's
24  correct, with her.
25 Q. With her, but it was the last of these group

23 (Pages 86 to 89)

90

1 of conversations that we're going to talk
2 about? In other words, the conversations
3 you had with your immediate acting
4 supervisor were before this, is that
5 correct? Yes or no?
6 A. Yes, yes.
7 Q. And the conversations you had with the HQ
8 managers was before this conversation with
9 Joan?
10 A. That is correct.
11 Q. When was the first conversation that you had
12 with either your acting immediate supervisor
13 or the HQ managers about the possibility of
14 Fairhaven closing?
15 A. When I heard on the news about the baby
16 bells and, you know, it was actually coming
17 to fruition that those caps were not going
18 to remain in place, and based on the
19 articles back in March, the articles back in
20 December that they said that was the crucial
21 part to the long distance companies that if
22 those -- if that went, union jobs would be
23 lost; if that was allowed to expire, those
24 caps. That last important mile meant
25 everything, so that was on the news during

91

1 that time period somewhere between May and
2 early June.
3 Q. Is that what prompted the conversation that
4 you had with either the HQ managers or
5 Mary Eustace?
6 A. That would be with Mary Eustace because the
7 HQ managers didn't come until June 1st.
8 They were there somewhere between June 1st
9 and June 18, I believe.
10 Q. So this, the first conversation you had on
11 the subject of the possibility of Fairhaven
12 closing, was with Mary Eustace?
13 A. Mary Eustace. It was more than once.
14 Q. We'll get to them. First I want to be sure
15 I understand what this means. When you say
16 the caps were not remaining in place, did
17 you understand that to be the discounts that
18 the baby bells were providing AT&T and other
19 carriers?
20 A. They were getting -- those regulations gave
21 them the discount.
22 Q. Right. What the issue was whether those
23 regulations that gave them those -- gave
24 AT&T and others those discounts would remain
25 in place?

92

1 A. Correct.
2 Q. If they did not remain in place, it would be
3 possible for the baby bells to charge a lot
4 more for access to the baby bells networks,
5 correct?
6 A. That is correct.
7 Q. And that might result in financial
8 difficulties or financial issues for AT&T
9 and other of those carriers to maintain
10 service at a reasonable price?
11 A. That is correct. It's fair to say that the
12 long distance companies would suffer because
13 of that.
14 Q. And there were -- there were at least
15 stories in print about the possibility of
16 long distance carriers -- well, let's not
17 talk about long distance -- the
18 possibilities of AT&T eliminating services
19 as a result of not being able to get these
20 discounts anymore?
21 A. Eliminating jobs. Is that what you mean by
22 services?
23 Q. Eliminating jobs. Eliminating services
24 which would cause the elimination of jobs?
25 A. That was as early as December of 2004, if

93

1 you heard about it.
2 Q. Early December of 2004?
3 A. Three, I'm sorry. It's been a long day.
4 I'm sorry.
5 Q. No, I understand, but those issues were
6 starting to come to the front as early as
7 December of 2003?
8 A. Correct.
9 Q. And as it appeared that they were coming to
10 fruition -- well, let me rephrase that
11 question. It appeared that as of May and
12 June of 2004, the thing that AT&T didn't
13 want to happen, namely the elimination of
14 the regulations for those discounts was, in
15 fact, taking place?
16 A. Correct.
17 Q. And that would have a negative impact on
18 AT&T, correct?
19 A. Based on their earlier documentation, yes.
20 Q. And it would have a negative impact on jobs?
21 A. Union jobs, correct.
22 Q. And that was the situation that you
23 understood the company to be in in May or
24 June of 2004?
25 MR. GODBOUT: Objection. What do

24 (Pages 90 to 93)

94

1   you mean by situation?
2 Q. That was what you understood was taking
3     place or one of the things that was taking
4     place at the company in this May, June of
5     2004 time period?
6 A. It was a big issue. I know that.
7 Q. And so --
8 A. That's what prompted my questions.
9 Q. Okay. The first conversation you had with
10    those questions was with Mary Eustace?
11 A. Right, because she was my immediate
12    supervisor.
13 Q. Okay. Now just in terms of Mary Eustace, do
14    you know how long she had been with AT&T as
15    of May of 2004?
16 A. It's just hearsay. I don't know for sure.
17    Seven years. She came when the office
18    opened. I could be wrong there. That was
19    my understanding.
20 Q. That was your understanding? She didn't
21    have the years of background prior to --
22 A. That was my understanding.
23 Q. Do you have any sense of how old a person
24    Mary Eustace was in 2004? No? Did you
25    believe she was younger than you?

95

1 A. I would say it's fair to say she's younger
2    than me.
3 Q. Isn't it fair to say she was probably at
4    least ten years younger than you?
5 A. How bad do I look?
6 Q. No, no, you don't look -- it's not --
7 A. I'm sorry.
8 Q. I have to tell you, I mean, I've never seen
9    Mary Eustace, so I can't compare your looks
10   to hers. Is that a fair thing to say, yes
11   or no?
12        MR. GODBOUT: Answer the question.
13 A. I never even thought of it. I will say yes.
14 Q. All right. Tell us about that first
15   conversation you had with Mary Eustace on
16   the subject of Fairhaven closing or reducing
17   the work?
18 A. One of them is when --
19 Q. I want the first one.
20 A. It's hard to say which is first.
21 Q. Well, I want you to tell us about the
22   conversation that, as you sit here today,
23   you think was the first one.
24 A. Okay. I was concerned because it was
25   getting so slow. I mean, there was waits

96

1    between calls. When there's waits between
2    calls something is going on, and then when a
3    lot of the call centers were being shipped
4    overseas, I said, where are our calls?
5    Where are our business? Are you sending
6    these calls overseas to see if you can do
7    without us? I mean, it started off very
8    light, you know. Where are the calls?
9    Because we take calls back to back. It's
10   nonstop, but they were getting far and few
11   between and then factoring in what you're
12   hearing on the news and everything else you
13   tend to worry, where is the business? I
14   mean, because customers is why I'm there,
15   and the call volume was going down. I want
16   to know where are the calls?
17 Q. That's all background to your first
18   conversation with Mary Eustace, I take it?
19 A. Yes.
20 Q. What you believe today was the first
21   conversation with Mary, where did it take
22   place?
23 A. On the board when the calls were -- there's
24   a time she came around walking through the
25   team.

97

1 Q. So she's walking through the team?
2 A. Right.
3 Q. You're at your work station on the board?
4 A. Right.
5 Q. What do you remember saying to her?
6 A. Where are my calls, you know?
7 Q. What did she say to you?
8 A. It's just slow.
9 Q. What did you -- what was said next?
10 A. That may go onto another day.
11 Q. Oh, that was the end of the conversation
12   that day?
13 A. It's in passing. They're all in passing.
14   There were a number of them in passing.
15 Q. All right. So when's the next passing
16   conversation?
17 A. Again, the next day was slow so it was
18   ongoing.
19 Q. So tell us about what happened the next day
20   when she went through?
21 A. Again, I emphasized, you know -- I wasn't
22   the only one. Where are our calls going?
23   Are you shipping them over to the call
24   center? There should be calls here, and I
25   even asked her, Are you testing us to see,

25 (Pages 94 to 97)

98

1 you know, if you can downsize some of us
2 here to see if you can do away with us? You
3 don't need us here? Where are they going?
4 And I wasn't the only one asking these
5 questions.
6 Q. I just want to know what you asked.
7 A. That's what I was asking.
8 Q. So you were asking whether the calls were
9    being shipped overseas?
10 A. That was one of the questions.
11 Q. Did Mary Eustace answer that question?
12 A. It was slow.
13 Q. You asked her if the company was testing to
14    see if they could downsize?
15 A. To do away with us.
16 Q. Okay. Do away with us?
17 A. You know, see if they can close some offices
18    and they can still meet their call volume.
19 Q. Did Mary Eustace answer that question?
20 A. Just slow.
21 Q. Just slow. Did you have any other
22    conversations with Mary Eustace about --
23 A. Yes.
24 Q. -- about the slow -- so go on. Tell me
25    about the next one.

99

1 A. Let's see. I asked her, in fact, if we were
2    closing or downsizing.
3 Q. Was that on another one of her walkthroughs?
4 A. That was her walking by. She was on the --
5    there's a set-up of cubicles and there's
6    cubicles on this side, and you can talk from
7    aisle to aisle if you stand up -- not taking
8    calls after sitting, can stand up.
9 Q. So you were standing up by your cubicle and
10    she was walking through?
11 A. She was walking by.
12 Q. And you asked her if Fairhaven was closing
13    or downsizing?
14 A. Are we closing or downsizing?
15 Q. What did she say?
16 A. Because I said, It's awfully slow here, and
17    she said, No, and I said, Well, you know,
18    you may want to warm up your resume because
19    this doesn't look good. She says, I feel
20    pretty confident that I'll be okay; I'll be
21    fine. It was, really, we were getting
22    30 minutes between calls.
23        MR. GODBOUT: There's no question.
24 Q. Now that conversation, that specific
25    conversation when you asked her if you were

100

1 closing or downsizing because it was awfully
2 slow and she said no, when do you recall
3 that conversation taking place?
4 A. That was around the immediate time that that
5    was on the phone, on the media about the
6    baby bells. They had an announcement on the
7    media.
8 Q. So was that June, May?
9 A. I would say May, May, June time frame.
10 Q. Can you pin it down any closer than that?
11 A. May, June time frame is what I come up with.
12 Q. Okay. And she said no. You said, you may
13    want to warm up your resume? She said she
14    was pretty confident she'd be okay?
15        MR. GODBOUT: I believe the
16    testimony was the deponent said, You might
17    want to warm up your resume.
18        MR. KAITZ: Right.
19        MR. GODBOUT: And then the
20    supervisor responded by saying, I think I'm
21    okay. I think you said --
22 Q. Pretty confident I'll be okay, is what she
23    said?
24 A. That's the gist of it, yes.
25 Q. Okay. Do you think Mary Eustace -- do you

101

1 believe Mary Eustace was lying when she said
2 no?
3 A. I don't know what to believe now. At the
4    time -- I'm sorry. Can you help me out here
5    a little?
6 Q. This was a conversation you had in the May,
7    June, 2004 time frame?
8 A. Right.
9 Q. Mary Eustace was just sort of walking
10    through?
11 A. Right.
12 Q. And you flat out asked her, Is this place
13    closing or downsizing? And she said, No,
14    right?
15 A. Right.
16 Q. And my question to you is do you believe
17    that she lied to you when she said no?
18 A. I didn't feel comfortable with the answer
19    because it was so slow. I was concerned.
20 Q. You didn't feel comfortable with her answer?
21 A. No.
22 Q. Do you know if Mary Eustace was keeping up
23    with these issues about the baby bells and
24    the discount?
25 A. Well, as an acting manager that's with the

26 (Pages 98 to 101)

102

1   management team, I don't know what their job
2   req. is, but I would think.
3 Q. You would think they would, but did you ever
4   have any conversations with her about the
5   discount issue and whether those regulations
6   would be --
7 A. We did talk about -- we both concurred that
8   it was an important factor.
9 Q. Okay.
10 A. You know, even if someone off the street
11   would know it's an important factor given
12   the articles.
13 Q. Did you have any other conversations with
14   Mary Eustace after this one in which you
15   again talked to her about whether Fairhaven
16   was closing or downsizing?
17 A. Specifically whether we were closing or
18   downsizing?
19 Q. Yes.
20 A. The day that -- the day of my anniversary,
21   30-year anniversary/retirement -- they
22   rolled it all, like, into one and that would
23   have been July 16th. I heard something in
24   the office about restructuring.
25       When you hear words like

103

1   restructuring, your ears go up, so I asked
2   her, Are we downsizing or closing? She
3   said, No, they're just restructuring their
4   sales team, is what she told me.
5 Q. Okay. Do you believe she was lying to you
6   when she gave you that answer on July 16?
7 A. Again, I didn't feel comfortable with it. I
8   accepted what she said, but I didn't feel
9   comfortable.
10 Q. You weren't comfortable with her answer?
11 A. No.
12 Q. You weren't sure whether she was telling you
13   the truth or not?
14       MR. GODBOUT: Objection.
15 A. Her body language seemed kind of nervous.
16 Q. Which suggested to you that she wasn't
17   telling you the truth?
18 A. I just didn't feel comfortable with her
19   answer, but again, why would she lie?
20 Q. Okay. Do you have any evidence that she
21   knew on July 16th that the company was going
22   to downsize in September?
23 A. Do I have any evidence?
24 Q. Yes.
25 A. Meaning written evidence or my perception?

104

1 Q. I'm not asking you for perception. I'm
2   asking for evidence, proof. Not a
3   perception or a belief. Anything specific?
4   Doesn't have to be written though.
5   Specific.
6 A. It doesn't have to be written?
7 Q. Doesn't have to be written, but anything
8   specific --
9 A. That seemed out of the ordinary?
10 Q. No, that tells you she knew on July 16th
11   that the company would, in fact, downsize or
12   announced to downsizing in September?
13 A. Well, there was something odd. Usually on
14   that day it's customary that you can visit,
15   go say good-bye to everybody, go visit other
16   teams, your friends that you worked with all
17   those years, but she kept me right there.
18   She even had me do work on my last day which
19   really seemed odd. It was, like, she was
20   keeping tabs on me.
21 Q. Why do you think she was doing that?
22 A. I don't know. Didn't want me to talk to
23   other people? I don't know.
24 Q. Between the May, June conversation when you
25   asked her if the place was closing or

105

1   downsizing and she told you no and this
2   July 16th conversation, did you have any
3   other conversations --
4 A. Yes.
5 Q. -- with Mary?
6 A. Just Mary?
7 Q. Just Mary about Fairhaven downsizing or
8   closing?
9 A. Again, they were in passing, just light
10   ones. I would ask again, Are you sure? And
11   she'd say, No. Like I said, it was ongoing
12   because, you know, the volume was not
13   picking up.
14 Q. Yes. Did you at any time ask her to check
15   with somebody else for you?
16 A. Well, her being an acting manager, the
17   acting managers tell their managers
18   everything.
19 Q. I'm just asking you, did you ask her at any
20   time to check this answer with anybody else?
21   Yes or no?
22 A. No, because she gave me a definite answer,
23   no. Not that I can recall.
24 Q. Did you tell her at any time that you
25   weren't comfortable with her answers?

27 (Pages 102 to 105)

**106**

1 A. By me keep asking her maybe that's a way of
2   telling her that I wasn't comfortable.
3 Q. Did you specifically tell her?
4 A. I didn't specifically say to her that I feel
5   uncomfortable with your answer and I didn't
6   challenge her. I thought that would be
7   argumentative.
8 Q. Did you continue to feel uncomfortable with
9   her answers as you kept asking her this
10   question?
11 A. That's why I asked other people besides her.
12 Q. So you never felt comfortable with her
13   answers to your questions, is that a fair
14   statement?
15 A. That's a fair statement.
16 Q. Okay. Now you told us you also spoke to the
17   HQ managers? Correct?
18 A. That is correct.
19 Q. But --
20 A. What I believed to be HQ managers.
21 Q. But you don't know? You don't have a
22   specific name to anyone you spoke with?
23 A. Well, AT&T could check that out because they
24   were assigned to our team.
25 Q. Well, let's talk about this. What do you

**107**

1   mean by assigned to your team?
2 A. In those managers that came out, there was a
3   gentleman there and he was assigned to our
4   team. He came over to check on the
5   strategic selling. He sat with the team.
6   He was there with Mary Eustace.
7 Q. Who else was on this team that this
8   gentleman was assigned to?
9 A. I believed it was John Palumbo because it
10   was a gentleman -- we would all go out to a
11   meeting first. That gentleman was there.
12   Barbara Gillooley was there. I maybe
13   mispronounced her name. I'm sorry.
14       There was a gentleman there,
15   John, from headquarters and it was my
16   understanding that he, in fact, was John
17   Palumbo, the president of the consumer
18   division, and he was going to visit all the
19   call centers within the channel, and we were
20   kind of in competition with each other.
21   There was a manager by the name of George.
22   I don't know what his last name is.
23 Q. Barbara, who was Barbara Gillooley?
24 A. She was the sales person, SMEAD (phonetics),
25   at AT&T, I believe.

**108**

1 Q. Sales person, what?
2 A. They call them SMEAD.
3 Q. SMEAD? Do you know what that stands for?
4 A. I have forgotten that.
5 Q. Was she based in Fairhaven or somewhere
6   else?
7 A. As far as I know she was based in Fairhaven,
8   and that's in that flyer that you --
9 Q. Yes, I understand. Exhibit 20, right?
10   Now how many conversations did you have with
11   whoever these HQ managers were, about the
12   subject of Fairhaven closing or reducing the
13   work force?
14 A. A number of them.
15 Q. Is that two, three, four, five? How many is
16   it?
17 A. I would say it's fair to say more than two.
18 Q. More than two. Did they take place on the
19   same day or different days?
20 A. Different days.
21 Q. When did the first one take place?
22 A. That would be at my position, I believe.
23 Q. Meaning, when you say, your position, you
24   mean you're working on the board?
25 A. I was at my position. There was no call

**109**

1   coming in, but they were observing to see if
2   we were using the sell-down strategy and
3   Carmel was with him, and they kind of stood
4   back from me because I get kind of nervous
5   if they plug right in, so they were right
6   there within the next cubicle over
7   listening.
8 Q. That's one person and Mary Carmel Eustace?
9 A. Correct. There was a heavyset black
10   gentleman somewhere between 30 and 40 years
11   old, but he was assigned to our team, so you
12   would be able to find his name or whoever
13   the assignment was given to.
14 Q. That was not John Palumbo then?
15 A. No. This was a heavyset black gentleman so
16   we were -- I'm not good on names, but I
17   would say between his thirties or forties.
18 Q. And he was with Mary Eustace and they were
19   observing --
20 A. Right.
21 Q. -- and you had a conversation?
22 A. Because there was no calls coming in.
23 Q. Tell us what you said to them and what they
24   said to you?
25 A. Well, in that conversation there they had

28 (Pages 106 to 109)

110

1 these little trinkets. They were going to
2 spend billions and billions of dollars until
3 years end, and I asked him, you know,
4 Instead of doing that internally, why don't,
5 you know, getting people to come to AT&T,
6 why don't you do it externally? Why don't
7 you take a portion of that amount of money,
8 these billions and billions of dollars?
9 Instead of giving us token prizes, why don't
10 you put something out there for the public
11 like a house maybe on a lot of their choice
12 or raffle off a car and he said, you know,
13 We don't have the money for that, and I
14 said, Let me see if I understand this
15 correctly. You have billions and millions
16 of dollars here to do this strategic
17 sell-down to the end of the year, but you
18 don't have the money to maybe do a, you
19 know, something for the public, a car or a
20 house? He said, Well, actually we've done
21 sweepstakes before and they just haven't
22 worked out, so there again, you know, a red
23 flag went up.
24     They don't have the money for a
25 $30,000 raffle, but yet they have money

111

1 for -- so there again.
2 Q. Before we get -- when he told you that we've
3 done sweepstakes before and they haven't
4 worked out, was that the end of the
5 conversation?
6 A. On that particular one. I know one of the
7 ones they discounted, like, on their own. I
8 can't remember if that was the conversation.
9 They kind of, like, left the area, I
10 believe.
11 Q. Do you remember anything else being said on
12 that occasion when you talked about, you
13 know, doing something, raffling off a car or
14 doing something with the public? Anything
15 else you remember being said on that
16 occasion?
17 A. There was reference to that. Whether it was
18 on that particular day, I don't know. I
19 brought it up in the meeting. We usually
20 would have a half-an-hour meeting, and I'm
21 not sure if that was on the same day, but in
22 the meeting I mentioned it to the heavyset
23 black gentleman, and then I wanted him to
24 articulate, when we were all sitting there,
25 to the gentleman that I thought was John

112

1 Palumbo at the head of the table on the
2 upper right. As you look at the table, it
3 would be the upper right corner there, and
4 he let me explain it
5 to him, and again I thought that was
6 John Palumbo, and he didn't seem to give a
7 definitive answer one way or the other as
8 far as if he thought it was a good idea or
9 not. I thought it was an awesome idea, so I
10 did mention that again.
11 Q. Okay. Do you remember any other
12 conversations with the HQ managers in which
13 the subject of downsizing or closing at
14 Fairhaven came up?
15 A. Yes. It came up again at my position. This
16 was an ongoing, I think, within a two-week
17 span we were there, one week or two-week.
18 There was another gentleman, younger. He
19 was a black gentleman, short, petite, and I
20 asked him, too, you know. Point blank asked
21 him, Are you here under disguise, you know,
22 trying to figure out what offices to keep,
23 what office to close? Is this just -- to
24 see you come out here, because I thought it
25 was odd that if we are in competition, why

113

1 are all these other managers coming out?
2 Almost seemed like they were coming out to
3 see if they wanted to transfer or, like, a
4 job req. or something. It just didn't make
5 sense. The whole thing didn't make sense to
6 me.
7 Q. So you asked this gentleman --
8 A. I believe it was him.
9 Q. Was anybody else with him at the time?
10 A. Carmel was there.
11 Q. Oh, okay. Just the two of them?
12 A. That's correct.
13 Q. This was a different black gentleman?
14 A. This was -- I believe his name was George.
15 He was younger, petite.
16 Q. But he's not the same one as this
17 heavyset?
18 A. Not the same one.
19 Q. He's not John Palumbo either?
20 A. No.
21 Q. Anyway, so you asked him if they were here
22 for the strategic selling program --
23 A. I asked him --
24 Q. -- under the disguise because they were
25 really just looking around to see what

29 (Pages 110 to 113)

114

1   office to keep and what to close?
2 A. I asked him point blank, that's correct.
3 Q. What was his response?
4 A. No.
5 Q. Do you believe he was lying to you?
6 A. Again, I didn't feel comfortable because we
7    didn't have -- we weren't getting the
8    customers to sell to. The volume was slow.
9 Q. So you didn't feel comfortable with his
10   answer one way or the other?
11       MR. GODBOUT: Objection.
12 A. I didn't feel comfortable. No, that's why I
13   kept asking questions. If you keep asking
14   the question, it keeps coming out the same
15   answer, at some point you have to realize,
16   Okay, maybe they are telling me the right
17   thing, you know?
18 Q. So you didn't feel comfortable with his
19   answer either?
20 A. No.
21 Q. Did you have any other conversations with
22   the HQ managers about the subject of
23   Fairhaven downsizing or closing?
24 A. As I said, there were at least two, and
25   those were the two main ones.

115

1 Q. Do you remember any other one?
2 A. I just thought it was odd when we were in
3    the meeting. As I told you, they would have
4    a half an hour rehab or recap or whatever
5    you want to call it to see how it was going
6    and share experiences, you know, what works
7    for you as far as selling and what doesn't
8    work, but before we started those meetings
9    they went around and they asked us how long
10   we were there; what job did we have before
11   we had AT&T, so I did mention not directly,
12   but Gee, are we closing or downsizing
13   because why would they be asking what job
14   did we have prior? Why would they be asking
15   what job did we have prior to working with
16   AT&T? And I might ask that of a peer. I
17   mean, just said it in general. At that
18   meeting I didn't put it to any one person.
19 Q. Did anybody respond to your comment?
20 A. I know somebody said, You're a lucky duck.
21   You should be retiring.
22 Q. Do you know who said that?
23 A. No, but we might have been on a conference
24   call so.
25 Q. Do you remember having any other specific

116

1    conversations with an HQ manager or the HQ
2    managers about the possibility of Fairhaven
3    closing or downsizing?
4 A. Well, that would have been the two that I
5    mentioned to you and the reference that I
6    made in the conference room.
7 Q. Anything else?
8 A. With the HQ managers?
9 Q. Correct.
10 A. At this point not that I can remember.
11 Q. Can you remember any other conversation you
12   had with Mary Eustace on the subject of
13   Fairhaven closing or downsizing?
14 A. As I mentioned a little bit earlier, I asked
15   right up to the day that I left and even the
16   day of July 16th, several of them.
17 Q. Any conversation that you haven't told us
18   about yet though?
19 A. Other than in passing, Are you sure? I
20   mean, I was always asking.
21 Q. Right. Are you sure? And she was telling
22   you no?
23 A. Kept saying no.
24 Q. But never mind. We've been through that,
25   right? And you told us you had one

117

1    conversation with Joan Cappuccio?
2 A. A pivotal one, yes.
3 Q. And that was in the ASD area?
4 A. That was in the ASD area. She was coming
5    down the corridor. ASD is here and she was
6    coming down the corridor so --
7 Q. And this was -- go ahead. I'm sorry. I
8    interrupted you.
9 A. No, that's all right.
10 Q. I apologize.
11 A. That's all right.
12 Q. This conversation was in early July?
13 A. Before she went on vacation.
14 Q. Well, do you know what date she went on
15   vacation in July?
16 A. No. Early July.
17 Q. July of 2000 --
18 A. 2004.
19 Q. Is it before you submitted your paperwork to
20   the pension service center or after?
21 A. It was before.
22 Q. Before.
23 A. I submitted to the pension service center.
24 Q. On July 10th?
25 A. Right, and they got it on the 3rd -- 13th.

30 (Pages 114 to 117)

**118**

1 Q. 13th?
2 A. 13th. I'm sorry.
3 Q. So it was before July 10th?
4 A. It was before July 10th. That's correct.
5 Q. Did you have a specific meeting with Joan or
6    were you just passing?
7 A. Actually she was coming down the corridor.
8    The opportunity presented itself, so I went
9    to her and I said, You know, with all of
10   this stuff going on I'm really concerned
11   about Supreme Court Justice William
12   Rehnquist's decision that, you know, with
13   the baby bells it looks like the caps are
14   going to come off. They're going -- you
15   know, that last important mile, you know,
16   Gee, what I'm doing. Maybe I should stay
17   and avail myself of a package.
18          She said, No, Bev. We're still
19   going to be here. We've sold the building.
20   We have secured a five-year lease. We're
21   still going to provide excellent customer
22   service to our customers, and she was
23   excited because she was having a trial for
24   voice over the Internet. They just started
25   a pilot on that.

**119**

1          She was all excited about that, so
2    she assured me no, we weren't going to close
3    and that they had a five-year lease that
4    would secure part of the deal, and that was
5    not a scheduled meeting. The opportunity
6    presented itself, so I went to her.
7 Q. She told you, No, we're not going to close,
8    Bev; we're still going to be here?
9 A. Not going to close or downsize. We're still
10   going to be here.
11 Q. She actually used the word, downsize?
12 A. Close or downsize.
13 Q. That's the word she used?
14 A. That's what I heard, close or downsize.
15 Q. I am not asking you if that's what you
16   heard. I'm asking you if that's what she
17   said. Do you remember her say?
18 A. That's what I heard her say.
19 Q. Okay. Do you believe she was lying
20   to you when she told you that in early
21   July of 2004?
22 A. She told me that with confidence. I mean,
23   her answer was with confidence, so then I'm
24   thinking to myself, HQ said they weren't
25   going to. Mary Eustace said she wasn't

**120**

1    going to. Joan Cappuccio, who held herself
2    out the year before as the person to go to
3    if you had any questions about downsizing or
4    closing, so at that point I said -- I felt
5    confident that what people had been telling
6    me right along was true and that was my
7    pivotal factor that I wasn't going to stay
8    there another five years, I might as well
9    exit now for all parties concerned; myself,
10   the company, my son, my family. That was a
11   good exit date.
12 Q. Okay. What caused you to believe that Joan
13   was intentionally lying to you on that day?
14 A. The subsequent events that happened and the
15   time frame they happened, chronological
16   order in which they happened.
17 Q. Well, do you know whether Joan Cappuccio was
18   involved in the decision to reduce the work
19   force in Fairhaven?
20 A. I would believe that she would have
21   knowledge of it --
22 Q. That's not --
23 A. -- being the regional director.
24 Q. But that's not my question. My question is,
25   do you know whether she actually had input

**121**

1    in the decision -- strike that. Do you know
2    whether she actually participated in the
3    decision to reduce the work force in
4    Fairhaven?
5 A. No, I don't.
6 Q. I want to go back. You worked in Worcester
7    and Worcester closed, correct?
8 A. Yes.
9 Q. Do you know whether the local people in
10   Worcester participated in the decision that
11   led to the closing of the Worcester office?
12 A. I don't know.
13 Q. You worked in Peabody when the Peabody
14   office closed. Do you know whether the
15   local people in Peabody had any
16   participation in the decision to close the
17   Peabody office?
18 A. No.
19 Q. Do you understand that it's entirely
20   possible that only people at headquarters
21   had any involvement in the decision to
22   reduce the work force at Fairhaven?
23        MR. GODBOUT: Objection.
24 A. Can you say that again, please?
25 Q. Do you understand that it's possible that

31 (Pages 118 to 121)

122

1  the only people who participated in the
2  decision to reduce the work force in
3  Fairhaven worked at headquarters in New
4  Jersey?
5       MR. GODBOUT: Objection.
6 A.  I would say they would be the ones to
7    decide.
8 Q.  So if they would be the ones to decide,
9    isn't it entirely possible that what Joan
10   told you in early July was truthfully what
11   she believed and knew at that time?
12      MR. GODBOUT: Objection.
13 A.  I would say no.  I believe she had
14   knowledge.  She didn't decide, but I believe
15   she had knowledge of their decision because
16   they put it right out there back in March
17   and February that that was a crucial part to
18   their business going forward.  Those baby
19   bells, those regulations came off and that
20   was loss of jobs.
21 Q.  And you knew that, too?
22 A.  But then again I asked her because she held
23   herself out the year before as the person to
24   go to.  You're hearing rumors, come to me.
25   I'll tell you what's going on.  That was the

123

1  memo that went out in 2000, April of 2003.
2 Q.  Did it concern you at all that a memo like
3    the one in April of 2003 hadn't been issued
4    in 2004?
5 A.  I guess the rumors were so bad then that
6    they had to put an end to it.
7 Q.  That's not my question.  My question is did
8    it concern you at all that a written memo
9    like the one in April of 2003, had not been
10   issued by Joan at any time in 2004 prior to
11   July?
12 A.  That was in response to something so --
13 Q.  But do you understand my question?
14 A.  Not really.
15 Q.  I'm just asking you a yes or no question.
16   Were you concerned in July of 2004 that
17   nothing had come out in writing that year?
18 A.  I didn't say anything.  You showed me
19   something that must have come out after I
20   left.
21 Q.  Right, but I'm asking you about before you
22   left.  Were you at all concerned that
23   nothing had come out in writing in 2004,
24   saying that rumors of our closing weren't
25   true?

124

1 A.  I was asking people, so I wasn't looking for
2    a memo.
3 Q.  Now am I correct that when you asked
4    people -- by that I mean basically Mary and
5    Joan, neither one of them said that they
6    would check with folks at headquarters for
7    you, did they?
8 A.  No.
9 Q.  Now let's talk for a couple of minutes about
10   your 30th anniversary luncheon.
11 A.  Okay.
12 Q.  That happened on July 16th, correct?
13 A.  Yes.
14 Q.  Did you have conversation with Chris Giblin
15   that day?
16 A.  That's correct.
17 Q.  Who was Chris Giblin?
18 A.  PDO for Fairhaven.
19 Q.  What is PDO?
20 A.  It's been a while.  I forget, but he was
21   going to be in some kind of management
22   position at the site over -- I think it was
23   over ASD.  I could be wrong there.
24 Q.  Did you have any conversation with him on
25   July 16th?

125

1 A.  Yes, at the luncheon.
2 Q.  Tell us about your conversation with
3    Mr. Giblin.
4 A.  Well, it kind of started with a question out
5    to everybody that was there.  Do you want to
6    know who was in attendance?
7 Q.  No.  Let's just start about what was the
8    question that he put out there or was put
9    out there?
10 A.  Well, it was put out to everybody.  Again, I
11   asked him if we were downsizing or closing,
12   and I believe five out of the seven people
13   that were there were management people.
14   There was just two other peers there,
15   myself, so there was a party of eight, I
16   believe, eight or nine, and I asked the
17   management team, you know, again are we
18   downsizing or closing?
19       They said, No, and then Paulette
20   Racine looked at Chris Giblin and he said,
21   "Bev, I want to congratulate you on your
22   milestone of 30 years.  I know I'll never
23   see mine," and everybody at the table heard
24   him say that.
25 Q.  First off, who is the one who said no to the

32 (Pages 122 to 125)

126

1    question?
2 A.  It was collaborative.  It was an array of
3    people.  You couldn't say any one person.
4    It was no.
5 Q.  And at the time Chris Giblin made this
6    statement, do you know how long he had been
7    with the company?
8 A.  At that time I didn't know.  I heard
9    afterwards.
10 Q.  What did you hear?
11 A.  About 19 years or so.
12 Q.  So this person in the management team who
13    had been there about 19 years said to you,
14    "I want to congratulate you on your
15    30 years.  I know I'll never see mine."
16 A.  With AT&T.
17 Q.  What did you take that to mean?
18 A.  You know, it was kind of strange because,
19    you know, I asked the question previously,
20    Are you downsizing or closing?  Says, No,
21    and he says he's not going to see his.  If
22    you got 19 years invested in the company,
23    you're going to do everything you can to
24    stay with it because you're only a decade
25    away from retirement.

127

1 Q.  So I take it you took that statement to
2    suggest that --
3 A.  In hindsight.
4 Q.  -- something negative was going to happen?
5 A.  In hindsight, but not -- I mean, they just
6    got finished telling me no, so I didn't know
7    what was going on.
8 Q.  So go ahead.  I'm sorry.  Have you finished?
9 A.  That's okay.
10 Q.  No, no, finish your answer first.  I don't
11    want to interrupt.
12 A.  No, no, you're fine.  Go ahead.
13 Q.  Okay.  Did you take his statement to be
14    inconsistent with the no you had just heard
15    a minute earlier?
16 A.  I thought it was odd, but I didn't want to
17    pry because I didn't know what was going on.
18 Q.  Did you sense there was some inconsistency
19    between the two?
20 A.  Yes.
21 Q.  Okay.  Do you know whether Chris Giblin is
22    still with the company at Fairhaven?
23 A.  It's my understanding.  Again, this is
24    hearsay.  You may want to check this out.
25    He cleared out his desk September 23rd.

128

1 Q.  Of 2004?  That's a yes?
2 A.  Yes.  I'm sorry.
3 Q.  Do you have an understanding whether
4    Mary Eustace is still employed at Fairhaven?
5 A.  I don't know, but I'd like to know.
6 Q.  You would like to know?
7 A.  Yes.
8        MR. KAITZ:  Let's go off the record
9    for a sec.
10        (Discussion off the record.)
11        (Brief Recess.)
12 Q.  At some point did anyone in supervision or
13    management from the company in 2004 start
14    asking you questions about when you were
15    going to retire?
16 A.  Mary Eustace did.
17 Q.  When did she do that?
18 A.  She actually took me off the board for that
19    conversation and she said, Bev, you got your
20    retirement papers in?  You got them in yet?
21    And I said, No.  When I said, No, I listened
22    to not only what they say, I also look at
23    their body language.  Her face turned bright
24    red and she said, I would be worried that
25    they wouldn't get in on time.  I said, I'm

129

1    not concerned.  You have -- you have -- the
2    earliest you can get them in is 90 days, and
3    the last minute is two weeks and you can
4    always overnight.  Again, she just seemed
5    shocked that I didn't have them in.  No, you
6    know.
7 Q.  When did this conversation with Mary take
8    place?
9 A.  Let's see.  It would be that May, June time
10    period.
11 Q.  She told you that if she were you, she'd be
12    worried that you wouldn't get it in on time?
13 A.  That's what she said.
14 Q.  Did you -- sorry.  Yes, that's what she
15    said.  Did you understand what she meant by
16    get it in on time?
17 A.  So it would commence when I wanted it to.
18 Q.  But how would she know when you might want
19    it to?
20 A.  I did say that, you know, if all went well I
21    would like to exit, you know, to -- I have
22    two weeks vacation that abutted the
23    July 16th retirement party, so if all went
24    well, then I would like it to commence on or
25    about August 1st, if all went well.  See,

33 (Pages 126 to 129)

130

1    again --
2 Q.  Okay, I'm sorry.  Go ahead.  I don't mean to
3      cut you off.
4 A.  That's okay.  I had concerns because I never
5      knew what was going on, if that was the best
6      exit date and that's why I kept asking the
7      questions and I kept phrasing it, and every
8      time someone asked me, When you leaving?  I
9      said, If all goes well, and make it definite
10     until I had that conversation with Joan and
11     that was the deciding factor.
12 Q.  But who did you make the statement to, If
13     all goes well, I'll be retiring?
14 A.  Everybody.  Joan would keep asking me, What
15     is your last day in the office?  I'd say,
16     July 16th, if all goes well, but got about
17     two weeks of vacation, just to commence on
18     August 1st.  I was asking over and over and
19     over --
20 Q.  What -- sorry.
21 A.  That's all right.
22 Q.  When did you first make that statement, If
23     all goes well, I'll be retired -- you know,
24     my last day of work will be July 16th and
25     I'll be retiring at the end of my vacation?

132

1      Wasn't definite, but that was the projected
2      date, if all goes well.
3 Q.  That was a projected date for almost an
4      entire year when you selected those last two
5      weeks in July as your vacation?
6 A.  The way I selected my vacation, as I did the
7      year before, as I did the year before that.
8      I even asked for a package one of those
9      years which I never filled out so didn't go
10     anywhere.  If you ask for a package, you're
11     not obligated to go until you actually sign
12     on the dotted line.
13 Q.  But unlike all those other years, July of
14     2004 was the first year that you could
15     retire without any discount on your pension
16     plan?
17 A.  That is correct.
18 Q.  And that vacation that you selected for the
19     last two weeks of July in 2004, when did you
20     make that selection?
21 A.  That was the year before.  You have to pick
22     your vacation a year before.
23 Q.  So that was roughly a whole year before
24     that?
25 A.  As I did the previous year before that.

131

1 A.  When I went to pick my -- obviously I went
2      to pick -- I had this in my mind when I went
3      to pick my vacation because you pick them a
4      year ahead of time, and just like the years
5      before.
6          I mean, I did it two years before
7      that.  I was picking vacations with the idea
8      that maybe I'll take a discounted one.
9      Then, you know, as you get closer to that
10     maybe date you check the factors out.  Well,
11     maybe I'll hang in another year, so then you
12     schedule your vacations to formulate when
13     you possibly are going to go, and then now I
14     think I'll stay.  If I made it this far,
15     let's see if I can get the 30 years in, but
16     I was toying with this idea like you
17     mentioned before.
18 Q.  For three or four years?
19 A.  Yes, and the deciding factor, what is the
20     best exit date?  Because we are all going to
21     face it.  Retiring is life-altering.  It's a
22     big decision.  A lot of factors have to be
23     taken in, so I asked a lot of questions,
24     thought I was doing the right thing and
25     that's why I kept saying, If all goes well.

133

1      Yes.
2 Q.  But it was roughly a whole year before that?
3 A.  That's correct.  You pick your vacation a
4      year before.  So you have -- you set some
5      plans and then you see how it goes.
6 Q.  When's the first time you said to anybody in
7      2004, if all goes well, you know, my last
8      day of work will be July 16th and I'll have
9      my two weeks vacation and retire at the end
10     of those two weeks?
11 A.  When was the first time I said that?
12 Q.  Yes.
13 A.  I must have said it when I was picking my
14     vacations, so must have been back in 2003
15     even, if all goes well, but a lot happened
16     that year.  It was a tough year, as so noted
17     by Chris Giblin.  It was a difficult year
18     for everybody.  That's why he was going to
19     have appreciation day in August, I think,
20     August 14th.
21          MR. KAITZ:  Let's mark this
22     document Exhibit 21, please.
23          (Plaintiff's Disclosure Statement
24          marked Exhibit Number 21.)
25 Q.  Let me show you what's marked defendant's

34 (Pages 130 to 133)

## SPORTS
### A NEW RACE

* Steve Burton and teammate Kenseth make a late charge in the NASCAR's Nextel Chase for the Championship. C1

## The Standard-Times

SERVING THE SOUTH COAST COMMUNITY

TUESDAY September 14, 2004
New Bedford, Mass.

SouthCoastToday.com

City Final • 50 cents

### NEWS
### Ivan's fury

* As Ivan pummels Cuba, the Gulf Coast braces for a possible landfall. A2

# 140 Fairhaven AT&T workers axed

### Call center employees to lose jobs by Nov. 19

By DAVID KIBBE
Standard-Times staff writer

See AT&T A5

## School boss



EXHIBIT
1 George
9-21-05

28

The Standard-Times, New Bedford, MA

## FROM PAGE ONE

# AT&T: 140 Fairhaven workers axed

# Powell, Ridge endorse new spy chief post

By JESSE J. HOLLAND
Associated Press writer

WASHINGTON — Homeland Security Secretary Tom Ridge...

# Fonseca: City men killed in boat explosion



Beverly George
7 Willow Street
Foxboro, Ma   02035

November 16, 2004

Ms. Linda Teoli:
President of CWA-Local 1051
59 Main Street
Fairhaven, MA   02917

Dear Ms. Teoli:

Corporations like AT&T should be held accountable when they wantonly deceive an employee for their profit margin.  Furthermore, AT&T should be prohibited from using AT&T Corp. and Communications workers of America Contract **ARTICLE 25 – TERMINATION PAYMENTS** No. 6 (a), see enclosed **ARTICLE 25**, to validate their wantonly deceivable deed.   **ARTICLE 25** No. 6 (a) does not apply in this case because you cannot use a legal contract to enforce a wantonly deceptive deed.

In June, Barbie Gillooley, Fairhaven's Sales Processing Manager; and I believe John Polumbo, president of consumer division; and other HQ leadership teams along with managers from other consumer call centers came to Fairhaven, MA Call Center to roll out "Strategic Selling" (sell a prospective local and long distance package with features and then tailor it down to meet the customer's needs).  Consumer Call managers from other consumer call centers listened in on our calls, and this seemed odd to me because John said, "AT&T is spending millions on the 'Strategic Selling' to year's end in all consumer call centers and each call center is in competition with the other."  It seemed more like a prospective job visit to me than a roll out strategy.  **They were in The Fairhaven Office from June 1, 2004 – June 18, 2004.**  (See enclosed **Fairhaven Flyer** June, 2004, a monthly publication, Special News Update: **Strategic Selling** by Barbie Gillooley page 6  – Executive Editors were Chris Giblin and Joan Cappuccio, as noted on page 11.)

Needless to say, I began asking questions.  I asked John, "Why not excite the public externally?  Why not raffle a midsize car, say no more than $30,000, or build a house capped at $300,000 on customer's own land instead of spending millions of dollars on token prizes given in sale reps' raffles?"  My questions did not receive a definitive answer.  I could not see spending all that money internally on the consumer call center for token sale prizes for a strategy that most of us were already using.

30

Each local team had HQ managers assigned to it and each time we made a sale our names were entered into a raffle to be drawn each Friday. They also gave recognition with noise makers on each local sale. Mary C. Eustace, my acting manager, and one of the HQ managers were observing one of my calls. After the call, there was an unusual, long wait so- I asked that manager the same questions I asked john. This time I got a definitive answer. He said, "We do not have the money!" I then said, "Let me see if I understand you correctly. You have millions of dollars for internal rep prizes till year's end but cannot shorten that expense and offer a raffle to the public"? He further explained, "We have tried sweepstakes before and they just don't work out."

AT this point, I asked the HQ manager, "Are you sure this whole 'Strategic Selling' is not really downsizing or office closing(s) and you are here under disguise to assess which offices to close and which office to reduce?" He said, "No" and both managers moved away, not sure where they went. In this same week, I asked my immediate …manager, Mary C. Eustace, "Why is it so unusually quiet? Is AT&T shipping all our call volume overseas to test the Market to see how many U. S. union jobs it can cut?" She said, "No it's just really slow." Slow is not the word, the calls were non existent! There would be as much as a half-an-hour between calls.

In the first Friday's 30 minute sell down meeting, we all had to introduce ourselves, give our years of service, our current status, and previous non AT&T jobs held. When I introduce myself … and after I said, "I'll have thirty years in July," one of my peers said, "The lucky duck is … retiring." Last year, I thought of retiring, as well, but obviously I did not, but maybe this year if all goes well.

Also in June, I heard about the Appeals Court's decision on June 4, 2004 to reject the stay that regulated what rates the "Baby Bells" could charge their rivals such as AT&T for leasing that last important mile. This meant that AT&T would not receive those deep discount leasing rates that they had enjoyed for so many years and I was concerned that Fairhaven Call Center would downsize or close, especially because of an AT&T TODAY last December 7, 2004 *** SPECIAL EDITION ***(see enclosed AT&T TODAY Friday, December 7- 4:45 p.m. ET … URGENT UPDATE). That SPECIAL EDITION explained that if regulation oversight of the Bells were wiped out it would make it impossible for AT&T "to compete with the Bells and it would cost thousands of AT&T union jobs." (Also see enclosed AT&T TODAY MONDAY, JUNE 7, 2004 p.m. EDT)

Repeatedly, I asked my acting manager, Mary C. Eustace, if Fairhaven Call Center would downsize or close because of the "Baby Bells" situation and she said, "No." I even suggested she may want to "warm up" her resume. She said she felt secure. "In every workplace managers are told to report what the workers are saying." (See enclosed TELL AT$T: WE ARE READY) Furthermore, "THE SUPREME COURT ALLOWS PHONE RULES TO EXPIRE" on June 14, 2004. (See AT&T TODAY TUESDAY, JUNE 15, 2004 2 p.m. EDT) But, the only concern she had was the concern if I had requested my retirement package, yet. When I said, "No," her snow white complexion turned to apple red. It seemed almost personal to her and she said, "I would be nervous

31

that the package would not be completed on time." I said, "I'm not concerned .... I can always overnight the retirement package; furthermore, you can request the retirement package as early as 90 days before commencement date or as late as two weeks before commencement date." My manager repeatedly continued to ask, "Have you requested your retirement package…and what is your last day in office?" She even took me off the board for said inquiry.

In addition to the above, I had (and still do) health issues with my ears that caused dizziness and tinnitus that actually had me on disability for two days in May. Just before ear health issue and while on call, my ear headset broke, not sure if related to health issue. I was concerned about the broken steel wire protruding out from my ear headset and reported it to Ms. Eustace. We both agreed that some part of wire had broken off but could not locate other part. She said, "Just go and get another headset."

The tinnitus made my ears very sensitive to sound and I asked Ms. Eustace not to use the sale recognition noise makers several times, but she continued to use them despite my request not to. I even went to my attendance manager, Sue Segatore, (a good friend of Ms. Eustace) and asked her to speak to Ms. Eustace about the added noise. She said she would take care of it. Ms. Eustace made a remark while in team area about noise makers and my ears that prompted one of my teammates to ask me, "Well! Bev, which is it? You can't hear well or are your ears sensitive to sound?" Unfortunately, I was compelled to answer and explained, "Sometimes they feel blocked and other times they're sensitive to sound." This created a hostile environment for me about my ear issue and I wondered if it was done intentionally to expedite my request for my retirement package.

In late May (much to my surprise) Ms. Eustace took my exit interview (see enclosed copy of exit interview in The **Fairhaven Flyer** June, 2004 page 5) and customarily this should have been done within a few days of exit date or day of exit date. My last day in office was July 16, 2004 and followed by two weeks of vacation; consequently, my last day on active payroll was July 30, 2004. **On June 18, 2004, I called AT&T Pension Service Center and request the infamous retirement package** that would not take effect until completely filled out. Therefore, Election Period began June 18, 2004 and Election Period ended July 31, 2004. (The **Fairhaven Flyer**, monthly publication, was printed early June.) Something seemed not right. Why not take interview in June and print "We say "farewell" to one of our best. **Bev George will be missed** as she retires after 30 years of service" in the July issue?

Last but not least in June, Mrs. Joan Cappuccio, Region Director, seeks me out in a busy hallway (as I returned from lunch) to introduce me to an out of office management person. Mrs. Cappuccio said, "This is Beverly George and she has 30 years of service and is going to retire." The out of office management person congratulated me on my milestone. I turned to Mrs. Cappuccio and said, "You should be retiring soon, as well." Mrs. Cappuccio, in an indignant and nervous voice, said, "No, No, No, not me." That whole contact seemed to be so intense.

In July, just before Mrs. Cappuccio went on vacation, we meet again in the hallway but this time it was by ASD. She apologized that she would not be able to attend my 30th service anniversary. She intended on spending time with her brother whom she seldom sees. Again, she asked me, "What is your last day in office, Bev?" "July 16, 2004, if all goes well, but I still have two weeks of vacation to follow, so my last day on active payroll should be July 30, 2004," I said. In addition, I told her I was concerned about Supreme Court Justice William H. Rehnquist's decision on June 14, 2004 to let the regulations on the "Baby Bells" expire on June 15, 2004 as originally designed last March. I asked, "Joan, is Fairhaven going to downsize or close because of the "Baby Bells'" deregulation?" Joan said, "No! AT&T Fairhaven has sold the office and the new owner has signed a (5) year lease with AT&T and we will still provide EXCELLENT CUSTOMER SERVICE for our present customers. Furthermore, I'm very excited about our Fairhaven VOIP team already in process." (But this information is not announced until September 3, 2004 – see AT&T TODAY FRIDAY, SETEMBER 3, 2004 and The Standard Times- Friday, September 3, 2004)

Based upon the assurance I was given from AT&T NJ HQ Managers; my immediate manager, Mary C. Eustace, on several occasions; and Joan Cappuccio, Region Director, that AT&T Fairhaven would not downsize or close; I decided to **fill out my retirement package on July 10, 2004.** (See enclosed AT&T Pension Payment Election Form (Side 1) **The final document was sent to Pension Service Center on July 22, 2004.**

On July 16, 2004 last day in office but before my manager, Mary C. Eustace, filled out my Termination Of Employment form ATT190(396), not me, I heard something about Restructuring in the office and asked Ms. Eustace what that was all about. She said, "Just some sales teams that's all." Another odd thing, although she gave me time off the board (and I even had to ask for that), she made me do team paper work and it was customarily to let the employee visit with other managers and employees on their last day to say good-bye. (See enclosed said Termination of Employment form)

At 12:30 p.m. I had my 30th Service Anniversary Luncheon off site via management and guests. The people in attendance were: Chris Giblin, PDL manager; Paulette Racine, manager; Mary C. Eustace, my acting manager; Sharon Pereira, former manager – now separated from AT&T took The Buy Out Package last year; Joan Dyer, an AT&T Retiree; and Jim Bourke, team member. Again, I asked if AT&T was going to downsize or close Fairhaven. The managers said, "No" I said, "You wait- I won't have one foot out the door and Fairhaven will offer an inducement package for voluntary retirement or close." All managers' eyes focused on Chris Giblin who promptly said, "Bev, I want to congratulate you on your milestone of 30 years of service, I know I'll never see mine." (Chris Giblin had 19 ½ years- now gone but maybe able to get recall later) At the Luncheon, I asked Ms. Eustace to make sure that I did not get cheated out of any money. She told me not to worry…she would take care of it for me. (Today, Ms. Eustace, because of the forced reduction, is back with the rank and file as an in charge.)

The **Fairhaven Flyer** (June issue page 4, the article **On your marks… Get set… Have fun !! 2004 Employee Appreciation Day** is in the works By Chris Giblin) advertised

33

there would be a tentative August 12th Employees' Appreciation Day.  Mr. Giblin stated, "We know it has been a very difficult year so far and this annual event is one way of saying that WE APPRECIATED all you do and THANK YOU!!  Well! I worked very hard as well, right up to the last minute, and **as one of their best**, why didn't they invite me?  I could have worn ear plugs for the noise.

Because of our AT&T COMMON BOND:  Respect for Individuals, Dedication to Helping Customers, HIGHEST STANDARDS OF INTEGRITY, Innovation, and Teamwork, I took AT&T'S assurance as golden and true.  Relying on this "true" assurance that the Fairhaven Office was not going to downsize or close; I was wantonly, deceptively, and willfully cheated out of the opportunity to avail myself for a company inducement to voluntarily leave the company due to the  force reduction at Fairhaven. The company inducement would have given me 100 weeks of pay for the 30 years. (At TG5 pay that would have given me 100 weeks x $837 gross weekly pay would have = $83,700 gross – standard deduction to be taken as lump sum or weekly – employees choice) plus my pension; furthermore, I could have delayed my pension by a 100 weeks that would have given me a larger dollar amount on my pension, as well.

I was trying to do the right thing for all parties concerned.  Because of my health issues, I knew I could not last another 5 years (too much stress) and did not want to drain AT&T of its Revenue by being on DISABILITY months on end.... I certainly could have worked a few more weeks and it wasn't like I did not ask before I filled out the retirement package if AT&T Fairhaven was going to downsize or close.  The timeline in this letter, the direct quotes from AT&T officials, the AT&T TODAY ISSUES and STANDARD TIMES ARTICLES all support the fact that AT&T new in June and even as far back as March if the "Baby Bells" were to be deregulated it would cost thousand of AT&T union jobs.  Furthermore, the sale of the Fairhaven building was in direct correlation with the cuts of these union jobs.  "AT&T spokeswomen, Deb Jones said, 'The sale is part of AT&T's continual evaluation of its need for space." (See STANDARD TIMES September 3, 2004; September 14, 2004; October 18, 2004; and October 21, 2004. (Remember, Mrs. Joan Cappuccio told me back in July before she went on vacation that the building had been sold and AT&T secured a 5 year lease. (for further supporting info see AT&T TODAY JUNE 1, 2004 - OCTOBER 21, 2004- hand written outline enclosed plus articles)

Consequently, I want the 100 weeks of inducement pay to voluntarily leave the company that I was cheated out of by AT&T's constant, deceptive lies and I want said payment in a lump sum since I already have my pension that should have also grown for another 100 weeks, as well.  I have been injured twice.  In the words of Winfred A. Eckenreiter, "a local Fairhaven attorney, farmer, and selectman, 'Feels like you've been had.'"  DO NOT LET AT&T ADD CWA TO ITS BEEN HAD LIST by allowing the company to use **ARTICLE 25 – TERMINATION PAYMENTS** NO. 6 (a) as its defense to not make payment requested that would be like the crook on the sidewalk selling stolen watches and is robbed and wants the court to prosecute the robber.  You cannot use a legal binding contract to defend a wantonly, deceptive deed that causes monetary losses, as well.

34

Sincerely,


Beverly A. George
An AT&T Fairhaven employee on active payroll until July 30, 2004

Enclosures: Handwritten references to AT&T TODAY ISSUES and the articles
themselves, copies of THE STANDARD TIMES, and other miscellaneous, supporting
timeline documents.
Cc:  Communications Workers of America
International Union Headquarters
501 3rd Street, N.W.
Washington, D.C. 20001-2797

QUOTE OF THE DAY "When you practice to deceive, what a tangled web you weave."

Beverly A. George
7 Willow Street
Foxboro, MA   02035

November 16, 2004

President Morton Bahr
Communications Workers of America
International Union Headquarters
501 3rd Street, N.W.
Washington, D.C.   20001-2797

Dear President Morton Bahr:

Enclosed you will find a copy of a Grievance sent to Ms. Linda Teoli, President of CWA-Local 1051, with Grievance filed date as 11/16/04.   You will also find a 6 page letter and documents that supports the timeline in said letter.  I am sending you this copy to make sure that the grievance is not physically lost, at the local level.  I am concerned that this may happen because Ms. Teoli, and Ms. Eustace are very good friends.   Please follow up on this Grievance at the national level, as well.  Thank you, President Bahr, for your time.

Sincerely,

Beverly A. George
Union Member ...

P.S. There was another Grievance filed about my pension amount Incident and file date same: 06/29/04, and it was hand carried to Steward Bob Young at AT&T, Fairhaven, MA 02719.  He viewed my Grievance form in front of me and said all set and he would file it.

**CWA GRIEVANCE FORM FOR AT&T OPERATIONS BARGAINING UNIT**

Local _1051_    AT&T _✓_    LUCENT ___

Grievance Numbers:

Local _1051_    C&T _____    Company _AT&T_

*Incidents In June and July while still active AT&T Employee at 200 mill Rd., Fairhaven, MA 02719*
*and →* Incident Date *on* _7/16/04_    Grievance filed _11/16/04_ *Became*
*a ware*
Grievant Name _Beverly A. George_    SS# _030_-_42_-_2116_ *of often*
*on 10/31*
Contractual Job Title _CCA (Fairhaven, MA)_ NCS Date _07/28/74_

ORG _1A28/5020_    Rate of Pay/Wage Level $ _837.00 Includes PEP_

*my*    Work Location _200 Mill Rd. & Bridge St._ City/State _Fairhaven, MA 02719_
*Supervisor's*
*was then*
*Line –* Work Phone # _1508 961-6083_    Home Phone # _(508) 698-6922_ *Daughter's #*
*as CBR.*
Steward _____    Work Phone # _(   )___

Contract Articles (if any) _AT&T should be prohibited from using Article 25 No._
_6 (A) see attached Article_
Issue or Condition creating the grievance _In June and July 2004 on several occas_
_AT&T wantonly, deceptively assured me that AT&T's Fairhaven, MA SSC was not going to downsize or_
_close; Consequently, AT&T knowingly cheated me out of the opportunity to avail myself of the_
_temporary's inducement voluntary leave package._

Remedy Sought _I want the 100 weeks of inducement pay to voluntarily leave the company that I am_
_cheated out of by AT&T's constant, deceptive lies. I want said payment in a Lump Sum - since_
_I already have my pension that should have also grown for another 100 weeks. Further-_
_more, I want my pension to be increased by the loss of growth, as well._

|  | **Date**<br>Meeting<br>Requested | **Date**<br>Meeting<br>Held | **In Attendance**<br>at meeting | | **Date of**<br>Company Written<br>Response |
|---|---|---|---|---|---|
|  |  |  | Union | Company |  |
| Step 1 * | _/_ _/_ | _/_ _/_ | _____ | _____ | _/_ _/_ |

Step 1 may be waived only by parties hearing Step 2 grievances
(Art. 9.2).

Step 2 *

| | _/_ _/_ | _/_ _/_ | _____ | _____ | _/_ _/_ |

* Step 2 may be waived only by parties hearing Step 3 grievances
(Art. 9.2).

Step 3 Appeal request sent to _____ on _/_ _/_.

Final Disposition _____

_____

_____



EXHIBIT
3 (George)
TEC 9-21-05

Page 1

37

Grievant's Statement corporations and personnel accountable when they wantonly deceive an employee for their profit margin. Furthermore, AT&T should be prohibited from using AT&T Corp. and Communications workers of Americas Contract ARTICLE 25 — TERMINATION PAYMENTS No. 6 (a), see enclosed ARTICLE 25, to validate their wantonly, deceivable deed. ARTICLE 25 No. 6 (a) does not apply in this case because you cannot use a legal binding contract to enforce a wantonly, deceptive deed. See enclosed a 7 page letter explaining how AT&T wantonly, deceptively lied by given False assurances and statements that AT&T's Fairhaven CSSC was NOT GOING TO DOWNSIZE or close on several occasions from Acting Managers to NJ HQ managers and leadership teams to AT&T's Fairhaven's CSSC Regional Director.

(use additional pages if necessary)

Signature of Grievant _Beverly A. George_     Date _11/16/04_

### RELEASE OF PERSONNEL AND/OR MEDICAL RECORDS

I, _Beverly A. George_ the undersigned, do hereby grant permission for all Union Representatives involved to examine, review and obtain copies, when necessary, of any and all portions of my personnel and/or medical records maintained by the Company, which are necessary to process a grievance in my behalf.

I understand all information and discussions of a personal nature pertaining to these records or copies of same will be held in strict confidence unless otherwise stated by me.

SIGNED _Beverly A. George_     DATE _11/16/04_

Page 2



**Article 24**

54

compensated for actually relocating their residence, shall be offered the opportunity to move back to the former location with relocation compensation for the lesser of: (1) the termination allowance for which they would have been eligible upon layoff; or (2) $12,000 if the following conditions are met:

1.   the employee is laid off at the new site within three (3) years of placement,

2.   the employee relocates back to the original geographic location,

3.   the employee does not qualify for any other AT&T provided relocation compensation program.

## ARTICLE 25 - TERMINATION PAYMENTS

1   A termination payment, plus compensation for any vacation to which the employee is entitled at the time of leaving the Company, shall be paid to a regular employee who is laid off or may be offered by the Company to an employee as an inducement to voluntarily leave the Company.

2   The termination payment shall be computed in accordance with the following schedule and shall be based on the employee's Net Credited Service and the employee's Adjusted Rate, except that for an employee who received an evening or night differential payment for the week in which the date of the layoff or resignation occurred, the rate of pay shall include the evening or night differential payment.

| YEARS OF NET CREDITED SERVICE | AMOUNT OF PAYMENT |
|---|---|
| Less than 1 year | None |
| 1 year but less than 2 years | 1 week's pay |
| 2 years but less than 3 years | 2 weeks' pay |
| 3 years but less than 4 years | 3 weeks' pay |
| 4 years but less than 5 years | 4 weeks' pay |
| 5 years but less than 6 years | 5 weeks' pay |
| 6 years but less than 7 years | 6 weeks' pay |
| 7 years but less than 8 years | 8 weeks' pay |
| 8 years but less than 9 years | 10 weeks' pay |
| 9 years but less than 10 years | 12 weeks' pay |
| 10 years but less than 11 years | 16 weeks' pay |
| 11 years but less than 12 years | 20 weeks' pay |
| 12 years but less than 13 years | 24 weeks' pay |
| 13 years but less than 14 years | 28 weeks' pay |
| 14 years but less than 15 years | 32 weeks' pay |
| 15 years but less than 16 years | 36 weeks' pay |

**Article 25**

| YEARS OF NET CREDITED SERVICE | AMOUNT OF PAYMENT |
|---|---|
| 16 years but less than 17 years | 44 weeks' pay |
| 17 years but less than 18 years | 48 weeks' pay |
| 18 years but less than 19 years | 52 weeks' pay |
| 19 years but less than 20 years | 56 weeks' pay |
| 20 years but less than 21 years | 60 weeks' pay |
| 21 years but less than 22 years | 64 weeks' pay |
| 22 years but less than 23 years | 68 weeks' pay |
| 23 years but less than 24 years | 72 weeks' pay |
| 24 years but less than 25 years | 76 weeks' pay |
| 25 years but less than 26 years | 80 weeks' pay |
| 26 years but less than 27 years | 84 weeks' pay |
| 27 years but less than 28 years | 88 weeks' pay |
| 28 years but less than 29 years | 92 weeks' pay |
| 29 years but less than 30 years | 96 weeks' pay |
| 30 years but less than 31 years | 100 weeks' pay |
| 31 years but less than 32 years | 104 weeks' pay |

Note: The maximum amount of termination payment shall not exceed twice the basic annual salary plus the applicable differential or one hundred four (104) weeks.

3   The termination allowance shall, at the option of the employee, be paid in a lump sum, less applicable deductions, or as income continuation in periodic installments, subject to the limitations in Subparagraphs (a) and (b) below. If an employee elects to receive income continuation periodic installments, each installment will be equal to one (1) week of the Adjusted Rate, for each week in the employee's normal payroll period, less applicable deductions, and will be paid during the normal payroll period. Income continuation periodic installments shall continue until the earliest occurrence of either of the following events:

(a)   The total amount of the income continuation installments to the employee equals the total amount of termination allowance which the employee is to receive.

(b)   The employee is recalled or rehired as a regular employee by AT&T or any of its affiliates, subsidiaries or entities.

4   Employees who have received or elect to receive a termination allowance in a lump sum shall, as a condition precedent to being recalled or rehired as regular employees of AT&T or any AT&T affiliate, subsidiary or entity, repay that portion of the termination allowance they received that is equal to their Adjusted Rate multiplied by the difference between the number of weeks

55



39

used to compute their termination allowance and the number of weeks (or fraction thereof) from the date of their termination to the date of their recall or rehire as regular employees of AT&T or any AT&T affiliate, subsidiary or entity. Employees who are recalled or rehired as other than regular employees and who are subsequently reclassified as regular employees shall, as a condition precedent to such reclassification, also make repayment pursuant to this Paragraph 4 based upon the difference between the number of weeks used to compute their termination allowance and the number of weeks (or fraction thereof) from the date of their termination to the date of their reclassification.

5. The amount of termination allowance for an individual (1) who has been previously laid off or terminated by AT&T or any AT&T affiliate, subsidiary or entity, (2) who has received termination allowance either in a lump sum or in the form of periodic income continuation installments, (3) who is re-engaged, and (4) who is again laid off or terminated after having been re-engaged, will be calculated as follows:

The number of weeks used to compute the termination allowance net of repayment pursuant to Paragraph 4 shall be deducted from the number of weeks that would be used to compute the termination allowance as of the date that the employee is again laid off or terminated.

6. THE PROVISIONS OF PARAGRAPH 1 DO NOT APPLY IN CASE OF:

(a) An employee leaving the Company voluntarily without inducement by the Company;

(b) An employee on a leave of absence;

(c) An employee transferred to or employed by AT&T Corp., its affiliates or subsidiaries, or their affiliates or subsidiaries;

(d) An employee who is dismissed for misconduct;

(e) An employee who is classified as Term or Temporary at the time they are work completed.

ARTICLE 26 - TECHNOLOGICAL DISPLACEMENT

1. If during the term of this Agreement, the Company notifies the Union in writing that technological change (defined as changes in equipment or methods of operation) has or will necessitate reassignments of regular employees to different job titles involving a reduction in pay or to locations requiring a change in residence, or if a force surplus necessitating any of the above actions exists for reasons other than technological change and the Company deems it appropriate, any regular employee who is in the affected job titles and work locations may elect not to accept such reassignment to a job title

56

---

Article 26

involving a reduction in pay or to a location requiring a change in residence and shall be paid a termination payment. Any such regular employee who refuses to accept a transfer to a job title having the same or greater rate of pay and which does not require a change in residence shall not be paid a termination payment.

2. Employees eligible for a termination payment under the terms of this provision may alternatively elect to participate in the AT&T Option Program (ATTOP) providing they meet the eligibility requirements of that program.

ARTICLE 27 - REASSIGNMENT PAY PROTECTION PLAN

1. If, because of force surplus adjustments, employees are assigned to vacancies where the Standard Rate of pay of the new job is less than the current Standard Rate of the employee's regular job, the rate of pay will be reduced over a period of time based on the employee's length of service. The reductions in pay are effective at periods following reassignment as shown below and are based on the difference between the employee's Adjusted Rate and the Standard Rate to which assigned in the new job title.

| 0-10 YEARS | |
| --- | --- |
| Weeks 1 thru 4 | No reduction |
| Weeks 5 thru 8 | 1/3 reduction |
| Weeks 9 thru 12 | 2/3 reduction |
| Weeks 13 & thereafter | Full reduction |

| 10-15 YEARS | |
| --- | --- |
| Weeks 1 thru 30 | No reduction |
| Weeks 31 thru 34 | 1/3 reduction |
| Weeks 35 thru 38 | 2/3 reduction |
| Weeks 39 & thereafter | Full reduction |

| 15+ YEARS | |
| --- | --- |
| Weeks 1 thru 56 | No reduction |
| Weeks 57 thru 60 | 1/3 reduction |
| Weeks 61 thru 64 | 2/3 reduction |
| Weeks 65 & thereafter | Full reduction |

57





# COMMUNICATION WORKERS OF AMERICA LOCAL 1051
59 Main Street ✲ P.O. Box 703 ✲ Fairhaven, MA 02719
508-961-1405 phone ✲ 508-961-1410 fax

DATE: _12/9/04_

GRIEVANT: _Bev George_

LOCAL 1051 GRIEVANCE NUMBER: _# 04RM63_

TO: _AT&T_ AT&T

DEAR_____,

PLEASE BE ADVISED THAT C.W.A. LOCAL 1051 IS REPRESENTING THE GRIEVANT NOTED ABOVE IN THE FOLLOWING COMPLAINT:
_Employee decieved into Early retirement company knowingly cheated employee by giving false information._

THIS COMPLAINT IS IN VIOLATION OF ARTICLE _25, 12, Common Bond & all others._
OF THE 1995 CONTRACT.

THE GRIEVANT IS SEEKING THE FOLLOWING RESOLUTION:
_100 weeks of inducement pay want my pension where it should be grown for the extra 100 weeks._

C.W.A. LOCAL 1051 REQUESTS A RESPONSE TO THIS LETTER SO WE MAY SET A MUTUALLY CONVENIENT DATE TO MEET WITHIN FOURTEEN (14) CALENDAR DAYS, PURSUANT TO ARTICLE 9.

SINCERELY,

_Jane Nelsen_

LOCAL 1051



EXHIBIT
2 (Georg)
rec 9-21-05

**AT&T**

200 Mill Road
P.O. Box 110
Fairhaven, MA  02719-0110

December 14, 2004

To: Jane Nilsen
    CWA Local 1051

Re: Beverly George #04RM63

The above mentioned grievance was filed beyond the 60-day timeline as per the

Contract Article 9.  Therefore, it will not be accepted by the company.  Generally,

grievances are also not accepted from retired employees, however, this also did not meet

the agreed upon timeline.

Sincerely,

Merilee Hanley
Site Development Leader

CC: Michelle Bliss

00857

42




EXHIBIT
8 (George)

REC 9-21-05

59 Main Street
Fairhaven, Ma  02719
(508) 961-1405 phone
(508) 961-1410 fax

December 17, 2004

Beverly George
7 Willow Street
Foxboro, Ma  02035

Dear Beverly,

Enclosed is the letter from AT&T regarding the grievance we filed on your behalf.
The grievance was filed under article 25, common bond and mutual respect.

However, AT&T will not accept your grievance based on the following conditions.

1) 60 day timeline has past
2) Grievances are not accepted from retired employees

Local 1051 received your grievance the last week of November, the actual file date on the
grievance is November 16, 2004.  The incident date on the grievance is July 16, 2004.  The time
between the incident date and the filed date is roughly 4 months, which is well beyond the 60
days per Article 9.  I am sorry AT&T will not accept the grievance.

In Unity,

Linda Teoli
President

43



Beverly George
7 Willow Street
Foxboro, MA   02035

December 19, 2004

Bill Bates
CWA Representative
Communications & Technologies
Communications Workers of America AFL-CIO, CLC
501 Third Street, N.W.
Washington, D.C.   20001-2797

**RE:  First grievance with Incident Date 06/29/04 with Actual File Date 07/08/04;
Second grievance with additional incident Dates in June and in July, while still an
active employee at 200 Mill Road, Fairhaven, MA   02719, and second grievance
also included Incident Date 07/16/04, as well, but not limited to with Actual File
Date of 11/16/04 (I was still on Active Payroll up to and including Friday, July 30,
2004)**

Dear CWA Representative Bates:

Enclosed you will find two correspondences one from President Teoli dated December
17, 2004 and the other a letter addressed to CWA  Representative, Jane Nilsen, from
Merilee Hanley, Fairhaven's Site Development Leader- pervious Zone 2 SDL, dated
December 14, 2004.  Both correspondences were received in one mailing on December
18, 2004 via certified mail.  Both correspondences carried the same message: "60 day
timeline has past per **ARTICLE 9** and Grievances are not accepted from retired
employees."  ·

Vice President, Bob Young, was hand given grievance with incident date 06/29/04 with
**actual file date** of 07/08/04.  In previous writing to President Bahr, I misspoke file date
but most importantly file dates were within 60days and on active payroll.  (Copy of
grievance with incident date 06/29/04 and actual file date 07/08/04 enclosed)  The
Subject of Incident 06/29/04  and additional Incidents in June and July that also included
July 16, 2004, as well but not limited to with file date of 11/16/04 also referenced same
general subject matter, miscalculation of Pension, and are therefore bounded  together
and thus meet 60 day requirement as set forth in **ARTICLE 9**.  The subsequent grievance
filed on 11/16/04 exasperated the grievance file on 070804.

44

In addition to the above, AT&T pursuant to **ARTICLE 9** has been in violation of **ARTICLE 9** on first said grievance with incident date of 06/29/04 and file date of 07/08/04 on the following but not limited to: **no prompt meeting, no fourteen (14) calendar day written notice of grievance decision; therefore, AT&T has also violated STEPS 1, 2, AND 3 of the grievance process. Remember, "A grievance is a complaint involving the interpretation or application of any of the provisions of this Agreement or a complaint that an employee(s) has in any manner been unfairly treated..." "...The Company and the Union desire to process grievances in an expeditious manner. Accordingly neither party will recess a grievance at Steps 1 or 2 in excess of sixty (60) calendar days."**

Both the Union and the Company knew that my last day on active payroll was July 30, 2004 and to not to process a grievance before that date would be not acting in good faith. Consequently, I am now asking that said grievances be given expeditious acceptance and bring said grievances to resolution without further delay.

Sincerely,

*Beverly A. George*

Beverly A. George

Enclosure: two letters *and two grievances – one with file date 07/08/04 and other with file date 11/16/04.*
Cc:  President Bahr
     Vice President Maly
     President Teoli – Local 1051

P.S. President Teoli received grievance with file date 11/16/04 (that has now been assigned reference #04RM63 via Merilee Hanley) on November 22, 2004 pursuant to UPS tracking no. 1Z R35 W72 03 0093 171 4.

**Communications
Workers of America
AFL-CIO, CLC**

501 Third Street, N.W.
Washington, D.C. 20001-2797
202/434-1302

**Ralph V. Maly Jr., Vice President**
Communications and Technologies





January 19, 2005

Beverly George
7 Willow Street
Foxboro, MA 02035

Dear Ms. George:

After a thorough review of your complaint, I am in support of CWA Local 1051's letter
to you dated December 17, 2004.

The Collective Bargaining Agreement between CWA and AT&T clearly states in
Article 9 "… unless a meeting regarding the grievance is requested in writing within sixty
(60) calendar days of the action…".  Unfortunately, AT&T is correct in not accepting this
grievance.

Sincerely,

Bill Bates
CWA Representative
Communications & Technologies

Cc:     Jerry Klimm

BB: sc
Opeiu#2, afl-cio

46






Beverly George
7 Willow Street
Foxboro, MA   02035

January 24, 2005

President Morton Bahr
Communications Workers of America
AFL-CIO, CLC
501 Third Street N.W.
Washington, D.C. 20001-2797

**RE:  Rep Bill Bates's January 19, 2005 letter**

Dear President Morton Bahr:

Please find enclosed a copy of Rep Bill Bates's January 19, 2005 letter.  Although I appreciate his thorough review, it is apparent that he does not understand the full gravity of the two grievances.  He only references one grievance where clearly there are two and the first grievance fully meets the guideline pursuant to **ARTICLE 9** but has not been acted upon in good faith.  (See grievance date 06/29/04 – note: on active payroll through July 30, 2004)

Consequently, the window of opportunity for resolve should still be open.  I am asking you to have the Union's Attorneys to do a full investigation to see what happen to the first grievance.  The first grievance is a spring board to the second grievance because of the subject matter, wrong calculation of monthly pension amount.   AT&T should not be able to release itself from liability by not acting in good faith.  Clearly their actions have outlined their intent.

For your convenience, I am also enclosing copies of said grievances.  In advance, I am thanking you for your anticipated cooperation.

In unity for life,


Beverly George
cc: Rep Bates
Enclosure: Rep Bates's January 19, 2005 and two grievances with incident dates of 06/29/04 and 07/16/04.  Furthermore, **07/16/04** represents more than 1 day and **not aware of damages until 10/31/04 and once aware filed grievance on 11/16/04.**

**47**



**Communications**
**Workers of America**
AFL-CIO, CLC

501 Third Street, N.W.
Washington, D.C. 20001-2797
202/434-1234  Fax 202/434-1219

Legal Department



February 14, 2005

Ms. Beverly George
7 Willow Street
Foxboro, MA 02035

Dear Ms. George:

Your inquiry to President Bahr has been referred to me. I have reviewed the file sent to me by Rep. Bates. His conclusion that your grievance is untimely is correct. I will explain.

You prepared a grievance showing an "Incident Date" of 6/29/04. You signed this grievance on 7/08/04. The grievance claimed that the company had incorrectly calculated the amount of the monthly pension you would receive when you retired on July 30, 2004. Shop Steward Robert J. Young has advised the Union that he discussed your pension calculations with you when you got a grievance form from him. He told you that you would have to discuss the calculations with the Pension Service Center. Several days later you gave him the completed grievance form (with the Incident Date of 6/29/04) and a file. Mr. Young said he would investigate the matter for you. When Mr. Young called Local 1051 District Vice President Julie Marks and related your pension calculation concerns, he was told that you had already spoken with the Pension Service Center about your concerns and that the issue was resolved. A few days before you actually retired Mr. Young discussed the matter with you. He told you that he did not believe your grievance was of merit. He asked you why you had not told him that you had already discussed the pension calculation issue with the union, the company, and the Pension Service Center. Since he believed the matter was resolved, he did not file your grievance.

I would note that the filing of a grievance with regard to a pension calculation is not quite the correct way to proceed. Although a grievance may result in a pension question being resolved, a grievant must also be aware that if he/she disagrees with a pension calculation, they must appeal such decision to the company's Benefits Committee. Grievances concerning pension calculations involve the "administration of the pension plan" and cannot be brought to arbitration in accordance with Article 19.4 of the collective bargaining agreement with AT&T. Since the Union cannot arbitrate a grievance relating to

48



an alleged incorrect pension calculation, your only recourse would be to hire an attorney and file an appropriate action pursuant to the Employee's Retirement Income Security Act (ERISA). However, before you can file an ERISA lawsuit you must first comply with the Pension Plan's procedures and appeal to the Benefits Committee.

On or about 11/16/04 you signed a grievance showing an "Incident Date" of 7/16/04, and claimed that AT&T had deceived you, and thereby deprived you, from receiving 100 weeks pay as an inducement to voluntarily leave the company. The grievance argues that AT&T should not be allowed to rely upon Article 25 of the Agreement because of its deception. The grievance is untimely on its face. The company would not accept the grievance because it is untimely. Local 1051 President Linda Teoli advised you by letter dated December 17, 2004, that the company had not accepted the grievance because it is untimely. CWA Representative Bill Bates advised you by letter dated January 19, 2005, that the grievance is untimely. The Agreement allows the company to offer a termination payment "to an employee as an inducement to voluntarily leave the Company" (Article 25.1). You are not eligible to receive a termination payment because you voluntarily had left the company [Article 25.6 (a)]. An arbitrator can only enforce the contract as written. An arbitrator lacks the authority to block the company from relying upon the clear language of Article 25.

In sum, your grievance regarding your pension calculation was not filed, and your grievance claiming that you are entitled to termination pay due to the company's deceptive statements is untimely. Your only recourse with regard o the allegedly incorrect pension calculation is to file an ERISA action after the Benefits Committee has first reviewed and then rejected your claim. You need to discuss your pension calculation claim with an ERISA attorney.

Sincerely,

Fred Cory

Frederick W. Cory
Headquarters Counsel

cc:    Morton Bahr
       Ralph Maly
       Bill Bates
       Linda Teoli, President, CWA Local Union



## Fairhaven Visitors

Over the past couple of weeks we have been fortunate to have a couple of important visitors to our Center. Nancy Pryor, Consumer Long Distance Vice President and Howard McNally Co President AT&T Consumer, stopped by to talk about the direction our new company will be taking next year.

Next year, Nancy will be responsible for all of the Long Distance consumer segment, including Global and Domestic. During her visit she had an opportunity to meet the Managers and hold a focus session with representatives from on line and offline work functions. Nancy described Fairhaven's role next year, as we continue to service Long Distance customers, as that of a "flagship center". She will be looking to us to continue providing the excellent customer service we have traditionally delivered and be a trial center for new offers in the Long Distance marketplace. She also sees a strong focus on sales and recognized the history we have had in delivering outstanding results in this area.

Nancy answered direct questions about the center closing by reassuring us that there are no plans to close the center. Although there are no plans to hire, she reinforced that people should not be concerned about the size of the center. People also asked about the outsourced centers and expressed concern over their performance. Nancy responded that the outsourced centers will continue to play an important role in the success of the company. She will be looking to enhance the training and feedback processes and will look to our center to be a role model for the other

centers.  We all look forward to working with Nancy next year.

Our next visitor, Howard McNally, addressed a conference room filled with a cross section of all employees. 140 people met Mr. McNally as he delivered a look into the future of the AT&T Consumer Company.  He answered questions for over an hour regarding issues surrounding stocks, the future of Fairhaven, the future of Long Distance and outsourced centers.

Mr. McNally also responded that there were currently no plans to close Fairhaven in 2001.  He pointed out that operational business plans are only completed through 2001 and that's why he can only reference next year. He reinforced that the best way to assure longevity is to keep delivering the numbers we have been achieving, pointing out he was familiar with our 61.7% One and Done results.

Mr. McNally was highly optimistic and enthusiastic about the future of our new AT&T Consumer Company. He clarified that although we will be a tracking stock with assets still held by the parent company, we will have every opportunity to succeed as our own company.

# RESPONSE



**RUMOR**: THE CHANNEL WILL ANNOUNCE THE CLOSING OF THIS CENTER AS OF OCTOBER 2002. IS THIS TRUE?

**RESPONSE**: NO! There are currently no plans to close this center. As a matter of fact, we recently completed exercises such as headcount and expense projections for next year's budget. We also have target dates of desktop transformation initiatives that extend throughout next year. I realize this is something we would like to hear every now and then, so I expect this same question every several months!

As a reminder, we can all help with make sure this rumor does not come true by keeping our absence numbers down and our value through excellent sales and customer satisfaction results up!

I expected this one!

*JOAN*





```
Requested by: bgeorge                                                    AT&T
Date         : 04/24/03
Time        .: 09:08:11                                          Mail Inbox


From          Subject                  Sent Date/Time               Type
ekramer       Message from Joan        04/24/03 08:18am EDT         mail
```

To All Employees,

The rumors in regards to Fairhaven closing are NOT TRUE!
We are having visitors to the site tomorrow to celebrate our
Winning Spirit event. There will be NO closing announcements.
If you have any information concerning the origin of this
rumor please share with your managers so we can put a
stop to this falsehood.

Joan Cappuccio
Region Director


                              AT&T Proprietary
                    Use pursuant to company instructions

Page 1

Volume: I
Pages: 1-113

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
Civil Action No. 05 11079(DPW)

- - - - - - - - - - - - - - - - - - x

BEVERLY A. GEORGE,

        Plaintiff,

    v.

AT&T CORP.,

        Defendant.

- - - - - - - - - - - - - - - - - - x

DEPOSITION OF JOAN GALLAGHER CAPPUCCIO
Thursday, January 12, 2006, 11:15 a.m.
Blake J. Godbout & Associates
33 Broad Street - 11th Floor
Boston, Massachusetts 02109
----- Reporter:  Toni F. Beckwith, RMR -----

Toni F. Beckwith, Registered Merit Reporter
50 Winsor Avenue
Watertown, Massachusetts 02472
Tel: 617.924.2731
Fax: 617.924.9899

---

Page 2

1  APPEARANCES:
2
3  BLAKE J. GODBOUT & ASSOCIATES
4  By Blake J. Godbout, Esquire
5  33 Broad Street - 11th Floor
6  Boston, Massachusetts 02109
7  Counsel for the Plaintiff
8
9  MORGAN BROWN & JOY, LLP
10  By Nathan L. Kaitz, Esquire
11  200 State Street
12  Boston, Massachusetts 02109
13
14
15
16
17
18
19
20
21  COPY
22
23
24

---

Page 3

1           I N D E X
2  Deposition of:  Direct Cross Redirect Recross
3  JOAN GALLAGHER CAPPUCCIO
4  By Mr. Godbout    4
5
6
7
8         E X H I B I T S
9  No.                          Page
10
11  1      Renotice of Deposition      5
12  2      Document Entitled AT&T
13         Today dated 12/7      53
14  3      AT&T News Letter dated
15         3/10/04      56
16  4      Response      61
17  5      Two-Page Typewritten
18         Note      63
19  6      Typewritten Note      69
20  7      Document Entitled
21         Monthly CS&S Call Handling  71
22  8      Photocopy of The Standard
23         Times Article      85
24

---

Page 4

1      P R O C E E D I N G S
2      MR. GODBOUT:  Usual stipulations?
3      MR. KAITZ:  Yes.
4      MR. GODBOUT:  What about reading?
5      MR. KAITZ:  Reading and sign, but
6  waive the notary.
7      MR. GODBOUT:  30 days?
8      MR. KAITZ:  30 days is fine.
9      MR. GODBOUT:  Why don't you swear the
10  witness, please.
11
12      JOAN GALLAGHER CAPPUCCIO,
13  having been satisfactorily identified by the
14  production of her driver's license, and duly
15  sworn by the Notary Public, was examined and
16  testified as follows:
17
18      DIRECT EXAMINATION
19  BY MR. GODBOUT:
20      Q.  Could you please identify yourself for
21  the record?
22      A.  Joan Gallagher Cappuccio.
23      MR. GODBOUT:  Let's mark this as the
24  first exhibit.  This is the notice of

Page 5

1  deposition.
2      (Exhibit 1 marked
3      for identification)
4      Q.  Mrs. Cappuccio, you are the same Joan
5  Cappuccio who was an employee of AT&T in the
6  year 2004?
7      A.  Yes.
8      Q.  And you're here in accordance with
9  this notice of deposition seeking your
10  testimony?
11      A.  Yes.
12      Q.  May I call you Mrs. Cappuccio or
13  Mrs. Gallagher?
14      A.  Cappuccio.
15      Q.  Have you ever been deposed before?
16      A.  Been where?
17      Q.  Have you ever been deposed before?
18      A.  I think I was once, years ago.
19      Q.  Well, I'm going to be asking you a
20  series of questions.  The first rule is you're
21  going to have to respond verbally, and you can't
22  nod or shake your head or --
23      A.  Mm-hmm.
24      Q.  -- say mm-hmm.

Page 6

1      A.  Yes.
2      Q.  The second is let me get my question
3  out even though you think you may know my
4  question and allow the stenographer to deftly
5  transcribe this discussion, which is essentially
6  what a deposition is, without impediment.
7      If you have any questions, for
8  instance, you don't understand the question that
9  I've asked you or you are unable to answer the
10  question, please say so.
11      A.  Okay.
12      Q.  I'll attempt to rephrase the question
13  if I can.
14      If at any time you would like to speak
15  to counsel -- I don't know, are you an employee
16  of AT&T?
17      A.  Yes.
18      Q.  Counsel here is on behalf of your
19  employer.  If you wish to speak with counsel,
20  feel free.  I'll presumably ask that you answer
21  the question before you take the break, but then
22  you can go outside and talk privately for as
23  long as you wish.
24      A.  Okay.

Page 7

1      Q.  I realize we're starting late.  We
2  originally scheduled this for 10:00 but because
3  of a court appearance, I couldn't get out.  I do
4  have lots of questions, and I'll try to be as
5  efficient as possible.
6      A.  Okay.
7      Q.  With that, why don't we just start
8  off.
9      A.  Sure.
10      Q.  Just tell me where you reside.
11      A.  I reside in Fairhaven, Massachusetts.
12      Q.  The address?
13      A.  Eight Hacker Street.
14      Q.  Would you spell that for the record?
15      A.  H A C K E R.
16      Q.  How long have you resided there?
17      A.  Since May of '99, so seven years.
18      Q.  Are you currently employed?
19      A.  Yes.
20      Q.  Who are you employed with?
21      A.  AT&T.
22      Q.  Could you tell me your current title?
23      A.  Group manager.
24      Q.  And group manager for any division?

Page 8

1      A.  Consumer sales and services.
2      Q.  A particular region of the country?
3      A.  For Fairhaven CSSE.
4      Q.  Is there a particular area of the
5  country that this CSSE relates to?
6      A.  It resides in Fairhaven,
7  Massachusetts.
8      Q.  Is there a geographic area that fits
9  within your job responsibility?
10      A.  I don't understand.
11      Q.  Are you the manager for the New
12  England area?
13      A.  Well, for that call center.
14      Q.  And the call center, what area does
15  the call center receive calls from?
16      A.  It handles calls from all over the
17  country.
18      Q.  I see.  Could you just give me a brief
19  summary of your educational background?
20      A.  I completed three-plus years of
21  college.  I've been to Holyoke Community
22  College; I completed my third year at University
23  of Massachusetts Amherst; then attended classes
24  at Worcester State College; Merrimac Valley

1    Q. Is that operator directory assistance?
2    A. Correct. Not directory assistance,
3  I'm sorry.
4    Q. Operator call assistance?
5    A. Right.
6    Q. When you describe yourself as a
7  district manager, is that for an area larger
8  than the New England states that you mentioned
9  previously?
10   A. Yeah. It was national. The last two,
11  the training job was national and the district
12  manager of training was national.
13   Q. What were those job responsibilities
14  for the district manager?
15   A. Basically it included all
16  responsibility for training development,
17  training delivery, writing the methods and
18  procedures as far as having people to do that,
19  ensuring that all training was completed in a
20  timely manner in every center.
21   Q. This was on a national level?
22   A. Right. Correct.
23   Q. So you were based in Boston?
24   A. Right.

1    Q. How long did you remain in this job?
2    A. Until I came to Fairhaven. So I want
3  to say I was only at the district level for
4  about a year before I came to Fairhaven, so that
5  would have to be '97 to '98.
6    Q. So you started working at the
7  Fairhaven facility sometime in 1998?
8    A. December of 1998.
9    Q. What were your responsibilities
10  initially in Fairhaven?
11   A. It was the center manager for
12  Fairhaven, but it was at a larger scale than
13  some of the previous positions.
14   Q. What was the difference, or as you
15  explained to me, the difference in job
16  responsibilities between being a district
17  manager on a national level and your job
18  responsibilities at Fairhaven?
19   A. Okay. The district manager for
20  training, again, was for one specific area of
21  responsibility, and that involved everything
22  associated with training, methods, procedures;
23  the position in Fairhaven was overseeing the
24  very specific operation of Fairhaven. It

1  differed in the respect that from a national
2  perspective, I still worked with my peers across
3  the country for consistency purposes and had
4  been on a lot of national teams. But the
5  responsibilities primarily focused on the
6  operations within the center.
7    Q. Was this the first time that you had
8  had those types of responsibilities?
9    A. No.
10   Q. Where in your job history did you have
11  similar responsibilities that you encountered in
12  Fairhaven?
13   A. The Brattleboro -- managing the center
14  in Brattleboro, Peabody, the Tewksbury, the
15  Salisbury. The center management support
16  functions were very similar, if not the same, in
17  Fairhaven. It's just that there was 1,000
18  people there.
19   Q. Was the switching jobs from district
20  manager to Fairhaven site supervisor -- is that
21  the title?
22   A. Well, at the time it was region
23  director.
24   Q. Was that considered a promotion in

1  your view?
2    A. No. I was acting as in the district
3  level for the training organization, and it was
4  a permanent position, so it was the same level
5  or lateral move, but more on a permanent basis.
6    Q. I see. That's the functional word,
7  "permanent"?
8    A. Right.
9    Q. When you went to AT&T/Fairhaven, was
10  there directory assistance calls there?
11   A. Not to my recollection, no.
12   Q. But there were individuals there that
13  had a previous career history with AT&T or New
14  England Telephone and they had been operators,
15  correct?
16   A. Correct.
17   Q. What kinds of services were the
18  employees, someone like Bev George, performing
19  at the Fairhaven facility?
20   A. They were doing billing, answering
21  billing questions. This was now, in comparison
22  to call servicing, this was now the consumer
23  sales and servicing organization and handle
24  customers' inquiries for billing questions,

1  sales.
2      Q. When you were in the Peabody office,
3  did they do any sales in that office?
4      A. I don't recall that we did, no.
5      Q. So in Peabody, the primary function
6  was, we'll say, caller assistance related
7  functions?
8      A. Correct.
9      Q. Did Fairhaven exist while Peabody was
10 in existence, or was it created anew for another
11 purpose?
12     MR. KAITZ: Objection. Do you
13 understand the question?
14     Q. You can answer the question. He's
15 objecting to form, so you can answer.
16     A. Thank you.
17     MR. KAITZ: That's right.
18     Q. He's not instructing you not to
19 answer, so feel free to...
20     A. Did...
21     Q. Do you want me to rephrase it?
22     A. Yes.
23     Q. When you went to Fairhaven, was that a
24 preexisting center?

1      A. It was fairly new in '97.
2      Q. Why was it established, for what
3  purpose, organizational purpose?
4      A. I don't know specifically. I wasn't
5  there when it was established.
6      Q. Were operators doing caller
7  assistance-type services at the Fairhaven
8  center?
9      A. Not to my knowledge.
10     Q. We know that the operators were not
11 acting as sales associates in the Peabody
12 office?
13     A. No.
14     Q. While you were there?
15     A. No.
16     Q. They were doing operator assistance
17 telephone calls. Were they doing any directory
18 assistance?
19     A. I don't believe so.
20     Q. Did you ever close down the Peabody
21 office?
22     A. No.
23     Q. Is it still operational?
24     A. I don't believe so.

1      Q. When did the Peabody office close?
2      A. I really don't know.
3      Q. But it was sometime after you left in
4  '94?
5      A. Around there. Maybe it was after I
6  left.
7      Q. Do you know when it closed?
8      A. I don't know exactly.
9      Q. But you were not involved in the
10 shutdown of that office?
11     A. No.
12     Q. Now, when you went to the Fairhaven
13 facility, you were a site supervisor?
14     A. Basically, yes.
15     Q. At the Fairhaven facility, was there
16 anyone that you reported to?
17     A. No.
18     Q. So it's fair to say you were the
19 person who was in charge of the whole facility?
20     A. Yes.
21     Q. Could you just tell me, as detailed as
22 you possibly can be, your responsibilities at
23 the Fairhaven facility?
24     A. Okay. My responsibilities involved

1  supporting the -- just the goal attainment of
2  the entire center. So that included meeting
3  objectives that were set for the center around
4  staffing, hiring, training and, again,
5  supporting an organization who has
6  responsibilities for doing that, but basically
7  overseeing individuals who would hire, train,
8  develop, coach customer contact associates.
9      I was responsible for the budget,
10 management of it. I was basically, I guess you
11 could say, the Fairhaven representative outside
12 the center providing the field perspective on
13 multiple national issues that might be
14 occurring, management education, communication,
15 cascading information.
16     Q. Where was the Fairhaven facility
17 located, the address?
18     A. 200 Mill Road.
19     Q. You said that the Fairhaven facility
20 was established in 1997 or '98?
21     A. '97.
22     Q. Do you know who owned the real estate?
23     A. AT&T, at that time.
24     Q. At that time. You moved there in

Page 49

1  1999?
2      A. '98. December of '98.
3      Q. So it's fair to say your employment
4  there was basically at the beginning of the
5  opening of this building as an AT&T facility?
6      Obviously there are employees there
7  besides yourself?
8      A. Correct.
9      Q. How many employees?
10     MR. KAITZ: In December of '98 now?
11     MR. GODBOUT: Yes.
12     A. In December of '98, there were about
13  900 in December, and then we continued hiring.
14  At its height it was over 1,000.
15     Q. What time period did it reach its
16  height?
17     A. '99 into 2000, maybe early 2000.
18     Q. Now, what type of -- this is a tough
19  question. You had 900 employees there?
20     A. Mm-hmm.
21     Q. If it was a factory, I could say to
22  you how many were in manufacturing and how many
23  were in -- but that's not the case. It wasn't a
24  factory, correct?

Page 50

1      A. Mm-hmm.
2      Q. It was a service facility. What types
3  of services did it provide for AT&T and its
4  customers?
5      A. It provided response to billing
6  inquiries, adjustments to customer calls when
7  customers made errors in dialing. It provided
8  sales for customers calling in.
9      Q. Now, the individuals that responded to
10  sales inquiry, these are associates? You call
11  them associates?
12     A. Yes.
13     Q. Is that the term that you would
14  designate for those types of employees?
15     A. Yes.
16     Q. Are they sales associates?
17     A. No. They're called customer contact
18  associates.
19     Q. We'll just call them associates then
20  for --
21     A. Okay.
22     Q. Did the associates that dealt with
23  sale inquiries also deal with billing inquiries?
24     A. Yes.

Page 51

1      Q. Was there any internal demarcation
2  between the associates as it applied to
3  different responsibilities as they dealt with
4  the public?
5      A. At different points in time there was.
6      Q. Why don't you tell me, starting when
7  you were first there in 1998, did you have a
8  demarcation for different associates and
9  different tasks or were they all doing the same
10  thing?
11     A. I'm thinking.
12     (Pause)
13     A. I don't remember.
14     Q. You don't remember. Do you remember
15  in 2004 whether everyone basically sitting there
16  at a desk fielding questions for sales and
17  billing inquires or were there -- again, this is
18  just about a year and a half ago?
19     A. There were times when we had what we
20  call sales teams where we specifically grouped
21  individuals who had a higher sales selling skill
22  set into particular teams.
23     In 2004 I believe we had a sales team
24  environment. That doesn't mean they did

Page 52

1  anything totally different. But when you talk
2  about is there a demarcation, there really was
3  between a sales team and a non-sales team,
4  however the expectations were the same.
5      Q. Now during the time period of its
6  opening?
7      A. Mm-hmm.
8      Q. How many floors in the building did
9  AT&T occupy in the beginning of 1998, 1999?
10     A. Three on one side; two on the other.
11     Q. Did you sublease any of that space out
12  to anybody else?
13     A. No.
14     Q. So it's fair to say that AT&T occupied
15  the entire building?
16     A. Yes.
17     Q. Is that the case today?
18     A. No.
19     Q. Does it still occupy any part of the
20  building?
21     A. Yes.
22     Q. Approximately how many floors?
23     A. One half.
24     Q. One half of a floor?

13 (Pages 49 to 52)

Page 61

1    testimony that the regulatory change as set
2    forth within this Exhibit 3 and Exhibit 2 would
3    not have any impact on the Fairhaven facility?
4         MR. KAITZ: Objection.
5         A. I wouldn't know.
6         Q. You have no recollection of any
7    discussions with anyone, your peers or
8    otherwise, detailing that the Fairhaven facility
9    would be impacted; it would have been impacted
10   by the promulgation of this change?
11        MR. KAITZ: Objection.
12        A. Not the date that -- you're saying the
13   date this came out where I saw this? No. We
14   didn't run around and say what's going to happen
15   for Fairhaven.
16        Q. Okay.
17        MR. GODBOUT: I'm going to be
18   referring to these documents here (indicating).
19        MR. KAITZ: Okay.
20        (Exhibit 4 marked
21        for identification)
22        Q. I'd like to show you this document
23   that's been produced by AT&T.
24        (Pause)

Page 62

1         A. Okay.
2         Q. This has been marked Exhibit 4. Do
3    you recognize this document?
4         A. Yes.
5         Q. It's signed Joan?
6         A. Yes.
7         Q. Is that you?
8         A. Yes.
9         Q. At the top it says Response?
10        A. Yes.
11        Q. Is it fair to say that this document
12   was in response to rumors that were going --
13        A. Yes.
14        Q. That were circulating through
15   Fairhaven?
16        A. Yes. It was a rumor board response.
17        MR. KAITZ: I'm going to object to
18   these questions just in one sense. You referred
19   to it as "this document," but really you have
20   two separate documents marked as Exhibit 4
21   because the first page is separate and apart
22   from the second and third page.
23        A. Yes.
24        Q. Okay. Well, then, why don't we just

Page 63

1    say for the record that this was prepared this
2    way for me, and so I presumed that it was one
3    document.
4         A. Okay.
5         Q. So Exhibit 4 has three pages, correct?
6         A. Yes.
7         Q. And the first page was an independent
8    document?
9         A. Yes.
10        Q. And then the other two also are an
11   independent document as well?
12        A. Yes.
13        Q. So why don't we separate it, and we'll
14   make the next document, the other two pages,
15   Exhibit 5.
16        (Exhibit 5 marked
17        for identification)
18        Q. There will be no confusion. For the
19   record, could you please identify what Exhibit 5
20   consists of?
21        A. It appears to be a communication to
22   employees in regards to Fairhaven visitors.
23        Q. Did you prepare that document?
24        A. Yes.

Page 64

1         Q. Let's go back to Exhibit No. 4. You
2    indicated there was a rumor board?
3         A. Yes.
4         Q. What was the rumor board? What is the
5    rumor board?
6         A. It was an attempt to respond to
7    numerous rumors that would circulate through a
8    center that was a substantial size. It was a
9    suggestion -- because I was constantly
10   responding to rumors -- that we just have an
11   opportunity for employees to put in their
12   questions around what they've been hearing.
13        Q. So --
14        A. And I would pose responses.
15        Q. This rumor board was at the Fairhaven
16   facility?
17        A. Yes.
18        Q. Where was it located?
19        A. I believe it was down near the ASD
20   operation center. It was somewhere off the
21   lobby.
22        Q. What does ASD mean?
23        A. Associate support desk.
24        Q. Was this a board in which employees

Page 65

```
 1  could lodge their complaints and questions?
 2      A.  No.  I believe this was just
 3  specifically targeted at rumors.
 4      Q.  Would an employee post a rumor and
 5  then you would respond, or was this something in
 6  which management was using as a vehicle to
 7  address rumors?
 8      A.  Both.
 9      Q.  So explain it to me.
10      A.  I believe we had a box that was
11  available to employees.  If they had heard
12  rumors and they wanted me to respond to
13  something, that they could submit it.
14          Another use was for me, when my
15  managers would say things like, Joan, there's an
16  awful lot of questions, people heard we were
17  closing again, so maybe it's time to continue to
18  respond.  So I would use them both.
19          But I did get this one from, as it
20  says, a submittal.
21      Q.  In October, was this the first time
22  that you had posted a response to a rumor that
23  the Fairhaven facility was closing, in October
24  of 2002?
```

Page 66

```
 1      A.  I don't believe so, because I
 2  responded to it for seven years.
 3      Q.  So is it fair to say that there had
 4  been a rumor that the Fairhaven facility was
 5  going to close from its inception?
 6      A.  Yeah, almost.
 7      Q.  And not getting into whether they were
 8  accurate or not, what was the basis upon which
 9  the rumors were being generated as to why -- why
10  were people saying it was going to close?
11          MR. KAITZ:  Objection.
12      A.  I can guess.
13      Q.  Why do you think people were saying it
14  was going to close?
15      A.  I think there were a lot of employees
16  who had come from centers that had closed, had
17  been in closing centers.  I had a large
18  contingency of people from Providence CSSC.
19          I don't know what year they closed,
20  but they did close that facility, and I think
21  people were surprised to see another center
22  opening up in the south coast area, basically.
23          So people came in being very skeptical
24  about the longevity of the center.  So we
```

Page 67

```
 1  constantly, even during hiring phases, how long
 2  would the center stay open.
 3      Q.  So it was a frequent topic?
 4      A.  Yes.
 5      Q.  And this is how you responded to them,
 6  by posting this document on the rumor board?
 7      A.  That was one way, yeah.
 8      Q.  Were there any other ways?
 9      A.  I had meetings.  It always came up.
10  If I had meetings with employees:  What are you
11  hearing, are we closing.
12      Q.  Would you have personal conversations
13  with employees on the topic?
14      A.  Sure.
15      Q.  With regard to this Exhibit 5?
16      A.  Mm-hmm.
17      Q.  Do you remember when this document was
18  prepared?
19      A.  I really don't.  Nancy just started.
20  McNally was still there, so it had to be maybe a
21  similar time frame, 2002.  I don't know.  I'm
22  guessing.
23      Q.  Well, I note here on Page 2 in the
24  third paragraph?
```

Page 68

```
 1      A.  Okay.
 2      Q.  We currently have no plans to close
 3  Fairhaven in 2001?
 4      A.  Okay.  Sorry.
 5      Q.  So it would appear that Exhibit 5
 6  referenced a visit by Mr. McNally sometime in
 7  the year 2001?
 8      A.  Yes.
 9      Q.  And it would also seem to indicate --
10  or earlier because it says here that he has no
11  current plans to close in 2001?
12      A.  Yes.
13      Q.  And it would appear, then, that the
14  closure rumor was certainly about in 2000?
15      A.  Mm-hmm.
16      Q.  Is that a yes?
17      A.  I'm sorry.  This rumor (indicating)?
18      Q.  The rumor about the closing of the
19  Fairhaven facility.
20      A.  Right.
21      Q.  It was about or floating about in the
22  year 2000?
23      A.  Yes.
24          MR. GODBOUT:  Can we take a little
```

17 (Pages 65 to 68)

Page 69

```
 1    break.  It's been an hour and a half.
 2        (Lunch recess taken)
 3    BY MR. GODBOUT:
 4        Q.  You're still under oath.
 5        A.  Okay.
 6        (Exhibit 6 marked
 7         for identification)
 8        Q.  Next document, No. 6.  I'll just show
 9    you a document and see if you can identify that
10    for the record.
11        A.  Yes.
12        Q.  What is it?
13        A.  It's an e-mail message I sent to all
14    employees responding to a rampant rumor that we
15    had at the time that we were having visitors the
16    next day, which they knew, but they thought --
17    the rumor was that the intent of the visit was
18    to announce the center closing.
19        Q.  And was that the intent of the visit?
20        A.  It was to attend a Winning Spirit
21    Event which was a recognition event.
22        Q.  The Winning Spirit Event was for the
23    winning spirit at the Fairhaven center?
24        A.  Right.  It's an organizational award
```

Page 70

```
 1    that each center hosts some of their top
 2    three percent performers, and we usually have
 3    vice presidents come in to recognize the people,
 4    the top performers.
 5        Q.  I note that the date is April 24,
 6    2003?
 7        A.  Mm-hmm.  Yes.
 8        Q.  And a performance award or some sort
 9    of award recognition was going to be announced
10    or celebrated the next day?
11        A.  Winning Spirit Event tomorrow, yes.
12        Q.  And was that for facility performance
13    for 2002?
14        A.  Yes.
15        Q.  You say that the facility's rating was
16    in the top three percentile?
17        A.  No.  The individuals receiving the
18    award were the top three percent in the
19    facility.
20        Q.  I see.  Was the facility a
21    well-performing facility?
22        A.  Yes.
23        Q.  In 2002?
24        A.  In 2002?  We've always done very well.
```

Page 71

```
 1    As far as being the top performing, I'm trying
 2    to think.  Usually when I win the award it's for
 3    an outstanding year for the entire facility, and
 4    I won it in 4 and 2003.
 5        Q.  You won it in 2004 and 2003?
 6        A.  2003 -- what's the year?  I won it for
 7    2003 and 2005.
 8        Q.  I'd like to show you another document.
 9    This is Exhibit 7.
10        (Exhibit 7 marked
11         for identification)
12        Q.  This is a three-page document.  So we
13    don't make the same mistake, why don't you take
14    a look at it and make sure I prepared it
15    accurately as a three-page document.  And also
16    if you could identify what that document is.
17        A.  Yes.  This is a three-page document
18    which is basically one report that we have that
19    identifies basically the answer performance
20    metrics within a center by month including
21    calls, speed of answer, abandons, handle time.
22        Q.  Directing your attention to -- it says
23    Fairhaven.  This refers to the Fairhaven
24    facility?
```

Page 72

```
 1        A.  Correct.
 2        Q.  Is it possible to determine what year
 3    this is?
 4        A.  I don't see it on here.
 5        MR. KAITZ:  It's the year called for
 6    in the production.
 7        MR. GODBOUT:  I believe we'll say,
 8    then, 2004.
 9        MR. KAITZ:  Correct.
10        MR. GODBOUT:  I don't want to put
11    words in her mouth.
12        MR. KAITZ:  I understand.
13        Q.  This inquiry is for the year 2004
14    because it was produced in accordance with that
15    request.
16        Looking across the top, the word ASA,
17    what does that reflect?
18        A.  Average speed of answer.
19        Q.  And percentage ANS?
20        A.  Percent of calls that were answered.
21        Q.  ANS?
22        A.  Answered calls.
23        Q.  ABN?
24        A.  Abandon.
```

1    Q. It would seem to me --
2    A. I do it weekly. I weekly look at
3 volumes and talk about do we need overtime, do
4 we need E time, what is the national operations
5 team telling us for next month, it looks like
6 things are quiet, do they think that E time is
7 going to last long.
8    Q. What is E time?
9    A. If business is slow like we have in
10 the summer months, it will get real quiet. You
11 have a lot of people on vacation, also. We will
12 get the national operations team to say, looking
13 at the staffing throughout the entire channel,
14 let's see if anybody wants to leave without pay
15 for a couple of days a week, hours. So it's a
16 dynamic staffing.
17    Q. Doesn't that violate some union
18 requirement of base minimum hours?
19    A. Not that I'm aware of. I think we
20 would have heard about it.
21    Q. But you're giving them -- you're
22 paying them to leave?
23    A. It's voluntary. No pay.
24    Q. No compensation?

1    A. No pay. If you want to take the
2 afternoon off, we have it available.
3    Q. I see. Were the operators,
4 associates, sales associates, were they
5 hourly-based people, in 2004, or were they
6 salaried?
7    A. They're hourly.
8    Q. The individuals that are union
9 employees?
10    A. Yes. Yes.
11    Q. Are they still that way?
12    A. Yes.
13    Q. My question, going back to your
14 response, as I look at this on a weekly basis is
15 to determine things on a lot of different things
16 in terms of staffing and E time and et cetera.
17        Did you ever determine why there was a
18 drop off in the number of phone calls that were
19 being processed through the Fairhaven facility?
20    A. I'm sure I did.
21    Q. Do you recollect what those opinions
22 or conclusions were approximately a year and a
23 half ago?
24    A. No.

1    Q. At any time during the process of
2 determining the drop off in these phone calls,
3 did it occur to you that phone calls were being
4 redirected to another center?
5    A. Well, let me -- can I explain?
6    Q. Sure. Go ahead.
7    A. The volumes that come into a center
8 are routed to us, so there can be different
9 variables that will cause a fluctuation in the
10 number of calls.
11        It doesn't necessarily mean there
12 didn't exist, I guess to your question, 40,000
13 calls somewhere in the channel. They didn't
14 send them to Fairhaven.
15        If I had high absence in a particular
16 month, they wouldn't send me -- or if I had been
17 trending high absence, they wouldn't send me
18 more calls than I could handle.
19        If I had a work force, which I do, who
20 loves E time versus another center that might
21 not take a lot of E time, they may cut my calls
22 more to allow me to give people time off without
23 pay and send the calls to another center. So
24 it's possible. I don't remember specifically.

1    Q. So is it fair to say that AT&T
2 someplace has the technical ability to route
3 calls to any facility that they want to?
4    A. Yes.
5    Q. So, for instance, if I wanted to
6 outsource, so use that horrible word, to India,
7 I could basically just outsource all my phone
8 calls, hypothetically, to a telephone answering
9 center in Bombay, technically, just by switching
10 a switch?
11    A. Technically, yes.
12    Q. And also in terms of reallocating
13 institutional resources, I can begin the process
14 of reallocating or relocating telephone calls in
15 accordance with, you know, whatever the --
16    A. Mm-hmm.
17    Q. Excuse me, whatever the landscape
18 dictates? Do you understand what I'm saying?
19    A. Yes.
20    Q. When do you believe AT&T decided to
21 downsize, made the decision to downsize the
22 Fairhaven facility? When do you believe that
23 decision was made?
24        MR. KAITZ: Which downsizing are you

Page 85

```
 1   referring to?
 2       Q. The downsizing in 2004?
 3       A. I believe it was very shortly before
 4   that, before I was told.
 5       Q. When do you recollect being told that
 6   there was going to be the downsizing?
 7       A. The Friday before the announcement.
 8       Q. When was the announcement?
 9       A. September 2004. I want to say the
10   11th.
11       Q. I'm going to show you a document,
12   Exhibit 8.
13          (Exhibit 8 marked
14          for identification)
15       Q. Have you ever seen that before?
16       A. Unfortunately, yes. Sorry.
17       Q. You have?
18       A. Yes. This was dated the 14th.
19       Q. This is seemingly the cover of the
20   front page of the Standard Times which purports
21   to be a New Bedford newspaper. The headline
22   says 140 Fairhaven AT&T workers axed, right?
23       A. Yes.
24       Q. I note at the corner it says September
```

Page 86

```
 1   14, 2004.
 2       A. Yes.
 3       Q. I asked you when did you first learn
 4   that the call center was going to be downsized
 5   by AT&T, and what was your answer?
 6       A. The Friday before the announcement, so
 7   the 10th. Yeah, the 10th.
 8       Q. So is it fair to say that your
 9   testimony is the first time that you learned
10   that the closing was going to occur was the
11   Friday before September 14?
12          MR. KAITZ: Objection.
13       A. The downsizing?
14       Q. The downsizing.
15       A. We didn't close.
16       Q. The reduction in staff?
17       A. Right.
18       Q. Now, my question to you is: When was
19   the first time that you discussed with any other
20   AT&T employee the possibility of downsizing the
21   Fairhaven facility?
22       A. The possibility of downsizing? I
23   didn't tell anyone until that Monday.
24       Q. I understand that. But my
```

Page 87

```
 1   question is: We know for a fact that a
 2   downsizing was announced on Friday prior to this
 3   article?
 4          MR. KAITZ: No. That's not what she
 5   testified.
 6       A. On Monday.
 7       Q. On Monday. Excuse me. September 13?
 8       A. Right.
 9       Q. You testified that you learned of this
10   on the Friday prior to that?
11       A. Correct.
12       Q. My question to you was, when do you
13   recollect first discussing with other AT&T
14   employees, supervisors, national employees the
15   possibility of downsizing -- the downsizing of
16   the Fairhaven facility?
17       A. Never.
18       Q. Never?
19       A. We never downsized before.
20       Q. I understand. But my question is --
21   just so this is very clear.
22       A. Okay.
23       Q. That from its inception, frankly, and
24   the documents that we've gone over today are
```

Page 88

```
 1   very clear that closure or downsizing was a
 2   rumor?
 3          MR. KAITZ: Objection.
 4          MR. GODBOUT: Excuse me.
 5       Q. Was a rumor at the Fairhaven facility
 6   from the year 2001, if not earlier, forward,
 7   correct?
 8          MR. KAITZ: Objection.
 9       A. No. I've never -- downsizing was
10   never asked of me that I can recall. No one
11   ever stopped and said, Joan, are we going to
12   downsize people. I never even thought that that
13   would be an option. It was either is the center
14   closing or do we have any longevity.
15       Q. So from your viewpoint the question
16   was, are we closing?
17       A. Mm-hmm.
18       Q. Or are we staying open?
19       A. Yes.
20       Q. Excuse me. At the level that we were
21   operating at?
22       A. Yes.
23       Q. With regard to closure during the year
24   2003, did you have any discussions with any AT&T
```

Page 89

1  employees in management -- frankly, I'm not
2  discussing union employees -- AT&T management,
3  relative to the closure of the Fairhaven
4  facility?
5      A. The only discussions --
6      Q. This was in the year 2003.
7      A. In 2003 it was the typical --
8  everybody took every opportunity to say, what
9  are the plans, what are center plans. The reps
10 would not go one to two months without saying,
11 Are we closing.
12      So were there questions on my staff
13 calls with my supervisors, did we ask when
14 rumors came around what are the thoughts about
15 closing centers, and no plans. So probably on a
16 couple of occasions throughout 2003 that
17 question came up.
18      Q. What about in 2004?
19      A. In 2004 after Dave Dorman made his
20 announcement about exiting the consumer strategy
21 there were a lot of questions about what does
22 that mean.
23      Q. And were the questions coming from the
24 bottom up, i.e., the union employees asking what

Page 90

1  is going on, or were the questions coming from
2  the top down saying this is what is going to
3  occur as we exit the consumer marketing or the
4  consumer sales strategy?
5      A. I think everybody had the questions.
6      Q. So it was coming from both directions?
7      A. It was coming from both directions
8  around where do we stand as far as still having
9  a job to do, servicing millions of customers,
10 what does that mean to us.
11      Q. When Mr. Dorman made his statement,
12 what was the layman's interpretation? What was
13 your layman's interpretation of the substance of
14 his remarks?
15      A. That we were no longer going to
16 provide consumers with long distance telephone
17 service. He was no longer going to advertise,
18 market, attempt to acquire any additional
19 customers.
20      Now, that is basically what he came
21 out and said, so we had a lot of questions.
22      Q. Was that statement or that business
23 posture implemented in the next 24 months?
24      MR. KAITZ: Objection.

Page 91

1      Q. Had AT&T -- I don't know whether
2  Mr. Dorman is still there at the helm or not --
3  begun to implement the business strategy that
4  was articulated in that statement?
5      A. Yes. In certain parts, yeah.
6      Q. And how has that implementation
7  manifested itself?
8      A. We cut out our advertising budget to
9  start with so you no longer -- let me back up.
10 Prior to SBC merger and acquisition, so between
11 the period of time that Dave Dorman announced we
12 were exiting consumer until we were purchased by
13 SBC, during that period of time we started
14 seeing a reduction in marketing both from a
15 staff perspective as well as a budget
16 perspective; no commercials, which usually
17 stimulates the additional calls, additional
18 customers who would then ultimately call in to a
19 center like mine.
20      Q. That's the end result manifestation of
21 the changes?
22      A. Right.
23      Q. And that process began in early 2004?
24      A. I don't recall when -- once Dave

Page 92

1  Dorman made his announcement, there was a period
2  of time there where we had a lot of questions
3  around what it meant.
4      Q. Do you remember when he made the
5  statement?
6      A. March.
7      Q. March of 2004?
8      A. Right. I think so. March 2004.
9  Around there.
10      Q. But still your testimony is that after
11 the Dorman statement, there was no discussion at
12 all relative to the downsizing that you knew of
13 or the elimination of the Fairhaven facility
14 from the management down?
15      MR. KAITZ: Objection.
16      A. Immediately my first thought was,
17 well, what does that mean? Are we closing? Are
18 we going to close every center? How can we do
19 that? I mean, we have all these calls. So we
20 had a lot of questions.
21      The reason I'm so confident, it never
22 entered my mind that you would cut half a
23 center. So no, there were no discussions about
24 downsizing. There was a lot of activity around

Page 93

1  what does that mean?  Are we going to be seeing
2  center closing?  Do we still sell to customers
3  coming in?  And the answers were yes.
4      So we started feeling comfortable that
5  we're still going to sell.  We still have
6  20-plus million customers to service.
7      Q.  Got you.  When did you first learn
8  that AT&T intended to sell the building that the
9  Fairhaven facility was in?
10      A.  I think we started marketing it in
11  2003.  I think we found a buyer -- when did I
12  learn we were going to sell it?  Probably in
13  2003.
14      Q.  Who made the decision to put the
15  building on the market?
16      A.  We have a global real estate group
17  whose responsibility it is to manage the assets.
18  We made the recommendation.  Who made the
19  decision?  I think I had input.
20      Q.  Pardon me?
21      A.  I think I had input, but...
22      Q.  What were the reasons, if you
23  remember, underlying the decision to put the
24  building that they had just bought on the market

Page 94

1  two years later?
2      MR. KAITZ:  Objection.
3      A.  It was a huge building, and we were
4  only occupying maybe a third of it.  We had made
5  several attempts to bring in other tenants to
6  kind of join us in the operational expenses, the
7  taxes, whatever, and we were unsuccessful.  So I
8  know global real estate felt it was a drain on
9  the expenses.
10      Q.  Did you ever discuss with global real
11  estate the amount of space that you folks
12  occupied in 2003?
13      A.  Oh, yeah.  We had multiple
14  discussions.
15      Q.  And then did you discuss with them the
16  space that you were going to occupy in 2004?
17      A.  Many times.
18      Q.  And didn't that involve actually the
19  reduction in space?
20      A.  Yes.
21      Q.  With the reduction of space, doesn't
22  that imply the reduction of personnel?
23      A.  We were already reduced.
24      Q.  Well, to what extent were you reduced

Page 95

1  from 2002 to 2003, December?
2      A.  I don't understand.
3      Q.  Well, I think you testified that your
4  high water mark was approximately 1,000
5  employees?
6      A.  Yes.
7      Q.  And you occupied, I'm paraphrasing
8  here, a substantial portion of the building by
9  your own testimony?
10      A.  Right.
11      Q.  And by your own testimony AT&T
12  currently occupies --
13      A.  Half a floor.
14      Q.  -- half a floor?
15      A.  Right.
16      Q.  Which represents probably about, is it
17  fair to say, not to put words in your mouth,
18  about 90 percent less space than it occupied in
19  2003?
20      A.  Yes.
21      Q.  How many employees occupy that half a
22  floor right now?
23      A.  220.  We just vacated the other side.
24      Q.  I understand.  My question to you was,

Page 96

1  during the course of these discussions with
2  global real estate and your knowledge that the
3  building is going on the market, that space is
4  going to be reduced, occupational space, because
5  you are entering into lease negotiations with
6  the previous owner, it's fair to say that you
7  knew that the space which AT&T was going to
8  occupy at Fairhaven was going to be reduced?
9      A.  Correct.
10      Q.  And my question to you is, that
11  implies or one can deduce from that that there
12  are going to be fewer people employed at that
13  facility?
14      A.  I think maybe I am misunderstanding
15  your question.
16      MR. KAITZ:  Objection.
17      A.  Because I had four or 500 people
18  spread out in 298,000 square feet.  That was the
19  space I didn't need, and I was paying for it.
20  So when I met with global real estate to talk
21  about occupying, in 2003 my 450 people could fit
22  in what I have today.  Is he restacking is
23  basically the term I think they used.
24      Q.  Okay.  With regard to Beverly George,

Page 97

1  do you remember having any discussions with her
2  relative to her retirement?
3      A. Yes.
4      Q. Why don't you tell me what your
5  recollections are of any of the discussions that
6  you might have had with her regarding her
7  retirement.
8      A. I know she -- I think I saw her when I
9  first heard she was retiring. I saw her and
10 congratulated her and told her I was excited
11 about, you know, her good news.
12     I remember talking to her about her
13 party and her wanting to have it at a similar
14 place that we had where we took some nice
15 pictures, and that's about it.
16     Q. Do you remember when you first
17 discussed that with her?
18     A. No.
19     Q. Is it fair to say that over the course
20 of Mrs. George's employment at AT&T at the
21 Fairhaven facility, that she would come to you
22 asking for information and make inquire as to
23 the current status of the facility as to where
24 it was going, status as an ongoing facility?

Page 98

1      A. In meetings and stuff, yeah. I don't
2  remember specifically.
3      Q. You don't have any specific memory?
4      A. No.
5      Q. Would you have meetings with
6  Mrs. George?
7      A. On occasion maybe the team. I don't
8  remember meeting one-on-one with Bev in a
9  meeting.
10     Q. Well, as a supervisor for the
11 facility, it's fair to say that you generally
12 probably didn't meet with the line operators?
13     A. Right.
14     Q. Is there someone else that would do
15 that?
16     A. Her direct supervisor.
17     Q. Do you remember who her direct
18 supervisor was in 2004?
19     A. Yeah. I believe it was Carmel
20 Eustace.
21     Q. Was she also her direct supervisor in
22 2003?
23     A. I believe so. She could have changed.
24 I'm not sure.

Page 99

1      Q. So is it fair to say that you do have
2  a recollection of Mrs. George making inquiry as
3  to whether the AT&T facility was going to
4  downsize or close?
5      A. No.
6      Q. You don't?
7      A. No. Again, the downsize is not
8  something that I ever considered, talked about,
9  thought would happen.
10     Q. So the answer is you have no
11 recollection --
12     A. No.
13     Q. Let me finish for the record.
14     -- of any conversation with Beverly
15 George relative to the downsizing or the
16 termination of the Fairhaven facility prior to
17 her retirement?
18     A. No.
19     MR. KAITZ: Objection.
20     Q. So it's fair to say that you never
21 made inquiry for Beverly George in June 2004 in
22 response to a question of hers as to the status
23 of the facility?
24     A. No.

Page 100

1      Q. So the answer is you never made an
2  inquiry to respond to a question of
3  Mrs. George's relative to the downsizing of the
4  facility in June of 2004? Do you understand
5  what I'm saying? I'm not trying to trick you.
6      A. People ask me every day, are we
7  closing, are we closing. I had no information
8  that we were closing. Now, did I go and call
9  somebody every time somebody asked me, no.
10     Q. Do you have any recollection of making
11 an inquiry as a result of a request by
12 Mrs. George to find out whether it was closing
13 or not?
14     A. No.
15     Q. In September 2004 they announced a
16 VTP. Do you know what that means?
17     A. Voluntary termination pay.
18     Q. What is a VTP?
19     A. It's where someone can volunteer to
20 leave the payroll and would be supplemented with
21 X number of week's pay depending on their
22 service.
23     Q. Is it sort of an early retirement
24 package?

25 (Pages 97 to 100)

Page 101

1        MR. KAITZ: Objection.
2        A. Not necessarily.
3        Q. No? A person who accepts a VTP is
4    terminating the relationship with AT&T?
5        A. Correct.
6        Q. And there are certain terms and
7    conditions within the VTP which act as an
8    inducement?
9        A. Yes.
10        Q. Because that's how you persuade
11    someone to leave or to switch status from
12    full-time employee to someone who is now
13    exiting?
14        A. Right.
15        Q. Was VTP offered to the people at
16    Fairhaven?
17        A. Eventually, yes.
18        Q. Well, when was it first offered?
19        A. The day we made the announcement that
20    the 140 people were being laid off, people asked
21    if individuals with more seniority could
22    volunteer and leave in their stead and be given
23    a VTP.
24        So I know I left one of my meetings

Page 102

1    and called labor relations to say is this an
2    option. Rather than the lower 140, would the
3    company be willing to offer the VTP and let
4    other individuals leave. And they came back and
5    said we will do that. We will allow it. It's
6    not a normal part of a downsizing package.
7        Q. This voluntary termination package?
8        A. Right.
9        Q. Is it a standard package, or did AT&T
10    have to prepare a special package for the
11    Fairhaven facility?
12        MR. KAITZ: Objection.
13        A. I don't know. I've seen packages
14    before. But I know it was updated by the time
15    we got it, so I'm not sure.
16        Q. When did you receive the VTP
17    prospectus that you were going to then
18    distribute to the Fairhaven employees?
19        A. Shortly after the announcement.
20        Q. Had you had any discussions with any
21    AT&T personnel, department individuals, prior to
22    the announcement regarding the VTP?
23        A. No.
24        Q. Had you had any discussions with any

Page 103

1    of your subordinates relative to any employees
2    that were on disability prior to September 14
3    and the status of those individuals?
4        MR. KAITZ: Objection.
5        Q. You don't understand the question?
6        A. Yeah. I think it just changed.
7        Q. I understand.
8        Returning back. What percentage of
9    the work force elected, if you remember, the VTP
10    program.
11        A. Not many, I don't believe. I'd really
12    be guessing, but I believe it was...
13        Q. How was it decided that who was
14    eligible?
15        A. The seniority decided the downsizing,
16    so the 140 people was the bottom 140 people.
17    Then you overlay that with does anyone above
18    that want to voluntarily leave, and that would
19    replace. So it would be up to the 140 people,
20    if I had 140 people wanting to volunteer instead
21    of the lower.
22        Q. Okay. If Bev George had not retired
23    in July but had stayed on through September 20
24    when the downsizing was announced, would she

Page 104

1    have been eligible for the VTP?
2        MR. KAITZ: Objection.
3        A. Yes.
4        Q. And how many weeks of VTP pay would
5    she be eligible for?
6        A. I don't know. It's in the contract,
7    but it's by years of service.
8        Q. So it's in the contract. It's by
9    years of service?
10        A. Yes.
11        Q. And by looking at that will give you
12    the answer of how many weeks she would be
13    entitled to?
14        A. Yes. I don't believe there was
15    anything additional other than what was in the
16    contract, but...
17        Q. But it was something that was in the
18    contract?
19        A. Yes.
20        Q. So if you know the contract, you know
21    the answer?
22        A. Right.
23        Q. Pretty much?
24        A. Right.

26 (Pages 101 to 104)

# UNITED STATES DISTRICT COURT
## for the
## DISTRICT OF MASSACHUSETTS

-------------------------------------------------------------x

BEVERLY A. GEORGE,

                Plaintiff,

   v.                            Civil Action No. 05-11079-DPW

AT&T CORP.,

                Defendant.

-------------------------------------------------------------x

## AFFIDAVIT OF JOAN GALLAGHER CAPPUCCIO

I, Joan Gallagher Cappuccio, do hereby depose and state:

1.      I am employed by AT&T as a Group Manager in the Consumer Sales and Services Division. I work at the Fairhaven Call Center where I have been employed since December of 1998. I am the Manager working on site charged with responsibility for the operations of the Fairhaven Call Center.

2.      At the Fairhaven Call Center, employees handle customer service and billing inquiry calls from all around the country. Customer calls come into a switching system and are routed from there to call centers in the United States or overseas.

3.      My responsibilities as Group Manager in Fairhaven do not include any responsibilities for decisions to close facilities or reduce workforce (surplus declarations). Those decisions are made on a national basis by others in the company who are not based in Fairhaven.

4.      I first became aware that an occupational workforce surplus was being declared in Fairhaven on Friday, September 10, 2004, when I received a telephone call. I was informed at that time that an announcement of the workforce surplus of 140 employees would be made on Monday, September 13, 2004. In fact, the announcement was made on that date.

5.      Before September 10, 2004, I had no knowledge that the company was considering any reduction of the workforce in Fairhaven. I was not consulted nor asked for any input on that decision.

6.      On the contrary, as of September 10, 2004, I was working on plans for the build out of office space for the company for 432 employees. A copy of the plan being worked on as of that time is attached hereto as Exhibit "A". On September 1, 2004, AT&T completed the sale of the Fairhaven facility, which sale included provisions that the company would lease portions of the space in the building from the new owner. The portions of the space we were to lease were significantly smaller than the space we previously occupied, but were large enough to accommodate at least 430 employees.

7.      Commencing with the beginning of 2004, until the workforce reductions resulting from the September 13, 2004 announcement, the company employed approximately 430 employees in Fairhaven. Until I received the telephone call on September 10, 2004, I fully expected to continue operations in the smaller, leased space with the same approximately 430 employees. Indeed, a meeting was scheduled for Wednesday, September 15, 2004, with a number of employees of the company to discuss the plans for accomplishing the build out of our new leased space for approximately 430 employees. The meeting was still held, but the focus of discussion involved whether and

how we could change plans to accomplish our needs to accommodate the smaller work

force resulting from the September 13 announcement.

Subscribed and sworn to under the pains and penalties of perjury this 23rd day of
February, 2006.

Joan Gallagher Cappuccio
Group Manager, Consumer Sales
And Services Division

70

**EXHIBIT A**



01847

# UNITED STATES DISTRICT COURT
## for the
## DISTRICT OF MASSACHUSETTS

-------------------------------------------------------------x

BEVERLY A. GEORGE,

                Plaintiff,

     v.                                     Civil Action No. 05-11079-DPW

AT&T CORP.,

                Defendant.

-------------------------------------------------------------x

## AFFIDAVIT OF NATHAN L. KAITZ

I, Nathan L. Kaitz, do hereby depose and state:

1.      I am a partner at Morgan, Brown & Joy and trial counsel for the defendant AT&T Corp. in the above matter.

2.      Attached as Exhibit "A" is a true and correct copy of excerpts from the June, 2004 issue of the Fairhaven Flyer containing an interview with Beverly George.

3.      Attached as Exhibit "B" is a true and correct copy of excerpts from the Voluntary Termination Pay (VTP) offer provided to Fairhaven employees on or about September 21, 2004.

Sworn to under the pains and penalties of perjury this 28th day of February, 2006.

                                                    Nathan L. Kaitz

**EXHIBIT A**



# Fairhaven Flyer

June, 2004

Vol. 11 Issue 6

**A Publication by the PVA PMT**          **PVA is Every Day**

## ONE OF OUR OWN
### By Michelle Earle



I would like to say a few words about one of our own Fairhaven employees who has been called to active Military Duty. Staff Sergeant Anthony Richards will be leaving for basic military training in Fort Drum, New York on June 18th, to prepare him for a tour of duty in Iraq.

Anthony's dedication to his job and his country are apparent as he has over 20 years of service both with AT&T and the United States National Guards.

Anthony Richards started with NYNEX as a temp clerk back in 1983. In 1984 at divestiture Anthony decided to come to AT&T and transferred to the Springfield, MA leased equipment office. Since then Anthony has performed many functions within the company. He worked as a data tech here in Fairhaven and also in Alpharetta, GA, and eventually came back to New England and worked at the Providence, RI CSSC and Relay Center. In 1997 Anthony returned to Fairhaven and displayed his versatility by holding numerous positions such as on-line representative, CSS and SACCE rep. Anthony has strong family ties to the New Bedford area being raised here by his parents, and has lived here for over 50 years. He is now raising his 5 children (4 daughters and 1 son) in New Bedford.

I have had the pleasure of working with Anthony for the last ten years and am confident that his vast experience and many talents will help him get through his tour of duty in Iraq. We will all miss Anthony while he is gone, however we will also be counting the days for his safe return back to the New Bedford area. Our thoughts and prayers are with you Anthony. God Bless you and BE SAFE.

5 smiles in every issue!
Consumer Long Distance
Sales & Service

Special Interest Articles:
One Of Our Own
Anthony's Celebration
Appreciation DAY
Behind the Headsets
Strategic Selling
Starfish Program

Individual Highlights:
Society Corner
Reflections
LEAGUE
Women of AT&T
Books Discount
Corner
PVA & Earth



# "Behind the Headset" by Carmel Eustace

**We say "Farewell" to one of our best. Bev George will be missed as she retires after 30 years of service.**

*CE: Can you outline your career with AT&T?*

BG: I started working for AT&T as a high-school senior. I applied at NET, as it was then, in Walpole and I worked after school from 3-7, in operator services. I worked very hard and was rewarded by being made part-time permanent. I was out of the company for two years when my first child was born and then came back to NET in Brockton, again working in operator services. When the phone company split in 1984, I was on the AT&T side, and continued to work in operator services. From Brockton, I moved to Taunton, back to Brockton, then to Worcester and Peabody for three years. I worked briefly in relay in Providence, before coming to Fairhaven in '97.

*CE: When you started, did you think you would be with the company for 30 years?*

BG: No. Initially I applied because my aunt had been a supervisor with NET and my sister was a supervisor at the time, so the family connection was there. I wanted to go to college, but they encouraged me to try it for a while. When I was made part-time permanent, and got all the benefits of working for the Phone Company, it was hard to leave. I realized my dream of going to college through the TAP

program, I got my BA in financing. AT&T was like another parent in that it allowed me to have things like an education that I couldn't afford otherwise. It also gave me a sense of value, and a sense of responsibility, and built on the integrity I already had. It made me the woman I am today and I'm proud to be a part of AT&T.

*CE: What will you miss the most?*

BG: I'll miss the people, and the daily interaction. I work with some great people and I'll really miss them. The work is stressful, but I'll miss the sense of satisfaction I get when I help a customer and he or she tells me it is appreciated and I've 'made their life easier'. That makes it all worthwhile.

*CE: To what do you look forward the most in retirement?*

BG: Taking time off. I plan to travel to visit my children. I'm going first to Maryland to see my daughter there, and then later in the summer I plan a road trip to Colorado to visit my other daughter.

*CE: Is there anything you think you got from AT&T that you might have missed out on elsewhere?*

BG: I don't think I would have gone to college; I can't thank the

company enough for that. It took time and effort to balance everything and took a lot of negotiating. Friends helped me by trading tours; we had a lot less flexibility back then. One person in particular, Ann Minihan, changed hours with me a lot, which really helped when I was going to college, working full time and had twins. I really couldn't have done it without the benefits from AT&T and the help of my peers.

*CE: Do you have plans for a second career?*

BG: I've had it in the back of my mind to go to law school, but I think that would be a little too stressful right now. I want to focus on horticulture for now, I have plans to construct an orchard on my property, and I have pear trees and apple trees waiting to be planted. I'd like to take some classes in that and join the local Flower Club. I'm going to do some volunteer work in the community also.



**EXHIBIT B**

# SEPTEMBER 21, 2004

# Voluntary Termination Pay (VTP) Offer

# EMPLOYEE'S
# COMMUNICATION PACKAGE



EXHIBIT 1
Iroli
2/15/06    KW

01790

# TABLE OF CONTENTS

| | PAGE |
|---|---|
| **GENERAL INFORMATION** | **3** |
| **CRITICAL DATES** | **4** |
| **ELIGIBILITY** | **5** |
| **VTP ELECTION FORM** | **6** |
| **BENEFITS** | **7 – 8** |
| **TAX INFORMATION** | **9 – 10** |
| **APPENDIX A  -  CAP INFORMATION** | **11** |
| **APPENDIX B  -  ARTICLE 25 VTP PAYMENT SCHEDULE** | **12** |
| **ARTICLE 43 VTP PAYMENT SCHEDULE** | **13** |
| **APPENDIX C  -  CONTACT LIST** | **14 – 15** |

| **APPENDIX D** | |
|---|---|
| **SECTION I    -  VTP PROCESS & RATIONALE** | **16 – 20** |
| **ALLIANCE PARTICIPANT FORM** | **21** |
| **ALLIANCE ELIGIBILITY MATRIX** | **22** |
| **SECTION II  -  PENSION PLAN** | **23 – 25** |
| **SECTION III -  PAYMENTS** | **26 – 30** |
| **SECTION IV -  BENEFITS** | **31 – 40** |
| **SECTION V  -  STAFFING** | **41** |
| **SECTION VI -  TRANSITION LEAVE OF ABSENCE (TLA)** | **42 – 43** |
| **APPLICATION FOR TLA** | **44 – 45** |

| **APPENDIX E -  VTP & YOUR PENSION** | **46 – 50** |
|---|---|

01791

AT&T Proprietary – Use Pursuant to Company Instructions

76

09-21-04

**September 21, 2004**

Dear Employee:

As an AT&T regular employee in one of the titles listed on APPENDIX A, you may be eligible to volunteer for and potentially be granted a voluntary termination offer with a separation payment. This offer is being made to employees in selected GCA's/RCA's as listed in APPENDIX A. The VTP payment schedule is listed in APPENDIX B. Please be sure to read all the enclosed material thoroughly before making your decision to accept or reject this offer.

To be eligible for this offer you must be in one of the affected titles and permanently assigned to one of the GCA's/RCA's listed in APPENDIX A.

The deadline for submitting your signed and dated VTP election form is **5:00 p.m. ET, October 6, 2004.** This deadline is firm. Any forms received after the cutoff date **will not** be accepted. You will be notified of your acceptance by close of business on **October 8, 2004.** Please ensure that all contact numbers where you may be reached after 5:00 p.m. ET are accurate.

A Frequently Asked Questions document has been prepared to help you answer questions. **Questions should be referred to 877-HR ANSWERS, Press 6, then 4 (877-472-6793) or your supervisor.** In addition, a contact list is attached which contains names and telephone numbers that may provide additional assistance.

**01792**

AT&T Proprietary – Use Pursuant to Company Instructions

77

09-21-04

## <u>CRITICAL DATES</u>

September 21, 2004           **Offer Notification Date**

October 6, 2004              **Close of VTP Election Period**
                             **(5:00 p.m. ET)**

By COB October 8, 2004      **Notification of Acceptance of**
                            **Offer to Employees and Managers**

October 14, 2004            **Exception Forms Due**

October 20, 2004            **Notification of Evening or**
                            **Night Differential Forms Due**

October 22, 2004            **Off-Payroll Date**

01793

AT&T Proprietary – Use Pursuant to Company Instructions                78

09-21-04

# Voluntary Termination Pay
## ELIGIBILITY REQUIREMENTS, ELECTION PROCESS AND SELECTION CRITERIA

ELIGIBILITY REQUIREMENTS:

→    You must be a regular full time or regular part time employee

   AND

→    You must be permanently assigned to an affected title and GCA/RCA

   AND

→    You must have at least one (1) year of Net Credited Service (NCS) as of the **October 22, 2004** off-payroll date

ELECTION PROCESS:

→    You must complete and return the "VTP Election Request Form" via fax prior to **5:00 p.m. ET, October 6, 2004.**

→    If your request is accepted, **THE ELECTION OF VTP IS IRREVOCABLE AFTER THE CLOSE OF THE CANVAS PERIOD (5:00 p.m. ET), October 6, 2004**

→    An earlier off-payroll date may be negotiated, on a very limited basis depending on the needs of the business. To request an off-payroll date other than **October 22, 2004** you must submit the request in writing to your supervisor, stating the date requested and the reason. The earliest off-payroll date is **October 8, 2004.**

SELECTION CRITERIA:

→    Requests for the VTP offer will be accepted in seniority order, by title, by GCA/RCA, most senior first

→    Only the number of employees not to exceed the GCA/RCA CAP (see APPENDIX A) will be granted the VTP offer in descending order of Net Credited Service (NCS), most senior first. If the number of employees volunteering exceeds the GCA/RCA CAP, management **MAY** elect to accept volunteers that exceed the GCA/RCA CAP based on needs of the business, most senior first.

→    You will be advised by your management team in writing if your election for the VTP offer has been accepted or denied by close of business on **October 8, 2004.**

**01794**

Appendix B

# CWA ARTICLE 25
# VTP PAYMENT SCHEDULE

| YEARS OF NET CREDIT SERVICE | AMOUNT OF PAYMENT | YEARS OF NET CREDIT SERVICE | AMOUNT OF PAYMENT |
|---|---|---|---|
| Less than 1 year | None | 16 years but less than 17 years | 44 week's pay |
| 1 year but less than 2 years | 1 week's pay | 17 years but less than 18 years | 48 week's pay |
| 2 years but less than 3 years | 2 week's pay | 18 years but less than 19 years | 52 week's pay |
| 3 years but less than 4 years | 3 week's pay | 19 years but less than 20 years | 56 week's pay |
| 4 years but less than 5 years | 4 week's pay | 20 years but less than 21 years | 60 week's pay |
| 5 years but less than 6 years | 6 week's pay | 21 years but less than 22 years | 64 week's pay |
| 6 years but less than 7 years | 8 week's pay | 22 years but less than 23 years | 68 week's pay |
| 7 years but less than 8 years | 10 week's pay | 23 years but less than 24 years | 72 week's pay |
| 8 years but less than 9 years | 12 week's pay | 24 years but less than 25 years | 76 week's pay |
| 9 years but less than 10 years | 16 week's pay | 25 years but less than 26 years | 80 week's pay |
| 10 years but less than 11 years | 20 week's pay | 26 years but less than 27 years | 84 week's pay |
| 11 years but less than 12 years | 24 week's pay | 27 years but less than 28 years | 88 week's pay |
| 12 years but less than 13 years | 28 week's pay | 28 years but less than 29 years | 92 week's pay |
| 13 years but less than 14 years | 32 week's pay | 29 years but less than 30 years | 96 week's pay |
| 14 years but less than 15 years | 36 week's pay | 30 years but less than 31 years | 100 week's pay |
| 15 years but less than 16 years | 40 week's pay | 31 or more years | 104 week's pay |

01801

AT&T Proprietary – Use Pursuant to Company Instructions

80

- 12 -                    09-21-04

Appendix D

## Voluntary Termination Pay (VTP)
## Frequently Asked Questions (FAQ)

## SECTION I
## VTP PROCESS & RATIONALE

1.    **How did AT&T decide who would be eligible to receive this VTP offer?**

AT&T has decided to make this offer to eligible employees in selected job titles and GCA's/RCA's where and to the extent that an imbalance is determined to exist; and in situations according to the needs of the business.  The GCA's/RCA's and titles have been selected after a review of work operations and resource requirements. While employees within the titles and GCA's/RCA's where the offer is extended will be eligible to participate, only the most senior volunteers will be approved up to the number of the imbalance without adversely impacting skill needs and service levels. If more employees volunteer than the maximum, AT&T **may** elect to accept the offers after a review has been completed by senior management.

2.    **Will VTP be offered retroactively to employees who recently retired?**

No, the VTP offer will not be extended retroactively to employees or former employees.

3.    **If an employee elects to take the offer and later changes their mind, can they withdraw their request?**

An employee's acceptance for the VTP offer is <u>final and irrevocable</u> after the final acceptance date **October 6, 2004 at 5:00 PM ET.**

4.    **What if an employee is on loan from their "home" work location, where the offer is being made, is the employee eligible for the offer?**

Yes. If the offer is made in the employee's permanent GCA/RCA and they are in an affected job title, they are eligible to participate.

01805

**5.    Can I request an "early" off-roll date?**

Yes, an employee may request an early off-roll date; the request will be considered based on business needs and seniority.  No requests for early termination will be granted until after the close of the VTP confirmation window, which is **October 6, 2004 at 5:00 PM ET.**

**6.    Once the VTP offer has been made in a selected GCA/RCA and Title, what are the eligibility requirements that must be met by the employees?**

An employee in the affected GCA/RCA and Title must be:
- A regular full-time or part-time occupational employee (i.e. Term, Temporary, Occasional, and Management are not eligible), and
- Must have at least 1 Year of Net Credited Service.

| Employee Status other than "active" | Treatment | Notes |
|---|---|---|
| Disability | As if active | 1. Employees receive VTP offer, if otherwise eligible,<br>2. Employees must elect VTP during prescribed window—(September 21, 2004 – October 6, 2004, 5:00 PM Eastern Time)<br>3. If employee election is approved by the company employee must be certified to return to work by the Company prior to being eligible for VTP Payments |
| Workers' Compensation | As if active | 1. Employees receive VTP offer, if otherwise eligible,<br>2. Employees must elect VTP during prescribed window—(September 21, 2004 – October 6, 2004, 5:00 PM Eastern Time)<br>3. If employee election is approved by the company employee's must be certified to return to work prior to being eligible for VTP Payments |
| LOA – with Guaranteed Re-instatement such as:<br>▪ Care of Newborn/Newly Adopted Child<br>▪ Family Care<br>▪ Union Business<br>▪ Anticipated Disability | | 1. Employees receive VTP offer, if otherwise eligible,<br>2. Employees must elect VTP during prescribed window—(September 21, 2004 – October 6, 2004, 5:00 PM Eastern Time)<br>3. An employee must be returned to the payroll prior to their termination date. |
| LOA – without Guaranteed Re-instatement<br>▪ Educational<br>▪ Personal | | Not eligible for VTP offer |
| Special Leave Program (SLP) | | Not eligible for VTP unless the employee was scheduled to return to the active payroll prior to September 21, 2004. |
| Long Term Disability | | Not eligible for VTP offer |

Details on other Leave of Absences can be found in the AT&T Personnel Guide, specifically url: http://wfs.web.att.com/WFS/0,1452,IE5-563,00.html

**01806**

AT&T Proprietary – Use Pursuant to Company Instructions

82

09-21-04

The offer will be granted to the most senior volunteers up to the number of the imbalance. If more employees volunteer than the maximum required, AT&T **may** elect to accept the offers after a review has been completed by senior management.

**7.    Will everyone who is eligible be accepted if they volunteer?**

AT&T will accept up to the maximum number of volunteers in each of the affected titles and GCA's/RCA's, in seniority order, (most senior first) by GCA/RCA and job title, up to the number of the imbalance. If more employees volunteer than the maximum, AT&T **may** elect to accept the offers after a review has been completed by senior management.

**8.    Are employees eligible for state unemployment since this is a voluntary offer?**

State laws vary. Employees should contact their state employment office for the laws applicable in their state.

**9.    Is an employee eligible for VTP if they were management for more than one (1) year and recently returned to the bargaining unit? Do they lose their seniority for election purposes? How are their VTP payments calculated?**

If the employee would be otherwise eligible (i.e.--they are in an impacted title and GCA/RCA) they would continue to be eligible. In addition, they would retain their NCS date for seniority purposes in the granting of the VTP offer and if they were granted the VTP offer their payments would be calculated using their NCS date as described in the collective bargaining agreements, Article 25 and/or Article 43 (CWA) and G25 (IBEW).

**10.    What happens if I accept VTP and become reemployed by AT&T at a later date?**

If you are re-employed as a regular full–time or regular part-time employee of AT&T Corp. or any AT&T affiliate, some of the Voluntary Termination Pay that you have been issued may be subject to repayment prior to re-employment. (For example, if you were entitled to 10 weeks of Voluntary Termination Pay and returned to AT&T's employment in 4 weeks, you would be required to pay back 6 weeks of the Voluntary Termination Pay.) If you are receiving stream (weekly) payments, they will be discontinued once you are re-employed.

**11.    Will there be a surplus declared if AT&T does not get enough volunteers to meet the company goal?**

The company is offering VTP in hopes of minimizing involuntary separations. If the voluntary numbers do not meet the company's goal, involuntary reductions may be necessary.

**12.  Do I need to pay back tuition assistance, if I take the VTP offer and leave payroll prior to completion of an approved tuition course?**

If you were an active employee when you started the course and you leave the AT&T payroll through a VTP Offer, the Tuition Assistance Center may waive an employees obligation to repay AT&T for tuition and allowed expenses by having the Manager provide a written explanation that you left AT&T via a VTP Offer, to the TAC, as long as you have met the other criteria as identified on the TAP website:

http://wfs.web.att.com/WFS/content/0,1452,IE5-3007-509-511-542-546,00.html.

If you do not have access to the web, call 877 HR ANSWERS, (877-472-6693) Press 5, then 1 where your tuition assistance questions can be answered.

**13.  What is the status of any Academic Award that my dependent child received during my employment if I leave AT&T through a VTP offer?**

If you were an active, eligible employee when the original award was granted and you leave the AT&T Payroll through a VTP offer, scholarship renewals will carry forward for those individuals who continue to meet the program eligibility requirements. New awards will only be granted to the children of active, eligible AT&T employees at the time that new awards are announced or at the time that awards are granted.

For more information on the Academic Awards program, please access the following website: http://www.edu.att.com/edu/aap/index.htm

**14.  If I take VTP will I be eligible for Alliance training?**

Yes.  Employees who leave the Company under VTP are eligible for Alliance training.

**15.  If I take VTP will I be eligible for Funds For Alliance Distribution (FAD)?**

No.  FAD is a program provided to employees who are involuntarily terminated due to force adjustment.  If you have additional questions, please contact the Alliance National Headquarters at 1-800-323-3436 or visit the Alliance web site at www.employeegrowth.com.

**16.  What is The Alliance and how can it help me?**

The Alliance for Employee Growth and Development was created out of the 1989 Collective Bargaining Agreement to serve AT&T bargaining unit employees.  The Alliance helps employees to take positive action in their career and personal development by seeking employment security through skill enhancement.  The Alliance can help you to develop effective and realistic career goals and provide you with the support necessary to reach these goals.  See www.employeegrowth.com or call 800-323-3436 for the latest information about Alliance Educational Opportunities and Employability Support.

**17. What types of services does the Alliance provide for employees?**

Alliance Options available to you are:

- Local Group Training
- Individual Training Options
- Alliance Pre-Paid Tuition (up to maximum for active employees)

Appendix D

## SECTION V
## STAFFING

**1.    Is an employee eligible for recall if they elect to leave under VTP?**

No.  This is a voluntary offer, not a surplus; therefore, there are no provisions for recall.

**2.    Will an employee leaving under VTP be eligible for ARS participation?**

No.  This is a voluntary offer, not a surplus; therefore, there are no provisions for ARS participation.

**3.    If I received previous termination pay and I'm granted VTP will my previous termination payment be deducted from my VTP payment?**

Your VTP payments will be offset by any previous termination payments you have received. Please refer to your appropriate collective bargaining agreement (Article 25 paragraph 5 and/or Article 43, Section 13, Paragraph 5, of the CWA contract or Article G25 paragraph (4c) of the IBEW contract).

01830

**Appendix D**

## SECTION VI
## TRANSITION LEAVE OF ABSENCE

1. **Will the 4 ATTOP Options (Special Leave Program, Optional Termination Pay, Extended Compensation Option and Transitional Leave of Absence) be offered with VTP?**

Employees leaving under VTP are not eligible for the ATTOP options, with the exception of TLA for retirement-related benefits.

2. **If I am within one year of retirement-related benefits eligibility, may I take a Transition Leave of Absence (TLA) and still receive my VTP payment?**

Yes, TLA will be available. An employee taking a TLA will receive the VTP payment within 30 days of the start of their Transitional Leave of Absence.

3. **If an employee takes a TLA, how long will they be eligible to remain on it?**

A Transitional Leave of Absence cannot exceed one year from the date the leave starts (leave expires on the first calendar date anniversary of your Company-specified separation date), but in any case, will end on the earliest of:

- the day prior to employee attaining required age and/or service to become retirement-related benefits eligible, <u>or</u>
- the date employee is hired by:
  - AT&T, or
  - any entity within AT&T's controlled group of corporations within the meaning of Section 1563 of the Internal Revenue Code (generally, this means that AT&T directly or indirectly owns 80%), or
  - any other company that participates in AT&T's pension plans, or
  - any company covered by the Mandatory Portability Agreement and the employee is covered under that agreement and **does not** elect to waive such coverage, or
  - any other company with which there is an agreement for the interchange of benefit obligations, and the employee is covered under this agreement.

  <u>NOTE</u>: The TLA will be canceled retroactive to the employee's last day on the active payroll of the AT&TPP participating company prior to the start of the TLA. Service credit will not be granted for the period of the TLA and retirement-related benefits eligibility will not be attained. The employee will be subject to the applicable bridging rules for bridging of prior service, <u>or</u>

- the date of the employees death (retirement-related benefits eligibility is not attained since the TLA is not completed)

**01831**

AT&T Proprietary – Use Pursuant to Company Instructions

09-21-04

87

**4. If an employee is currently eligible for "retirement-related benefits" when they elect VTP, but they don't have 30 years can they take a TLA?**

No, TLA eligibility is for those employees who are within one year of the actual age and/or service requirements for a retirement-related benefit under the AT&TPP, once an employee is retirement-related benefits eligible they are no longer eligible for TLA.

**5. Is an employee eligible for Benefits during a TLA?**

Benefits are provided during a TLA in accordance with the provisions of the respective plans or programs.

**Medical Expense Plan**
The participating company will pay the necessary cost to continue coverage on the same basis as for active employees under the AT&T Medical Expense Plan for Occupational Employees for twelve (12) months of your TLA. If you are enrolled in an HMO, you are responsible to continue to pay the HMO employee contributions.

**Dental Expense Plan**
The participating company will pay the necessary cost to continue coverage on the same basis as for active employees under the AT&T Dental Expense Plan for Occupational Employees for twelve (12) months of your TLA.

**Vision Care Plan**
The participating company will pay the necessary cost to continue coverage on the same basis as for active employees under the AT&T Vision Care Plan for one (1) month after TLA commences and you may continue coverage thereafter under COBRA continuation coverage for up to an additional seventeen (17) months by paying the coverage premium set forth in the COBRA billing statement.

Shortly after you leave on Transitional Leave of Absence, SHPS, Inc. will mail you a COBRA continuation coverage package. It is imperative that you carefully review this package to determine what action you are required to take to ensure continued health coverage. Should you have any questions regarding COBRA, you must call SHPS, Inc. at 800-277-4038.

01832