## UNITED STATED DISTRICT COURT
## FOR THE
## DISTRICT OF MASSACHUSETTS

-------------------------------------------------------------x

BEVERLY A. GEORGE,

                   Plaintiff,

       v.                                             Civil Action No. 05 11079 (DPW)

AT&T CORP.,

                   Defendant.

-------------------------------------------------------------x

## PLAINTIFF BEVERLY A. GEORGE'S MEMORANDUM IN OPPOSITION TO DEFENDANT AT&T CORP.'S MOTION FOR SUMMARY JUDGMENT

NOW COMES, the Plaintiff, Beverly A. George ("Plaintiff") and respectfully submits this Memorandum in Opposition to Defendant AT&T Corp.'s Motion for Summary Judgment.

### FACTS

Plaintiff began working for Defendant AT&T Corp. ("Defendant") in the 1970s. Her net credited service date was July 28, 1974, due to various time off from her employment with the Defendant. In 2004, Plaintiff was employed by Defendant at the Fairhaven Call Center, located at 200 Mill Road, Fairhaven, Massachusetts (the, "Fairhaven Facility"). Plaintiff worked in operator services for AT&T Consumer Division.

During her period of employment with Defendant, Plaintiff was a member of the Communication Workers of America (the, "CWA"). Therefore, the terms and conditions of her employment were governed by a Collective Bargaining Agreement ("CBA") between Defendant and the CWA. (Defendant's Statement of Undisputed Material Fact ("DSUF") at ¶¶ 1, 7). Article 25

1

of the CBA provided employees with the right to receive termination payoffs in the event of a workforce reduction at defendant's facilities.

In summer 2003, pursuant to the policy of the Defendant, Plaintiff chose her 2004 vacation for the last two (2) weeks in July with the possibility of retirement at the end of her vacation. Plaintiff testified that a number of factors were considered before she made her decision to retire. (DSUF, ¶¶ 29,31).  Plaintiff testified that the pivotal factor that she relied upon in making her decision to retire was the responses she received from Defendant's management relative to the fate of the workforce at the Fairhaven Facility. (PR at ¶¶ 27, 30 and 32)

From December 2003, through May/June 2004, Defendant published numerous announcements concerning the effect that the expiration of various Federal Communications Commission regulations would have on the ability of the Defendant to continue its operations in the consumer sector.  (Plaintiff's Response to Defendant's Statement of Undisputed Facts ("PR") at ¶¶65-66)  Several of these publications discussed regional exits and exit strategies for the Consumer Division.  (PR at ¶¶ 65-67)

In May 2004, Plaintiff noticed an abnormally large drop-off, thirty-three (33%) percent, in the call volume at the Fairhaven Facility.  (PR at ¶35) Plaintiff therefore began inquiring of AT&T management about whether Defendant was planning a workforce reduction or closing of the Fairhaven Facility.

On a number of occasions Plaintiff inquired of her acting manager, Mary C. Eustace ("Eustace"), who repeatedly replied in the negative. (DSUF at ¶ 39) Eustace did not check with her superiors to confirm the accuracy of her replies notwithstanding the fact that she knew there was going to be an announcement.  (PR at ¶39)

2

Plaintiff requested her retirement package from Defendant's pension center on June 18, 2004. (DSUF at ¶52)  At this point Plaintiff's decision to retire was not final.[1]  (PR at ¶52) Plaintiff was still considering a number of factors in finalizing her decision to retire.  (DSUF at ¶ 30)

Strangely, Eustace inquired if Plaintiff had turned in her retirement paperwork before she even requested it.  (DSUF at ¶ 42; PR at ¶42).  Plaintiff responded she would if all went well. (DSUF at ¶43)  Plaintiff's response concerned the inquiries she was making relative to the fate of the workforce at the Fairhaven Facility.  (PR at ¶43)

Eustace thereafter conducted a retirement interview with Plaintiff despite Plaintiff's repeated protests that her decision was not yet final.  (DSUF at ¶55; PR at ¶ 55)  Eustace conducted this interview before Plaintiff requested her paperwork.  (PR at ¶55)  Defendant published this interview in the Fairhaven Flyer prior to George submitting the paperwork for processing.  (PR at  ¶55)

Plaintiff also inquired relative to Defendant's intent to downsize or close the Fairhaven Facility of a group of managers from Defendant's headquarters (the, "HQ managers").  (DSUF at ¶44).  These managers arrived in early June 2004.  (DSUF at ¶44) The managers (names unknown) replied in the negative.  (DSUF at ¶45)

In early July 2004, Plaintiff stopped Cappuccio in the hallway of the Fairhaven Facility. Plaintiff specifically inquired of Defendant's intent to downsize or close the Fairhaven Facility.  (PR at ¶47) Cappuccio replied that they were not going to close or downsize.  (DSUF at ¶48)

Rumors existed relative to the possibility of a workforce reduction at the Fairhaven Facility, especially after Defendant's announcements throughout the first half of 2004.  On three prior occasions, Cappuccio held herself out as a contact person with knowledge of the truth or veracity

---

[1] On at least one other occasion, Plaintiff requested retirement paperwork from the pension center, only to thereafter decide not to retire at that point due to various factors under consideration at the time.  (PR at ¶52)

3

of the rumors.  (PR at ¶33-34)

Cappuccio testified that a possible workforce reduction, instead of a closing of the Fairhaven Facility, was not something she ever considered, talked about or thought would happen.  (PR at ¶ 50)  Nonetheless, Cappuccio did not make inquiry of her superiors as to the truth of her responses. (DSUF at ¶ 49).  Cappuccio never testified that she could not have obtained the information, only that she never made inquiry.  (DSUF at ¶ 49; PR at ¶51)

In reliance on the repeated assurances of her acting manager, Eustace, the HQ managers and Defendant's Regional Director, Cappuccio, the Plaintiff decided to retire.  (PR at ¶¶ 27, 30 and 32) Plaintiff submitted her retirement package on July 10, 2004.  (DSUF at ¶ 53)  Defendant received the package on July 13, 2004.  (PR at ¶ 9)  Plaintiff's last day on active payroll was July 30, 2004, with thirty (30) years of net credited service to Defendant. (DSUF at ¶ 9)

As of July 30, 2004, Plaintiff was no longer an employee of the Defendant as defined in the CBA.  The CBA only applies to employees of AT&T Corp.  (PR at ¶ 21)

Defendant owned the building housing the Fairhaven Facility.  (DSUF at ¶56) On September 1, 2004, Defendant sold the building housing the Fairhaven Facility.  (DSUF at ¶ 59)  Defendant entered into a leasing arrangement with the grantee whereby it continued to occupy only a portion of the building.  Defendant knew, at least as of December 2003, that it would be substantially reducing the amount of space it occupied at the building.  (PR at ¶58, 62)

On September 13, 2004, Defendant announced a workforce reduction at the Fairhaven Facility through a Voluntary Termination Pay Offer (the, "VTP").  (DSUF at ¶ 11) Defendant's announcement did not reach the public until September 14, 2004, through local news outlets.  (PR at ¶) Plaintiff, not a resident of Fairhaven, did not learn of the VTP until October 2004, after

speaking with former colleagues.  (PR at ¶11) If Plaintiff had not retired, she would have been entitled to one hundred weeks of separation payments under the terms of the VTP.  (DSUF at ¶25)

On November 16, 2004, Plaintiff wrote to Linda Teoli ("Teoli"), President of CWA Local 1051, to request a grievance be filed on her behalf concerning the loss of the separation payments.  (DSUF at ¶¶17-18)  On December 9, 2004, CWA Local 1051 filed a grievance claiming a violation of Section 6(a) of Article 25. (DSUF ¶19) George's sole remedy under the CBA was to submit her claims through the CWA.  (PR at ¶19)

On December 14, 2004, Defendant denied the grievance, stating that it was: (1) untimely; and, (2) that the Defendant does not accept grievances from retired employees.  (DSUF at ¶ 21)  The CBA requires all grievances to be brought within sixty (60) calendar days of the disputed action.  (DSUF at ¶ 21)  The CBA also only applies to the Defendant's employees who are CWA members. (PR at ¶21)

Teoli replied to Plaintiff stating that her grievance was untimely and that Defendant did not accept grievances from retired employees.  (DSUF at ¶ 22; PR at ¶ 22)  Plaintiff attempted to appeal the decision by letter dated December 19, 2004, addressed to Bill Bates ("Bates"), CWA Representative.  (DSUF at ¶23)  Bates replied that CWA agreed with the Defendant's refusal to accept the grievance. (DSUF at ¶24) Plaintiff wrote to the President of CWA, Morton Bahr ("Bahr"), seeking further review.  (DSUF at ¶25) By letter dated February 14, 2005, Frederick W. Cory replied that the Defendant's conclusion was correct and that the CWA agreed with the Defendant's assessment of Plaintiff's grievance.  (DSUF at ¶ 26).  Teoli testified that CWA agreed with Defendant's position and would not take any further action on Plaintiff's behalf.  (PR at ¶ 22)

**ARGUMENT**

**I.      Summary Judgment Standard**

Plaintiff incorporates by reference the Summary Judgment Standard contained in Defendant's Memorandum in support of its Motion for Summary Judgment.  Defendant's Memorandum at 5-6. "In ruling on the motion, the Court must view the facts in the light most favorable to the non-moving party ... drawing all reasonable inferences in that party's favor."  Bienkowski v. Northeastern University, 285 F.3d 138, 140 (1st Cir. 2002).

Viewed in the light most favorable to the Plaintiff, genuine issues of material fact remain as to: (1) whether Plaintiff's claims are preempted by the collective bargaining agreement; and, (2) whether the Plaintiff can sustain her claims of negligent and intentional misrepresentation.

**II.     Plaintiff's Misrepresentation Claims Are Not Preempted By The Collective Bargaining Agreement.**

"Suits for violation of contracts between an employer and a labor organization representing employees in an industry ... may be brought in any district court of the United States having jurisdiction of the parties."  29 U.S.C. § 185(a) (the, "Labor Management Relations Act" or "LMRA").  Claims that arise under a collective bargaining agreement, even when brought under state law causes of action, are subject to the preemption provisions of Section 301 of the LMRA.  See, e.g. Allis-Chalmers Corp. v. Lueck, 471 U.S. 202 (1985); Gibson v. AT&T Technologies 782 F.2d 686 (7th Cir. 1986).  Plaintiff brought suit under two (2) state law theories of misrepresentation, negligent and intentional.  If the resolution of Plaintiff's claims is "substantially dependent upon an analysis of the terms of [a collective bargaining agreement]" this court should treat it as a claim brought under the LMRA, subject to the preemption provisions.  Lueck, 471 U.S. 202 at 220-221.

If the LMRA does apply to Plaintiff's claims the Defendant must prove an adequate remedy under the contract and the Plaintiff's failure to pursue that remedy for the preemption provisions to apply. Doty v. Sewall, 908 F.2d 1053, 1061 (1st Cir. 1990).

Furthermore, there are exceptions to the exhaustion of remedies requirement. Exhaustion is not required where it would be "futile, where the union breaches its duty of representation, or where union remedies are otherwise inadequate." Vaca v. Sipes, 386 U.S. 171, 184-188, 87 S.Ct. 903 (1967). For the following reasons, Plaintiff's claims do not substantially depend on an analysis of the terms of the CBA and therefore do not give rise to a Section 301 analysis. To the extent that they fall under the umbrella of Federal labor law, Defendant has failed to prove an adequate remedy under the CBA nor proven Plaintiff's failure to pursue that remedy. Finally, Plaintiff's claims fall within an exception to the exhaustion requirement and therefore are not preempted by the LMRA.

A.      Plaintiff's Claims are not "substantially dependent" upon an analysis of the CBA and therefore are not subject to Federal Labor Law.

"If the resolution of a state law claim *depends upon the meaning of a collective-bargaining agreement*, the application of state law ... is pre-empted and federal labor-law principles ... must be employed to resolve the dispute." Lydon v. Boston Sand & Gravel, 175 F.3d 6, 10 (1st Cir. 1999). The "bare fact that a collective-bargaining agreement will be consulted in the course of state-law litigation plainly does not require the claim to be extinguished." Id. citing Livadas v. Bradshaw, 512 U.S. 107, 124, 114 S.Ct. 2068 (1994) (internal citations omitted). The "premise is that this means a *real* interpretive dispute and not merely a pretended dispute." Martin v. Shaw's supermarkets, Inc., 105 F.3d 40, 42 (1st Cir. 1997).

A state law claim can depend on the meaning of a collective bargaining agreement in two ways. "First, a claim so qualifies if it alleged conduct that arguably constitutes a breach of a duty that arises pursuant to the CBA." Flibotte v. Pa. Truck Lines, Inc., 131 F.3d 21, 26 (1st Cir. 1997). "Second, a claim so qualifies if its resolution hinges upon an interpretation of the CBA." Id. This has been commonly referred to as the "duty" rubric or the "interpretation" rubric. Id.

For a claim to arise under the duty rubric, the CBA must "specify the parties rights and duties contractually." White v. Bell Atlantic Yellow Pages, 2004 WL 594957 (D.Mass. 1997) (Woodlock, J.), citing Bertrand v. Quincy Mkt. Cold Storage & Warehouse Co., 728 F.2d 568, 568 (1st Cir. 1984). Plaintiff's claims are distinguishable from situations involving a breach of duty under the CBA. In this regard, Plaintiff's claims are analogous to those in White.

In White, this Court found the plaintiff's claims distinguishable "because no provision in the CBA directly applies to their claim that Verizon misrepresented its intentions." Id. at 11. Therefore, this Court analyzed the possibility of preemption under the LMRA under the interpretation rubric only. Id. Similar to White, Defendant has not pointed to any provision of the CBA which directly applies to Plaintiff's misrepresentation claims. As there is no remedy under the CBA for misrepresentation claims, there is no alleged breach of duty under the terms of the CBA. As such, Plaintiff's claims are not subject to the LMRA under the "duty rubric".

The interpretation rubric was addressed by the Supreme Court in Lueck, supra. The Court found that "questions relating to what the parties to a labor agreement agreed, and what legal consequences were intended to flow from breaches of that agreement must be resolved by reference to uniform federal law." Lueck, 471 U.S. at 211. The Court noted, however, that "not every dispute concerning employment, or tangentially involving a provision of a [CBA], is preempted by §301."

Id.

Plaintiff's claims do not involve interpretation of the provisions of the CBA. In the instant case, Plaintiff and Defendant are in agreement as to the interpretation of the provisions of the CBA which will be tangentially consulted throughout the litigation. See Pltff's A. at 28-32. The parties agree that if Plaintiff was still employed in September 2004, she would have been eligible for the VTP and entitled to one hundred (100) weeks of payments. See Pltffs A. at 28-32. There is no real interpretive dispute involving the CBA.

This case is similar to the factual situation underlying Rand v. Bath Iron Works Corp., 2001 WL 127655, 167 L.R.R.M. (BNA 2617 (D.Me. 2001). In Rand, the plaintiffs brought various claims against the defendant for fraud and misrepresentation. Id. at 4. The court, in finding the plaintiffs claims not preempted by the LMRA, held that there was "no bona fide dispute necessitating interpretation of applicable CBA ... provisions." Id. at 5. Therefore, Plaintiff's claims were not subject to the LMRA.

In the instant case, as with the Rand plaintiffs, Plaintiff can testify as to her wages and "net credited service" to the Defendant. As in Rand, there is no dispute necessitating interpretation of the CBA provisions. The parties are in agreement as to the effect of the CBA. This case is more analogous to a situation of "purely factual questions about an ... employer's conduct and motives." Flibotte, 131 F.3d at 26 [internal citations omitted].

Plaintiff's claims do not involve a duty under the CBA Defendant allegedly breached. Nor do they present an interpretative dispute as to the effect or provisions of the CBA. Therefore Summary Judgment must be denied.

B.    Even if the LMRA applies, Defendant has failed to prove that a remedy existed under the CBA and Plaintiff's failure to pursue that remedy.

Assuming arguendo that Plaintiff's claims do depend upon the meaning of the CBA, the Defendant is then under a duty to prove "not only the existence of an adequate [CBA] remedy, but also [Plaintiff's] failure to pursue that remedy." Doty, supra, at 1061.

Pursuant to the terms of the CBA, employees are required to pursue their claim, through for example, the grievance procedure, within sixty (60) days of the action or failure to act which forms the basis of the complaint. (PR at ¶ 19) The Defendant's allegedly tortious actions forming the basis of Plaintiff's grievance (and now this suit) occurred prior to the finalization of her decision to retire on July 10, 2004. (PR at ¶¶ 11, 27) The Defendant's announcement of the VTP did not reach the public until September 14, 2004. (PR at 11) Plaintiff did not find out about the VTP until October 2004. PR at ¶ 11.

Defendant denied the grievance on two (2) grounds: (1) as untimely; and, (2) that the company does not accept grievances from retired employees. The actions giving rise to Plaintiff's grievance occurred more than sixty (60) days prior to the date Plaintiff gained knowledge of the actions. Plaintiff attempted on two (2) subsequent occasions to obtain redress through the CWA, including requesting the CWA appeal the decision. Each attempt was stymied by the CWA's agreement with Defendant's assessment and refusal to take further action. (DSUF at ¶¶ 22-26; PR at ¶ 22)

Defendant also denied Plaintiff's grievance on the grounds that it does not accept grievances from retired employees. (DSUF at ¶ 21) A genuine issue of material fact exists as to whether the CBA provides a remedy for retired employees. Defendant produced no evidence to meet its burden that the second ground for denial was either inaccurate or that Plaintiff would have been an exception

10

to this rule.

The express terms of the CBA restrict its application to employees, not retired employees. (PR at ¶ 21) Defendant states that the CWA did not comment on the second grounds. However, the CWA did mention it in Teoli's initial response apprising Plaintiff of Defendant's decision. Teoli testified at deposition that the CWA would not pursue her claims any further upon Defendant's denial. This fact is supported by the two (2) letters from Bahr and Cory setting forth CWA's absolute agreement with Defendant's assessment.

The time limitations imposed by the CBA did not provide Plaintiff with a remedy under the contract. For Plaintiff to have brought her grievance in a timely fashion (i.e. within sixty days after the conduct giving rise) she would have had to file her grievance before the VTP was offered. Furthermore, a genuine issue of material fact exists as to the availability of a remedy under the CBA for retired employees. Plaintiff attempted to pursue the remedies available to her immediately after gaining knowledge of the VTP. Due to Defendant's failure to announce the VTP until September 2004, Plaintiff was not able to use the remedies provided because of the time lapse between the aggrieved action and the date Plaintiff learned of the VTP. Defendant has not met its burden and Summary Judgment must be denied..

       C.    <u>Plaintiff's Claims Fall Under an Exception to the Exhaustion Requirement</u>.

To the extent that this Court finds Plaintiff to have had a remedy under the CBA requiring exhaustion, her claims fall within an exception to the exhaustion requirement. Exhaustion is not required where it would be "futile, where the union breaches its duty of representation, or where union remedies are otherwise inadequate." <u>Vaca v. Sipes,</u> 386 U.S. 171, 184-188, 87 S.Ct. 903 (1967). Therefore, Summary Judgment must be denied.

11

Plaintiff attempted to file her grievance in November 2004, immediately after learning of the VTP offer in October 2004. Defendant denied her grievance because (1) it was untimely; and, (2) the company does not accept grievances from retired employees. (DSUF at ¶ 21). Plaintiff requested the CWA appeal the denial of the grievance. CWA repeatedly advised her that they agreed with Defendant's assessment of the claim. Teoli testified that the union was not going to take any more action on her behalf relative to the grievance. Therefore, further pursuit of her remedy under the CBA would have been futile.

The terms of the CBA required Plaintiff to pursue her remedy, assuming one existed, through the union. (PR at ¶ 19) In this instance, however, the union was not willing to further pursue her remedy, assuming one existed. After the denial of her grievance, Plaintiff attempted to appeal and pursue her remedy by writing to Union Representative Bates and CWA President Bahr. Each inquiry was met with the same response, i.e. that the union agreed with the Defendant's assessment and would take no further action. Requiring a former employee to exhaust whatever remedies may have existed when the union is not willing to assist the pursuit, is futile.

The same arguments apply with equal force to the exceptions for the union's breach of its duty of representation and that the union's remedies were otherwise inadequate. Plaintiff could not have brought her grievance within the negotiated sixty (60) day time frame. The union refused to take any further action on her behalf or appeal the Defendant's assessment of her grievance. The union's refusal came from Cory, CWA counsel, after Plaintiff's correspondence with CWA President Bahr.

Plaintiff's claims fall within the exceptions to the exhaustion requirement. Pursuing further remedy in light of the union's position would have been futile. The union refused to take any further

12

action, such directive coming after inquiry of the CWA President. Lastly, union remedies in this case were inadequate. Plaintiff could not have learned of the disputed action within the sixty (60) days mandated by the CBA. The Defendant does not accept grievances from retired employees. Based upon the foregoing, Defendant's Motion for Summary Judgment must be denied.

## II.    Genuine Issues of Material Fact Exist as to Plaintiff's Misrepresentation Claims.

Defendant argues that Plaintiff's misrepresentation claims are unfounded and therefore Summary Judgment is appropriate. Defendant's Memorandum at 9. To sustain her misrepresentation claim, Plaintiff "must show a false statement of a material fact made to induce the plaintiff to act, together with reliance on the false statement to the plaintiff's detriment." Rodowicz v. Mass. Mut. Life Ins. Co., 279 F.3d 36, 42 (1st Cir. 2002) [internal citations omitted]. "The speaker need not know the statement is false if the truth is reasonably susceptible of actual knowledge, or otherwise expressed, if through a modicum of diligence, accurate facts are available to the speaker." Id.

The record shows that from December 2003, through July 2004, Defendant made statements to the effect that union jobs would be lost if the regulatory framework at the FCC expired. Defendant made these statements in its AT&T Today publication and in its 2003 Annual Report to Stockholders. These regulations expired in June 2004.

Immediately thereafter, Defendant announced it was pulling out of consumer services in several states, including states in the Northeast Region over which Cappuccio served as Director. Defendant produced no evidence to prove that the decision to reduce the workforce at the Fairhaven Facility was made subsequent to July 10, 2004, the date on which Plaintiff completed her retirement package. However, Plaintiff has produced evidence showing that a similar decision to close a facility

in September 1994, was made in May of that year.  Defendant's past practice creates a genuine issue of material fact as to the truth or falsity of the statements made by Eustace, Cappuccio and the HQ managers throughout June and July 2004.  See, e.g. White, supra, at 14; Waterman S.S. v. 350 Bundles of Hardboard, 603 F.Supp. 490 (D. Mass. 1984).

Viewed in the light most favorable to the Plaintiff, the record is sufficient for a jury to find that the decision to downsize the workforce at the fairhaven Facility was made prior to Eustace and Cappuccio's statements to the Plaintiff.  Eustace testified that she knew an announcement was coming.  Defendant announced that  regional exits were underway.  From December 2003 through June 2004, AT&T made numerous statements predicting the exact result which occurred through the September 2004 workforce reduction at Fairhaven. Indeed, as far back as December 2003, Defendant knew that it was gong to dramatically reduce the amount of space it was going to be occupying at the building housing the Fairhaven Facility.  These facts are sufficient for a jury to find that the decision to reduce the workforce at the Fairhaven Facility was made prior to Eustace and Cappuccio's statements.

Plaintiff testified both during her deposition and in her affidavit filed herewith, that it was the statements of Eustace, the HQ Managers, and Cappuccio which induced her to finalize her decision to retire.  She testified that she relied on the Defendants' statements and that they were the pivotal factor in her decision.  Cappuccio, Defendant's Regional Director, held herself out on three (3) separate occasions as a person with knowledge of the truth or veracity of rumors of a workforce reduction or closing.  It was Cappuccio's statements which George testified were pivotal in her decision.

14

Furthermore, Plaintiff testified that Eustace forced her to submit to a retirement interview in May 2004, before she requested her retirement package and before she finalized her decision to retire. Eustace did this over Plaintiff's objection. Furthermore, Eustace asked Plaintiff about the status of her retirement paperwork. Both Eustace and Cappuccio admittedly knew that Plaintiff was considering retirement throughout this period, yet repeatedly assured her that no workforce reduction was imminent. This is sufficient for a jury to find that Cappuccio and Eustace knew that Plaintiff would rely on their responses in making her decision and therefore meets Plaintiff's burden as to this element of misrepresentation.

Cappuccio and Eustace both testified that they did not check with their superiors to determine the truth or veracity of Plaintiff's inquiry. They immediately answered in the negative. Plaintiff presented testimony, by way of deposition and affidavit, that at prior facilities during her tenure in defendant's employ, Defendant's management team would check with their superiors before responding to an inquiry relative to an intended workforce reduction.

Cappuccio held herself out on multiple occasions as a contact person with regard to the rumors regarding a workforce reduction at the Fairhaven Facility. Cappuccio testified that the reduction in workforce was not something she ever thought about or even talked about. She did not testify that the truth or veracity of the answer could not have been obtained through reasonable inquiry. She merely testified that she failed to make inquiry. This is sufficient for a jury to find that the truth of the statement was reasonably susceptible of actual knowledge or that accurate facts would have been available to her at the time.

Unlike Rodowicz, Plaintiff has produced evidence that the Defendant had in effect a plan to reduce workforce. The 2003 Annual Statement to Stockholders discusses the Company's intent to

effectuate further workforce reductions in 2004. It addresses the impact on the Defendant's ability to operate its consumer division. Defendant made numerous statements throughout the first half of 2004 indicating that union jobs would be lost. Eustace testified that she knew an announcement was coming and that they were just waiting for it. Finally, Plaintiff produced evidence relative to Defendant's past practice as to the timing of a decision to reduce a workforce. These facts distinguish Plaintiff's claims from the claims in <u>Rodowicz</u>. Therefore, Summary Judgment must be denied.

## CONCLUSION

For all the above stated reasons, and based upon the record as a whole and viewed in the light most favorable to the Plaintiff, Plaintiff respectfully requests that this Court deny Defendant's Motion for Summary Judgment.

**BEVERLY A. GEORGE**,

By her attorneys,

/s/ Blake J. Godbout
Blake J. Godbout (BBO#196380)
**BLAKE J. GODBOUT & ASSOCIATES**
33 Broad Street, 11th Floor
Boston, MA 02109
(617) 523-6677

Dated: March 28, 2006

**CERTIFICATE OF SERVICE**

I, Blake J. Godbout, hereby certify that a true copy of the above document was served upon the attorney of record for each party by first class mail, postage prepaid, on March 28, 2006.

_____/s/ Blake J. Godbout_____
Blake J. Godbout
