**UNITED STATED DISTRICT COURT**
**FOR THE**
**DISTRICT OF MASSACHUSETTS**

-------------------------------------------------------------x

BEVERLY A. GEORGE,

                Plaintiff,

      v.                                    Civil Action No. 05 11079 (DPW)

AT&T CORP.,

                Defendant.

-------------------------------------------------------------x

**PLAINTIFF BEVERLY A. GEORGE'S RESPONSE TO DEFENDANT'S STATEMENT**
**OF UNDISPUTED MATERIAL FACTS**

      NOW COMES Plaintiff Beverly A. George ("Plaintiff") and pursuant to Rule 56 of the

Federal Rules of Civil Procedure, hereby responds to Defendant AT&T Corp.'s ("Defendant")

Statement of Undisputed Material Facts as follows:

**I.      THE PARTIES**

      1.   The Plaintiff disputes the facts contained in Paragraph 1 of AT&T's Statement.  At

the time the Voluntary Termination Pay Offer was announced to the public and at the time she

submitted her grievance, the Plaintiff was no longer an employee of AT&T Corp.  See Appendix

to Defendant's Statement of Undisputed Material Fact (hereinafter "Def. A.") at 3, 28 and 75;

see also Appendix to Plaintiff's Response to Defendant's Statement of Undisputed Facts

(hereinafter "Pltff's A.") at 78.

      2.  Plaintiff does not dispute the facts contained in Paragraph 2.

      3.  Plaintiff does not dispute the facts contained in Paragraph 3.

1

4.  Plaintiff does not dispute the facts contained in Paragraph 4.

5.  Plaintiff does not dispute the facts contained in Paragraph 5.

6.  Plaintiff does not dispute the facts contained in Paragraph 6.

7.  Plaintiff disputes the facts contained in Paragraph 7.  At the time she retired, she was no longer an employee of the Defendant and not covered by the terms of the Collective Bargaining Agreement.  (Def.. A. at 4-5; Pltff's A. at 35-36)  AT&T does not accept grievances from retired employees.  (Def. A. at 42-49)

## II.    THE CLAIM

8.  Plaintiff does not dispute the facts contained in Paragraph 8.

9.  Plaintiff does not dispute the facts contained in Paragraph 9.  Plaintiff states further that Plaintiff completed her retirement paperwork on July 10, 2004.  (Def. A. at 3; Pltff's A. at 29, 78)  AT&T received the retirement paperwork on July 13, 2004.  (Pltff's A. at 4, 78)

10.  Plaintiff does not dispute the facts contained in Paragraph 10.

11.  Plaintiff does not dispute the facts contained in Paragraph 11.  Plaintiff states further that the announcement did not reach the public until September 14, 2004.  (Def's A. at 28-29)  Plaintiff does not read the paper in which it was announced and did not learn of the downsizing announcement until October 2005 after speaking with several of her former AT&T colleagues.  (Pltff's A. at 4-6, 78)

12.  Plaintiff does not dispute the facts contained in Paragraph 12.

13.  Plaintiff does not dispute the facts contained in Paragraph 13.

14.  Plaintiff does not dispute the facts contained in Paragraph 14.

15.  Plaintiff disputes the facts contained in Paragraph 15.  The VTP offer states that the offer will not be extended retroactively to employees who recently voluntarily retired from the

company.  (Def. A. at 40)

16.  Plaintiff does not dispute the facts contained in Paragraph 16.

## III.    THE GRIEVANCE

17.   Plaintiff disputes the facts contained in Paragraph 17.   Plaintiff learned of the downsizing several weeks after the announcement by way of conversations with third-parties. (Pltff's A. at 4-6, 78)

18.  Plaintiff does not dispute the facts contained in Paragraph 18.

19.  Plaintiff does not dispute the facts contained in Paragraph 19.  Plaintiff states further that the collective bargaining agreement requires employees desiring to bring a grievance to submit it through the union, in this case to the Communication Workers of America ("CWA"), within sixty (60) days of the disputed action.  (Pltff's A. at 37)

20.  Plaintiff does not dispute the facts contained in Paragraph 20.

21.  Plaintiff does not dispute the facts contained in Paragraph 21.  Plaintiff further states that the collective bargaining agreement only applies to employees of the company.  (Pltff's A. at 35-36)

22.  Plaintiff does not dispute the facts contained in Paragraph 22.  Plaintiff further states that Linda Teoli, President of CWA Local 1051 ("Teoli"), also stated that Defendant also does not accept grievances from retired employees.  (Def. A. at 43, 46, 48 and 49)  Teoli further testified that CWA agreed with AT&T's position as to Plaintiff's grievance and would not take any further action.  (Pltff's A. at 11)

23.  Plaintiff does not dispute the facts contained in Paragraph 23.

24.  Plaintiff does not dispute the facts contained in Paragraph 24.

25.  Plaintiff does not dispute the facts contained in Paragraph 25.

3

26.  Plaintiff does not dispute the facts contained in Paragraph 26.  Plaintiff states further that the Union would not agree to pursue an appeal, or take any further action on Plaintiff's behalf relative to the grievance.  (Def's A. at 43, 46, 48 and 49).

## IV.  PLAINTIFF'S DECISION TO RETIRE AND THE ALLEGED MISREPRESENTATIONS

27.  Plaintiff does not dispute the facts contained in Paragraph 27.  Plaintiff states further that the decision to retire was not finalized until July 10, 2004, after receiving repeated assurances from Defendant that the Fairhaven, Massachusetts Call Center (the, "Fairhaven Facility") would not be downsizing or closing.  (Def's A. at 9, 14, 15, 23 and 25; Pltff's A. at 78-80)

28.  Plaintiff does not dispute the facts contained in Paragraph 28.

29.  Plaintiff does not dispute the facts contained in Paragraph 29.

30.  Plaintiff does not dispute the facts contained in Paragraph 30.  Plaintiff states further that Defendant's numerous representations as to the intent not to downsize or close the Fairhaven Facility was the pivotal factor in her decision.  (Def's A. at 9, 14, 15, 23 and 25; Pltff's A. at 78-80)

31.  Plaintiff does not dispute the facts contained in Paragraph 31.

32.  Plaintiff does not dispute the facts contained in Paragraph 32.  Plaintiff further states that the Defendant's numerous representations as to the intent not to downsize or close the Fairhaven Facility addressed her concerns in regard to this issue.  (Def's A. at 21-24)

33.  Plaintiff does not dispute the facts contained in Paragraph 33.  Plaintiff further states that on numerous occasions AT&T's Regional Director, Joan Gallagher Cappuccio ("Cappuccio") held herself out as a contact person with regard to the trust or veracity of these

rumors.  (Def's A. at 50-53; Pltff's A. at 79).

34.  Plaintiff does not dispute the facts contained in Paragraph 34.  Plaintiff further states that on these three occasions Cappuccio held herself out as a contact person with regard to the trust or veracity of these rumors.  (Def's A. at 50-53; Pltff's A. at 79)

35.  Plaintiff does not dispute the facts contained in Paragraph 35.  Plaintiff further states that Cappuccio testified that call volumes dropped by thirty three percent (33%) and monitored the call volumes daily.  (Pltff's A. at 23-24)  Plaintiff further states that the decrease in call volume in May 2004 was abnormally large.  (Def. A. at 18-19; Pltff's A. at 79)

36.  Plaintiff does not dispute the facts contained in Paragraph 36.  Plaintiff further states that on this occasion she inquired of Mary C. Eustace ("Eustace") if the Fairhaven Facility was going to downsize or close.  (Def's A. at 19).

37.  Plaintiff does not dispute the facts contained in Paragraph 37.  Plaintiff further states that Eustace replied on this occasion that the Fairhaven Facility was not going to downsize or close.  (Def's A. at 19)

38.  Plaintiff does not dispute the facts contained in Paragraph 38.

39.  Plaintiff does not dispute the facts contained in Paragraph 39.  Plaintiff further states that Eustace did not check with her superiors to confirm the truth or veracity of the fact that AT&T would not be downsizing the Fairhaven Facility.  (Pltff's A. at 16-17)

40.  Plaintiff does not dispute the facts contained in Paragraph 40.

41.  Plaintiff does not dispute the facts contained in Paragraph 41.

42.  Plaintiff does not dispute the facts contained in Paragraph 42.  Plaintiff further states that this was prior to the time Plaintiff had finalized her decision to retire.  (Def. A. at 3; Pltff's A. at 29, 78-80)

43.  Plaintiff does not dispute the facts contained in Paragraph 43.  Plaintiff further states that by if all went well, she was referring to her inquiries relative to Defendant's intent to downsize or close the Fairhaven Facility.  (Pltff's A. at 80)

44.  Plaintiff does not dispute the facts contained in Paragraph 44.

45.  Plaintiff does not dispute the facts contained in Paragraph 45.

46.  Plaintiff does not dispute the facts contained in Paragraph 46.

47.  Plaintiff does not dispute the facts contained in Paragraph 47.  Plaintiff further states that she specifically inquired of Cappuccio as to the possibility of Defendant downsizing or closing the Fairhaven Facility.  (Def. A. at 23-24; Pltff's A. at 79)

48.  Plaintiff does not dispute the facts contained in Paragraph 48.

49.  Plaintiff does not dispute the facts contained in Paragraph 49.  Plaintiff further states that other of AT&T's managers during her tenure as Defendant's employee would make inquiry when posed with similar inquiries from employees.  (Pltff's A. at 7-9, 79)

50.  Plaintiff does not dispute the facts contained in Paragraph 50.  Plaintiff further states Cappuccio testified that downsizing was not something she ever considered, talked about or thought would happen (Def. A. at 66).

51.  Plaintiff disputes the facts contained in Paragraph 51.  Plaintiff further states that Cappuccio testified that she had conversations with employees about potential layoffs. (Pltff's A. at 21) Cappuccio did not testify that she could not possibly call someone every time, she testified only that she did not make inquiry. (Def. A. at 66)

52.  Plaintiff does not dispute the facts contained in Paragraph 52.  This was not the critical date in her decision to retire.  On at least one other occasion, Plaintiff requested a retirement package and never completed it.  (Pltff's A. at 80)

6

53.  Plaintiff does not dispute the facts contained in Paragraph 53.

54.  Plaintiff does not dispute the facts contained in Paragraph 54.

55.  Plaintiff does not dispute the facts contained in Paragraph 55.  Plaintiff further states that this interview was conducted prior to Plaintiff requesting her retirement paperwork or making her decision to retire.  (Pltff's A. at 14-15, 79-80)    Plaintiff attempted to refuse to submit to the interview because her decision was not yet final.  (Pltff's A. at 80)  Plaintiff acquiesced to Eustace's repeated demands.  (Pltff's A. at 80)

### V.    THE SALE AND LEASE BACK OF THE FAIRHAVEN FACILITY

56.  Plaintiff does not dispute the facts contained in Paragraph 56.

57.  Plaintiff does not dispute the facts contained in Paragraph 57.

58.  Plaintiff does not dispute the facts contained in Paragraph 58.  Plaintiff states further that by December 2003, Defendant knew that it was going to downsize the space it occupied at the building.  (Pltff's A. at 65, 67-68)

59.  Plaintiff does not dispute the facts contained in Paragraph 59.

60.  Plaintiff does not dispute the facts contained in Paragraph 60.

61.  Plaintiff does not dispute the facts contained in Paragraph 61.

62.  Plaintiff does not dispute the facts contained in Paragraph 62.  Plaintiff further states that Defendant knew, in December 2003, that it would be downsizing the space it occupied at the building. (Pltff's A. at 65, 67-68)

63.  Plaintiff does not dispute the facts contained in Paragraph 63.

64.  Plaintiff does not dispute the facts contained in Paragraph 64.

## VI.    THE DECISION TO REDUCE THE WORK FORCE BY 140 EMPLOYEES

65.    Plaintiff disputes the facts contained in Paragraph 65.    As a result of various regulatory actions taken throughout 2003 and early 2004, Defendant had in place regional exit strategies.    (Pltff's A. at 55, 72-73)    Cappuccio was the Regional Director for the Northeast Region, which was comprised of Maine, New Hampshire, Vermont, Massachusetts, Connecticut and Rhode Island.    (Pltff's A. at 20)    Defendant announced on numerous occasions throughout December 2003, through June 2004, that the expiration of the regulatory framework would cost union jobs.    (Pltff's A. at 45-56)

66.    Plaintiff does not dispute the facts contained in Paragraph 66.    Plaintiff further states that Defendant's Annual Report to Stockholders for 2004, discussed the company's intent to effectuate further workforce reduction during 2004.    (Pltff's A. at 73).    This same report addressed the adverse impact the expiration of various FCC regulations would have on the Defendant's business and ability to continue to maintain its operations. (Pltff's A. at 71, 75).

67.    Plaintiff does not dispute the facts contained in Paragraph 67.    Plaintiff further states that on at least one other occasion, a decision to reduce workforce in September 1994 was planned and addressed with the Commonwealth of Massachusetts' Department of Employment and Training ("DET") as of May 19, 1994.    (Pltff's A. at 79-80)

**BEVERLY A. GEORGE**,
By her attorneys

_____/s/ Blake J. Godbout_____
Blake J. Godbout (BBO#196380)
**BLAKE J. GODBOUT & ASSOCIATES**
33 Broad Street, 11th Floor
Boston, MA 02109
(617) 523-6677

Dated: March 28, 2006

## CERTIFICATE OF SERVICE

I, Blake J. Godbout, hereby certify that a true copy of the above document was served upon the attorney of record for each party.

/s/ Blake J. Godbout
Blake J. Godbout

# UNITED STATED DISTRICT COURT
# FOR THE
# DISTRICT OF MASSACHUSETTS

-----------------------------------------------------------x

BEVERLY A. GEORGE,

              Plaintiff,

    v.                                           Civil Action No. 05 11079 (DPW)

AT&T CORP.,

              Defendant.

-----------------------------------------------------------x

## APPENDIX TO PLAINTIFF'S RESPONSE TO DEFENDANT'S
## STATEMENT OF UNDISPUTED MATERIAL FACTS

March 27, 2006

                        Blake J. Godbout, Esq. (BBO#196380)
                        BLAKE J. GODBOUT & ASSOCIATES
                        33 Broad Street, 11th Floor
                        Boston, MA 02109
                        (617) 523-6677

## TABLE OF CONTENTS

**PAGES**

1.  Pages from the Deposition Transcript of Beverly A. George........................1-9

2.  Pages from the Deposition Transcript of Linda Teoli....................................10-11

3.  Pages from the Deposition Transcript of Mary C. Eustace.............................12-17

4.  Pages from the Deposition Transcript of Joan Gallagher Cappuccio.............18-27

5.  Defendant's Responses to Plaintiff's Request for Admissions.......................28-32

6.  Pages from the Collective Bargaining Agreement
    between the Communication Workers of America and AT&T Corp.............33-42

7.  Pages from the Massachusetts Department of Employment
    and Training's publication ...........................................................................43-44

8.  Publications generated by AT&T Corp. from
    December 7, 2003,  through June 23, 2004..................................................45-56

9.  Call volumes at AT&T Fairhaven from April through August 2004.............57-59

10. Documents relative to the sale and lease back of the
    Fairhaven, Massachusetts building...............................................................60-69

11. Pages from AT&T's 2003 Annual Report to Stockholders..........................70-75

12. Affidavit of Counsel Verifying contents of Appendix................................76-77

13. Affidavit of Beverly A. George..................................................................78-81

1

1  UNITED STATES DISTRICT COURT FOR THE
          DISTRICT OF MASSACHUSETTS

2

3  NO. 05-11079 (DPW)

4

BEVERLY A. GEORGE,            )
5          Plaintiff            )
                               )
6          VS.                  )
                               )
7  AT&T CORP.,                  )
          Defendant             )

8

9

10          DEPOSITION of BEVERLY A. GEORGE,

11  called as a witness by and on behalf of the

12  Defendant, pursuant to the Federal Rules

13  of Civil Procedure, before Teresa E.

14  Costello, Registered Professional Reporter,

15  Certified Shorthand Reporter No. 1452S98,

16  and Notary Public within and for the

17  Commonwealth of Massachusetts, at the

18  offices of Morgan, Brown & Joy, LLP,

19  200 State Street, Boston, Massachusetts,

20  on Wednesday, September 21, 2005, commencing

21  at 10:27 a.m.

22

23

24

25

**2**

1 APPEARANCES:
2
3 MORGAN, BROWN & JOY, LLP
   (by Nathan L. Kaitz, Esquire)
4  200 State Street
   Boston, Massachusetts 02109-2605
5  for the Defendant.
   Nkaitz@morganbrown.com
6
7 BLAKE J. GODBOUT & ASSOCIATES
   (by Blake J. Godbout, Esquire)
8  (by David A. Conti, Esquire)
   33 Broad Street
9  11th Floor
   Boston, Massachusetts 02109
10  for the Plaintiff.
   Blake@bjgalaw.com
11
12
   Also present:
13
   Erin Walsh, Law Student
14
   Sarah George
15
16
17
18
19
20
21
22
23
24
25

**4**

1        S T I P U L A T I O N S
2        It is agreed by and between counsel
3   for the respective parties that the deponent
4   will read and sign the deposition within
5   thirty (30) days from receipt, and the
6   signing before a Notary Public is waived.
7        It is further agreed that all
8   objections, except as to form and motions to
9   strike, are reserved for the time of trial.
10       BEVERLY A. GEORGE,
11       having been satisfactorily
12       identified by the production of
13       her driver's license, and duly
14       sworn by the Notary Public, was
15       examined and testified as
16       follows to direct interrogatories:
17  BY MR. KAITZ:
18 Q.  Would you state your full name and address
19      for the record?
20 A.  Sure.  It's Beverly A. George.  7 Willow,
21      W-I-L-L-O-W, Street, Foxboro,
22      F-O-X-B-O-R-O -- I love to say home of the
23      Patriots -- Mass., and it's 02035.
24 Q.  Miss George, have you ever had your
25      deposition taken before?

**3**

1        I N D E X
2 DEPONENT                    PAGE
3 BEVERLY A. GEORGE
4 Examination by Mr. Kaitz          4
5 Examination by Mr. Godbout      155
6 Examination by Mr. Kaitz        188
7
8
9
10
        E X H I B I T S
11
   NO.                      PAGE
12
   1      Article            33
13 2      Letter dated 11/16/04    43
   3      CWA Grievance Form      44
14 4      Attachment          45
   5      CWA Form           49
15 6      CWA Form           51
   7      Letter dated 12-14-04    52
16 8      Letter dated 12-17-04    53
   9      Letter dated 12-19-04    54
17 10     Letter dated 1-19-05     54
   11     Letter dated 1-24-05     54
18 12     Letter dated 2-14-05     55
   13     Letter dated 12-11-04    63
19 14     Letter dated 12-6-04     63
   15     Letter dated 12-8-04     63
20 16     Two Pages           82
   17     Response            84
21 18     Attachment to Complaint  85
   19     Memorandum         85
22 20     News Update         88
   21     Disclosure Statement    133
23
24     (Exhibits retained by counsel.)
25

**5**

1 A.  No.
2 Q.  Have you ever been a party to a lawsuit
3      either as a plaintiff or a defendant other
4      than this one?
5 A.  As a lawsuit I've been to small claims
6      before.  Is that what you're referring to?
7 Q.  That would apply.
8 A.  All right.
9 Q.  So other than this lawsuit, the only other
10     time you've been a party is in small claims
11     court?
12 A.  Small claims court and let me just think for
13     a second.  Can you define lawsuit for me?
14     I'm not sure.  I don't quite understand.
15 Q.  Well, you know this case began with a
16     complaint --
17 A.  Right.
18 Q.  -- filed on your behalf by your lawyers
19     against the company, correct?  So you would
20     be a plaintiff because you filed the
21     complaint, and the company, AT&T, would be
22     the defendant, correct?
23 A.  Correct.
24 Q.  Is there any other time where a complaint
25     has been filed in which you've been a named

2 (Pages 2 to 5)

2

22

1  have a sense of how long prior to the
2  closing of the Brockton office those rumors
3  were swirling about?
4 A.  As I said, it's a long time back, but the
5  way the rumors would go, like I said, one
6  would say a day, a week, a month, a year,
7  two years, so.
8 Q.  I'm not asking you about what the rumors
9  said.  I'm asking you about what period of
10  time those rumors existed for.  Did they
11  start a month before the Brockton office
12  closed, or did they start a year before the
13  Brockton or two years before the Brockton
14  office closed?
15 A.  If you're asking me about the Brockton,
16  that's too far back.
17 Q.  You just don't remember?
18 A.  That's too far back to be precise to say
19  whether it was a month, a day, a year.  It's
20  just too far back.
21 Q.  But nevertheless after Brockton down-sized
22  or closed you went to Worcester?
23 A.  Worcester.
24 Q.  And you remained an operator in the
25  Worcester office, correct?

23

1 A.  That is correct, until approximately 1993.
2 Q.  And am I correct that the Worcester office
3  closed in 1993?
4 A.  That is correct.
5 Q.  And same types of rumors in Worcester as
6  there had been in Brockton?
7 A.  Right.
8 Q.  Some people saying it's going to close
9  tomorrow or a month from tomorrow, two
10  months from tomorrow?
11 A.  Or a year, yes.
12 Q.  And some people saying no, it wasn't going
13  to happen?
14 A.  It was yes and no.
15 Q.  And when the Worcester office closed in
16  1993, where did you go?
17 A.  I went all the way to Peabody.  I've been
18  North, South, East and West of
19  Massachusetts.
20        MR. GODBOUT:  Just answer the
21  questions.
22 Q.  Were you living at 7 Willow Street in
23  Foxboro at that time?
24 A.  There was a lot of moving.  Let me think.
25  No.  16 Hickory Road.

24

1 Q.  In Norton?
2 A.  That's correct.  At a gambrel house.  Ranch.
3 Q.  So you were commuting from Norton to
4  Peabody, is that correct?
5 A.  Correct.
6 Q.  And how long did you remain at the Peabody
7  office?
8 A.  Approximately until -- the Peabody office
9  until September of '96 approximately.
10 Q.  That's when the Peabody office closed,
11  correct?
12 A.  Correct.
13 Q.  And the same types of rumors swirling about
14  for a period of time before that closure?
15 A.  Right.
16 Q.  So it's fair to say as of 1996 while working
17  for AT&T anyways, you had been in three
18  offices that closed, Brockton, Worcester and
19  Peabody?
20 A.  Right.
21 Q.  Now when the Peabody office closed, where
22  did you go?
23 A.  I went to -- on a stipulation I went to
24  Providence.
25 Q.  That's the Relay Center in Providence?

25

1 A.  That's correct.
2 Q.  And how long did you remain at the Relay
3  Center for?
4 A.  For approximately three months.
5 Q.  That's when you transferred to Fairhaven?
6 A.  I transferred to Fairhaven in the first part
7  of January.
8 Q.  That would have been of 1997?
9 A.  That is correct.
10 Q.  Now the Providence Relay Center remained
11  open after you transferred to Fairhaven,
12  correct?
13 A.  That's correct.
14 Q.  Did you learn at some point that the
15  Providence Relay Center closed?
16 A.  Yes.
17 Q.  And when did you learn that the Providence
18  Relay Center had closed?
19 A.  When I was in Fairhaven.
20 Q.  Was that approximately 2003 or thereabouts?
21 A.  I would say approximately between 2002,
22  2003.  Approximately.
23 Q.  Now at some point in 2004 you retired from
24  AT&T, correct?
25 A.  That is correct.

7 (Pages 22 to 25)

3

26

1 Q. And when did that occur?
2 A. The actual commencement date for my
3    retirement started on August 1st of 2000.
4 Q. Given the fact that you left New England
5    Telephone for a couple of years, and I know
6    you told us you started around 1970, did you
7    have an adjusted net credited service date?
8 A. They adjusted it, yes.
9 Q. For the time that you were on leave. So
10    what was your net credited service date?
11 A. July 28th, 1974.
12 Q. So with that net credited service date, it
13    meant that you reached 30 years of
14    employment with AT&T on July 28th, 27th,
15    28th of 2004, correct?
16 A. (Witness nodded.)
17 Q. Now in order for your retirement to commence
18    on August 1st, 2004, what did you have to
19    do?
20 A. I had to call the pension center and request
21    a package.
22 Q. And when did you do that?
23 A. On or about June 18th of 2000.
24 Q. And they gave you some material that you had
25    to fill out and return to them?

27

1 A. To be effective you had to fill out and
2    return it.
3 Q. Did you complete the package and return it
4    to the pension center?
5 A. I completed the package on or about
6    July 10th, and I believe they received it on
7    or about July 13th.
8 Q. Now after you put in your time and package
9    and you commenced your retirement, did you
10    learn that there was some downsizing at
11    Fairhaven?
12 A. I asked -- I'm not quite sure.
13 Q. I just want to know after you retired?
14 A. Correct.
15 Q. Commencing August 1st, 2004, did you learn
16    that there was some downsizing in Fairhaven?
17 A. Yes.
18 Q. When did you learn that?
19 A. During the summer of 2004.
20 Q. Did you learn that when you saw an article
21    in the Standard Times?
22 A. I actually got the information through phone
23    calls which brings me to dates and times,
24    number of phone calls. I'm sorry.
25 Q. You received a number of phone calls?

28

1 A. No, I made a number of phone calls.
2 Q. You made a number of phone calls. Who did
3    you make those phone calls to?
4 A. I called Sharon Perriera. She was my former
5    manager who had left the company earlier.
6 Q. And why did you call Sharon?
7 A. Well, first I wanted to thank her for the
8    pictures. She went to my retirement
9    luncheon, and she saved the day by bringing
10    her camera. She has kids and she had a
11    camera in the car, so I wanted to thank her
12    for that. We also got talking about
13    Fairhaven downsize. I heard something prior
14    to that phone call that I made to her. I
15    made a number of phone calls.
16 Q. What I'm trying to learn, if I may, is when
17    you first learned that there was downsizing
18    taking place at Fairhaven? When did you
19    first learn that?
20 A. It was in the summer. What part of the
21    summer? Wall Street Journal. There was
22    articles in the journal.
23 Q. There was an article in the Wall Street --
24 A. There were more than one article that was in
25    the journal.

29

1 Q. An article about the closing, the downsizing
2    in Fairhaven?
3 A. There was articles that were alarming in
4    regards to AT&T that --
5 Q. Go ahead.
6 A. -- prompted me to start calling people
7    because I was concerned what I read. I
8    called -- before I called Sharon Perriera I
9    called Fairhaven and I spoke with some
10    people that are at the ASD desk.
11 Q. The what desk?
12 A. ASD.
13 Q. What does ASD stand for?
14 A. Let's see. I don't remember the technical
15    terms of ASD, but basically it's like
16    central operations. They do the scheduling.
17    They keep the line, so on and so forth.
18 Q. When you say the line, the line of
19    operators, you mean?
20 A. How many people they need to have on line to
21    meet the customer's demand, you know? They
22    get a call from some other office -- we need
23    so many people on. I call it the central
24    unit. That's how I identify, but I call
25    people there and I ask them. I said, I've

8 (Pages 26 to 29)

4

30

1 been reading the Wall Street Journal. Did
2 you see the article in the Wall Street
3 Journal?
4         I even told them I think one was
5 the early part of August, somewhere between
6 August 3rd and August 7th, and then we
7 started talking about, you know, you guys,
8 have you heard anything? No, nothing yet,
9 but we're waiting for the shoe to drop, is
10 the way they put it.
11 Q. Who said that to you?
12 A. Oh, I spoke to a number of people. I can't
13 say exactly who actually said it, but I
14 spoke to a number of people in ASD.
15 Q. So in early to mid August you were speaking
16 to people, and they were telling you they
17 hadn't heard anything yet, but they were
18 waiting for the shoe to drop?
19 A. That's correct. Because we were all aware
20 by that point of --
21         MR. GODBOUT: There's no question
22 before you.
23         THE WITNESS: I'm sorry.
24 Q. How did you first learn that, in fact,
25 employees at Fairhaven had been notified

31

1 that a work force reduction was going to
2 take place?
3 A. Conversation with Sharon Perriera.
4 Q. And when did that conversation take place?
5 A. Actually that's when it was confirmed. I
6 had heard something previously.
7 Q. What had you heard previously?
8 A. Reading the articles in the paper, as I
9 mentioned.
10 Q. You mentioned that, but are you telling us
11 that there was an article in the Wall
12 Street --
13 A. More than one.
14 Q. Just let me finish the question.
15 A. I'm sorry.
16 Q. Are you telling us that there was an article
17 in the Wall Street Journal in which they
18 announced that there was going to be a
19 reduction in force in Fairhaven?
20 A. They didn't announce it, but you could read
21 between the lines something was going to
22 happen. That's why they were waiting for
23 the other shoe to drop. There was no
24 announcement, per se, if that's what you're
25 asking.

32

1 Q. That's what I'm asking you. Did the article
2 in the Wall Street Journal that you're --
3 A. No.
4 Q. Just let me finish the question. Are you
5 telling us that the article in the Wall
6 Street Journal talked at all about the
7 Fairhaven location specifically?
8 A. Said AT&T.
9 Q. So it didn't talk about Fairhaven
10 specifically at all?
11 A. It said AT&T. I didn't hear -- I didn't --
12 Fairhaven specifically, I would say no.
13 Q. Okay. When did you hear specifically that
14 there was going to be a reduction in force
15 in Fairhaven?
16 A. The actual number or count I heard
17 from Sharon Perriera because she's the
18 one that told me it was in the Standard
19 Times.
20 Q. So she told you there had been an article in
21 the Standard Times?
22 A. More than one article. A number of
23 articles.
24         MR. KAITZ: Let's mark this
25 document as Exhibit 1.

33

1         (Article marked as
2         Exhibit Number 1.)
3 Q. I'm going to show you what's been marked
4 as Exhibit 1. Is that a copy of an
5 article from the Standard Times dated
6 September 14th, 2004?
7 A. Standard Times. I can't actually see the
8 date.
9 Q. Well, let's point it out. Can you see the
10 date there?
11 A. I need to get my glasses. That is correct.
12 Q. The Standard Times represents -- Standard
13 Times comes out of what city?
14 A. That comes out in the Fairhaven area.
15 Q. And am I correct that this is the first
16 article that spoke to the issue of a work
17 force reduction in Fairhaven?
18         MR. GODBOUT: Objection.
19 A. In Fairhaven I believe so, yes.
20 Q. So Sharon Perriera alerted you to this
21 article? Is that correct?
22 A. A number of articles.
23 Q. She alerted you to those articles?
24 A. That is correct.
25 Q. This was one of them?

9 (Pages 30 to 33)

5

34

1 A. That is correct.
2 Q. And, in fact, you made this -- this is a
3     copy of the article that you made, isn't it?
4 A. That is correct.
5 Q. Did you make copies of these other articles
6     that you're referring to?
7 A. That is correct.
8 Q. You produced them all in this litigation?
9 A. I gave them to my counsel.
10 Q. You gave them to your counsel?
11 A. That is correct.
12 Q. Now do you have a recollection -- was the
13     Standard Times a newspaper that you read
14     regularly?
15 A. No.
16 Q. Do you have a recollection of when you first
17     saw this article?
18 A. Shortly after I spoke to Sharon, called
19     Standard Times.
20 Q. Was it shortly after September 14th?
21 A. It had to have been after September 14th.
22 Q. Right, no, I understand that, but was it a
23     day or two after or a month after?
24 A. I can tell you it was the fall of 2004.
25 Q. But you can't tell me whether it was within

35

1     a day or two or a month?
2 A. Well, actually I would say it would have to
3     have been because it was October articles,
4     too, that I got. I have September and
5     October articles, so it would have to
6     be -- chronologically speaking would have to
7     be some time in October.
8 Q. That you spoke to Sharon Perriera and then
9     she alerted you to these articles?
10 A. It was fall, so it would have to be. I got
11     the articles, themselves. It was September
12     and October articles. Whether I spoke to
13     her -- I'd actually spoken to her earlier to
14     find out if the article was dated September,
15     so again I would say some time frame between
16     September and October more articles
17     appeared.
18 Q. But between September and October you were
19     learning from Sharon and from looking at
20     articles and perhaps from talking to others
21     that there was a work force reduction in
22     Fairhaven?
23 A. The work force reduction in Fairhaven, that
24     is correct.
25 Q. And --

36

1 A. Specifically in Fairhaven, yes.
2 Q. Do you have any knowledge as to when the
3     company decided to reduce the work force in
4     Fairhaven?
5 A. That's something the company would know. I
6     don't know.
7 Q. You have no idea?
8 A. I have what I saw in the paper, the AT&T
9     Today.
10 Q. That's not my question. Do you have any --
11 A. Sorry.
12 Q. -- knowledge of when the company decided to
13     reduce the work force in Fairhaven by the
14     140 workers identified in Exhibit 1?
15 A. It appeared to me that it was hinged on the
16     baby bells, so it appeared to me that they
17     knew back in June.
18 Q. Do you have any evidence other than these
19     AT&T Today --
20 A. In the Standard Times and around -- between
21     the Standard Times and AT&T Today it was in
22     the September issue, I believe, there is a
23     statement. It says that it was hinged upon
24     what happened with Supreme Court Justice
25     Rehnquist. Is that how you say his name? I

37

1     don't want to mispronounce his name -- that
2     it was decided because of what happened in
3     June, that's why these jobs were lost. It
4     all hinged on that.
5 Q. Do you know when they made that decision
6     based upon what happened in June?
7 A. They referenced that that cut was because of
8     that expiration of the cap on the regulatory
9     back in June. They said it was directly
10     linked to that is why this cut resulted.
11 Q. But that doesn't tell us, does it, when they
12     decided to make that cut, does it?
13 A. Well, AT&T, that's something that I don't
14     know the exact date that they did it, but
15     what they said was that this decision was
16     made because of a direct result from the
17     cap being removed. I think it expired on
18     June 14th or June 15th, and they so stated
19     either in one of those articles or in an
20     AT&T Today issue, that that was a direct
21     result and that's why those people lost
22     their jobs and also they closed, I think,
23     Charleston.
24 Q. That's Charleston, West Virginia?
25 A. The Charleston office, wherever the

10 (Pages 34 to 37)

154

1  because it was on the MLS report, and I
2  believe his name was on the report, so
3  somewhere in there his name was there.
4 Q. Okay. Any other information that he would
5  have as far as you know relevant to the
6  lawsuit?
7 A. Not as far as I know. I only went by what I
8  saw in the MLS sales report.
9 Q. Who is Jeffrey Osuch?
10 A. Again, I would have to refer to the AT&T --
11  either the AT&T Today or something in the
12  paper, but again you would have that article
13  or that documentation.
14 Q. Well, it says here Fairhaven executive
15  secretary. What's your understanding of
16  what that means?
17 A. Well, it means Jeffrey is an executive
18  secretary. Must be one of the corporate
19  officers, so it must have been something.
20 Q. Your understanding would be he was an
21  executive secretary that worked for AT&T?
22 A. Fairhaven executive secretary. It's on the
23  executive level. There must have been
24  some document where his name was mentioned
25  and the value, so you must have a copy of

155

1  it.
2       MR. KAITZ: I don't have any
3  further questions.
4  CROSS-EXAMINATION
5  BY MR. GODBOUT:
6 Q. I'm going to ask you some follow-up
7  questions and some additional. You
8  indicated that you had been employed at a
9  series of different locations besides the
10  Fairhaven location, is that correct?
11 A. That's correct.
12 Q. And some of those areas closed during the
13  course of your employment?
14 A. That's correct.
15 Q. And which ones that you worked at during
16  your career at either New England Telephone
17  or AT&T closed during your employment?
18 A. The Worcester, Peabody, Brockton.
19 Q. Now which of the three closed first?
20 A. Brockton and then it was Worcester and then
21  it was Peabody.
22 Q. Fairhaven?
23 A. Right.
24 Q. Now with regard to -- so it's fair to say
25  that the Brockton closing was the first time

156

1  during your employment with New England
2  Telephone at the time or AT&T?
3 A. New England Telephone was in Walpole.
4 Q. So you were employed by AT&T at the time?
5 A. At the time of the closing, yes.
6  Divestiture had already came and went, so
7  yes.
8 Q. Was there any signs as an employee that you
9  witnessed at the time of the Brockton or
10  prior to the Brockton closing that gave you
11  some indication that a closing was in the
12  offing?
13       MR. KAITZ: Objection. Go ahead.
14 A. Okay. We would always get nervous when we
15  would see people come out in suits,
16  unfamiliar faces, and that usually was when
17  rumors would fly and start asking questions.
18 Q. With regard to the Brockton closing and the
19  rumors, did you do anything? Do you have
20  any recollection of doing anything at that
21  time to determine whether the rumors were
22  accurate?
23 A. No.
24 Q. Do you have any recollection of talking with
25  any of your senior managers regarding

157

1  closing of Brockton?
2 A. Well, if we did have any questions we could
3  go and talk to -- the manager of that office
4  at that time was Nilsa Weaver. She was the
5  manager of the office, and if you had any
6  questions you could go and ask her, and if
7  she didn't know, she would get back to us
8  and check it out for us.
9 Q. Now with regard to the Worcester office, was
10  there a time period where rumors flew as
11  well?
12 A. Yes.
13 Q. And were there any observations that you can
14  recollect the time that gave some indication
15  to you that something was going on with
16  regard to the closing of that office?
17 A. Again, we would call them suits. Again,
18  there would be coming in in suits that we
19  didn't recognize, and then we would start to
20  be concerned. When we get visitors we get
21  concerned especially when they were in suits
22  and we've never seen them before.
23 Q. When -- with regard to Worcester, when
24  people would arrive as you described in
25  suits, would they be escorted or shown

40 (Pages 154 to 157)

7

158

1  around by personnel that were in the
2  Worcester office?
3      MR. KAITZ: Objection.
4 A. They would be escorted by the office manager
5  around the office.
6 Q. And who was the office manager in Worcester?
7 A. Again, that would have been Nilsa Weaver in
8  Worcester. Same Nilsa Weaver that was in
9  Brockton.
10 Q. Now when you were in the Worcester office,
11  were you a member of a union?
12 A. Yes.
13 Q. Which union was that?
14 A. That one, I believe that one was IBEW.
15 Q. Now was Miss Weaver a member of a union?
16 A. Miss Weaver was the office manager for AT&T.
17 Q. My question to you is was she a member of a
18  union, or was she a non-member of the union?
19 A. Not a member of the union.
20 Q. She was a part of the management?
21 A. Correct.
22 Q. Now with regard to the Worcester closing, do
23  you have any recollection of any
24  conversations with Miss Weaver with regard
25  to the closing of this office and what was

159

1  in store?
2      MR. KAITZ: Objection.
3 A. She was straightforward. She came out and
4  told us.
5 Q. My question is do you have any recollection
6  of any of the conversations? Yes or no?
7 A. Yes.
8 Q. And do you remember -- I know it was a while
9  ago as to the substance of those
10  conversations. If you do, maybe outline?
11 A. We were in, like, group meetings and they
12  informed us. They gave us a 60-day notice.
13  They told us exactly what was going to
14  happen. They got us Alliance; they got us
15  all kinds of programs to help us with the
16  transition, but they gave us a 60-day
17  notice. They were right up front, told us
18  everything, got us prepared, helped us keep
19  our, you know, morale. They tried to keep
20  morale high at that time, had many focus
21  meetings, offers many alternatives. Like I
22  said, they gave us a 60-day notice.
23 Q. Was AT&T your employer in Worcester?
24 A. Yes.
25 Q. Was there a collective bargaining agreement

160

1  in force and effect between your union and
2  AT&T when you were in Worcester?
3 A. Yes.
4 Q. And in accordance with that CBA, collective
5  bargaining agreement, was there a certain
6  time period where they would have to give
7  you notice if they were going to shut down,
8  close that office?
9 A. Usually 60 days.
10 Q. Now do you recollect how you received that
11  notice?
12 A. I would believe it would be in a formal
13  announcement. I don't remember whether it
14  was -- it would have had to be a written
15  formal announcement.
16 Q. Now thinking back as to the time in which
17  you received the 60-day notice from AT&T,
18  can you remember the number of days, weeks
19  or months that preceded those visits by the
20  suits as you referred to them earlier in
21  your testimony?
22 A. Short period of time. I don't know exact
23  period of time, but it was a short period of
24  time.
25 Q. Was it a year? Was it six months? Was it

161

1  three months?
2 A. I would say a few.
3      MR. KAITZ: Objection.
4 A. I would say a few months. Short period of
5  time.
6 Q. More than two months or less than two
7  months?
8      MR. KAITZ: Objection.
9 A. Well, a few meaning probably three. Around
10  three as opposed to a couple.
11 Q. So is it fair to say it is your recollection
12  that these unfamiliar AT&T employees were
13  visiting or inspecting the Worcester office
14  approximately three months before you
15  received your 60-day notice?
16      MR. KAITZ: Objection.
17 A. I would say a few, so the definition of a
18  few would be at least three months. It was
19  a short period of time between the time they
20  came and the time of the announcement, but
21  at least -- I would say at least three.
22 Q. You're saying at least three months?
23 A. At least, because even a few would be more
24  than two, would be a couple, say at least
25  three.

41 (Pages 158 to 161)

162

1 Q. Now while you were in Worcester did you ever
2    ask Miss -- is it Weaver?
3 A. Nilsa Weaver.
4 Q. As to whether the site was going to close?
5 A. We all were asking questions after seeing
6    those people come and, you know, if she
7    didn't have a definite answer, she would
8    say, Let me check and get back to you.
9    She wouldn't just arbitrarily spit out an
10   answer. She was very, very good in that
11   way. She was very up front. She always
12   checked her facts and we all liked Nilsa.
13 Q. Do you have any recollection of her getting
14   back to you?
15 A. She got back to everybody and let us know
16   what was going to happen, so yes.
17 Q. Did Miss Weaver tell you they were going to
18   close the Worcester office?
19 A. We got a formal -- had to be a formal
20   writing that this was going to take place.
21 Q. But prior to receiving that formal writing
22   of the closure, do you have any recollection
23   of her telling you that in a conversation?
24 A. In a focus meeting perhaps. That's usually
25   how they would do it. She was up front and

163

1    told us straightforward. That was her
2    persona anyways.
3 Q. Now with regard to the Peabody office, were
4    there any other circumstances that were
5    different with regard to events that
6    occurred prior to the closing of that
7    office?
8        MR. KAITZ: Objection.
9 A. Again, we get a visit from people we didn't
10   know that came in suits and, you know,
11   usually that's when rumors would start
12   flying around, and shortly after that we
13   would get the announcement. As a matter of
14   fact I think when the Peabody office went
15   out, it was the whole Northeast corridor
16   that went out, all of the New England. All
17   the offices went in the Peabody closing.
18 Q. When you say, the Peabody closing, are you
19   referring to the northeast offices that did
20   work similar to the Peabody office?
21 A. We were call centers and they had them in
22   New England, Peabody being one of them, and
23   I think the only thing they kept was
24   something down in Philadelphia. The whole
25   Northeast corridor went. What I call

164

1    Northeast corridor. The whole New England.
2 Q. During the course of your 30 years with
3    AT&T, New England Telephone, is it fair to
4    say that your job responsibilities changed?
5 A. That is correct.
6        MR. KAITZ: Objection.
7 Q. Just in a summary fashion could you sort of
8    summarize when you started out and how it
9    evolved to what you were doing at the end of
10   your employment there?
11 A. Positions I've held?
12 Q. Yes.
13 A. Okay. I started out in operator services in
14   Walpole as operator services, and then I
15   left because of the birth of my first child,
16   and then I went to Brockton as an operator,
17   and then from Brockton I went to Peabody as
18   an operator.
19       From Peabody I went to Providence
20   as a relay CCA, and then from Providence I
21   transferred to Fairhaven, so where the job
22   was, I followed the job.
23 Q. When you said that -- you testified earlier
24   when they closed the Peabody office, was
25   that an operator service office?

165

1 A. That's correct.
2 Q. What type of duties were you doing as an
3    operator's service employee?
4 A. You dial zero and that was me, collect,
5    person-to-person, third-party, credit card.
6    That's what I did.
7 Q. Now when you got to Fairhaven, did your
8    responsibilities change?
9 A. Yes. I became a customer sales and service
10   rep, so I did selling which I didn't do
11   prior and I also gave customer service as
12   well, prepared their bills, answered their
13   questions, formulate plans to meet their
14   needs and also to do the -- to sell them the
15   product that I felt they need.
16 Q. So is it fair to say that you started out as
17   a line operator the beginning of your career
18   with New England Telephone, and then you
19   ended up as a sales person for AT&T?
20       MR. KAITZ: Objection.
21 A. It's fair to say that.
22 Q. At any time during your employment with
23   AT&T -- strike that question. Prior to your
24   being at the Fairhaven facility, you were in
25   Providence?

42 (Pages 162 to 165)

VERITEXT COURT REPORTING (800) 227-8440

1

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

CONDENSED
COPY

```
*   *   *   *   *   *   *   *   *   *   *
                                        *
BEVERLY A. GEORGE,                      *
                Plaintiff,              *
                                        *
vs.                                     *
                                        *
AT&T CORP.,                             *
                Defendant.              *
                                        *
*   *   *   *   *   *   *   *   *   *    *
```

DEPOSITION OF LINDA TEOLI, taken on behalf

of the Defendant, pursuant to the Massachusetts Rules

of Civil Procedure, before Karen Watschke, Notary

Public within and for the Commonwealth of

Massachusetts, at the law offices of Morgan, Brown &

Joy, 200 State Street, Boston, Massachusetts, on

Wednesday, February 15, 2006, commencing at 2:04 p.m.

10

22

1   Q.  What responsibility does Mr. Maly have with
2 respect to grievances on behalf of employees who are
3 members of the Communication Workers of America and
4 work for AT&T?
5   A.  I don't know what exactly he does with them.
6   Q.  Are you familiar with the terms of the
7 voluntary termination pay offer that the company made
8 to employees in Fairhaven, in September of 2004?
9   A.  Yes.
10   Q.  Did you, in fact, see the communication
11 package that the company sent to employees?
12   A.  Yes.
13   Q.  Am I correct that in that communication
14 package it indicated that employees who had recently
15 retired would not be eligible for the VTP offer?
16   A.  I never saw that in there.  I mean, it could
17 have been in there, I just don't remember seeing it.
18        MR. KAITZ:  Let's mark that document as
19 Exhibit No. 1, please.
20        (Voluntary Termination Pay Offer
21          was marked as Exhibit No. 1.)
22   Q.  For the record, Exhibit No. 1 is a September
23 21, 2004, Voluntary Termination Pay, VTP Offer,
24 Employees communication Package.  And it's Bates
25 Stamped 01790 through 01839.

23

1        I want to show you Page 16 of the document
2 which is Bates stamped 01805, and specifically
3 Question 2 on Page 16.  Do you see the question and
4 answer there?
5   A.  (Peruses document.)  Yes.
6   Q.  Does that refer to the issue of whether the
7 VTP offer will be applied to employees who had retired
8 prior to September of 2004?
9   A.  Yes.
10   Q.  What does it say?
11   A.  It says "No.  The VTP offer would not be
12 extended retroactively to employees or former
13 employees."
14   Q.  And that was part of the communication that
15 was sent by AT&T to employees in September of 2004?
16   A.  Yes.
17        MR. KAITZ:  I have no further questions of
18 the witness.
19        MR. CONTI:  I just have a couple of
20 questions.
21        EXAMINATION BY MR. CONTI
22   Q.  My name is David Conti, and I represent the
23 plaintiff, Beverly George.  I want to turn first to
24 the Voluntary Termination Pay Offer.
25        Do you remember how many employees lost

24

1 their jobs as a result of this offer and the work
2 force reduction at Fairhaven?
3   A.  One hundred forty.
4   Q.  As a result of the work force reductions, were
5 any managers or acting managers put back into what
6 could be termed as rank and file of the employee
7 force?
8   A.  Yes.
9   Q.  Do you remember how many?
10   A.  I believe it was five.
11   Q.  Do you have any understanding of what sort of
12 effect that had on the rest of the work force, the
13 rest of the employees, what was their reaction to the
14 managers returning to rank and file?  Did they have
15 any reaction?
16   A.  I don't really know what they -- three of the
17 -- it was actually only three managers who actually
18 stayed working.  And two of them quit because they
19 didn't want to go back to rank and file, so...
20   Q.  After the work force reduction, were there any
21 employees or managers that were rehired by the
22 company?
23   A.  Not that I'm aware of.
24   Q.  Were there any transfers to the Fairhaven
25 facility from other facilities as a result of this

25

1 work force reduction?
2   A.  Yes.
3   Q.  Do you remember how many there were?
4   A.  I don't remember exactly.  I can give you an
5 estimate.
6   Q.  That's okay.
7   A.  Okay.
8   Q.  With regard to the grievances that Ms. George
9 filed, it was Local 1051 and the Communication Workers
10 of America's position that the grievances were not
11 timely filed and therefore they couldn't be processed
12 by the company; is that correct?
13   A.  Yes.
14   Q.  And Communication Workers of America's
15 assessment of Ms. George's grievances was the same as
16 the company's; is that correct?
17   A.  Yes.
18   Q.  And so is it fair to say that the union wasn't
19 going to take any more action with regard to these
20 grievances because of the position of the company?
21   A.  Yes.
22        MR. CONTI:  I don't think I have any
23 further questions.
24        MR. KAITZ:  Just one or two.
25        FURTHER EXAMINATION BY MR. KAITZ

7 (Pages 22 to 25)

11

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

C.A. No. 05 11079 (DPW)                Rule 30 Deposition

BEVERLY A. GEORGE,
Plaintiff,


-vs-


AT&T CORPORATION,
Defendant.


DEPOSITION OF MARY CARMEL EUSTACE, taken
pursuant to Rule 30 of the Massachusetts Rules of Civil
Procedure on behalf of the Plaintiff, before Denise L.
Szumita, CSR, a Notary Public in and for the
Commonwealth of Massachusetts, at the offices of
Moses, Smith & Markey, 50 Homers Wharf, New Bedford,
Massachusetts, commencing at 10:02 a.m., on Saturday,
January 28, 2006, pursuant to Notice and agreement of
parties as to the date and time of taking said deposition.


\* \* \* \* \*
Parisi Court Reporting
270 Hixville Road
Dartmouth, Massachusetts  02747
(508) 984-5502

Denise L. Szumita, CSR (CSR#1381S95)

```
 1   APPEARANCES:     Blake J. Godbout, Esquire
                      David A. Conti, Esquire
 2                      BLAKE J. GODBOUT & ASSOCIATES
                        33 Broad Street, 11th Floor
 3                      Boston, MA  02109;
                        Representing the Plaintiff
 4
                      Nathan L. Kaitz, Esquire
 5                      MORGAN, BROWN & JOY, LLP
                        200 State Street
 6                      Boston, MA  02109-2605;
                        Representing the Defendant
 7
     ALSO PRESENT:  Beverly A. George
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

1                    MR. KAITZ:  Objection.

2    A   I'm going to say no.  My understanding of that

3        question is that I did not talk to any of my

4        managers, people I reported to, about not giving

5        out information about a potential closing?

6    Q   That's exactly right.

7    A   No.  I did not.

8    Q   I'm trying to ask in a nice way, did they all tell

9        you -- anyway, the answer is no?

10   A   Right.

11                   MR. GODBOUT:  Could you give us a

12       couple of minutes to talk?  I think we're just

13       about done.

14                   MR. KAITZ:  Sure.

15                   (Recess taken 11:51 a.m. to 12 noon)

16                   MR. GODBOUT:  We have no further

17       questions.

18                   MR. KAITZ:  I've got a few.

19                   CROSS-EXAMINATION

20   BY MR. KAITZ:

21   Q   Do you recall a publication called "The Fairhaven

22       Flyer"?

23   A   Yes.

24   Q   What was that publication?

Denise L. Szumita, CSR (CSR #1381S95)

```
 1    A   It was a newsletter generated within the site.

 2    Q   Did you interview Beverly George upon the

 3        announcement of her retirement about her retirement

 4        for the "Flyer"?

 5    A   Sure.

 6    Q   And do you recall roughly when it was that you

 7        interviewed her for the "Fairhaven Flyer"?

 8    A   Not really.

 9    Q   It came out in the June edition.  When would the

10        June edition come out?

11    A   Probably late June, early July.  But right around

12        that time.  But I remember it was right down to the

13        day we had to get it in.

14    Q   Did you consider that Interview of Miss George for

15        the "Fairhaven Flyer" to be an exit interview under

16        company policy?

17    A   No.

18    Q   Did you play any role, that you're aware of, in

19        Mrs. George's decision to retire?

20    A   No.

21    Q   Did you make any effort to influence that decision?

22    A   No.

23    Q   Do you recall saying anything to her that may have

24        been made in an effort to influence her decision
```

1   that you have no recollection of discussing with

2   Mrs. George whether AT&T was contemplating

3   downsizing or closing the Fairhaven facility?

4            MR. KAITZ:  Objection.

5   A   Right.

6   Q   You also testified -- so you also testified that

7       the first time that you learned that -- that you

8       learned of the downsizing of the Fairhaven facility

9       was on that Monday in September of 2004?

10  A   Right.

11  Q   Now, is it also fair to say that at no time prior

12      to the 2004-September-Monday epiphany did you have

13      any -- did you have any conversations with

14      supervisors at Fairhaven that this was going to

15      occur?

16  A   We knew there was going to be an announcement of

17      some kind, but there had been -- we knew there was

18      going to be an announcement in September.  We were

19      kind of waiting on it, but we had no idea what that

20      announcement would be.

21  Q   When you say "there was going to be an

22      announcement," was that an announcement -- what was

23      the subject matter of the announcement?

24  A   Generally reorganizations.  As I said, the one in

1      April where they -- I don't know if it was operator

2      services or what, but there would be a broadcast.

3      The vice president, I guess, Nancy Pryor or

4      whoever, would come on and say this, this, and this

5      was happening.

6          They were pretty regular throughout 2004.  So we

7      had speculation and speculation, but nothing had

8      happened.

9  Q   When you say "announcements," you're saying

10     announcements as to reorganization?

11 A   In general.  Yes.

12 Q   Did you have any -- what was your understanding as

13     to why AT&T was reorganizing?

14 A   I don't know that I had an understanding other than

15     they were reducing management levels.  Basically,

16     the basic restructuring.  We weren't expanding.

17     That was for sure.

18 Q   Was AT&T losing business to its -- we'll say

19     recently deregulated competition?

20              MR. KAITZ:  Objection.

21 A   I don't know which competition you mean.  If you

22     mean the local service, I think it was AT&T wasn't

23     going to be able to get into the local business as

24     much as it had thought.  But I don't know that we

## Page 1

Volume: I
Pages: 1-113

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
Civil Action No. 05 11079(DPW)

- - - - - - - - - - - - - - - - - x

BEVERLY A. GEORGE,

        Plaintiff,

    v.

AT&T CORP.,

        Defendant.

- - - - - - - - - - - - - - - - - x

DEPOSITION OF JOAN GALLAGHER CAPPUCCIO
Thursday, January 12, 2006, 11:15 a.m.
Blake J. Godbout & Associates
33 Broad Street - 11th Floor
Boston, Massachusetts 02109
----- Reporter: Toni F. Beckwith, RMR -----

Toni F. Beckwith, Registered Merit Reporter
50 Winsor Avenue
Watertown, Massachusetts 02472
Tel: 617.924.2731
Fax: 617.924.9899

## Page 2

1  APPEARANCES:
2
3  BLAKE J. GODBOUT & ASSOCIATES
4  By Blake J. Godbout, Esquire
5  33 Broad Street - 11th Floor
6  Boston, Massachusetts 02109
7  Counsel for the Plaintiff
8
9  MORGAN BROWN & JOY, LLP
10  By Nathan L. Kaitz, Esquire
11  200 State Street
12  Boston, Massachusetts 02109
13
14
15
16
17
18
19
20
21
22  **ORIGINAL**
23
24

## Page 3

1            I N D E X
2  Deposition of:  Direct Cross Redirect Recross
3  JOAN GALLAGHER CAPPUCCIO
4    By Mr. Godbout    4
5
6
7
8          E X H I B I T S
9  No.                Page
10
11  1      Renotice of Deposition   5
12  2      Document Entitled AT&T
13        Today dated 12/7   53
14  3      AT&T News Letter dated
15        3/10/04   56
16  4      Response     61
17  5      Two-Page Typewritten
18        Note   63
19  6      Typewritten Note   69
20  7      Document Entitled
21        Monthly CS&S Call Handling 71
22  8      Photocopy of The Standard
23        Times Article   85
24

## Page 4

1        P R O C E E D I N G S
2      MR. GODBOUT: Usual stipulations?
3      MR. KAITZ: Yes.
4      MR. GODBOUT: What about reading?
5      MR. KAITZ: Reading and sign, but
6  waive the notary.
7      MR. GODBOUT: 30 days?
8      MR. KAITZ: 30 days is fine.
9      MR. GODBOUT: Why don't you swear the
10  witness, please.
11
12      JOAN GALLAGHER CAPPUCCIO,
13  having been satisfactorily identified by the
14  production of her driver's license, and duly
15  sworn by the Notary Public, was examined and
16  testified as follows:
17
18      DIRECT EXAMINATION
19  BY MR. GODBOUT:
20    Q. Could you please identify yourself for
21  the record?
22    A. Joan Gallagher Cappuccio.
23      MR. GODBOUT: Let's mark this as the
24  first exhibit. This is the notice of

Page 9

1 College, and that's it.
2    Q. Have you --
3    A. Associate's degree.
4    Q. Have you taken any business courses?
5    A. Numerous business courses throughout
6 the years.
7    Q. Could you give me an example of the
8 types of business courses that you have taken
9 throughout the years?
10    A. I've taken leadership courses with the
11 company. I've taken communications, problem
12 solving, management courses; technical training
13 courses when I was in a job that involved
14 technical support.
15    Q. Were these programs provided by your
16 employer, or were they the types of programs
17 that were provided by an independent educational
18 facility?
19    A. Both.
20    Q. When did you first begin your employ
21 with AT&T?
22    A. July 3, 1978.
23    Q. Prior to July 3 of 1978, had you had
24 any previous employment?

Page 10

1    A. No, I just -- no. Well, I mean high
2 school -- different varieties of jobs throughout
3 college and high school, but I really -- it was
4 a summer temp job.
5    Q. So your first job was with AT&T?
6    A. Not my first job.
7    Q. But your first job after high school?
8    A. I think when I was in college I also
9 worked as a cashier in a grocery store.
10    Q. When you first began working for AT&T,
11 what were your job responsibilities?
12    A. I was hired as a directory assistance
13 operator.
14    Q. Was that a job that required you to be
15 a union member?
16    A. Yes.
17    Q. What union was that?
18    A. IBEW.
19    Q. How long did you remain in that job
20 with AT&T as an operator?
21    A. Approximately six months.
22    Q. What location were you working as an
23 operator?
24    A. Springfield, Massachusetts.

Page 11

1    Q. After six months were you promoted?
2    A. Temporarily.
3    Q. What position was that?
4    A. First line supervisor.
5    Q. As a first line supervisor, was this
6 in the Springfield office?
7    A. No. It was in Greenfield.
8    Q. Were you still a member of the IBEW?
9    A. No.
10    Q. At that time you went from being an
11 employee with union affiliation to management?
12    A. Right.
13    Q. How long did you remain in that
14 position?
15    A. Approximately a year.
16    Q. What were the job responsibilities?
17    A. To coach and develop employees who
18 were handling directory assistance calls, train.
19    Q. This was out of the Greenfield center?
20    A. Right.
21    Q. Is that Greenfield center still in
22 operation?
23    A. No.
24    Q. When was that closed?

Page 12

1    A. I don't know.
2    Q. This was sometime in 1979?
3    A. Yes.
4    Q. Do you have a recollection as to how
5 many directory assistance centers were in the
6 Springfield/Greenfield location when you first
7 started working in 1978?
8    A. No.
9    Q. Were there more than five?
10    A. In just Springfield and Greenfield.
11    Q. In that general area of western
12 Massachusetts?
13    A. I'm thinking.
14    Q. Take your time.
15    (Pause)
16    A. Perhaps, yes.
17    Q. More than five?
18    A. Yes.
19    Q. Were the directory assistance centers
20 based upon a geographic location, or was it
21 based upon a use, a number of phone calls you
22 receive basis?
23    MR. KAITZ: Objection. Go ahead.
24    Q. In 1978?

Page 33

1    A. Bottom line, I think it was
2  efficiencies. They were looking at basically
3  real estate. I remember a lot of discussion at
4  that time around the cost-savings of
5  consolidating everyone under one roof, being
6  able to start shedding some of your excess real
7  estate. I think the concept was more some of
8  the bigger centers were better.
9    Q. So the office in Tewksbury was owned
10 or the land was owned by AT&T, or leased, do you
11 remember?
12    MR. KAITZ: If you know.
13    A. I don't know. I did back then, but I
14 don't now.
15    Q. Were you involved in coordinating the
16 termination of that office space in Tewksbury?
17    A. As far as selling the real estate?
18    Q. Yes.
19    A. No.
20    Q. At some point, though, you had to tell
21 people that they were moving?
22    A. Yes.
23    Q. And was it your responsibility for
24 doing that or did you have subordinates that

Page 34

1  were responsible for doing that?
2    A. I think both. I communicated, as well
3  as my managers.
4    Q. And ultimately the consolidation
5  process occurred and was completed by 1988?
6    A. I think so.
7    Q. At what stage or at this stage while
8  you were at Peabody during the consolidation,
9  had you met Beverly George?
10    A. I believe I had, yes.
11    Q. Was Beverly --
12    A. I just don't remember when.
13    Q. Do you remember working with Beverly
14 George in Worcester?
15    A. I don't know. I don't remember.
16    Q. Peabody is now the consolidated
17 location for three or four different other
18 offices. Did that remain the case, or was the
19 Peabody office essentially closed?
20    A. I do know personally that it
21 eventually closed.
22    Q. Do you remember when that was?
23    A. No. I don't remember.
24    Q. What was your next job after the

Page 35

1  Peabody?
2    A. I accepted a position as region staff
3  manager in Boston which pretty much supported
4  all the centers from kind of a headquarters
5  perspective.
6    Q. Could you describe the various centers
7  that you oversaw at that time?
8    A. Well, it was Peabody and Concord and
9  all the centers really in the northeast region.
10    Q. What states are in the northeast
11 region?
12    A. Portland, Maine; New Hampshire,
13 Vermont, Massachusetts, Connecticut, Rhode
14 Island.
15    Q. Approximately how many centers were
16 under your responsibility?
17    A. I don't remember.
18    Q. So is it fair to say that your title
19 was the supervisor of all the other individuals
20 whose job you had been in previously, a site
21 supervisor, you now supervised all of them?
22    A. No.
23    Q. Okay.
24    A. I was basically in a support role to

Page 36

1  all of them. They were my peers. All the
2  center managers basically looked to me for
3  support around issues, a lot of issues that went
4  beyond their center.
5    Q. What kinds of issues would those be?
6    A. Executive complaints and supporting
7  the center managers in regards to any issues
8  they couldn't handle there, methods and
9  procedures that would come down through, say, a
10 marketing organization, training, writing the
11 training, developing it. We were responsible
12 for recording all information that was
13 considered position information. Just about
14 anything and everything could fall into our shop
15 as far as center managers needing assistance on
16 something; hiring, training, anything.
17    Q. How long did you remain in that Boston
18 supervisory position?
19    A. Well, I stayed in Boston from about
20 '90, '91, in that specific region support job,
21 maybe until about '94, '95. And then my job
22 transitioned to training.
23    Q. Did you remain in Boston when your job
24 transitioned to training?

20

Page 53

1      A.  Right.
2      Q.  We're going to start marking some
3  exhibits.
4      (Exhibit 2 marked
5      for identification)
6      Q.  I'd like to show you a document that's
7  been marked Exhibit 2.  Have you ever seen that
8  before?
9      A.  Yes.
10      Q.  Could you identify that for the
11  record?
12      A.  It's an AT&T Today communication or
13  special edition on the Tauzin-Dingell Bill.
14      Do you need more information?
15      Q.  I'll ask you some questions about it.
16  AT&T Today, is this a daily publication that is
17  issued by the parent company?
18      A.  It was, yes.
19      Q.  Do you know who prepared this
20  document?
21      A.  No.  The document itself, no.
22      Q.  My understanding is this document was
23  distributed to the employees?
24      A.  It's electronically distributed, yes.

Page 54

1      Q.  So is this sort of an e-mail?
2      A.  I'm not sure what method this came in.
3  AT&T Today is usually computer-based.  I do get
4  it personally via e-mail.  We post it at times,
5  and employees are able to access it.
6      Q.  So it's your testimony that your
7  employer, AT&T, creates a document called AT&T
8  Today?
9      A.  Right.
10      Q.  And it's distributed presumably on a
11  daily basis or regular basis to employees of
12  AT&T?
13      A.  Yes.
14      Q.  Have you had a chance to read through
15  this first page?
16      A.  No.
17      (Pause)
18      A.  Yes.
19      Q.  Directing your attention to the first
20  paragraph, this Tauzin-Dingell Bill?
21      A.  Mm-hmm.
22      Q.  Do you have any familiarity with that?
23      A.  Yeah, a little bit.
24      Q.  Could you tell me what you understand

Page 55

1  the Tauzin-Dingell Bill was all about?
2      A.  I think basically, like it said, that
3  it was a bill that was going allow the local
4  Bell operating companies to compete in long
5  distance.
6      Q.  Now, it says here in Paragraph 2, if
7  you take a look at that, it says, That's why we
8  are very disappointed to report that the
9  leadership of the Communications Workers of
10  America has thrown its lot in with the Bell
11  companies and has come out in support of the
12  bill, even though they know that this bill will
13  almost certainly mean the elimination of many
14  union jobs at AT&T.
15      Did the Fairhaven facility perform any
16  long distance telephone services?
17      A.  Yes, we do.
18      Q.  You did?
19      A.  Yes.  It was billing inquires for long
20  distance.
21      Q.  But it wasn't actually acting as an
22  operator assistance facility?
23      A.  No.
24      Q.  Was it your understanding that if the

Page 56

1  Tauzin-Dingell Bill passed, it would have a
2  negative impact on Fairhaven?
3      A.  I don't recall thinking that, no.
4      Q.  Do you have any recollection of
5  convening any meetings with the employees to
6  request they contact their congressman or
7  congresswoman to act on behalf of this?
8      A.  I don't remember that, no.
9      Q.  Do you remember any discussions with
10  the employees relative to the closing of the
11  Fairhaven facility because of regulatory
12  scenarios like this?
13      A.  Could you repeat the question?
14      Q.  Do you recollect having any
15  conversations with employees relative to the
16  closing of the Fairhaven facility because of
17  regulatory outcomes or scenarios like that which
18  is discussed in the Tauzin-Dingell Bill?
19      A.  I did have discussions with employees
20  about the Fairhaven layoffs, but not -- I didn't
21  have any discussion with employees about
22  Fairhaven closing, no.
23      (Exhibit 3 marked
24      for identification)

Page 57

1    Q. Could you identify that as well? This
2 has been marked as Exhibit 3. It's a news
3 release dated March 10, 2004. Do you remember
4 this AT&T news release?
5    A. No.
6    Q. It would appear from the substance of
7 this AT&T news release that the transition which
8 was going to occur as a result of that bill
9 passing was going to occur, correct?
10    MR. KAITZ: Objection.
11    Q. Is that fair to say? If I can just
12 show you this. The possibility of the
13 Tauzin-Dingell Bill passing?
14    A. Mm-hmm.
15    Q. Or not being stayed by the FCC was
16 going to have a negative repercussion on AT&T?
17    MR. KAITZ: Objection.
18    Q. Correct?
19    A. I'm not seeing the immediate jump from
20 this to this (indicating).
21    Q. Well, this date here --
22    MR. KAITZ: For the record, the "this
23 to this" is from Exhibit 2 to Exhibit 3.
24    THE WITNESS: Okay.

Page 58

1    Q. This is dated seemingly, it would
2 appear, December 7, 2003. Exhibit 3 that I've
3 shown you is March 10, 2004?
4    A. Mm-hmm.
5    Q. Now, it says here in reference to a
6 speech made by Chairman Powell who appears from
7 this document to be the FCC chairman?
8    A. Correct.
9    Q. I'm sure his name was taken in vein
10 many times in your office.
11    A. I don't know.
12    Q. You have no idea?
13    A. No.
14    Q. Okay. Fine.
15    Directing your attention to the second
16 paragraph, it says, Chairman Powell made clear
17 in his speech today that absent agreement in 30
18 days, he will attempt to impose some ill-defined
19 moratorium and 18-month transition away from
20 competition. Under those conditions, Chairman
21 Powell's call is not for negotiation but rather
22 a call for surrender. Clearly this will mean an
23 end to a competitive local marketplace not only
24 for the millions of customers who have chosen

Page 59

1 competitive carriers as their local providers
2 but also for the millions of others who are
3 benefiting from the lower prices that
4 competition brings.
5    Do you see that?
6    A. Mm-hmm.
7    Q. I think I've read that accurately?
8    A. Yes.
9    Q. Do you have any recollection of seeing
10 this news release?
11    A. No.
12    Q. Do you have any recollection of
13 discussing the consequences of the regulatory
14 change?
15    A. With people?
16    Q. Yes.
17    A. Yes.
18    Q. And could you tell me, again, give me
19 your best recollection as to the substance of
20 the conversations you had as to the regulatory
21 change with people and how it was going to
22 impact Fairhaven?
23    MR. KAITZ: Objection.
24    A. Well, the discussion in regards to

Page 60

1 when this first came out was, you know, what are
2 our options. I remember talking with someone
3 about, well, based on what decisions were made
4 and whether we were able to appeal it, would we
5 then go state by state and start looking for
6 different response from the state legislatures,
7 and that was an option from what I understood.
8    So I remember having that discussion
9 with just some peers of mine around I'm
10 wondering what this means and how hard we're
11 going to fight back and what are our other
12 alternatives to, you know, leasing through the
13 local exchange company. And there were others.
14    And there's new technology like Silver
15 Internet that we were starting to take a look at
16 and how viable would that be for the consumer.
17 Those were some of the discussions.
18    Q. How was this FCC regulation change
19 going to impact the Fairhaven facility, if at
20 all?
21    A. At this time, I didn't have any
22 discussion about that regulatory change
23 impacting Fairhaven.
24    Q. Is it your understanding or is it your

22

Page 73

1      Q.  What does abandon mean?
2      A.  Those calls that were not answered
3  that dropped off.
4      Q.  Do you have any idea why or what
5  causes would create an abandoned phone call?
6      A.  Just customers don't wish to wait.  If
7  you get an influx of calls in a particular --
8  sometimes you see it early morning.  You get an
9  influx of calls and you don't have the staff.
10 So people, rather than wait, will hang up.
11     Q.  NCC?
12     A.  Number of complete calls.  That's the
13 abandon plus the answer.
14     Q.  At the top of the page it says S&S
15 Call Holding.  What is that?
16     A.  It's the title of the report.  It's
17 monthly CS&S call handling report.  I think it's
18 cut off.  It's monthly CS&S.
19     Q.  That's Page 2.
20         Directing your attention to Page 3, it
21 says, Number of conferences, ATT targets, AHT
22 targets.  What is that reference to?
23     A.  If you read across the report, it
24 gives all the metrics of the calls that were

Page 74

1  handled, those that involved a conference which
2  could be anything from getting on a customer
3  specialist or adding on a third-party
4  verification for a sale.
5      Q.  Okay.
6      A.  Any reason that the representative
7  conferences, like a third party on the call.
8      Q.  For instance, when someone would say
9  would you like to speak to my supervisor,
10 something like that?
11     A.  You could.  That would normally be a
12 transfer.
13     Q.  Okay.  I understand.  Now, looking at
14 Page 1 of Exhibit 7, is it possible to determine
15 whether the number of calls that were being
16 received by the Fairhaven facility was dropping
17 off?
18     A.  Yes.
19     Q.  And how can you determine that?
20     A.  You can look at month over month.  If
21 you look under the column of answered or even
22 number of complete calls, you can see month over
23 month.  April was 274,000 and May was 218, a
24 56,000 call drop.  Then it picks back up in

Page 75

1  August.
2      Q.  In fact, between April of 2004 and
3  August, say, it was roughly an 85,000 phone call
4  drop-off?
5      A.  Yeah, that we handled.
6      Q.  That you handled.  Were you able to
7  determine -- did you ever make inquiry as to why
8  there was seemingly a 33 percent reduction in
9  phone calls that were being handled by the
10 Fairhaven facility?
11         MR. KAITZ:  Objection.
12     A.  Did I -- excuse me.
13     Q.  It's fair to say --
14         MR. GODBOUT:  Off the record.
15         (Discussion off the record)
16 BY MR. GODBOUT:
17     Q.  Earlier in this deposition you
18 testified that as a part of your supervisory
19 responsibilities in Worcester?
20     A.  Mm-hmm.
21     Q.  In Gardner?
22     A.  Mm-hmm.
23     Q.  In Brattleboro?
24     A.  Mm-hmm.

Page 76

1      Q.  You were constantly monitoring the
2  volume of calls, correct?
3      A.  Correct.
4      Q.  As a function of the success or as a
5  function of the business?
6      A.  Correct.
7      Q.  Originally you testified that
8  monitoring the calls provided you with some
9  ability to maintain correct staffing?
10     A.  Correct.
11     Q.  Because in 1978 when you first
12 started, your company was a monopoly, there was
13 only one show in town, correct?
14     A.  Correct.
15     Q.  So, therefore, you had to make sure
16 that service was an element, people could get
17 into the operators if you had --
18     A.  Mm-hmm.
19     Q.  Correct?
20     A.  Mm-hmm.
21     Q.  Now, it's fair to say during the
22 course of your long career with the company,
23 your concern as a supervisor, some of the issues
24 had changed?

23

Page 77

1    A. Mm-hmm.
2    Q. It was clear that you were not doing
3 information calls as frequently, that had
4 changed?
5    A. Yes.
6    Q. In fact, over the course of your
7 career, a series of operational centers had
8 closed, correct?
9    A. Correct.
10    Q. We can go through them all.
11    A. Yes.
12    Q. But we have only a certain amount of
13 time today, and I want to try to move it along.
14    A. Yes.
15    Q. And it's fair to say that you were
16 monitoring the number of phone calls at the
17 Fairhaven facility on a daily basis?
18    A. Yes.
19    Q. And that was your responsibility or
20 someone else's?
21    A. It was the national operations team
22 responsibility to monitor short-term,
23 long-term-range plans, but my responsibility
24 really was looking at a lot of metrics, making

Page 78

1 sure I'm staffing appropriately, et cetera.
2    Q. In the year 2003 --
3    A. Mm-hmm.
4    Q. -- who was responsible for examining
5 the volume of phone calls that were coming into
6 the Fairhaven facility, in 2003?
7    A. There were many people monitoring
8 them.
9    Q. Do you know who they are?
10    A. Yeah. There is the national
11 operations team who was led by Dave Marynak.
12    Q. Okay.
13    A. He monitored the entire channel volume
14 and helped to distribute those volumes to the
15 centers. Within a center I had an operations
16 manager. In 2003, I believe it was Bea Martins.
17 I think it was Bea Martins.
18    Q. Could you spell that?
19    A. M A R T I N S, Beatrice. But I'm not
20 sure -- actually, let me think. Was it 2003?
21 Bea retired and Chris Giblin replaced her,
22 Christopher Giblin. So it could have been
23 Chris, also. Then, of course, I monitored them
24 all, so...

Page 79

1    Q. With regard to 2003 and monitoring the
2 volume of phone calls, would you have daily
3 discussions about the monitoring, the volume,
4 weekly or monthly meetings with national
5 operations and local operations staff?
6    MR. KAITZ: Objection.
7    A. I would not have meetings with the
8 national operations staff. There were weekly
9 staff meetings that I held where I would get
10 briefed by my managers on what the volumes
11 looked like, what they're hearing from the
12 national teams.
13    On monthly staff meetings Dave would
14 sometimes talk about long-term plans,
15 short-term. And I -- actually, I don't know if
16 that would be monthly. But on occasion he would
17 talk about what volumes look like.
18    Q. Does Dave still work for AT&T?
19    A. Yes.
20    Q. Where is he located?
21    A. San Antonio.
22    Q. What job responsibilities does he
23 currently have?
24    A. He's basically the district over the

Page 80

1 national operations management team.
2    Q. Is that essentially the same job that
3 he had in 2003 or has that changed?
4    A. Yes. I believe so.
5    Q. Is Christopher Giblin still --
6    A. No. He's retired. He's not retired.
7 He left the company under a forced management
8 plan.
9    Q. A reduction in staff?
10    A. Yes.
11    Q. That seems to be the tendency.
12    Were you able to determine why, again
13 for this snapshot period of April of 2004
14 through August of 2004, why there was a drop in
15 the number of phone calls that you were
16 receiving?
17    A. There's a lot of factors that
18 influence the volumes.
19    Q. Okay. So the answer is yes, you did
20 make inquiry into why the number of phone calls
21 received at Fairhaven had dropped off?
22    A. The --
23    Q. Is it a yes or a no?
24    A. Yes.

24

Page 81

1    Q.  It would seem to me --
2    A.  I do it weekly.  I weekly look at
3  volumes and talk about do we need overtime, do
4  we need E time, what is the national operations
5  team telling us for next month, it looks like
6  things are quiet, do they think that E time is
7  going to last long.
8    Q.  What is E time?
9    A.  If business is slow like we have in
10 the summer months, it will get real quiet.  You
11 have a lot of people on vacation, also.  We will
12 get the national operations team to say, looking
13 at the staffing throughout the entire channel,
14 let's see if anybody wants to leave without pay
15 for a couple of days a week, hours.  So it's a
16 dynamic staffing.
17   Q.  Doesn't that violate some union
18 requirement of base minimum hours?
19   A.  Not that I'm aware of.  I think we
20 would have heard about it.
21   Q.  But you're giving them -- you're
22 paying them to leave?
23   A.  It's voluntary.  No pay.
24   Q.  No compensation?

Page 82

1    A.  No pay.  If you want to take the
2  afternoon off, we have it available.
3    Q.  I see.  Were the operators,
4  associates, sales associates, were they
5  hourly-based people, in 2004, or were they
6  salaried?
7    A.  They're hourly.
8    Q.  The individuals that are union
9  employees?
10   A.  Yes.  Yes.
11   Q.  Are they still that way?
12   A.  Yes.
13   Q.  My question, going back to your
14 response, as I look at this on a weekly basis is
15 to determine things on a lot of different things
16 in terms of staffing and E time and et cetera.
17      Did you ever determine why there was a
18 drop off in the number of phone calls that were
19 being processed through the Fairhaven facility?
20   A.  I'm sure I did.
21   Q.  Do you recollect what those opinions
22 or conclusions were approximately a year and a
23 half ago?
24   A.  No.

Page 83

1    Q.  At any time during the process of
2  determining the drop off in these phone calls,
3  did it occur to you that phone calls were being
4  redirected to another center?
5    A.  Well, let me -- can I explain?
6    Q.  Sure.  Go ahead.
7    A.  The volumes that come into a center
8  are routed to us, so there can be different
9  variables that will cause a fluctuation in the
10 number of calls.
11      It doesn't necessarily mean there
12 didn't exist, I guess to your question, 40,000
13 calls somewhere in the channel.  They didn't
14 send them to Fairhaven.
15      If I had high absence in a particular
16 month, they wouldn't send me -- or if I had been
17 trending high absence, they wouldn't send me
18 more calls than I could handle.
19      If I had a work force, which I do, who
20 loves E time versus another center that might
21 not take a lot of E time, they may cut my calls
22 more to allow me to give people time off without
23 pay and send the calls to another center.  So
24 it's possible.  I don't remember specifically.

Page 84

1    Q.  So is it fair to say that AT&T
2  someplace has the technical ability to route
3  calls to any facility that they want to?
4    A.  Yes.
5    Q.  So, for instance, if I wanted to
6  outsource, so use that horrible word, to India,
7  I could basically just outsource all my phone
8  calls, hypothetically, to a telephone answering
9  center in Bombay, technically, just by switching
10 a switch?
11   A.  Technically, yes.
12   Q.  And also in terms of reallocating
13 institutional resources, I can begin the process
14 of reallocating or relocating telephone calls in
15 accordance with, you know, whatever the --
16   A.  Mm-hmm.
17   Q.  Excuse me, whatever the landscape
18 dictates?  Do you understand what I'm saying?
19   A.  Yes.
20   Q.  When do you believe AT&T decided to
21 downsize, made the decision to downsize the
22 Fairhaven facility?  When do you believe that
23 decision was made?
24      MR. KATZ:  Which downsizing are you

Page 93

1  what does that mean?  Are we going to be seeing
2  center closing?  Do we still sell to customers
3  coming in?  And the answers were yes.
4       So we started feeling comfortable that
5  we're still going to sell.  We still have
6  20-plus million customers to service.
7       Q.  Got you.  When did you first learn
8  that AT&T intended to sell the building that the
9  Fairhaven facility was in?
10      A.  I think we started marketing it in
11 2003.  I think we found a buyer -- when did I
12 learn we were going to sell it?  Probably in
13 2003.
14      Q.  Who made the decision to put the
15 building on the market?
16      A.  We have a global real estate group
17 whose responsibility it is to manage the assets.
18 We made the recommendation.  Who made the
19 decision?  I think I had input.
20      Q.  Pardon me?
21      A.  I think I had input, but...
22      Q.  What were the reasons, if you
23 remember, underlying the decision to put the
24 building that they had just bought on the market

Page 94

1  two years later?
2       MR. KAITZ:  Objection.
3       A.  It was a huge building, and we were
4  only occupying maybe a third of it.  We had made
5  several attempts to bring in other tenants to
6  kind of join us in the operational expenses, the
7  taxes, whatever, and we were unsuccessful.  So I
8  know global real estate felt it was a drain on
9  the expenses.
10      Q.  Did you ever discuss with global real
11 estate the amount of space that you folks
12 occupied in 2003?
13      A.  Oh, yeah.  We had multiple
14 discussions.
15      Q.  And then did you discuss with them the
16 space that you were going to occupy in 2004?
17      A.  Many times.
18      Q.  And didn't that involve actually the
19 reduction in space?
20      A.  Yes.
21      Q.  With the reduction of space, doesn't
22 that imply the reduction of personnel?
23      A.  We were already reduced.
24      Q.  Well, to what extent were you reduced

Page 95

1  from 2002 to 2003, December?
2       A.  I don't understand.
3       Q.  Well, I think you testified that your
4  high water mark was approximately 1,000
5  employees?
6       A.  Yes.
7       Q.  And you occupied, I'm paraphrasing
8  here, a substantial portion of the building by
9  your own testimony?
10      A.  Right.
11      Q.  And by your own testimony AT&T
12 currently occupies --
13      A.  Half a floor.
14      Q.  -- half a floor?
15      A.  Right.
16      Q.  Which represents probably about, is it
17 fair to say, not to put words in your mouth,
18 about 90 percent less space than it occupied in
19 2003?
20      A.  Yes.
21      Q.  How many employees occupy that half a
22 floor right now?
23      A.  220.  We just vacated the other side.
24      Q.  I understand.  My question to you was,

Page 96

1  during the course of these discussions with
2  global real estate and your knowledge that the
3  building is going on the market, that space is
4  going to be reduced, occupational space, because
5  you are entering into lease negotiations with
6  the previous owner, it's fair to say that you
7  knew that the space which AT&T was going to
8  occupy at Fairhaven was going to be reduced?
9       A.  Correct.
10      Q.  And my question to you is, that
11 implies or one can deduce from that that there
12 are going to be fewer people employed at that
13 facility?
14      A.  I think maybe I am misunderstanding
15 your question.
16      MR. KAITZ:  Objection.
17      A.  Because I had four or 500 people
18 spread out in 298,000 square feet.  That was the
19 space I didn't need, and I was paying for it.
20 So when I met with global real estate to talk
21 about occupying, in 2003 my 450 people could fit
22 in what I have today.  Is he restacking is
23 basically the term I think they used.
24      Q.  Okay.  With regard to Beverly George,

26

Page 97

1  do you remember having any discussions with her
2  relative to her retirement?
3      A. Yes.
4      Q. Why don't you tell me what your
5  recollections are of any of the discussions that
6  you might have had with her regarding her
7  retirement.
8      A. I know she -- I think I saw her when I
9  first heard she was retiring. I saw her and
10 congratulated her and told her I was excited
11 about, you know, her good news.
12     I remember talking to her about her
13 party and her wanting to have it at a similar
14 place that we had where we took some nice
15 pictures, and that's about it.
16     Q. Do you remember when you first
17 discussed that with her?
18     A. No.
19     Q. Is it fair to say that over the course
20 of Mrs. George's employment at AT&T at the
21 Fairhaven facility, that she would come to you
22 asking for information and make inquire as to
23 the current status of the facility as to where
24 it was going, status as an ongoing facility?

Page 98

1      A. In meetings and stuff, yeah. I don't
2  remember specifically.
3      Q. You don't have any specific memory?
4      A. No.
5      Q. Would you have meetings with
6  Mrs. George?
7      A. On occasion maybe the team. I don't
8  remember meeting one-on-one with Bev in a
9  meeting.
10     Q. Well, as a supervisor for the
11 facility, it's fair to say that you generally
12 probably didn't meet with the line operators?
13     A. Right.
14     Q. Is there someone else that would do
15 that?
16     A. Her direct supervisor.
17     Q. Do you remember who her direct
18 supervisor was in 2004?
19     A. Yeah. I believe it was Carmel
20 Eustace.
21     Q. Was she also her direct supervisor in
22 2003?
23     A. I believe so. She could have changed.
24 I'm not sure.

Page 99

1      Q. So is it fair to say that you do have
2  a recollection of Mrs. George making inquiry as
3  to whether the AT&T facility was going to
4  downsize or close?
5      A. No.
6      Q. You don't?
7      A. No. Again, the downsize is not
8  something that I ever considered, talked about,
9  thought would happen.
10     Q. So the answer is you have no
11 recollection --
12     A. No.
13     Q. Let me finish for the record.
14     -- of any conversation with Beverly
15 George relative to the downsizing or the
16 termination of the Fairhaven facility prior to
17 her retirement?
18     A. No.
19     MR. KAITZ: Objection.
20     Q. So it's fair to say that you never
21 made inquiry for Beverly George in June 2004 in
22 response to a question of hers as to the status
23 of the facility?
24     A. No.

Page 100

1      Q. So the answer is you never made an
2  inquiry to respond to a question of
3  Mrs. George's relative to the downsizing of the
4  facility in June of 2004? Do you understand
5  what I'm saying? I'm not trying to trick you.
6      A. People ask me every day, are we
7  closing, are we closing. I had no information
8  that we were closing. Now, did I go and call
9  somebody every time somebody asked me, no.
10     Q. Do you have any recollection of making
11 an inquiry as a result of a request by
12 Mrs. George to find out whether it was closing
13 or not?
14     A. No.
15     Q. In September 2004 they announced a
16 VTP. Do you know what that means?
17     A. Voluntary termination pay.
18     Q. What is a VTP?
19     A. It's where someone can volunteer to
20 leave the payroll and would be supplemented with
21 X number of week's pay depending on their
22 service.
23     Q. Is it sort of an early retirement
24 package?

25 (Pages 97 to 100)

27

# UNITED STATES DISTRICT COURT
## for the
## DISTRICT OF MASSACHUSETTS

-------------------------------------------------------------x

BEVERLY A. GEORGE,

                Plaintiff,

    v.                                   Civil Action No. 05-11079-DPW

AT&T CORP.,

                Defendant.

-------------------------------------------------------------x

## DEFENDANT'S RESPONSE TO PLAINTIFF'S
## FIRST REQUEST FOR ADMISSIONS

NOW COMES AT&T Corp. ("defendant") and pursuant to Rule 36 of the Federal Rules of Civil Procedure, hereby responds to Plaintiff's First Request for Admissions as follows:

**ADMISSION NO. 1:**

From January 1, 2004, through July 30, 2004, Beverly George was a "regular full-time employee" of AT&T Corp.

**REPONSE NO. 1:**

Admits.

**ADMISSION NO. 2:**

Beverly George's net credited service date ("NCS") for her employment with AT&T Corp. was July 28, 1974.

**RESPONSE NO. 2:**

Admits.

28

**ADMISSION NO. 3**:

On or about July 1, 2004, Beverly George was a member of the Communication Workers of America ("CWA").

**RESPONSE NO. 3**:

Admits.

**ADMISSION NO. 4**:

On July 16, 2004, Beverly George submitted her retirement paperwork to AT&T Corp.

**RESPONSE NO. 4**:

Denies.  Further answering, Respondent states that Beverly George submitted her

retirement paperwork to AT&T Corp. on or about July 10, 2004.

**ADMISSION NO. 5**:

As a result of unused vacation time, Beverly George's effective retirement date was July 30, 2004.

**RESPONSE NO. 5**:

Admits that Beverly George's effective retirement date was July 30, 2004.

Denies this was "as a result of unused vacation time."

**ADMISSION NO. 6**:

Based upon her net credited service date, Beverly George retired with thirty (30) years of service to AT&T Corp.

**RESPONSE NO. 6**:

Admits that Beverly George retired with thirty (30) years of service to AT&T

Corp. and its predecessors.

29

**ADMISSION NO. 7:**

At the time she retired, Beverly George's base weekly wage was Eight Hundred Thirty Seven Dollars ($837.00).

**RESPONSE NO. 7:**

Admits.

**ADMISSION NO. 8:**

At the time she retired, Beverly George was employed by AT&T Corp. at the company's Fairhaven, MA call center/facility ("Fairhaven Facility") located at 200 Mill Road, Fairhaven, Bristol County, Massachusetts.

**RESPONSE NO. 8:**

Admits.

**ADMISSION NO. 9:**

In September 2004, AT&T Corp. announced a Voluntary Termination Pay Offer ("VTP") dated September 21, 2004 for employees at the Fairhaven Facility.

**RESPONSE NO. 9:**

Admits.

**ADMISSION NO. 10:**

The VTP was open to "regular full-time" or "regular part-time" employees at the Fairhaven Facility with more than one (1) year NCS as of October 22, 2004.

**RESPONSE NO. 10:**

Admits that these were two of the eligibility requirements with the other being

that the employee must have been permanently assigned to an affected title and

GCA/RCA.

**ADMISSION NO. 11:**

The VTP entitled employees at the Fairhaven Facility to payments based upon their NCS.

30

**RESPONSE NO. 11:**

Admits.

**ADMISSION NO. 12:**

Requests for the VTP were taken in seniority order, by title, most senior first.

**RESPONSE NO. 12:**

Admits that requests for the VTP offer were accepted in seniority order, by title,

by GCA/RCA, most senior first.

**ADMISSION NO. 13:**

If Beverly George was still employed by AT&T Corp. on September 21, 2004, she would have been eligible to accept the VTP.

**RESPONSE NO. 13:**

Admits that if Beverly George was still employed by AT&T Corp. on September

21, 2004, she would have been eligible to elect the VTP offer.

**ADMISSION NO. 14:**

Based upon Beverly George's NCS of thirty (30) years, her acceptance of the VTP would have entitled her to one hundred (100) weeks of regular wages.

**RESPONSE NO. 14:**

Admits that based on Beverly George's NCS of thirty (30) years, her election of

VTP would have entitled her to one hundred (100) weeks of pay at her adjusted rate.

Dated: February 21, 2006                    AT&T Corp.,

                                            By its Attorneys,


                                            _____
                                            Nathan L. Kaitz
                                            (BBO#256760)
                                            Morgan, Brown & Joy, LLP
                                            200 State Street, 11th Floor
                                            Boston, MA 02109
                                            (617) 523-6666

### Certificate of Service

I hereby certify that a copy of the foregoing pleading was served on this 21st day of February, 2006, by first class mail, postage prepaid, upon counsel for Plaintiff, Blake J. Godbout & Associates, 33 Broad Street, 11th Floor, Boston MA  02109


                                            _____
                                            Nathan L. Kaitz


32

# AGREEMENT

**By and Between**

**Certain Business Operating Units and Divisions**

**of**

**AT&T CORP.**

**- and -**

**Communications Workers of America**

**Effective May 10, 1998**

01404

33

**TABLE OF CONTENTS**

PROVISIONS OF THE 1995 SETTLEMENT MEMORANDUM .................................... 1

THE 1998 AGREEMENT ........................................................................................ 3

ARTICLE 1    RECOGNITION ............................................................................... 3
ARTICLE 2    COLLECTIVE BARGAINING ........................................................... 4
ARTICLE 3    DEFINITIONS ................................................................................ 4
ARTICLE 4    AUTHORIZED UNION REPRESENTATIVES ................................... 11
ARTICLE 5    UNION REPRESENTATION ........................................................... 13
ARTICLE 6    UNION ACTIVITIES ....................................................................... 13
ARTICLE 7    AGENCY SHOP AND COLLECTION OF DUES ............................. 15
ARTICLE 8    NON-DISCRIMINATION ................................................................ 17
ARTICLE 9    GRIEVANCE PROCEDURE ........................................................... 18
ARTICLE 10   ARBITRATION ............................................................................. 21
ARTICLE 11   MEDIATION .................................................................................. 25
ARTICLE 12   DISCIPLINE .................................................................................. 27
ARTICLE 13   PERSONNEL RECORDS ............................................................... 28
ARTICLE 14   SAFETY ........................................................................................ 28
ARTICLE 15   TITLES AND WAGES ..................................................................... 30
ARTICLE 16   TRANSFERS, TRAVEL ALLOWANCES, AND MOVING
             EXPENSES .................................................................................. 34
ARTICLE 17   NEW JOB TITLES AND JOB CLASSIFICATIONS ........................... 39
ARTICLE 18   CLASSIFICATION AND TREATMENT OF PART-TIME
             EMPLOYEES ............................................................................... 40
ARTICLE 19   BENEFIT PLAN CHANGES ........................................................... 41
ARTICLE 20   ABSENCE ..................................................................................... 42
ARTICLE 21   EXCUSED WORK DAYS ................................................................ 44
ARTICLE 22   VACATIONS .................................................................................. 46
ARTICLE 23   HOLIDAYS .................................................................................... 49
ARTICLE 24   FORCE ADJUSTMENT - LAYOFF, PART-TIMING, AND
             RECALL ....................................................................................... 51
ARTICLE 25   TERMINATION PAYMENTS ........................................................... 54
ARTICLE 26   TECHNOLOGICAL DISPLACEMENT .............................................. 57
ARTICLE 27   REASSIGNMENT PAY PROTECTION PLAN ................................... 57
ARTICLE 28   SENIORITY ................................................................................... 59
ARTICLE 29   TECHNOLOGY CHANGE COMMITTEE .......................................... 59
ARTICLE 30   CONTRACTING OF WORK ............................................................ 60
ARTICLE 31   EMPLOYEES IN MILITARY SERVICE OR ACTIVE DUTY
             FOR TRAINING ........................................................................... 63
ARTICLE 32   MESSAGING APPLICATION SERVICES ......................................... 67
ARTICLE 33   COMPUTER SERVICES ................................................................ 77
ARTICLE 34   AT&T LABS - SUPPORT ............................................................... 85
ARTICLE 35   SALES .......................................................................................... 107
ARTICLE 36   SUPPORT ..................................................................................... 115
ARTICLE 37   OPERATOR SERVICES ................................................................. 123

Article 1

## THE 1998 AGREEMENT

The 1998 Agreement shall consist of the Table of Contents, Articles 1 through 41, Exhibits, and Appendices related thereto. This Agreement is made and entered into the 10th day of May, 1998, by and between certain Business Operating Units and Divisions of AT&T Corp. listed in Appendix 3, (hereinafter referred to as the "Company") and the Communications Workers of America (hereinafter referred to as the "Union").

### ARTICLE 1 - RECOGNITION

**1  Certification of Membership**

The Union hereby certifies that it represents the majority of the employees to whom the Agreement applies, and the Union is the acknowledged, designated and selected collective bargaining representative of such members.

**2  Recognition**

(a)  The Company recognizes the Union as the exclusive representative of those employees whose current job titles appear in Articles 32 through 41 and Appendix 6 of this Agreement, and those whose job titles are created pursuant to the new titles provisions of this Agreement, and whose permanent reporting location is in a state within which that job title is listed in Appendix 5 and who are not represented by another Union.

(b)  If during the term of this Agreement, the Union is certified by the National Labor Relations Board or is recognized by the Company as the collective bargaining representative of employees not previously so represented, who occupy job titles or occupations in which other employees are represented by the Union and are covered by this Agreement, such employees shall be included within and be covered by this Agreement upon the conclusion of any negotiations on any necessary amendments thereto.

**3  Federal and State Laws**

In the event that any provision of this Agreement should be modified or deleted to conform to any federal or state law or regulation, or any order, determination or ruling or regulation of a federal or state administrative agency or court, the Company shall notify the Union in writing. Negotiations shall then take place if requested by the Union. In the event of such negotiations, the changes proposed by the Company shall not be implemented until (a) agreement is reached, or (b) the Company determines that timely action is required by the law, regulation, order, determination or ruling, whichever occurs sooner.

3

01412

Article 3

(g) **Wage Protection Allowance**

The Wage Protection Allowance (WPA) consists of all forms of existing wage protection, including Green Circle, Red Line, Reassignment Pay Protection (RPPP), ATS Wage Treatment for Surplus/Lateral Placement, and any other forms of wage protection which result in a "protected" wage rate.

3 **Definitions Relating to Types of Employees**

(a) **Employees**

The term "employee(s)", for the purpose of the terms of this Agreement, shall refer only to employees of the Company included within the bargaining unit as defined in Article 1 (Recognition).

(b) **Regular Employees**

Regular employees are those whose employment is reasonably expected to continue for longer than twelve (12) months. A regular employee may be either full-time or part-time.

(c) **Temporary Employees**

A temporary employee is one who is engaged for a specific project or for a limited period with a definite understanding that employment will terminate upon completion of the project or at the end of the period. Temporary employment is expected to continue for not more than twelve (12) months. A temporary employee may be either full-time or part-time.

(d) **Term Employee**

A term employee is a regular employee who is engaged for a specific project or for a limited period of normally not less than one (1) year nor more than three (3) years with a definite understanding that employment may terminate on or before completion of the project or at the end of the period.

Term employees shall be treated the same as regular employees except that:

(1) They are not eligible to participate in Tuition Assistance and,

(2) The provisions of the following Articles shall not apply to term employees:

(i) Article 25 (Termination Payments)

(ii) Article 26 (Technological Displacement)

(iii) Article 27 (Reassignment Pay Protection Plan)

10

01419

Article 8

2   The use of the masculine or feminine gender or any titles which connote gender in this Agreement shall be construed as including both genders and not as sex limitations unless the Agreement clearly requires a different construction.

3   It is mutually agreed that no discrimination shall be practiced by the Company or the Union against any employee because of membership or non-membership in the Union, or by the Company against any member or officer of the Union because of lawful activities on behalf of the Union.

### ARTICLE 9 - GRIEVANCE PROCEDURE

The Company and the Union recognize and confirm that the grievance procedures set forth in Article 9, and, where applicable, Article 10 (Arbitration) and Article 11 (Mediation), provide the mutually agreed upon and exclusive forums for resolution and settlement of employee disputes during the term of this Agreement. A grievance is a complaint involving the interpretation or application of any of the provisions of this Agreement, or a complaint that an employee(s) has in any manner been unfairly treated. Neither the Company, nor the Union, its locals or representatives will attempt by means other than the grievance, arbitration, and/or mediation procedures to bring about the resolution of any issue which is properly a subject for disposition through such procedures. It shall be the objective of both the Company and the Union to settle the grievance promptly and at the lowest step of the grievance procedure.

1   **The grievance procedure shall consist of:**

**STEP 1:**

Shall involve the Union representative of the Local which has been designated pursuant to Article 4 (Authorized Union Representatives) and the duly designated representative of the Company, normally the first or second level of supervision of the aggrieved employee(s). Any adjustment or settlement of a grievance at Step 1 shall be binding for the particular grievance involved, but shall not be used as precedent by either party.

No grievance shall be considered, nor shall any appeal thereof be handled as a formal grievance, unless a meeting regarding the grievance is requested in writing within sixty (60) calendar days of the action or failure to act which is the subject of the grievance. The written request shall be sent to the duly designated representative of the Company, normally the first or second level of supervision of the aggrieved employee(s), and shall state the name(s) of the grievant(s), the issue being grieved, the contract provisions alleged to have been violated, if any, and the remedy sought and shall be delivered to the Company representative prior to the Step 1 meeting.

18

01427

37

6   Any employee who is absent and unexcused on the scheduled work day before and after the holiday shall not be paid the holiday allowance.

7   An employee who is scheduled for work on a holiday but who fails to report for work and is not excused shall receive no payment for the holiday.

## ARTICLE 24 - FORCE ADJUSTMENT - LAYOFF, PART-TIMING, AND RECALL

1   **Layoffs and Part-Timing**

Whenever force conditions are considered by the company to warrant part-timing or layoff of regular employees, such force adjustments as the Company may deem necessary, shall be made among those regular employees in a Geographical Commuting Area (GCA) as defined in Article 16 (Transfers, Travel Allowances, and Moving Expenses), in the same Organization having the same job title (except for force adjustments affecting Construction Technicians or Senior Construction Technicians, where the geographical area shall be a Region of the company), through part-timing or layoffs or both, subject to the following conditions:

(a)  Prior to any regular employee being laid off or part-timed pursuant to this Article temporary and term employees in the same job title, same Organization and GCA shall be work completed. However, such temporary or term employees may be retained or employed temporarily to meet peak load situations or other temporary situations unless there are qualified volunteers from among those at-risk employees in the same job title, same Organization and GCA scheduled to be laid off who will assume the duties of the temporary or term employees.

(b)  In the event that further force adjustments by means of layoff are deemed by the Company to be necessary, the Union shall be advised by the Company as to its proposed plan for accomplishing such further force adjustments sixty (60) days before the adjustment is to become effective. During the first forty- five (45) calendar days of the sixty (60) day period, the Union may offer the Company, in writing, a plan to accomplish the force adjustments deemed by the Company to be required. If the Union's plan meets the foregoing requirements, the Company agrees to consider the plan proposed by the Union. If no such written plan is received by the Company from the Union within said forty-five (45) days, or if the parties are unable to agree upon a plan, the Company will proceed with the force adjustments according to the plan the Company proposed.

(c)  Whenever such force adjustments are accomplished by layoffs, such layoffs shall be among those regular employees in the same Organization having the same job title, in the GCA. Layoffs shall be in inverse order of

51

01460

38

Article 24

seniority except that employees who (1) have been assigned to a management title, other than as a result of a temporary promotion, for a continuous period of twelve (12) or more months prior to their most recent return to the bargaining unit and (2) whose most recent return to the bargaining unit from a management title other than one arising from a temporary promotion, is within twelve (12) months of a declaration of surplus in the bargaining unit title in the GCA and Organization to which they are assigned at the time of the surplus declaration (hereinafter referred to as a returning manager), shall be laid off prior to any other employee in the same title in the same Organization and the same GCA being laid off. For employees in the titles of Customer Engineer I, Customer Engineer II, and Customer Engineer III, however, the Company may retain three percent (3%) of the total employees in the same job title within the same Organization in any GCA despite lesser seniority. In each GCA, when the provisions of this Article are implemented, at least one (1) employee may be protected. An individual may only be protected two (2) times during the life of the Agreement.

(d)  When employees other than a returning manager (as described in Paragraph 1(c)) in the affected job title within the same Organization of the Company in the GCA (as identified in Paragraph 1) who have five (5) or more years net credited service are notified by the Company that they are to be laid off, those employees shall have the right to select in order of seniority, another job from a list of jobs with the same job title, in the same Organization of the Company held by employees having the least seniority within the employee's Force Adjustment Region (as outlined in the note below) provided (1) the selecting employee is qualified to perform the selected job; (2) the employee holding the selected job is not one of the employees designated for retention by the Company in accordance with Paragraph 1(c) above; and (3) the employee holding the selected job has less seniority than the selecting employee. The list of jobs held by the least senior employees identified above shall not be greater than the number of jobs declared surplus, or the number of employees who have indicated a desire to select from this list another job within the applicable Force Adjustment Region, whichever is less.

**NOTE: The Force Adjustment Regions shall be comprised of the following groups of states:**

REGION 1: NY, ME, NH, VT, MA, CT, RI, NJ, PA, DE, MD, WV, VA, DC
REGION 2: NC, SC, GA, KY, TN, MS, LA, FL, AL, AR, MO, KS, OK, TX
REGION 3: OH, IN, IL, MI, MN, WI, NE, IA, ND, SD
REGION 4: AZ, NM, CO, CA, MT, WY, UT, ID, WA, OR, NV, HI, AK

52

01461

Article 24

4  **Layoff Payments**

Employees laid off under the provisions of this Article will be entitled to a payment as specified in Article 25 (Termination Payments).

5  **Relocation Expenses**

A Surplus Placement employee who accepts a position that is outside his/her Local Placement Area (LPA) will receive a lump sum relocation allowance provided the new reporting location exceeds thirty-five (35) road miles from the employee's old reporting location, and is further in road miles from the employee's current residence than the old reporting location.

Provided the employee actually relocates his/her residence within six (6) months from the effective date of the transfer, the allowance will be the lesser of: (1) the termination allowance for which they would have been eligible upon layoff; or (2) $12,000.

Surplus employees who are placed via the AT&T Transfer System (ATS) Surplus Placement program, meet the ATS relocation criteria, and are compensated for actually relocating their residence, shall be offered the opportunity to move back to the former location with relocation compensation for the lesser of: (1) the termination allowance for which they would have been eligible upon layoff; or (2) $12,000; however, in no case shall an allowance for a relocating employee be less than $5,000, provided the following conditions are met:

1.  the employee is laid off at the new site within three (3) years of placement,
2.  the employee relocates back to the original geographic location,
3.  the employee does not qualify for any other AT&T provided relocation compensation program.

### ARTICLE 25 - TERMINATION PAYMENTS

1  A termination payment, plus compensation for any vacation to which the employee is entitled at the time of leaving the Company, shall be paid to a regular employee who is laid off or may be offered by the Company to an employee as an inducement to voluntarily leave the Company.

2  The termination payment shall be computed in accordance with the following schedule and shall be based on the employee's Net Credited Service and the employee's Adjusted Rate, except that for an employee who received an evening or night differential payment for the week in which the date of the layoff or resignation occurred, the rate of pay shall include the evening or night differential payment.

54

01463

Article 25

| YEARS OF NET CREDITED SERVICE | AMOUNT OF PAYMENT |
|---|---|
| Less than 1 year | None |
| 1 year but less than 2 years | 1 week's pay |
| 2 years but less than 3 years | 2 weeks' pay |
| 3 years but less than 4 years | 3 weeks' pay |
| 4 years but less than 5 years | 4 weeks' pay |
| 5 years but less than 6 years | 6 weeks' pay |
| 6 years but less than 7 years | 8 weeks' pay |
| 7 years but less than 8 years | 10 weeks' pay |
| 8 years but less than 9 years | 12 weeks' pay |
| 9 years but less than 10 years | 16 weeks' pay |
| 10 years but less than 11 years | 20 weeks' pay |
| 11 years but less than 12 years | 24 weeks' pay |
| 12 years but less than 13 years | 28 weeks' pay |
| 13 years but less than 14 years | 32 weeks' pay |
| 14 years but less than 15 years | 36 weeks' pay |
| 15 years but less than 16 years | 40 weeks' pay |
| 16 years but less than 17 years | 44 weeks' pay |
| 17 years but less than 18 years | 48 weeks' pay |
| 18 years but less than 19 years | 52 weeks' pay |
| 19 years but less than 20 years | 56 weeks' pay |
| 20 years but less than 21 years | 60 weeks' pay |
| 21 years but less than 22 years | 64 weeks' pay |
| 22 years but less than 23 years | 68 weeks' pay |
| 23 years but less than 24 years | 72 weeks' pay |
| 24 years but less than 25 years | 76 weeks' pay |
| 25 years but less than 26 years | 80 weeks' pay |
| 26 years but less than 27 years | 84 weeks' pay |
| 27 years but less than 28 years | 88 weeks' pay |
| 28 years but less than 29 years | 92 weeks' pay |
| 29 years but less than 30 years | 96 weeks' pay |
| 30 years but less than 31 years | 100 weeks' pay |
| 31 years but less than 32 years | 104 weeks' pay |

Note: The maximum amount of termination payment shall not exceed twice the basic annual salary plus the applicable differential or one hundred four (104) weeks.

55

01464

41

Article 25

6  **The provisions of Paragraph 1 do not apply in case of:**

(a)  An employee leaving the Company voluntarily without inducement by the Company;

(b)  An employee on a leave of absence;

(c)  An employee transferred to or employed by AT&T Corp., its affiliates or subsidiaries, or their affiliates or subsidiaries;

(d)  An employee who is dismissed for misconduct;

(e)  An employee who is classified as Term or Temporary at the time they are work completed.

## ARTICLE 26 - TECHNOLOGICAL DISPLACEMENT

1  If during the term of this Agreement, the Company notifies the Union in writing that technological change (defined as changes in equipment or methods of operation) has or will create a surplus in any job title in a work location which will necessitate reassignments of regular employees to different job titles involving a reduction in pay or to locations requiring a change in residence, or if a force surplus necessitating any of the above actions exists for reasons other than technological change and the Company deems it appropriate, any regular employee who is in the affected job titles and work locations may elect not to accept such reassignment to a job title involving a reduction in pay or to a location requiring a change in residence and shall be paid a termination payment. Any such regular employee who refuses to accept a transfer to a job title having the same or greater rate of pay and which does not require a change in residence shall not be paid a termination payment.

2  Employees eligible for a termination payment under the terms of this provision may alternatively elect to participate in the AT&T Option Program (ATTOP) providing they meet the eligibility requirements of that program.

## ARTICLE 27 - REASSIGNMENT PAY PROTECTION PLAN

1  If, because of force surplus adjustments, employees are assigned to vacancies where the Standard Rate of pay of the new job is less than the current Standard Rate of the employee's regular job, the rate of pay will be reduced over a period of time based on the employee's length of service. The reductions in pay are effective at periods following reassignment as shown below and are based on the difference between the employee's Adjusted Rate and the Standard Rate to which assigned in the new job title.

57

01466

<u>DEPARTMENT OF EMPLOYMENT AND TRAINING'S (DET) OVERVIEW OF THE CLOSING OF</u>

<u>AT&T OPERATOR SERVICES DIVISION, WORCESTER MASS.</u>

DET HAS MET WITH REPRESENTATIVES OF AT&T AND HAS REVIEWED THE "ATTOP" PLAN AND ITS OPTIONS.

ATTACHED IS AN OVERVIEW OF HOW PARTICULAR SITUATIONS MAY BE VIEWED FOR UNEMPLOYMENT PURPOSES. NOTHING CONTAINED IN THIS PACKAGE IS A BINDING DETERMINATION. IT IS BASED ON DET'S KNOWLEDGE OF THE WORCESTER AT&T CLOSING AS OF MAY 18, 1994, AND CURRENT DEPARTMENT OF EMPLOYMENT AND TRAINING LAW AND POLICY.

43

The AT&T facility located at 175 Main St., Worcester, will be closing its Operator Services division on September 2, 1994. Facilities located in Concord, NH, and Portland, ME, will also close on September 2nd. The facility in Peabody, MA, will remain open and, in accordance with union procedures, the 105 positions available in Peabody will be offered to the 195 most senior New England employees interested in filling them. In an effort to reduce the number of involuntary layoffs in Worcester and the other affected New England sites, AT&T has offered to its entire 103 surplus Worcester employees the "AT&T Option Program" (ATTOP). Employees will have from June 2, 1994 until July 2, 1994 to sign up and choose an ATTOP option. Participation in the program is strictly voluntary and as long as employees meet the requirements of the option chosen, they will be accepted for the program. Employees who sign up for the ATTOP program will remain employed until the actual closing on September 2, 1994.

Once interested employees have signed up and chosen an option, AT&T will then place the highest 105 employees interested employees in the positions in Peabody.

On September 2nd, those employees who did not choose an ATTOP option and did not have enough seniority to bump into a Peabody position will be involuntarily laid off.

## SEPARATION ISSUES

Participation in ATTOP:
In order to be eligible for unemployment benefits, any employee who participates in a voluntary program, such as ATTOP, must establish that he/she had a reasonable belief that he/she could be laid of if he/she did not participate. Clearly, those employees not identified as one of the highest 105 have a very reasonable belief since the Worcester site will be closing on September 2, 1994. Separation for these individuals would be approvable for the purpose of unemployment benefits.

Employees eligible to bump who do not exercise bumping rights:
Any employee in Worcester who has been offered the opportunity to bump to a position in Peabody and opts not to exercise bumping rights must establish that the reason he/she failed to take the new job was because it was unsuitable. One reason which make a job unsuitable is increased commuting time. Issues DET would look at would be: How far from your home is the new job? How far from your most recent workplace? How long was your commute to your job in Worcester? How long would it take you to get to Peabody? Would the new commute involve added expense?

It appears quite reasonable to believe that in most cases the new job in Peabody would be unsuitable and therefore, an employee who chooses not to exercise bumping rights to take a job in Peabody would be approved under DET policy.

Involuntary layoff:
For individuals who choose not to participate in ATTOP and who do not receive a job in Peabody, there is no separation issue since they will be laid off on September 2, 1994.

44

# AT&T TODAY

### FRIDAY, DECEMBER 7 - 4:45 p.m. ET

### *** SPECIAL EDITION ***

### URGENT UPDATE: TAUZIN-DINGELL BILL

AT&T Employees:

We need your help in opposing the so-called Tauzin-Dingell bill (H.R. 1542), which would essentially wipe out regulatory oversight of the Bell monopolies in the provision of data services. If it's passed, this bill will make it nearly impossible for us to compete with the Bells and it will cost us thousands of jobs.

That's why we are very disappointed to report that the leadership of the Communications Workers of America has thrown its lot in with the Bell companies and has come out in support of the bill - even though they know that this bill will almost certainly mean the elimination of many union jobs at AT&T. Attached are more details about how the proposed Tauzin-Dingell Bill would be harmful to AT&T.

It's more important than ever that you write a letter to your Member of Congress urging him or her to vote against H.R. 1542. In fact, if you're a union member, you should let the CWA leadership in Washington, D.C., know that you don't appreciate their selling AT&T union jobs out to the Bells.

Please log on to http://www.attcan.org, register if you haven't already, and we'll help you draft a letter to your Member. We'll ask you to respond to a few simple questions. The letter then will be e-mailed to the Member, and a copy also will be available for you to print and mail through the postal system.

Please log on as soon as possible and help us defeat this bill. The next few days are critical.

Thank you,

Jim Cicconi
General Counsel

Dick Martin
EVP, Public Relations

1

45

More details:

- H.R. 1542 would prevent AT&T from providing DSL services to residential customers and virtually all business customers.

    This is because H.R. 1542 would entirely eliminate access to incumbent LEC local loops that include any fiber in the feeder plant, and eliminate cost-based access to loops that are entirely copper.

- H.R. 1542 would substantially restrict AT&T's ability to provide local voice services to residential and most business customers.

    This is because DSL will increasingly be a crucial component of any economically viable offering of competitive local voice services, and will, in the longer term, be the vehicle for delivering voice services.

    In addition, by permanently reducing the Bells' incentive to comply with the market-opening requirements of Section 271 of the Telecom Act (which is required today for the Bells to provide voice and data interLATA services, and would be required under H.R. 1542 only for voice interLATA services), H.R. 1542 would make it less likely that the Bells would comply with any remaining market-opening requirements.

- H.R. 1542 would force AT&T to discontinue local voice and data services provided to many business customers.

    This is because AT&T today relies on high-speed facilities (T1 and greater) that it must lease from the Bell companies and other incumbent LECs to provide local services to business customers. H.R. 1542 would deregulate these facilities.

- H.R. 1542 would prevent AT&T from remaining a meaningful competitor in the long distance market for many consumers.

    This is because consumers have demonstrated a very strong preference for buying local and long distance services from the same provider. Because H.R. 1542 would substantially restrict AT&T's ability to provide local services, it would preclude AT&T from being the single provider that a large portion of consumers demand.

- H.R. 1542 would increase AT&T's cost of providing long distance services for residential and business customers.

    This is because H.R. 1542 deregulates many of the high-speed exchange access services and facilities that AT&T and other interexchange carriers require from the Bells and other incumbent LECs to originate and terminate long distance calls.

- For all of these reasons, H.R. 1542 would make capital even more difficult to raise, further undercutting AT&T's efforts to invest and expand market opportunities.

- In short, H.R. 1542 would substantially limit AT&T's future, restricting AT&T largely to a provider of big business networking services. AT&T would have little prospect for providing local voice, data and long distance services to the vast preponderance of other customers that AT&T does not, and cannot, serve today entirely over its own facilities, including local loop facilities.

Due to anticipated high volumes, you may experience some difficulty in accessing the AT&T CAN Web site. Given the urgency of this issue, we encourage you to keep trying. Please e-mail your questions to mailto:info@attcan.org.

The http://www.attcan.org Web site is best viewed in Internet Explorer 6.0 or Netscape 6.1. You will need to have the "cookies" option enabled on your browser. If you are using an older browser, you may experience difficulties with the functionality on this Web site. Please click on one of the above links to get the latest version of Internet Explorer or Netscape in order to have full access to this Web site.

HELP SPREAD THE WORD

Please post or pass along copies of AT&T TODAY for co-workers who can't access it.

46



# News Release

FOR RELEASE WEDNESDAY, MARCH 10, 2004

## AT&T Response To FCC Chairman Powell's Call For A Transition From A Competitive Marketplace

(Background: Today during a speech at the National Association of Regulatory Utility Commissioners (NARUC), FCC Chairman Michael Powell urged the Bell companies and competitive telecom carriers to enter into 30 days of negotiation after which he would attempt to impose a moratorium and transition from the facilities competitors lease to provide competitive services to consumers. The following may be attributed to Jim Cicconi, AT&T general counsel.)

Chairman Powell made clear in his speech today that absent agreement in 30 days he will attempt to impose some ill-defined moratorium and 18 month transition away from competition. Under those conditions, Chairman Powell's call is not one for negotiation but rather a call for surrender. Clearly this will mean an end to a competitive local marketplace not only for the millions of customers who have chosen competitive carriers as their local providers but also for the millions of others who are benefiting from the lower prices that competition brings.

The request for the industry to "negotiate in good faith" for thirty days is not a new or novel idea. In fact, Section 252 of the Telecom Act requires such negotiations and the reality is that AT&T has, in good faith, engaged in negotiations with the Bells for the past eight years. As a result of those negotiations, we have not had a single agreement with the Bells that did not require state or federal commission arbitration. While we will seize any opportunity and would be more than willing to make it eight years and thirty days of good faith negotiations, we are skeptical that such discussions will suddenly bear fruit and result in a competitive marketplace, particularly under the anti-consumer D.C. Circuit decision. Given these facts, it is unlikely that the called-for negotiations will result in anything good for consumers or competition. The only certainty afforded by Chairman Powell's proposal is the certainty that most consumers will have no choice of a local service provider. Frankly, we would rather stand up for our current and future customers' right to competition and fair prices instead. Millions of consumers and the industry need the certainty and finality that only a Supreme Court review can bring. If the FCC had appealed the original D.C. Circuit decision we would have that certainty today.

### About AT&T

For more than 125 years, AT&T (NYSE: T) has been known for unparalleled quality and reliability in communications. Backed by the research and development capabilities of AT&T Labs, the company is a global leader in local, long distance, Internet and transaction-based voice and data services.

### AT&T 'Safe Harbor'

The foregoing contains forward-looking statements which are based on management's beliefs as well as on a number of assumptions concerning future events made by and information currently available to management. Readers are cautioned not to put undue reliance on such forward-looking statements, which are not a guarantee of performance and are subject to a number of uncertainties and other factors, many of which are outside AT&T's control, that could cause actual results to differ materially from such statements. These risk factors include the impact of increasing competition, continued capacity oversupply, regulatory uncertainty and the effects of technological substitution and other risks. For a more detailed discussion of the factors that could cause such a difference, please see AT&T's 10-K, 10-Q, 8-K and other filings with the Securities and Exchange Commission. AT&T disclaims any intention or obligation to update or revise any forward-looking statements whether as a result of new information, future events or otherwise. This information is presented solely to provide additional information to further understand the results of AT&T.

For more information, reporters may contact:

Claudia Jones
AT&T
232-457-3933

© 2005 AT&T. All rights reserved.


**AT&T** The world's networking company™

# News Release

## FOR RELEASE WEDNESDAY, MARCH 31 2004

# AT&T Reaction To FCC's Call To For An Additional 45-Day Period Of Negotiation

*(The following statement may be attributed to Jim Cicconi, AT&T general counsel.)*

We support the FCC's decision to ask the D.C. Circuit for an extension of the stay of the Court's decision, and to ask the Solicitor General to request an extension of the deadline for seeking Supreme Court review. The D.C. Circuit Court decision would devastate competition in local telephone markets, harming millions of American consumers and businesses, and reducing employment and investment in the industry. It is, therefore, important that the FCC is taking the steps announced today.

AT&T welcomes any opportunity to negotiate a fair, economically viable agreement with the Bell companies for access to the facilities they control. It was only last September when AT&T Chairman and CEO Dave Dorman called for the industry to come together and resolve its disputes in business-to-business discussions. We need no convincing that this is a preferable course, and we embrace it fully.

It must be recognized, however, that any such talks are inherently difficult given that the Bell companies control the sole supply of a needed good. Nonetheless, AT&T has always been willing to negotiate with the Bells because we prefer the business security of a fair, long-term commercial agreement that benefits both parties if one can be achieved.

We therefore welcome the FCC's initiative to encourage genuine commercial negotiation. It is AT&T's hope that, despite past difficulties, a fresh approach can be found that will foster the competition and lower prices currently enjoyed by 19 million Americans, and bring the benefits of competitive local phone service to many millions more.

### About AT&T

For more than 125 years, AT&T (NYSE 'T') has been known for unparalleled quality and reliability in communications. Backed by the research and development capabilities of AT&T Labs, the company is a global leader in local, long distance, Internet and transaction-based voice and data services.

### AT&T 'Safe Harbor'

The foregoing contains 'forward-looking statements' which are based on management's beliefs as well as on a number of assumptions concerning future events made by and information currently available to management. Readers are cautioned not to put undue reliance on such forward-looking statements, which are not a guarantee of performance and are subject to a number of uncertainties and other factors, many of which are outside AT&T's control, that could cause actual results to differ materially from such statements. These risk factors include the impact of increasing competition, continued capacity oversupply, regulatory uncertainty and the effects of technological substitution, among other risks. For a more detailed description of the factors that could cause such a difference, please see AT&T's 10-K, 10-Q, 8-K and other filings with the Securities and Exchange Commission. AT&T disclaims any intention or obligation to update or revise any forward-looking statements, whether as a result of new information, future events or otherwise. This information is presented solely to provide additional information to further understand the results of AT&T.

### For more information, reporters may contact:

Claudia Jones
AT&T
202-457-3933

Terms & Conditions   Privacy Policy   Contact Us
© 2005 AT&T. All rights reserved.
Hosted by AT&T.



 **AT&T** The world's networking company.

att.com   At Home & On the Go   Small & Medium Business   Enterprise Business

**SEARCH**

Home | Suggestions | Help/FAQ | Sitemap

- BENEFITS
- COMMUNITY INVOLVEMENT
- GOVERNMENT ORGANIZATIONS
- NEWS & INFORMATION
- FINANCIAL & INVESTMENT

Back to News & Information

# AT&T TODAY

## MONDAY, JUNE 7, 2004 12:30 p.m. EDT

**AT&T STOCK WATCH (Fridays close)** \*\*\* T 16.45; +.28

**AT&T ANNOUNCES \*\*\* METSO SELECTS AT&T FOR $8 MILLION GLOBAL NETWORKING CONTRACT** AT&T announced it has won an $8 million, three-year contract from Metso, a global supplier of process industry machinery and systems, as well as know-how and aftermarket services. Metsos core businesses are fiber and paper technology, rock and mineral processing, and automation and control technology. The agreement provides an integrated, global networking solution linking 130 sites in 23 countries and expands upon an existing contract by which AT&T provides Metso with communications service. Previously, Metso relied on 15 vendors in different regions to provision its global network. Now, Metsos global communications reside on AT&Ts secure, flexible Internet protocol (IP) network, affording the company significant efficiencies and economies of scale.

**AT&T WINS $2 MILLION NETWORKING CONTRACT FROM HANOVER DIRECT** AT&T announced it has won a two-year, $2 million contract to provide Hanover Direct an integrated networking solution linking 14 company locations across the United States, including contact centers in Hanover, Pa., and La Crosse, Wis. Hanover Directs commerce operations include its catalog and Web site portfolio of home fashions, apparel and gift categories. The companys business-to-business services consist of its third-party, end-to-end, distribution, logistics, telemarketing and e-care fulfillment operations.

For the complete news releases, go to the AT&T Newsroom at http://www.att.com/news/.

[AT&T TODAY publishes excerpts from selected news items to inform employees and retirees about AT&T in the news worldwide. Publication of a news clip is not an endorsement of its viewpoint or accuracy. All news sources are today's date unless otherwise noted.]

**AT&T AND INDUSTRY NEWS \*\*\* APPEALS COURT REJECTS REQUEST FOR STAY** [The New York Times, C1, 6/5.] In a ruling that could reduce competition in local phone markets, a federal appeals court Friday rejected a request by regulators and the two largest long-distance telephone providers to extend regulations that give the companies and small rivals deep discounts for leasing the network equipment of the four

Bell operating companies. The decision puts pressure on the Bush administration to take sides in the long-running telephone wars, as the Justice Department will have to decide whether to take an appeal to the Supreme Court. A majority of commissioners at the Federal Communications Commission [FCC] have said that the agency intends to appeal the earlier decision by the United States Court of Appeals for the District of Columbia that struck down the regulations, but the Supreme Court is more likely to consider an appeal if the Justice Department decides to join it. Executives and lawyers for the losers of Fridays decision, including the association representing state telephone regulators, said that they would go to the Supreme Court early [this] week to ask Chief Justice William H. Rehnquist, who oversees such applications for matters arising out of the federal appeals court, to issue a stay blocking the expiration of the old rules. Neither the Justice Department, the FCC or the White House issued a response to the latest court decision. Industry executives and lobbyists said they believed that the administration had still not reached a decision on how to proceed. The rate rules are set to lapse on June 15 under a decision by the appeals court last March. But in a letter sent on Tuesday, a Verizon lawyer told an AT&T lawyer that Verizon did not feel constrained from changing rates after giving 90 days notice. [Print and wire coverage elsewhere.]

**BUSH ADMINISTRATION UNDER PRESSURE ON PHONE RULES** [Los Angeles Times, C1, 6/5.] A federal court ruling Friday has put the White House in an election-year quandary: Should it back big local phone companies in their drive to undo regulations or side with consumer groups by supporting a plan they say will bring more choices and lower prices? The Bush administration had hoped the U.S. Circuit Court of Appeals in Washington would head off such a dilemma by agreeing to give SBC, Verizon and other Baby Bells more time to negotiate pacts with rivals like AT&T and MCI for leasing Bell local-phone networks. Instead, the court affirmed that a contentious set of rules designed by the FCC to spur competition would be thrown out June 15, giving the Bells more power to raise wholesale rates. Now Bush's advisors must decide whether to appeal to the Supreme Court, as a majority of the FCC commissioners and consumer groups would like, or to let the ruling stand, as the Bells prefer. [AT&T and Reston, Va.-based service provider Talk America] have heavily lobbied the administration to appeal. Set against the specter of rising phone bills, the issue is growing into another political headache for Bush. Consumers already are fretting over higher prices for gasoline and milk, and some key swing states are still waiting for an economic recovery to take hold. Without the FCC rules, the Bells would be free to raise the wholesale rates they charge to allow rivals to plug into their massive phone networks. AT&T, MCI and other competitors say price hikes will force them to raise the prices they charge consumers, abandon some calling plans or pull out of some states altogether. Still, AT&T and MCI executives believe an appeal is necessary. They say that unless the Bells believe the government wants to keep the rules, the Bells wont negotiate lease agreements in good faith. •

**SAGE TELECOM MAY END AGREEMENT WITH SBC OVER TRANSPARENCY ISSUE** [San Antonio Business Journal, online, 6/4.] Dallas-based Sage Telecom is threatening to pull out of a seven-year commercial agreement with SBC. Prompting the threat is a recent ruling by the Texas Public Utility Commission (PUC) that calls for making the terms

of the agreement public by June 21. Sage officials worry that such public disclosure will jeopardize the company's competitive position in the market. Sage and SBC negotiated the agreement in April for SBC to provide wholesale local phone services to Sage, covering all 13 states comprising SBCs local phone territory. In the past, such interconnection agreements have been subject to review by the state utility boards and made available to competing independent phone companies to review. But ever since a federal court overturned some of the FCCs rules underpinning these types of agreements, SBC has insisted it has the right to set up private commercial agreements in their place. But a group of independent telecommunications companies known as competitive local exchange carriers, or CLECs, have challenged that assumption. On April 28, they filed a joint petition before the Texas PUC arguing that the SBC-Sage agreement falls under the auspices of the telecom act and is required to be filed for public review. Under federal law, the public filing of such agreements is extremely important, the petition states. Compliance with (the filing provision of the law) is the first and strongest protection under the act against discrimination by the incumbent local exchange carrier (SBC) against its competitors.

**AT&T BRINGS VOIP OFFERING TO ATLANTA AND CHICAGO** [LTW (Local Tech Wire), online.] AT&T is expanding its voice over Internet protocol (VoIP) phone services offerings to both Atlanta and Chicago. The [AT&T] CallVantage Service was launched by AT&T in March and is now available in 36 markets. The company is shooting for deployment in 100 markets by years end.

**TIME WARNER TO OFFER VOIP** [Associated Press, online.] Time Warner Cable is offering unlimited local and long-distance telephone service via the Internet to customers who also subscribe to its cable and high-speed Internet. With it, the company hopes to compete with local phone providers that have dominated the market. [Today], the company plans to outline its service rollout in the Cincinnati area, where local provider Cincinnati Bell has about 1 million lines. Time Warner Cable says it plans to offer its digital phone service nationwide by the end of 2004.

**OTHER STOCKS TO WATCH (Fridays close)** *** **AWE** 14.22, +.03; **BellSouth** 24.92, +.10; **Comcast** 28.80, +.40; **IBM** 87.56, +.21; **Qwest** 3.63, +.03; **SBC** 23.93, +.21; **Sprint** 17.27, +.10; **Verizon** 34.96, +.03; **Vodafone** 23.14, +.16; **Dow Jones** 10,242.82, +46.91; **NASDAQ** 1,978.62, +18.36; **S&P 500** 1,122.50, +5.86 *Prices quoted are American Depository Receipts

**QUOTE OF THE DAY** Ability will never catch up with the demand for it. Confucius

OUR COMMON BOND
Respect for Individuals * Dedication to Helping Customers *
Highest Standards of Integrity * Innovation * Teamwork

*AT&T TODAY* is published by AT&T Public Relations. A proprietary publication for AT&T employees and retirees, it is not intended for use by external audiences.



Home | Suggestions | Help/FAQ | Sitemap

⤵ BENEFITS

⤵ COMMUNITY
INVOLVEMENT

⤵ GOVERNMENT
ORGANIZATIONS

⤵ NEWS &
INFORMATION

⤵ FINANCIAL &
INVESTMENT

Back to News & Information

# AT&T TODAY

## TUESDAY, JUNE 15, 2004 2 p.m. EDT

AT&T STOCK WATCH (Mondays close) ••• T 15.95; -.40

**AT&T ANNOUNCES** ••• AT&T WINS TELECOM ASIA "BEST MANAGED SERVICES CARRIER" 2004 AWARD AT&T received the Telecom Asia Award of "Best Managed Services Carrier" in the Asia-Pacific region. A distinguished panel of 10 judges, including telecom analysts, telecom user groups, industry experts and Telecom Asia's editorial team, voted for the award winners. The judging criteria for the Telecom Asia Award -- one of the industry's most prestigious regional awards -- were based on three elements: financial performance; innovation and leadership; and corporate governance. The selection of award winners was based in part on an analysis by one of the world's premier telecom research houses, the Yankee Group.

For the complete news release, go to the AT&T Newsroom at http://www.att.com/news/.

[AT&T TODAY publishes excerpts from selected news items to inform employees and retirees about AT&T in the news worldwide. Publication of a news clip is not an endorsement of its viewpoint or accuracy. All news sources are today's date unless otherwise noted.]

**AT&T AND INDUSTRY NEWS** ••• AT&T CALLVANTAGE SERVICE ROLLS OUT IN FLORIDA [Southwest Florida Herald-Tribune, online, 6/14.] AT&T is launching voice over Internet protocol [VoIP] phone service for 10 Florida markets. The service allows users to make and receive phone calls over a high-speed Internet connection. It is AT&T's first overture to the Sarasota area, which has lost out to more populated areas such as Tampa and Miami when alternative carriers decide where to compete for local customers. In light of recent regulatory decisions, VoIP may turn out to be a more cost-effective way for carriers such as AT&T to enter new markets. [Tampa Bay Business Journal, online, 6/14.] AT&T announced [yesterday] the expansion of its [AT&T] CallVantage Service to 10 major Florida markets including Lakeland-Winter Haven, Sarasota-Bradenton and Tampa-St. Petersburg. [AT&T] CallVantage [Service] is a residential voice over Internet protocol [service] that requires a customer to have a high-speed Internet connection to the home.

**SUPREME COURT ALLOWS PHONE RULES TO EXPIRE** [Washington

Post, E5.] The U.S. Supreme Court declined yesterday to stop the government from discarding a set of rules that forced regional phone companies to lease their networks to rivals at deep discounts. [AT&T] was one of more than two dozen phone companies that had asked Supreme Court Justice William H. Rehnquist on Thursday to keep the rules on the books while they appeal a lower court's finding that the regulations were improper. AT&T and the other phone companies say they depend on the rules to offer local phone service in regions where they must compete with giants such as Verizon and BellSouth. The Supreme Court's decision is not surprising given the Bush Administration decision to abandon the litigation. said AT&T spokeswoman Claudia Jones in a statement e-mailed to reporters. This confirms that the Administration has set the industry on a path to higher prices. less competition, fewer jobs and depressed investment. AT&T and other competitors say the prospect of rate increases will hinder their ability to market the service to new customers and they hinted they may highlight the issue in states key to deciding the presidential election. Once the current rules expire, the major phone companies still must seek the approval of state regulators before they raise rates. There is no deadline on the states to complete their review of the rate hikes, an FCC [Federal Communications Commission] official said yesterday. In the meantime, AT&T and the other competitors say they will continue to seek a Supreme Court review of the appeals courts ruling. [Print and wire coverage elsewhere.]

SPECULATION: RULING MAY FORCE AT&T TO STOP OFFERING LOCAL SERVICE IN SOME MARKETS [The Wall Street Journal, B6.] AT&T [reportedly may] announce soon it will stop offering local service in some states in the wake of a court decision that becomes effective today. The ruling strikes down government competition rules that control wholesale rates charged to AT&T by the regional Bell companies. AT&T [may] stop offering service in these states. a person familiar with the matter said. even though the Bells have sent the FCC letters promising they won't raise wholesale rates until the end of the year. The company has warned in the past that it would stop offering local service in some regions if price increases make its margins too slim. AT&T is also reluctant to rely on promises from the Bells rather than actual government policy.

RULING LEAVES RATE UNCERTAINTY FOR CONSUMERS AND COMPANIES [The New York Times, C4.] The decision by the Bush administration last week to side with the regional Bell companies in their legal fight over the access fees they charge others to lease their phone lines has set off alarm bells among consumer groups. long-distance providers and state utility commissions. The groups say that an appeals court decision to remove the cap on these access fees. which goes into effect today, will give the Bells a free hand to raise the prices they charge AT&T, MCI and hundreds of other companies trying to get into the local phone market. It will also push many smaller phone companies out of business. they say. and ultimately lead to higher phone rates for consumers. But most analysts say that if and when they start charging higher fees, the Bells are unlikely to raise rates by more than 30 percent. Anything higher would be viewed as politically unpalatable and probably push long-distance companies to move even faster to use new phone technology, like Internet calling services, that bypass the Bells networks altogether. Long-distance providers contend that total customers aside. their mere presence in the local phone market keeps pressure on the Bells

53

to maintain service at reasonable prices.

**FCC CANNOT PRE-EMPT STATE EFFORTS IN BROADBAND REGULATION, AT&T SAYS** [TR Daily, online, 6/14.] The Telecommunications Act of 1996 bars the FCC from pre-empting state efforts to stop incumbent telcos from cutting off broadband service to end-users who switch service providers, AT&T has told the Commission. In a letter opposing a BellSouth petition for a declaratory ruling pre-empting state commissions in this area. AT&T said the FCC must meet traditional pre-emption standards, which allow pre-emption only where, and to the extent that, state regulation so conflicts with federal requirements that it negates the exercise of federal powers. BellSouth had asked for a declaratory ruling that state commissions may not regulate broadband Internet access service by requiring the incumbent telco to provide wholesale or retail broadband service. AT&T also reiterated its argument in previous filings that the state broadband requirements at question do not establish unbundling obligations or implicate the Commission's unbundling regulations or determinations.

**SENATE TO TAKE UP VOIP LEGISLATION** [CNET News.com, online, 6/14.] The U.S. Senate [tomorrow] is scheduled to begin hearings on Internet telephone services, in what could be the first step toward banning state governments from regulating the fast-growing technology. Under discussion during the hearing will be a proposal introduced in April that would flatly ban state regulators from monkeying around with voice over Internet protocol services. The bill, called the VoIP Regulatory Freedom Act, says regulatory authority is reserved solely to the federal government. The proposal is aimed at heading off state officials, who are eyeing VoIP companies as potentially lucrative taxing opportunities. The bill protects consumers by ensuring that this new service won't be taxed at the state level, Sen. John Sununu said on the Senate floor when introducing the federal bill in April. Everyone knows the more you tax something, the less you get. If you want to discourage investment, innovation and capital from moving into important new services like this, then raise the taxes and discourage that investment. The Justice Department and FBI are keenly interested in wiretapping VoIP calls. The Sununu bill says that VoIP companies that provide links to the existing telephone network must provide some access to necessary information to law enforcement agencies.

**OTHER STOCKS TO WATCH** (Mondays close) *** AWE 14.30, -.03; BellSouth 25.70, -.31; Comcast 28.82, -.79; IBM 90.07, -.39; Qwest 3.60, -.06; SBC 24.55, -.26; Sprint 17.60, -.20; Verizon 36.01, -.25; Vodafone 23.21, -.54; Dow Jones 10,334.73, -75.37; NASDAQ 1,969.99, -29.88; S&P 500 1,125.29, -11.18 *Prices quoted are American Depository Receipts

**QUOTE OF THE DAY** To accomplish great things, we must not only act, but also dream; not only plan, but also believe. Anatole France, author

OUR COMMON BOND

54

AT&T TODAY

## Foti, Maureen

| | |
|---|---|
| **From:** | Sherman,John - LGCRP [johnsherman@att.com] |
| **Sent:** | Monday, September 26, 2005 10:20 AM |
| **To:** | Sherman,John - LGCRP |
| **Subject:** | Emailing: TODAY.04.175.1.htm |

# AT&T TODAY

### WEDNESDAY, JUNE 23, 2004 – 9:45 a.m. EDT

### *** *SPECIAL EDITION* ***

### AT&T To Stop Competing In Residential
### Local and Long-Distance Markets In Seven States

AT&T today announced that it will stop competing for local and long-distance residential customers in Ohio, Missouri, Washington, Tennessee, Louisiana, Arkansas and New Hampshire -- states comprising a population of nearly 38 million Americans.

This action is a result of a June 9 decision by the Administration and the FCC not to appeal a recent Federal court decision that overturned FCC wholesale rules put in place to introduce competition in local markets. The reversal of local competition policy by the Administration will permit the Bell companies to raise wholesale rates as early as November. This increase in wholesale rates means that AT&T will likely be unable to economically serve customers with the competitive bundles currently available.

The Administration's decision two weeks ago effectively eliminated pro-competition rules adopted by the FCC nearly 18 months ago. Without these rules, AT&T has been forced to reassess its ability to serve residential consumers in the other 39 states in which it provides local and long-distance service.

Today's announcement to stop competing in seven states for residential customers is a result of that reassessment. AT&T will make further announcements as it continues its review. "We foresee a future with less choice for consumers," said David Dorman, chairman and CEO of AT&T. "Competitive alternatives are simply not available today for most Americans," he added, "because as AT&T loses the ability to provide them with an alternative to the Bell companies, they will have virtually no choice of telecommunications provider."

Dorman noted that for the consumer market, the ability of a competitor to bundle a variety of services -- particularly local and long-distance service -- has essentially been eradicated by the June 9 decision. Without an effective local product in its service bundle, AT&T foresees that it will not be able to effectively provide customers with a complete package of telecommunications services.

Since the passage of the Telecom Act in 1996, almost 30 million lines, representing more than 20

00868

55   9/29/2005

AT&T TODAY

million consumers and small businesses, are receiving local phone service from a non-Bell service provider.  Studies have shown that all purchasers of local phone service save over $11 billion a year because competition brings better pricing and improved service offers.

The company stressed that it will continue to serve its existing residential customers in the affected states, and that its announcement today does not affect its enterprise, government and other small- and medium-sized business customers.  It will also not affect customers with DSL and cable modem offerings who subscribe to the company's voice over IP offering, AT&T CallVantage$^{SM}$ Service.

HELP SPREAD THE WORD
Please post or pass along copies of AT&T TODAY for co-workers who can't access it.


**OUR COMMON BOND**
**Respect for Individuals * Dedication to Helping Customers ***
**Highest Standards of Integrity * Innovation * Teamwork**

*AT&T TODAY* is published by AT&T Public Relations.  A proprietary publication for AT&T employees, it is not intended for use by external audiences.  AT&T TODAY also is available at InfoCenter@AT&T, http://infocenter.att.com/, which carries additional news and information.

# Monthly C

Fairhaven

| | ASA | %ANS | ANS | ABN | NCC |
|---|---|---|---|---|---|
| **FAIRHAVEN TOTAL** | | | | | |
| April | 160.74 | 87.61 | 240,713 | 34,031 | 274,744 |
| May | 102.33 | 92.95 | 203,332 | 15,421 | 218,753 |
| June | 70.19 | 95.02 | 193,601 | 10,147 | 203,748 |
| July | 61.12 | 96.14 | 168,389 | 6,762 | 175,151 |
| August | 57.37 | 96.35 | 182,135 | 6,895 | 189,030 |

57

# S&S Call Handling (MONTHLY)

| ATT | AHT | Avg Hold (Incld in ATT) | %OCC | HoldCalls | HoldTime | # Of Transfers |
|---|---|---|---|---|---|---|
| 402.87 | 415.99 | 96.43 | 92.46 | 64824 | 6250847 | 26,930 |
| 400.72 | 413.81 | 97.8 | 94.32 | 55324 | 5410730 | 23,550 |
| 417.65 | 430.63 | 102.44 | 88.45 | 53241 | 5454212 | 20,827 |
| 415.2 | 427.99 | 104.71 | 86.98 | 47408 | 4964093 | 18,009 |
| 413.55 | 426.43 | 102.28 | 87.94 | 53375 | 5459210 | 20,569 |

58

| # Of Conferences | ATT TARGETS | AHT TARGETS | AUX TARGETS |
|---|---|---|---|
| 26,402 | | | |
| 21,817 | | | |
| 22,970 | | | |
| 21,070 | | | |
| 23,068 | | | |

59



**CONTRACT FOR SALE OF REAL ESTATE**
**Basic Terms**

In consideration of the mutual promises that are stated in this *Contract*, *Buyer* and *Seller* agree that *Seller* will sell the *Subject Property* to *Buyer*, and *Buyer* will purchase the *Subject Property* from *Seller*, in accordance with this *Contract*. The terms that appear in this *Contract* in italicized type have the following definitions:

| | |
|---|---|
| *Buyer* means | Sakonnet Properties, Inc, a Massachusetts corporation. |
| *Buyer's Address* means | 700 Pleasant Street, P.O. Box 4023, New Bedford, Massachusetts 02741-4023. |
| *Buyer's Broker* means | None. |
| *Closing Date* means | the earlier to occur of (i) thirty days after the expiration of the *Inspection Period*; or (ii) any earlier date which *Buyer*, in *Buyer's* discretion, may elect to designate by giving a written notice to *Seller* not later than five days (not including weekends and federal holidays) before such designated earlier date. |
| *Deposit* means | two hundred fifty thousand dollars, subject to Section 2 of *Rider - Additional Terms and Conditions of Sale*. plus all interest or other earnings, if any, realized from this money while it is held by the *Escrow Agent* pursuant to this *Contract*. |
| *Effective Date* means | the date on which this Contract is signed on behalf of *Buyer* and *Seller* by their respective authorized officers or representatives. If this *Contract* is signed on behalf of *Buyer* and *Seller* on two different dates, then the *Effective Date* shall be the later of the two dates. |
| *Exhibits and Riders* means | *Rider - Standard Terms and Conditions of Sale*, and *Exhibit A - Description of the Land* and *Exhibit C –Assignment Agreement*, and the following other documents, if any: |

• *Rider - Additional Terms and Conditions of Sale*
• *Exhibit D - List of furniture, furnishings, equipment, and other items of personal property excluded from the Subject Property*.
• *Exhibit E - List of existing licenses and leases for the communications tower and adjacent portions of the Land.*
• *Exhibit F - List of permits, licenses, authorizations, and approvals.*
• *Exhibit G - Form of bill of sale.*
• *Exhibit H - Form of commercial mechanic's lien affidavit.*

00887



**CONTRACT FOR SALE OF REAL ESTATE**
**Basic Terms**

- *Exhibit I - Form of lease for Main Building.*
- *Exhibit J -    Form of lease for Annex Building.*
- *Exhibit K -    Form of new license agreement for the communications tower.*

*Inspection Period* means **ninety days**      days after the *Effective Date.*

*Purchase Price* means **three million one hundred thousand dollars ($3,100,000.00).**

*Seller's Broker* means **Cushman & Wakefield and Hayes & Sherry Real Estate Services.**

*AT&T and Affiliates* means *Seller,* and all subsidiary companies, affiliates, and predecessors-in-interest of *Seller,* and all companies and entities that are directly or indirectly controlled by *Seller,* if any; and all companies and entities that directly or indirectly control *Seller,* if any; and all of their respective directors, officers, shareholders, employees, contractors and agents.

*Buyer's Costs* means (i) the cost of obtaining the *Title Commitment,* if *Buyer* elects to obtain title insurance coverage; and (ii) the cost of obtaining the *Survey,* if *Buyer* elects to obtain the *Survey;* and (iii) all premiums and other costs of obtaining all owner's title insurance that may be desired by *Buyer* and all premiums and other costs of obtaining all mortgagee's title insurance coverage, if any; and (iv) all fees to have any documents *Recorded,* (v) all costs of *Buyer's* mortgage financing, if any; and (vi) all escrow fees or termination charges and fees of *Escrow Agent* for holding the *Deposit* in escrow and conducting the *Closing.*

*Closing* means the execution and delivery of the *Deed* by *Seller* concurrently with the payment by *Buyer* of the entire remaining balance of the *Purchase Price* due under this *Contract.*

*Contract* means these *Basic Terms* and the *Exhibits and Riders,* which are incorporated into and made a part of this document.

*Deed* means a good and sufficient Massachusetts quitclaim deed, in proper from for recording, conveying good, clear and marketable fee simple title to the *Subject Property* to *Buyer* that conveys all of the *Seller's* right, title and interest in the *Land* (and the appurtenances and other real property that is included as part of the *Subject Property* to *Buyer* and that contains no warranties other than a warranty that *Seller* has done no act to encumber title to the *Subject Property.*

*Escrow Agent* means any title insurance company, escrow company, lawyer, or other person or entity that (i) is authorized by the laws of the jurisdiction in which the *Land* is located to act as a real estate settlement agent; and (ii) agrees in writing to hold the *Deposit* in accordance with this *Contract;* and (iii) agrees in writing to conduct the *Closing* by receiving the deposit of the *Purchase Price* and *Deed* into escrow, disbursing the *Purchase Price* at the *Closing* in accordance with this *Contract,* and completing delivery of the *Deed* at the *Closing* in accordance with this *Contract.*

*Exchange* means a tax-deferred exchange under the provisions of Section 1031 of the Internal Revenue Code of 1986, as amended, and all administrative regulations under the Internal Revenue Code.

*Indemnify* means to indemnify, defend and hold harmless from and against all claims, suits, proceedings, damages, liability, costs and expenses (including reasonable attorneys' fees, court costs and other litigation expenses, through all levels of appeal).

*Land* means the parcel or parcels of land described in *Exhibit A - Description of the Land.*

1166258A01041404

00888



**CONTRACT FOR SALE OF REAL ESTATE**
**Basic Terms**

*Subject Property* means  the *Land*, all buildings and other improvements, if any, that are located on the *Land*, and all easements and other rights that are appurtenant to the *Land*.

*Recorded* means  the filing or recording in the official land or real estate records of the county or other jurisdiction in which the *Land* is located, in accordance with applicable law.

*Qualified Intermediary* means  any entity designated by *Seller* to act as the intermediary pursuant to an agreement in the substantial form of *Exhibit C - Assignment Agreement*, if *Seller* elects to have the *Subject Property* conveyed to *Buyer* as part of an *Exchange* in accordance with *Section 13 of Rider - Standard Terms and Conditions of Sale*.

*Seller* means  AT&T Corp., a New York corporation (formerly named American Telephone and Telegraph Company), or the subsidiary or affiliate of AT&T Corp. that holds title to the *Subject Property*. If title to the *Subject Property* is held by a subsidiary or affiliate of AT&T Corp., then AT&T Corp. is acting as the agent of its subsidiary of affiliate under this *Contract*.

*Seller's Address* means  AT&T Global Real Estate, 55 Corporate Drive, Bridgewater, New Jersey 08807.

*Survey* means  a map of a survey of the *Land* made by a surveyor licensed in the state in which the *Land* is located.

*Title Commitment* means  a commitment for a standard policy of owner's title insurance for the *Land* (and appurtenances and the buildings and improvements located on the *Land*) issued by any title insurance company that is selected by *Buyer* and authorized to do business in the state in which the *Land* is located.

*Title Defects* means  all exceptions to coverage in the *Title Commitment* for any liens or encumbrances against the *Land*, if any, and for any defects in the title to the *Land*, if any, that are not acceptable to *Buyer* in the sole discretion of *Buyer*.

This *Contract* constitutes the entire agreement between the parties and supersedes all prior written or oral understandings of the parties, all of which are merged into this *Contract*. *Seller* and *Buyer* sign, seal and deliver this *Contract* as of the *Effective Date*.

Seller:

AT&T Corp.

By: _____

Name: Debra D. Bell

Title: Global Real Estate
      Vice President

Date: April 26 , 2004

Buyer:

Sakonnet Properties, Inc.

By: _____

Name: PAUL C. Downey

Title: President

Date: April 20 , 2004

Contract_GENERAL_2_ver.3.doc

00889



CONTRACT FOR SALE OF REAL ESTATE
*Exhibit I-    Form of lease for Main Building*


**AT&T**
Global Real Estate

**CONTRACT FOR SALE OF REAL ESTATE**
*Exhibit I - Form of lease for Main Building*

*Lease*

between

**Sakonnet Properties, Inc.,**

*Landlord,*

and

**AT&T Corp.,**
*Tenant,*

for *Premises*

located at
200 Mill Road,
Fairhaven, Massachusetts.



CONTRACT FOR SALE OF REAL ESTATE
*Exhibit I – Form of lease for Main Building*

Revision date: 12/12/03
Lease_Main_05a.doc

Table of Contents

Page

Section 1.    Definitions; date of this *Lease*; demise of the *Premises*; *Fixed Rent*. ........................................... 1
Section 2.    Use. ........................................................................................................................................ 1
Section 3.    *Tax Increase*, *Building Expense Increase*, and *Site Expense Increase*. ......................................... 1
Section 4.    Payment of *Additional Rent*. .............................................................................................. 2
Section 5.    Compliance with *Legal Requirements*. ............................................................................... 3
Section 6.    Environmental compliance. ................................................................................................. 4
Section 7.    Landlord's Work; repairs and maintenance. ........................................................................ 4
Section 8.    Services and utilities. .......................................................................................................... 5
Section 9.    *Alterations*. ........................................................................................................................ 7
Section 10.   Assignment and sublease. .................................................................................................... 8
Section 11.   Damage or destruction. ....................................................................................................... 10
Section 12.   Eminent domain. ................................................................................................................. 11
Section 13.   Insurance. ............................................................................................................................ 11
Section 14.   Mutual waiver of claims for property damage. .................................................................. 12
Section 15.   Indemnity. ........................................................................................................................... 12
Section 16.   Subordination and non-disturbance. ................................................................................... 13
Section 17.   *Landlord*'s right of entry. .................................................................................................... 14
Section 18.   Parking. ............................................................................................................................... 15
Section 19.   Signs. .................................................................................................................................. 15
Section 20.   Common areas and access; temporary battery storage. ...................................................... 15
Section 21.   Use of the roof. ................................................................................................................... 16
Section 22.   *Event of Tenant Default*. .................................................................................................... 16
Section 23.   *Event of Landlord Default*. ................................................................................................ 17
Section 24.   Possession after expiration of *Term*. ................................................................................. 17
Section 25.   Quiet enjoyment. ................................................................................................................ 18
Section 26.   Mutual representation of authority. .................................................................................... 18
Section 27.   *Landlord's* claims. .............................................................................................................. 18
Section 28.   Real estate brokers. ............................................................................................................. 18
Section 29.   Access. ................................................................................................................................ 18
Section 30.   Attorneys' fees. ................................................................................................................... 19
Section 31.   Estoppel certificate. ............................................................................................................ 19
Section 32.   Recordable memorandum. ................................................................................................... 19
Section 33.   Option to extend. ................................................................................................................. 19
Section 34.   Governing law. .................................................................................................................... 20
Section 35.   Notices. ............................................................................................................................... 20
Section 36.   Non-Binding Mediation. ..................................................................................................... 20
Section 37.   Counterparts. ....................................................................................................................... 20
Section 38.   Entire agreement. ................................................................................................................ 21
Section 39.   Certain Rights Reserved By Landlord. ............................................................................... 21
Section 40.   Miscellaneous. ..................................................................................................................... 21

Exhibit A ................................................................................................................................ Definitions
Exhibit B-1 ..................... Floor plan diagram of the portion of the *Premises* on the third floor of the *Building*
Exhibit B-2 ..................... Floor plan diagram of the portion of the *Premises* on the second floor of the *Building*
Exhibit C ........................................................................................... Definition of *Building Expenses*
Exhibit D .................................................................................................. Definition of *Site Expenses*
Exhibit E ........................................................................................ Specifications for janitorial services
Exhibit F ................................................................................... Superior interests in the *Property*
Exhibit G ........................................................ Diagram showing *Tenant's* exclusive portion of parking lot
Exhibit H ........................................................................................ Description of UPS battery system
Exhibit I ................................................................................................... Common Area Break Area
Exhibit J ...................................................................................... Inventory of *Relocation Furniture*

00909

In consideration of the mutual promises stated in this *Lease*, *Landlord* and *Tenant* agree as follows:

Section 1.    Definitions; date of this *Lease*; demise of the *Premises*; *Fixed Rent*.

1(a)    The words and phrases that appear in this *Lease* in an italicized typeface with the initial letter of each word of the term capitalized are defined in **Exhibit A**.

1(b)    This *Lease* is made and entered into by *Landlord* and *Tenant* on the *Term Commencement Date*.

1(c)    *Landlord* leases and demises the *Premises* to *Tenant* for the *Primary Term* and *Tenant* hires the *Premises* from *Landlord* for the *Primary Term*.

1(d)    Beginning on the *Term Commencement Date*, *Tenant* will pay *Landlord* the *Fixed Rent* for the *Primary Term* in equal monthly installments due on the first day of each month of the *Primary Term*. If the *Term Commencement Date* is a date other than the first day of a month, then the first monthly installment of *Fixed Rent* will be prorated for the month during which the *Term Commencement Date* occurs. If the *Term* expires or is terminated on a date other than the last day of a month, then the last monthly installment of *Fixed Rent* will be prorated for the month during which the *Term* expires or is terminated.

1(e)    For a period of one hundred twenty (120) days after the Term Commencement Date, Tenant shall have the right to occupy the entire Building at no additional Fixed Rent, but subject to the other relevant provisions of this Lease. These areas outside of the Premises are hereafter called the "Excess Space." During such period as Tenant occupies any portion of the Excess Space during such one hundred twenty (120) day period, Tenant shall pay to Landlord as Additional Rent the sum of seven dollars ($7) per rentable square foot of space actually occupied by Tenant, in order to defray operating expenses attributable to such space. If Tenant does not vacate all of the Excess Space by the end of such one hundred twenty (120) day period, Tenant shall be obligated to pay to Landlord Fixed Rent and Additional Rent attributable to such Excess Space still occupied by Tenant, on a monthly basis, at a per square foot rate equal to the per square foot rate payable by Tenant hereunder with respect to the Premises. Such payments shall be without prejudice to the right of Landlord to institute eviction proceedings for the removal of Tenant from the occupied areas of the Excess Space.

Section 2    Use.

2(a)    At all times during the *Term*, *Tenant* will have the right to use and occupy the *Premises* for general office purposes, as a call center, and for storage and other uses that are accessory and incidental to general office purposes, and for any other purpose that complies with *Legal Requirements*, and does not violate an exclusive use clause given by Landlord to another tenant of the Building, of which Tenant had previous notice. *Tenant* hereby covenants with *Landlord* that *Tenant* during the term hereof and for such further time as it shall hold the *Premises* or any part thereof: (i) will not commit any nuisance on the *Premises*; (ii) will not overload the existing electrical systems serving the *Premises*; (iii) will not carry on any business, trade or occupation upon the *Premises* or make any use thereof which shall be unlawful or contrary to any *Legal Requirements* for the time being in force; (iv) will keep the *Premises* equipped with all safety appliances required by and *Legal Requirements* because of the use made of the *Premises*; and (v) will procure any authorizations or licenses required for Tenant's use or repair of the *Premises*.

Section 3.    *Project Expenses*.

3(a)    If Tenant's Proportionate Share of Project Expenses due for any Project Year is greater than *the Project Expense Base Amount*, then *Tenant* will pay to *Landlord*, as *Additional Rent*, an amount equal to the amount by which Tenant's Proportionate Share of such Project Expenses exceeds the Project Expense Base Amount for such Project Year, in accordance with **Section 4** of this *Lease*.

1

Exhibit A
Definitions

*Additional Rent* ..................................... means all money that *Tenant* is obligated to pay to *Landlord* under this *Lease* other than *Fixed Rent*.

*Alterations* ........................................... means any changes, alterations, additions or improvements to the *Premises* installed by *Tenant*.

*Building* ............................................... means the building located at 200 Mill Road, Fairhaven, Massachusetts with a total rentable floor area deemed conclusively to be 291,299 square feet, consisting of a lower level with a rentable floor area deemed conclusively to be 97,270 square feet, and a first floor with a rentable floor area deemed conclusively to be 87,659 square feet, and a second floor with a rentable floor area deemed conclusively to be 90,429 square feet, and a third floor with a rentable floor area deemed conclusively to be 15,940 square feet.

*Building Expenses* ................................. has the meaning set forth in **Exhibit C** that is attached to and made a part of this *Lease*.

*Business Day* ........................................ means any day other than a Saturday, Sunday or a federal holiday.

*Business Hours* ...................................... means the period from 7:00 A.M. to 9:00 P.M. Mondays through Fridays and from 7:00 A.M. to 1:00 P.M. on Saturdays, except New Years Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day and Christmas Day.

*Casualty* ............................................... means damage to the *Premises* by fire or explosion, or by vandalism, or by weather, flood, or any other force of nature.

*Claims* ................................................. means all claims, demands, suits, fines, penalties, liability, losses, damages, administrative or arbitration proceedings, costs (including, without limitation, the cost of removing contamination by any *Hazardous Substances*), and expenses, including the reasonable fees of lawyers, the cost of paralegal assistants employed by lawyers, the cost of expert witnesses, the cost of stenographers and stenographic transcripts of depositions and other proceedings, and other litigation costs.

*Communication Equipment* .................. means radio antennas and associated equipment for transmitting or receiving any type of communications signal.

*Event of Landlord Default* ................................................ means failure by *Landlord* to observe, perform or comply with any covenant, agreement, condition, representation, warranty or provision of this *Lease*, if the failure continues for thirty days after *Tenant* gives written notice of the failure to *Landlord*, except that if the failure cannot be cured within the thirty-day period due to

23

00933

68

*Legal Requirements*...........................means all applicable laws, statutes, ordinances, orders, codes, rules and regulations (including but not limited to all environmental protection laws and the Americans With Disabilities Act) of all federal, state, county, city and local governmental authorities, departments and agencies, and all restrictive covenants affecting the *Property*.

*Material Service Interruption*.........................means any failure by *Landlord* to provide any service required to be provided to *Tenant* under this *Lease* or any failure by *Landlord* to perform any other obligation required under this *Lease*, regardless of *Force Majeure*, that results in any condition that materially infers with *Tenant's* ability to conduct its business in the *Premises* in whole or in part. Any failure of a public utility to supply electricity, water, gas or other utility service to the *Building* does not constitute a *Material Service Interruption* unless the interruption of utility service is caused by *Landlord's* non-payment of utility charges or *Landlord's* failure to provide, maintain, and replace any meters, pipes, wires, or other facilities serving the *Property* that the public utility is not obligated to provide, maintain or replace.

*Minimum Number of Parking Spaces*......................means the minimum number of automobile parking spaces in the parking lot on the *Property* that is immediately adjacent to the *Building*: Five spaces for each one thousand square feet of rentable floor area of the *Premises*, for a total of 254 spaces based on the rentable floor area of 50,801 square feet.

*Non-Business Hours* ...........................means all times other than *Business Hours*.

*Non-Business Hours HVAC Rate*..........means $40 per hour.

*Premises*...............................means a portion of the *Building* with a rentable floor area that is deemed conclusively to be 50,801 square feet, consisting of (i) a portion of the second floor of the *Building* depicted in the floor plan diagram that is attached to this *Lease* as **Exhibit B-1**; and (ii) a portion of the third floor of the *Building* depicted in the floor plan diagram that is attached to this *Lease* as **Exhibit B-2**; and (iii) the *Leased Furniture*; and (iv) the *Relocation Furniture*.

*Primary Term*..........................means the initial term of this *Lease*, from the *Term Commencement Date* through the *Primary Term Expiration Date*.

*Primary Term Expiration Date*................means the day before the fifth anniversary of the *Term Commencement Date*.

*Project Expense Base Amount*..............means $355,607. ($7 per square foot)

*Project Expenses*................................means Taxes, Building Expenses and Site Expenses.

27

00937

## AT&T CORP. AND SUBSIDIARIES

### MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

**Forward-Looking Statements**

This document contains certain forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995 with respect to:

- financial condition,
- results of operations,
- cash flows,
- dividends,
- financing plans,
- business strategies,
- operating efficiencies,
- capital and other expenditures,
- competitive positions,
- availability of capital,
- growth opportunities for new and existing products,
- benefits from new technologies,
- availability and deployment of new technologies,
- plans and objectives of management, and
- other matters.

Statements in this document that are not historical facts are hereby identified as "forward-looking statements" for the purpose of the safe harbor provided by Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934. The words "estimate," "project," "intend," "expect," "believe," "plan" and similar expressions are intended to identify forward-looking statements. Readers are cautioned not to place undue reliance on these forward-looking statements, which speak only as of the date of this document. Any Form 10-K, Annual Report to Shareholders, Form 10-Q or Form 8-K of AT&T may include forward-looking statements. In addition, other written or oral statements which constitute forward-looking statements have been made and may in the future be made by or on behalf of AT&T, including with respect to the matters referred to above. These forward-looking statements are necessarily estimates reflecting the best judgment of senior management that rely on a number of assumptions concerning future events, many of which are outside of our control, and involve a number of risks and uncertainties that could cause actual results to differ materially from those suggested by the forward-looking statements. These forward-looking statements should, therefore, be considered in light of various important factors, including those set forth in this document. Important factors that could cause actual results to differ materially from estimates or projections contained in the forward-looking statements include, without limitation:

- the impact of existing, new and restructured competitors in the markets in which we compete, including competitors that may offer less expensive products and services, desirable or innovative products, technological substitutes, or have extensive resources or better financing,
- the impact of oversupply of capacity resulting from excessive deployment of network capacity,

2

70

**AT&T CORP. AND SUBSIDIARIES**

**MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS — (Continued)**

- the ongoing global and domestic trend toward consolidation in the telecommunications industry, which may have the effect of making the competitors of these entities larger and better financed and afford these competitors with extensive resources and greater geographic reach, allowing them to compete more effectively,

- the effects of vigorous competition in the markets in which we operate, which may decrease prices charged and change customer mix and profitability,

- the ability to establish a significant market presence in new geographic and service markets,

- the availability and cost of capital,

- the impact of any unusual items resulting from ongoing evaluations of our business strategies,

- the requirements imposed on us or latitude allowed to competitors by the Federal Communications Commission (FCC) or state regulatory commissions under the Telecommunications Act or other applicable laws and regulations,

- the possible invalidity of portions of the FCC's Triennial Review Order,

- the risks associated with technological requirements; wireless, Internet, VoIP or other technology substitution and changes; and other technological developments,

- the risks associated with the repurchase by us of debt or equity securities, which may adversely affect our liquidity or creditworthiness,

- the results of litigation filed or to be filed against us, and

- the possibility of one or more of the markets in which we compete being impacted by changes in political, economic or other factors, such as monetary policy, legal and regulatory changes, war or other external factors over which we have no control.

The discussion and analysis that follows provides information management believes is relevant to an assessment and understanding of AT&T's consolidated results of operations for the years ended December 31, 2003, 2002 and 2001, and financial condition as of December 31, 2003 and 2002.

**Overview**

AT&T Corp. (AT&T) has undertaken significant changes to its business in recent years. In 2002, we spun off our broadband business and in 2001 we spun off our wireless business. Today, we are in the midst of transforming our business from a predominantly voice-services business to a more diversified telecommunications and networking provider.

However, the communications industry we operate in continues to be fraught with economic and competitive challenges, reflecting significant changes the industry is undergoing. Industry dynamics that have impacted us include years of excess investment that has led to overcapacity and lower prices.

Our 2003 results reflect the impacts of this challenging environment. We continue to see declines in long distance voice revenue, which has long been the mainstay of our business. For 2003, stand-alone long distance voice services accounted for approximately one-half of our total revenue compared with nearly two-thirds in 2001.

We offer a growing list of services to businesses of all sizes, government agencies and residential customers. Our product set includes stand-alone long distance voice services, local voice services, data services, Internet Protocol (IP) and enhanced services, as well as a variety of bundled offerings that package long distance voice, local voice, wireless and Internet services. In addition, we believe our balance sheet

3

**AT&T CORP. AND SUBSIDIARIES**

**MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS — (Continued)**

offset by $0.1 billion of increased pension and postretirement costs primarily resulting from a lower expected long-term rate of return on plan assets in 2003 and the effects of lower actual plan assets, as well as approximately $0.1 billion of increased marketing, customer care and sales expenses associated with new local service offerings by AT&T Consumer Services.

We expect that our SG&A expenses will continue to decline in 2004, as we continue to focus on further cost reduction efforts.

SG&A expenses decreased $0.1 billion, or 0.9%, in 2002 compared with 2001. This decrease was driven by a reduction in the number of residential customers as well as cost control efforts of $0.7 billion, and lower transaction costs of $0.2 billion associated with the AT&T restructuring. Partially offsetting these decreases was $0.3 billion of lower pension credits (income) primarily due to a lower expected long-term rate of return on plan assets and the effects of lower actual plan assets, and $0.3 billion associated with increased marketing and sales expenses for new local consumer service offerings and increased investment for business sales and customer care development. SG&A expenses also increased as a result of the reintegration of customers and assets from the unwind of Concert.

*Depreciation and amortization expenses* decreased $18 million, or 0.4%, in 2003 compared with 2002. The decreases were primarily due to the adoption of SFAS No. 143, "Accounting for Asset Retirement Obligations," lower depreciation associated with our AT&T Latin America subsidiary which was classified as an asset held for sale in December 2002 and lower asset impairments in 2003. These declines were largely offset by an increase in the asset base.

In 2004, we expect depreciation and amortization expenses to remain relatively flat compared with 2003 as lower expenses resulting from reduced levels of capital expenditures in recent years will essentially be offset by increased expenses associated with the shortening of lives of certain network assets in connection with our development of an IP-based network.

Depreciation and amortization expenses increased $0.3 billion, or 7.2%, in 2002 compared with 2001. The increase was primarily due to a larger asset base resulting from continued infrastructure investment supporting our advanced services. The increase was partially offset by the adoption of SFAS No. 142 as of January 1, 2002, which eliminated the amortization of goodwill. In 2001, we recorded $0.2 billion of amortization expense on goodwill.

Total capital expenditures were $3.4 billion, $3.9 billion and $5.6 billion for 2003, 2002 and 2001, respectively. The 2003 amount includes $0.4 billion recorded in connection with the adoption of Financial Accounting Standards Board Interpretation (FIN) No. 46, "Consolidation of Variable Interest Entities — an Interpretation of Accounting Research Bulletin No. 51." The decreases in expenditures were primarily due to less spending on infrastructure related projects, as many projects were completed in 2002, partially offset by increased spending on capitalized software related to process improvements and initiatives to improve the customer experience. During 2003, approximately one-quarter of our spending related to capitalized software. We continue to focus the majority of our capital spending on our advanced services offerings of IP&E services and data services, both of which included managed services, as well as local voice services. We expect capital expenditures to be approximately $2.5 billion in 2004.

In 2003, *net restructuring and other charges* of $0.2 billion primarily consisted of separation costs associated with our management realignment efforts. The net charge included $0.1 billion related to AT&T Business Services, $26 million related to AT&T Consumer Services and $38 million related to the Corporate and Other group. The separations were involuntary and impacted approximately 2,000 managers, more than 90% of which have exited the business as of December 31, 2003. These activities were partially offset by the reversal of $17 million of excess vintage employee separation liabilities. These exit plans did not yield cash savings (net of severance benefit payouts) or a benefit to operating income (net of the restructuring charge

11

**AT&T CORP. AND SUBSIDIARIES**

**MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS — (Continued)**

recorded) in 2003, however, we expect to realize approximately $0.3 billion of cash savings and benefit to operating income in subsequent years, when the exit plan is completed.

As we continue to evaluate our cost structure and improve processes, further workforce reductions are anticipated to occur during 2004, and are expected to result in the recognition of additional charges.

In 2002, net restructuring and other charges were $1.4 billion. The net charge included $1.2 billion related to AT&T Business Services, $0.2 billion related to AT&T Consumer Services and $23 million related to the Corporate and Other group.

In December 2002, our Board of Directors approved a plan for AT&T to sell its approximate 95% voting stake in AT&T Latin America in its current condition. On December 31, 2002, we signed a non-binding term sheet for the sale of our shares within one year for a nominal amount. As a result of this action, we recorded a $1.0 billion asset impairment charge to write down AT&T Latin America's assets to fair value. This charge was recorded within our AT&T Business Services segment.

An impairment charge of $0.2 billion was also recorded in 2002 relating to certain Digital Subscriber Line (DSL) assets (including internal-use software, licenses, and property, plant & equipment) that would not be utilized by AT&T as a result of changes to our "DSL build" strategy. Instead of building DSL capabilities in all geographic areas initially targeted, we have signed an agreement with Covad Communications to offer DSL services over its network. As a result, the assets in these areas were impaired. This charge was recorded within our AT&T Consumer Services segment.

Net business restructuring charges of $0.2 billion recorded in 2002 consisted of new exit plans totaling $0.4 billion and reversals of liabilities associated with prior years' exit plans of $0.2 billion. The new plans primarily consisted of $0.3 billion for employee separation costs ($28 million of which was recorded as a pension liability associated with management employees to be separated in 2002, which was funded from the pension trust) and $39 million of facility closing reserves. These exit plans separated slightly more than 4,800 employees, approximately one-half of whom were management employees and one-half were non-management employees. The majority of these employee separations were involuntary and were largely the result of improved processes and automation in provisioning and maintenance of services for business customers.

The $0.2 billion reversal primarily consisted of $0.1 billion of employee separation costs (approximately $48 million of which was reversed from the pension liability) and $26 million related to prior plan facility closings that were deemed to be no longer necessary. The reversals were primarily due to management's determination that the restructuring plan established in the fourth quarter of 2001 for certain areas of AT&T Business Services, including network services, needed to be modified given industry conditions at that time, as well as the redeployment of certain employees to different functions.

During 2001, net restructuring and other charges of $1.0 billion were primarily comprised of $0.9 billion for employee separations, of which $0.4 billion related to benefits to be paid from pension assets as well as pension and postretirement curtailment losses, and $0.2 billion for facility closings. The restructuring and exit plans supported our cost reduction efforts through headcount reductions across all segments of the business, primarily network support and customer care functions in AT&T Business Services. These charges were slightly offset by the reversal of $33 million related to business restructuring plans announced in the fourth quarter of 1999 and the first quarter of 2000 (of which $15 million related to employee separations and $18 million related to contract terminations). The net charge consisted of $0.6 billion related to AT&T Business Services, $31 million related to AT&T Consumer Services and $0.4 billion related to the Corporate and Other group. The charge covered separation costs for approximately 10,000 employees, approximately one-half of whom were management and one-half were non-management employees. More than 9,000 employee separations related to involuntary terminations and the remaining 1,000 were voluntary.

## AT&T CORP. AND SUBSIDIARIES

## MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS — (Continued)

|  | For the Years Ended December 31, | | |
|---|---|---|---|
|  | 2003 | 2002 | 2001 |
|  | (Dollars in millions) | | |
| Other income (expense), net................................. | $191 | $(77) | $1,327 |

***Other income (expense), net,*** in 2003 was income of $0.2 billion compared with expense of $0.1 billion in 2002. The favorable variance of $0.3 billion can primarily be attributed to $0.3 billion of lower impairment charges recorded in 2003 compared with 2002. In 2002, due to the occurrence of several airline bankruptcies, write downs were recorded on certain aircraft leases that are accounted for as leveraged leases. In 2003, ongoing difficulties in the airline industry resulted in the write downs of the residual values of certain aircraft. The lower impairment charges related to these leases and aircraft in 2003 compared with 2002 favorably impacted other income by $0.2 billion in 2003. Also, in 2003, investment-related impairment charges declined $0.1 billion, primarily driven by the impairment of Time Warner Telecom in 2002. Our investment in Time Warner Telecom was subsequently sold in 2003. Further contributing to the favorable other income variance was higher investment-related income of $0.1 billion, largely reflecting improved market returns on certain holdings. Partially offsetting these favorable variances were losses of $0.1 billion on the early call and repurchase of long-term debt in 2003. This loss was comprised of $0.3 billion associated with the early call and repurchase of long-term debt instruments, partially offset by a $0.2 billion gain on the early retirement of exchangeable notes that were indexed to AT&T Wireless common stock. Also offsetting the favorable variance was a decline in settlements associated with disposed businesses, primarily reflecting reimbursements from Comcast Corporation (Comcast) in 2002 in connection with the debt exchange completed in conjunction with the spin-off of AT&T Broadband.

We continue to hold investments in leveraged leases of commercial aircraft, which we lease to domestic airlines as well as aircraft related companies. Should the financial difficulties in the U.S. airline industry lead to further bankruptcies or lease restructurings, we could record additional losses associated with our aircraft lease portfolio. In addition, in the event of bankruptcy or renegotiation of lease terms, if any portion of the non-recourse debt is canceled, such amounts would result in taxable income to AT&T and accordingly a cash tax expense.

Other income (expense), net, in 2002 was expense of $0.1 billion compared with income of $1.3 billion in 2001. The unfavorable variance of $1.4 billion was primarily due to $1.2 billion of higher net gains on sales of businesses and investments in 2001, including gains on the sale of AT&T's retained interest in AT&T Wireless and Japan Telecom. The unfavorable variance was also due to impairments of $0.2 billion recorded in 2002 related to certain leases of aircraft that are accounted for as leveraged leases, $0.2 billion of lower income related to mark-to-market adjustments on derivative instruments and lower investment-related income of $0.2 billion, reflecting the declines in the stock market. Favorably impacting other income (expense), net, were lower investment impairment charges of $0.4 billion in 2002, primarily driven by lower impairment charges for Time Warner Telecom. In 2001 and 2002, as a result of significant changes in the general business climate as evidenced by the severe downward movement in the U.S. stock market, including the decline in the value of publicly-traded industry stocks, we recorded an other-than-temporary investment impairment on our investment in Time Warner Telecom.

|  | For the Years Ended December 31, | | |
|---|---|---|---|
|  | 2003 | 2002 | 2001 |
|  | (Dollars in millions) | | |
| Interest (expense)........................................ | $(1,158) | $(1,448) | $(1,493) |

***Interest expense*** decreased $0.3 billion, or 20.0%, in 2003 compared with 2002 and decreased $45 million, or 3.0%, in 2002 compared with 2001. The declines in both periods are reflective of our deleveraging activities, which included significant early debt redemptions during 2003 and virtually no net debt issuances during both

**AT&T CORP. AND SUBSIDIARIES**

**MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND
RESULTS OF OPERATIONS — (Continued)**

cash up to €1 billion of its outstanding €2 billion 6.0% Notes due November 2006, which now carry an interest rate of 6.75%. This repurchase is expected to close by the end of March 2004.

In March 2004, a U.S. Court of Appeals vacated a number of recent FCC rulings made in connection with the Triennial Review, including the FCC's delegation to state commissions of decisions over impairment as applied to mass market switching and certain transport elements. If this decision is not reversed, or unless the FCC issues new valid rules, which assure us of fair resale prices, our current local business could be materially affected.

31

75

UNITED STATED DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

------------------------------------------------------------x

BEVERLY A. GEORGE,

                Plaintiff,

      v.                                        Civil Action No. 05 11079 (DPW)

AT&T CORP.,

                Defendant.

------------------------------------------------------------x

## AFFIDAVIT OF COUNSEL VERIFYING EXHIBITS

The undersigned is an attorney for the Plaintiff Beverly A. George ("Plaintiff"), and makes the following affidavit to verify the documents and exhibits filed in support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment:

1. Pages 1-9 are excerpts from the Deposition Transcript of Beverly A. George;

2. Pages 10-11 are excerpts from the Deposition Transcript of Linda Teoli;

3. Pages 12-17 are excerpts from the Deposition Transcript of Mary C. Eustace;

4. Pages 18-27 are excerpts from the Deposition Transcript of Joan Gallagher Cappuccio;

5. Pages 28-32 are Defendant's Responses to Plaintiff's Request for Admissions;

6. Pages 33-42 are excerpts from the Collective Bargaining Agreement between the Communication Workers of America and AT&T Corp. For the period material to this lawsuit;

7. Pages 43-44 are excerpts from the Massachusetts Department of Employment and Training's publication with regard to AT&T's 1994 closing of a facility in Worcester, MA;

76

8. Pages 45-56 are publications generated by AT&T Corp. from December 7, 2003, through June 23, 2004;

9. Pages 57-59 are documents produced by AT&T showing call volumes at the Fairhaven, Massachusetts facility for April through August 2004;

10. Pages 60-69 are documents produced by AT&T relative to the sale and lease back of the Fairhaven, Massachusetts building;

11. Pages 70-75 are excerpts from AT&T's 2003 Annual Report to Stockholders.


SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 31 DAY OF MARCH, 2006.

DAVID A. CONTI, ESQ.

77

UNITED STATED DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

-------------------------------------------------------------x

BEVERLY A. GEORGE,

               Plaintiff,

    v.                                      Civil Action No. 05 11079 (DPW)

AT&T CORP.,

               Defendant.

-------------------------------------------------------------x

## **AFFIDAVIT OF BEVERLY A. GEORGE**

I, Beverly A. George, do hereby depose and state under oath as follows:

1. I am the Plaintiff in the above-captioned action.

2. I have personal knowledge of the facts contained in this Affidavit.

3. My actual date of retirement from AT&T Corp. was August 1, 2004. I submitted my retirement paperwork on July 10, 2004. AT&T received the paperwork on July 13, 2004. At that point the decision to retire was final, however due to unused vacation time my effective retirement date was August 1, 2004. After August 1, 2004, I was no longer an employee of AT&T.

4. The Company announced the work force reduction in Fairhaven through the Standard Times, a local newspaper, on September 14, 2004.

5. I did not learn of the workforce reduction until October 2004, during conversations with my former colleagues from AT&T, including Sharon Pereira.

6. I requested my retirement paperwork from AT&T's Pension Center on or about June 18, 2004. However, this was not the date I actually decided to retire. On a prior occasion I requested

78

the retirement paperwork from AT&T and never filled it out, deciding at that point to continue my employment.

7.  I did not make my decision to retire from AT&T until July 10, 2004, after receiving numerous assurances from company management, including Joan Cappuccio, Regional Director, Mary C. Eustace, my acting manager, and various headquarters personnel.

8.  I relied on these assurances and filled out my retirement package on July 10, 2004.  The assurances I received from AT&T management relative to their intent not to downsize the facility where I was employed were the pivotal factor I considered in deciding to complete my retirement paperwork and retire.

9.  One of the persons from whom I received the assurances described in Paragraph 7, was Joan Cappuccio, who previously held herself out on several occasions as a contact person with regard to rumors of a layoff of closing at the Fairhaven Facility.

10.  One of the reasons I inquired of a potential downsizing or closing was the abnormally large drop off in call volumes in May 2004.  In my experience this drop-off was abnormal, sometimes with close to thirty (30) minutes between calls. A second reason was AT&T's statements concerning the regulatory framework surrounding local phone service rules at the FCC.  AT&T stated that the expiration of the regulations would cost union jobs.

11.  I remember having a specific conversation with Joan Cappuccio relative to FCC regulations which I asked if I should stay and avail myself of a package, and Ms. Cappuccio responded that AT&T was not planning to downsize or close the Fairhaven Call Center.

11.  Each time I inquired of Ms. Eustace, Ms. Cappuccio or the headquarters managers as to an intent to downsize or close AT&T Fairhaven, each person would immediately respond in the negative.  At no time did any of these persons  make inquiry to their superiors prior to responding

79

to my inquiry.

12. At prior facilities and offices, the AT&T Management Team would inquire of their superiors before answering.

13. In May/June 2004, Mary Carmel Eustace asked me what my epxected retirement date might be. I responses that if all went well, it would commence August 1, 2004. In stating that "if all went well" I was referring to the inquiries I was making of management as to the intent to downsize or close the Fairhaven Facility.

14. Ms. Eustace made several inquiries of me, asking if I had filled out my retirement paperwork. At this point I had not requested my retirement paperwork nor finalized my decision to retire. It was not until after receiving repeated assurances that I finalized my decision on July 10, 2004.

15. In May 2004, Ms. Eustace requested that I be interviewed for the Fairhaven Flyer on my retirement. My initial response was absolutely no, because I had not finalized my decision to retire. However, after repeated requests I submitted to the interview. This interview appeared in the June edition of the Fairhaven Flyer, prior to the date on which I finalized my decision to retire and submitted my paperwork to AT&T.

SIGNED UNDER THE PAINS AND PENALITIES OF PERJURY THIS 31 DAY OF MARCH, 2006

*Beverly A. George*

BEVERLY A. GEORGE