# UNITED STATED DISTRICT COURT
## FOR THE
## DISTRICT OF MASSACHUSETTS

------------------------------------------------------------x

BEVERLY A. GEORGE,

                  Plaintiff,

      v.                                Civil Action No. 05 11079 (DPW)

AT&T CORP.,

                  Defendant.

------------------------------------------------------------x

## PLAINTIFF BEVERLY A. GEORGE'S SUPPLEMENTAL MEMORANDUM IN OPPOSITION TO DEFENDANT AT&T CORP.'S MOTION FOR SUMMARY JUDGMENT

NOW COMES, the Plaintiff, Beverly A. George ("Plaintiff"), and respectfully submits this Supplemental Memorandum in Opposition to Defendant AT&T Corp.'s ("Defendant") Motion for Summary Judgment. During argument on June 7, 2006, this Court granted Plaintiff the opportunity to produce additional materials which go to the issues of: (1) the date upon which the Defendant made the decision to downsize AT&T Fairhaven; and, (2) who Joan Cappuccio could have inquired of to discover the truth or accuracy of the alleged misrepresentations.[1]

---

[1] The Court additionally inquired during argument as to Mrs. George's compliance with the six (6) month procedural requirement to file a §301 or "hybrid" action. In the event that Plaintiff's claims are "substantially dependent upon an analysis of the terms of [a collective bargaining agreement]" this Court should treat it as a claim brought under the LMRA, even though brought under a state law theory of relief. Lueck, 471 U.S. 202 at 220-221. Plaintiff notes for the record that she filed her grievance on November 16, 2004. Def.A. at 37. Defendant denied the grievance on December 14, 2004. Def.A. at 42. The CWA's final refusal to prosecute her appeal was delivered February 14, 2005. Def.A. at 48-49. Plaintiff filed this "hybrid" action in state court on April 21, 2005. Defendant removed it to Federal Court thereafter. This is less than six (6) months after Plaintiff filed her grievance and less than ninety (90) days after the Union President rejected her request to appeal Defendant's decision.

**ARGUMENT**

**I.     The Date Upon Which Defendant Decided to Downsize AT&T Fairhaven.**

AT&T argues that Plaintiff produced no evidence to support her claim that the decision to downsize AT&T Fairhaven was made on or before July 2004, thereby negating one of the essntial elements of her misrepresentation claims.[2]  To this end, Plaintiff directs the Court's attention to Plaintiff's Supplemental Appendix ("Pltff's S.A.") at p. 90 stating "in September 2004, AT&T announced that it would close its call center in Fairhaven, laying off 140 workers. The company said that they did not plan to send the work elsewhere, but that they simply would be phasing out long-distance service. Indeed, a company spokesperson stated, 'We are not moving any of these jobs overseas' (Blanton 2004). However, workers were not convinced. The company had cut its US-based call-center in half since 2000, and in January 2004, the union obtained an internal memo from an Indian consultant firm that showed how those jobs would be moved to India."

This article, the accuracy of which is certified by counsel's affidavit submitted herewith, shows that the as early as January 2004, AT&T was outsourcing their jobs, including those jobs to be lost at Fairhaven, to foreign sources.  This article will be admissible through authentication by the authors who Plaintiff can call as witnesses and who will be identified as such in the Pre-Trial Memorandum.  The statements concerning internal memoranda of AT&T constitute party admissions and therefore once authenticated, are admissible into evidence under exceptions to the hearsay rule.

---

[2]  An issue also arose as to the actual date on which Plaintiff submitted her retirement paperwork.  Plaintiff points to the Supplemental Appendix which reveals that in actuality, Plaintiff's retirement paperwork was not complete until July 22, 2004, when she mailed the final piece of information to the Pension Center.  Pltff's S.a. at 82-83.

Secondly, Plaintiff directs the Court to Page 86 of the Supplemental Appendix, detailing AT&T's intentions as of January 10, 2003, to continue their reductions in workforce. Mrs. George specifically referenced this previous separation, including management, in her deposition testimony relative to one of her former managers, Sharon Pereira. Def.A. at 3.

Thirdly, in " autumn 1997, Michael McGrath, president of Local 7026, and Catherine Berry, AT&T's then manager of the Tuscon TFDA facility, became aware that AT&T was considering closing that facility." *AT&T Corp. and Communication Workers of America, Local 7026* 337 N.L.R.B. No. 105, Case 28-CA-14967 (June 24, 2002). "McGrath and Berry closely collabered in an effort to suggest a plan to AT&T's upper management that would keep the Tuscon facility open and improve its performance." *Id.* In " mid-December 1997, AT&T announced it would close the Tuscon facility, and provided formal WARN Act announcements to various State and local officials later that month." *Id.*

This shows that the general practice of AT&T is to notify facility managers several months in advance of a pending decision. It also shows that there is a two (2) step process in notifying state and local officials prior to making an official announcement to the public. *See also* Pltff's A. at 43-44. Contrary to Cappuccio's assertions in her affidavit, it is unreasonable to believe that the first notification she, as Regional Director and head of AT&T Fairhaven, would have been informed just days before the announcement to the public.

On September 6, 2005, Plaintiff served Defendant with a request for Documents pursuant to Fed.R.Civ.P. 34. Request No. 2 asked for "Any and all documents relative to the planning, decision and action taken to effect a reduction of workforce and/or closing of AT&T's Fairhaven Facility." Defendant's response should have included corporate minutes, note, memoranda, the above mentioned WARN notification, and all other documents showing the dates and times on

which the planning and ultimately the decision to reduce the workforce at Fairhaven was made. In response, Defendant failed to produce any relevant documentation showing the date on which the decision was made, including the corporate minutes, votes, etc., together with the WARN notifications delivered to state and local officials relative to the 2004 downsizing forming the basis of this Action.

It is apparent that the documents requested in Plaintiff's Request No. 2 are essential to Plaintiff's ability to prosecute her claims, in light of the Court's position during oral argument that the documentation in Plaintiff's Appendix is insufficient to create an issue of fact as to the date of the decision. Therefore, pursuant to Fed.R.Civ.P. 56(f), Plaintiff requests this Court stay its decision on Defendant's application for judgment until such time as Defendant complies with its discovery obligations relative to the Plaintiff's Rule 34 Request and thereby allow Plaintiff to complete the record. This Court should additionally issue an Order, in the interests of justice, compelling Defendant to produce the documents requested in September 2005. Mass.R.Civ.P. 56(f).

## II.    Individuals To Whom Cappuccio Could Have Made Inquiry.

The Court further inquired as to the individuals to whom Ms. Cappuccio could have made inquiry to find out the truth or accuracy of the alleged misrepresentations to Plaintiff. To this end, Plaintiff directs the Court's attention to the attached article showing that Defendant's Director of their Consumer Division was John Polumbo. See Pltff's S.A. at 83-84. Ms. Cappuccio could have contacted Mr. Polumbo to obtain the information relative to impending downsizing of AT&T Fairhaven. Mr. Polumbo was informed as to the company's intentions relative to their reductions in workforce. *Id.* The record creates an issue of fact as to whether Mr. Polumbo was one of the HQ Managers at AT&T Fairhaven in May/June 2004 allegedly to discuss a new strategic selling program. Def.A. at 17, 21-22.

4

# CONCLUSION

For all the above stated reasons, those reasons stated in Plaintiff's Memorandum, and based upon the record as a whole and viewed in the light most favorable to the Plaintiff, Plaintiff respectfully requests that this Court deny Defendant's Motion for Summary Judgment.

**BEVERLY A. GEORGE**,

By her attorneys,

/s/ Blake J. Godbout
Blake J. Godbout (BBO#196380)
**BLAKE J. GODBOUT & ASSOCIATES**
33 Broad Street, 11th Floor
Boston, MA 02109
(617) 523-6677

Dated: June 9, 2006

# CERTIFICATE OF SERVICE

I, Blake J. Godbout, hereby certify that a true copy of the above document was served upon the attorney of record for each party by first class mail, postage prepaid, on June 9, 2006.

/s/ Blake J. Godbout
Blake J. Godbout

5

UNITED STATED DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

-------------------------------------------------------------x

BEVERLY A. GEORGE,

                Plaintiff,

     v.                                       Civil Action No. 05 11079 (DPW)

AT&T CORP.,

                Defendant.

-------------------------------------------------------------x

**SUPPLEMENTAL APPENDIX TO PLAINTIFF'S RESPONSE TO DEFENDANT'S
STATEMENT OF UNDISPUTED MATERIAL FACTS**

**June 9, 2006**

                                      Blake J. Godbout, Esq. (BBO#196380)
                                      BLAKE J. GODBOUT & ASSOCIATES
                                      33 Broad Street, 11th Floor
                                      Boston, MA 02109
                                      (617) 523-6677

## TABLE OF CONTENTS

**PAGES**

1. Certified Mail Receipt.................................................................................82

2. UPS Shipment Receipt..............................................................................83

3. Boston.Internet.Com Article.......................................................................84-85

4. Look Smart Article.....................................................................................86

5. U-Mass Article, Stephanie Luce and Kate Bronfenbrenner..........................87-101





AT&T, Accenture Ink $500M Outsourcing Pact                    Page 1 of 4

I, N, B, InternetNewsBureau.com™   Send your Press Release to More Than 14,000 Subscribing Journalists

**Sponsored Links**

Internet and Online Info

Best Buy For Business: Find
Software Applications and
more

MonsterCommerce:
Ecommerce Software & Design

Time Warner Cable
Class: Broadband



**Regional News:** Boston D.C. New York Silicon Valley **More Tech News:** News
Business | Developer | Ecommerce | Enterprise | Networking | Security
Storage | Wireless | xSP | Special Reports | Stats | Commentary

you are in:

7 day summary        Search News

Download: Microsoft Security Assessment Tool. Install it on your
computer to obtain information and recommendations about best practices to
help and your security within your IT infrastructure.


Funny T-Shirts

internet.com


**boston.**
internet.com.



Compare
prices
& save on:

**Home Theater**
- LCD TVs
- Plasma TVs
- Flat Panel TVs
- Video Projectors
- LCD Projectors
- HDTV Receivers
- Home Audio

**GPS**
- Garmin
- Magellan
- Lowrance
- TomTom
- Navman
- Marine GPS
- Handheld GPS

**Computer Printers**
- Canon
- Lexmark

**April 17, 2003**
## AT&T, Accenture Ink $500M Outsourcing Pact
**By Colin C. Haley**

Continuing to outsource to save money and improve
customer service, AT&T (Quote, Chart) will pay Accenture
(Quote, Chart) $500 million over five years to manage its
residential billing operations.

It's the second big-money deal between the companies.
Previously, the communications giant and consulting firm
inked a $2.6 billion contract to develop and integrate help
desk systems using voice-recognition technology.

Under the new pact, 45 AT&T managers, whose work is
within the scope of the agreement, will move to Accenture.
Another 250 AT&T employees will be part of a shared
Accenture operation but will remain on the AT&T payroll.

AT&T, of Bedminster, N.J., will retain control of business
planning, credit policy and customer interaction, while
Accenture will oversee the transition and ultimately handle
the credit risk management and collections functions.

"(The deal) is an important opportunity to introduce new

**Related Articles**
- Will Wireless
- Motorola Snap
- Selective IT
- Sprint Affiliate

**For more sto**
AT&T Hewlett-P

**Hot Topics**
- Phone Spy Ga
- A Patent Batt
- Return of The

**Most Popular**
- South Korea F

84

* Inkjet
* Laser
* Photo Printers
* Toner Cartridges
* Inkjet Refills

innovative capabilities and tools that support our plans for expansion into new markets, new offers and broader customer relationships, while delivering operational efficiencies," said John Polumbo, president and CEO of AT&T's consumer division.

•Leaked Docs
•StreamCast T
•Salesforce Se
•Rough Start F

In addition to its technology expertise, AT&T chose Accenture because of its particularly financial services, which closely relates to this project.

Like other large companies, AT&T is farming out non-core tasks to third-par example is Hewlett-Packard's 10-year, $3 billion IT Services deal with cons Gamble. Among the most commonly outsourced items are call center syste management.

The practice is catching on with mid-tier firms as well, although the scope a According to experts at a recent trade show in Boston this week, outsourcing percent and 25 percent of IT budgets.

It is popular in the state and federal governments, which are facing a budge in financial services and other sectors.

Mp3 Players
* Ipod Nano
* Ipod Video
* Gigabeat
* Sansa
* Zen Micro
* Mp3 Transmitters
* Ipod Speakers



Compare Prices

GO

 Email this article      Print this article

internet.commerce

Be a Commerce Partner
Computer Parts
Custom Degrees
Mortgage Refinance
New Car Prices
Anti-Aging Shop
No Fax Loans
Home Automation
Nextel
Mortgage Refinancing
Fonts Download
Domain Names
Bank Insurance
Money and Accounts
2007 New Cars

News Archives

Current Headlines by Topic

Business
•EMC Files Suit in John Anthos' Non-Challenge
•RIM, Research in... Appeal of Apple Deal
•Jumpen Rising from the...

Developer
•IBM Lands a Software and... Management
•A Gem: CFA Language for Java and Perl
•Expert: Open Source a Judgment Free Zone

Ecommerce
•On Deck: Clothing for Sleeping
•The No-Sleep Quest for Micro-Engraving
•StreamCast Takes Legal Aim at eBay's Skype

Enterprise
•Microsoft In.. and Its Other Business Software
•Throwing Tiny Fires at Perimeters
•Pkg: Oracle Take The Plunge

Networking
•Rough Start for Aol Emotions
•Vonage IPO into Market Turbulence
•Don't Count 30NET Out For Ethernet, Yet

Security
•Microsoft Tells Avoid Users to Play it Safe
•Security Firm Warns on Dynamics Flaw
•Danger Hsa... Data Hacked

New sletter Signup

✓  Internet Daily

Boston News

DC News

NY News

SiliconValley News

email [ ▶ ]
select a newsletter above,
type your email and click

85

# **Look**Smart

**AT&T to take restructuring and asset impairment charges - Business**

AT&T said it will report a pre-tax restructuring charge of approximately $240 million in the company's fourth quarter 2002 results. The charge is primarily associated with approximately 3,500 planned employee separations. Affected employees, slightly more than half of whom are in management, were notified last year that their organizations will be reduced in size; most will leave the payroll in the first half of 2003. The company said it expects the restructuring charge to have an earnings-per-share impact of approximately $0.20 in the fourth quarter of 2002. AT&T said the employee separations are largely the result of improved processes and automation in provisioning and maintenance of services for business customers. As previously indicated, AT&T will take an asset-impairment charge of approximately $1.1 billion in the fourth quarter associated with its past investment in AT&T Latin America. This charge is expected to have an earnings-per-share impact of approximately $1.40 in the fourth quarter of 2002.

COPYRIGHT 2003 Information Gatekeepers, Inc.
COPYRIGHT 2003 Gale Group

Capital Mobility and Job Loss in Massachusetts:

A Look at Corporate Restructuring, Production Shifts, and Outsourcing

Paper to be presented at the Future of Work Conference

University of Massachusetts-Boston

April 28, 2005

by

Stephanie Luce

Assistant Professor

Labor Center

University of Massachusetts-Amherst

and

Kate Bronfenbrenner Director of Labor Education Research New York State School of Industrial and Labor Relations Cornell University

Introduction

In the past year global outsourcing, the shifting of jobs from the US to other countries, has been a hot button issue in American politics. Lou Dobbs made the "Exporting of America" a regular feature of his nightly news show, and states like Ohio suddenly came up for grabs in the presidential race when Kerry was unable to offer a motivating vision for the tens of thousands of workers who had watched their good jobs and their economic hopes and futures disappear in the last decade. But as we found in our recent study on global outsourcing, completed for the US China Economic Security Commission in the fall of 2004, this was not just a US story or a US problem. Throughout the world, US and foreign-owned multinationals are simultaneously shifting production from high-wage countries to multiple low-wage destinations, across nearly every industry and market. Massachusetts, always ahead of the curve in US economic history, has played a similar role in the pattern of global outsourcing. Therefore, the story of global outsourcing in Massachusetts provides some important insights into what is happening in the rest of the US and worldwide.

In March 2004, when the US Department of Labor released results of a study on job losses nationwide, Massachusetts was the state that had experienced the greatest percentage job loss (more than 6 percent, compared to 2 percent nationally) since the recession hit in 2001 (Gavin 2004a). Indeed, unemployment rates rose from 2.7 percent in January 2001 to 5.6 percent in January 2004 in that period, and news stories seemed to confirm that many workers were feeling hit hard by a combination of plant closings, layoffs, and outsourcing. To understand the future of work in Massachusetts, we must understand the phenomenon behind these trends— where are the jobs going and what, if anything, is different about what is happening with job loss and global outsourcing trends in Massachusetts and the rest of the country?

2

In this chapter, we examine the impact of corporate restructuring and global outsourcing on employment in the Commonwealth. In particular, we examine the degree to which production is shifting from the workplaces in

Massachusetts to other countries. We chose to focus on global outsourcing, the shifting of work from Massachusetts offshore, to countries in Europe and Asia, and nearshore, to countries in Canada and Latin America, not because we believe that these are the sole or even the primary causes of job losses in the state. Rather, we focus on these topics because they have received so much media attention and they represent an increasing trend towards corporate restructuring and capital mobility that has lasting repercussions for workers, families, unions, and communities in the Commonwealth.

Massachusetts has always been a state at the forefront of economic trends in the country. It was among the first states to undergo industrialization when textile mills developed in the eastern part of the state in the early 1800s, and some of the country's earliest and most vibrant unions began in the Commonwealth. By the 1970s, Massachusetts was one of the earlier states to experience large-scale deindustrialization. Although companies had already been leaving Massachusetts for southern states for years, there was a particularly large wave of plant closings and downsizings that shut manufacturing plants across the Commonwealth in this period (Bluestone, Harrison and Baker 1981). The state managed to rebuild its economy in the late 1980s and 1990s by encouraging the growth of the high-tech/information and financial sectors. But when these industries began to outsource work to lower-wage countries in the late 1990s and early 2000s, Massachusetts again seemed the first to reveal the trend. And given that the state had a higher concentration of technology workers than most (7.5 percent of total employment, compared to 4.5 percent nationally), it was hit early by the hi-tech stock market bubble crash (New England Economic Partnership 2004; Gavin 2004b).

3

This chapter will examine corporate restructuring and global outsourcing of jobs from Massachusetts in 2004. We compare these numbers to national data we collected on global outsourcing for the first quarters of 2004 and 2001 in studies we were asked to conduct by the US China Economic Security Review Commission and its predecessor, the US Trade Deficit Review Commission, to gain a better understanding of the nature, extent, and economic impacts of national global outsourcing trends on US workers and employment (Bronfenbrenner and Luce 2004; Bronfenbrenner and Burke et al. 2001).

Global Production Shifts

Globalization and outsourcing have become hot topics in the media and policy debates within the past several years. However, there continues to be little hard data available to measure the trends and the impact on jobs and wages. There are a few sources that analysts tend to rely on when trying to measure this phenomenon at the national level, and essentially none at the state level.

First are data that are collected by the federal government through the administration of government programs or policies. These include Trade Adjustment Act (TAA) data, administered through the Department of Labor.[1]

The TAA provides assistance to workers who are found to have lost their jobs due to increased imports or production shifts overseas. Unfortunately, although the TAA compiles statistics on the number of workers covered by certified TAA petitions each year and their basic characteristics, these data do not distinguish between job loss due to imports and job loss due to production shifts. However, these data do show that Massachusetts experienced a steady increase

4

in the number of TAA petitions filed and certified from 2001 to 2003, with a slight drop-off in 2004.

There has been national level predictions by private consulting firms and academic experts estimating the numbers of jobs expected to be outsourced in the coming years, including extremely high predictions for the outsourcing of tens of millions of white collar and service sector jobs in the next decade (Hilsenrath 2004; Kroll 2004). However all of these have been limited to national, not state data. Our own research on global outsourcing in

2001 and 2004 did break down our findings by state, but focused on too brief a time period (one quarter) to gain the kind of detail necessary to gain a real understanding of the nature and extent of global outsourcing within a small state such as Massachusetts (Bronfenbrenner and Burke et al 2001; Bronfenbrenner and Luce 2004). It is for this reason we decided to employ the same media-tracking methodology we had used in our national studies to develop a clearer picture of the extent and effects of global outsourcing in the Commonwealth.

Research Design and Methodology

To calculate the number of planned or actual job shifts, we replicated our research methodology from our previous studies. We constructed a database of firm and job relocations using an extensive search of English-language media sources, relying heavily on international, national, and regional news sources in Lexis-Nexis, the premiere database for full text global news sources as well as other on-line media search engines. We searched for cases of plant closings and relocations from Massachusetts to any other country, using a complex Boolean search string, on a day-by-day basis for January 1, 2004 through December 31, 2004. In addition, we utilized government data sources to track plant closings including TAA applications and

5

determinations, as well as Worker Adjustment and Retraining Notification (WARN) notices, plus a variety of other sources (For more detail on our other sources and methodology, see Bronfenbrenner and Luce 2004).

For each case where we were able to confirm a planned or actual production shift, we did follow-up research for additional or corroborating information. This included descriptive information on the company, parent company, parent company country and financials, as well as information on the location of the city and country where the production was shifted.[2]

There are limitations to using media-tracking for this work. Although there is a growing amount of information available through electronic sources, we found that companies are increasingly reluctant to make public announcements about production shifts because of the sensitivity that surrounds outsourcing and globalization.[3]

A Reuter's story from December 2003 noted that companies are continuing to offshore, but doing so more quietly. Industry analysts, such as Jack Trout of Trout and Partners, a marketing and strategy-consulting firm, say that executives are realizing that public announcements could be bad for business. "The problem is that companies aren't sure if it's politically correct to talk about it," said Trout. "Nobody has come up with a way to spin it in a positive way" (Zielenziger 2003). This situation creates problems for publicly traded companies. In the past, announcements of offshoring could help them financially. In our 2001 study we found a number of examples of companies that would make public announcements of plant closings and offshoring to see their stock prices rise. But as noted in the Reuters article, companies now "send vague signals that they are opening up operations in India and China, but often decline to elaborate." On the other end, technology firms in other countries such as India have stopped identifying their US customers. Unions and journalists have managed to obtain some internal memos and reports that

6

expose offshoring practices, but certainly much goes missed. For this and other reasons, we estimate that we were only able to capture a portion of the shifts out of the state.

It is also important to highlight that our research has only measured Massachusetts-based employers that are outsourcing work overseas. This ignores the important category of firms that are outsourcing work to other states, such as Atlas Copco in Holyoke, which moved jobs to South Carolina in 2004, and Future Electronics in Bolton, which announced plans to move 250 jobs to Mississippi in 2005. This kind of outsourcing has the same impact on the workers and communities left behind, so it is important to include it in broader studies of corporate restructuring.

Our research also excludes firms that are currently expanding in overseas locations, but not necessarily laying off workers in the US. In some cases, these may result in job growth in both countries. In other cases, the overseas expansion lays the groundwork to slowly shift production abroad over time, by not hiring in Massachusetts and hiring only in the new locales. For example, the Boston Globe highlighted the case of Fidelity Investments, which continues to hire high-tech workers in Boston while hiring increasing numbers in Bangalore, India. While employment in Massachusetts remains fairly stable, the company has hired over 750 people in Bangalore in the past two years (Healy 2004).

We also leave out cases of plant closings and job loss due to foreign competition (increased imports), such as with Lexcraft and Quaker Fabrics in Fall River. Again, this job loss is just as significant to the workers and their families, and is just as relevant for deliberation on industrial policy and job creation. However, for the purposes of this study we chose to focus solely on those instances of corporations that are moving production across national borders.



Finally, we only include cases where we were able to confirm an actually announcement or relocation of jobs out of the country. This means that there were many cases where we found articles where laid off workers, or union or local government officials argued quite convincingly that production shifts had occurred, but we could not include these cases in the database because there was not strong enough corroborating evidence to overcome company denials that no global production shift had taken place. For example, in September 2004, AT&T announced that it would close its call center in Fairhaven, laying off 140 workers. The company said that they did not plan to send the work elsewhere, but that they simply would be phasing out long-distance service. Indeed, a company spokesperson stated, "We are not moving any of these jobs overseas" (Blanton 2004). However, workers were not convinced. The company had cut its US-based call-center in half since 2000, and in January 2004, the union obtained an internal memo from an Indian consultant firm that showed how those jobs would be moved to India. AT&T documents showed that one out of four customer calls "were handled by independent US contractors employing 1,400 workers overseas" (Blanton 2004). Massachusetts employees such as Michael Brightman reported that they worked daily with their counterparts in other countries. When call center workers in New Delhi couldn't solve long-distance billing issues, they would reroute the calls to the US employees. Still, while AT&T acknowledges it has operations in many countries, it remains adamant that these jobs were not shifted overseas.

Companies shifting production out of Massachusetts

From our database, we are able to describe the basic characteristics of the kinds of companies shifting production from Massachusetts out of the country in 2004 and then compare this to the data we had compiled for the country as a whole for the first quarter 2004. In total, we

8

found thirty-four companies that announced plans for relocation or did relocate work out of Massachusetts to other countries in 2004.

Table 1 describes the companies shifting production out of the country from Massachusetts and compares them to what we found in our national database for 2004.[4] While in many ways the companies shifting production out of Massachusetts to other countries were remarkably similar to the kinds of companies that were doing so nationally, we found some important exceptions. Like the rest of the country, companies shifting production out of Massachusetts tend to be large publicly-held, US-based multinationals that have been in operation for, on average, more than forty five years. However, Massachusetts companies are less likely to be in the manufacturing sector than their national counterparts (71 percent versus 83 percent) and thus, not surprisingly tend to be shifting, on average, smaller numbers of jobs at one time (137 versus 292). This is because manufacturing employers tend to be larger employers than those in finance, business services, and communications and IT, the non-manufacturing industries which are shifting production out of Massachusetts. Massachusetts firms tend to have slightly smaller parent

companies and are slightly less likely to be foreign-owned.[5] The other notable difference is that Massachusetts firms tend to be somewhat "younger," with only 55 percent in operation more than twenty years compared to the national rate of 76 percent, and similarly have fewer average years under the current owner (eleven for Massachusetts versus eighteen for the US overall). In fact, half of the companies shifting production in Massachusetts had been under the same owner for five years or less.

[TABLE 1 ABOUT HERE]

These differences in parent companies are best explained through examining the production shifts by industry. Table 2 provides a breakdown of production shift by industry,

9

comparing Massachusetts firms to the firms in our national study. The most striking aspect of the data is the high concentration of firms leaving Massachusetts that are in the electronics and electrical equipment industry. These after all were the new high tech firms that were supposed to rebuild the Massachusetts economy after the de-industrialization of the generation before. Thirty-eight percent of all firms shifting production out of Massachusetts to foreign countries and 63 percent of all jobs leaving Massachusetts for foreign countries are in the electronics or electrical equipment industry, including well known companies such as Sanmina SCI, Texas Instruments, ITT, AGFA, and newer entries such as Medtronics, Medsource Technologies and Juniper Networks. This compares to the national picture where only 16 percent of firms shifting production out of the country and 13 percent of all jobs shifted off shore or near shore were in the electronics or electrical equipment industry. At the same time, Massachusetts also has a higher concentration of production shifts in one of its oldest industries, industrial equipment and machinery, reflecting the long tradition of skilled tool making that still has a foothold in the state (Juravich 2005). Twelve percent of the firms with shifts and 11 percent of jobs lost in the state were in industrial equipment and manufacturing, compared to 9 percent of the firms and 5 percent of the jobs lost nationwide. The remaining Massachusetts manufacturing job losses ranged from apparel, textile, and footwear (6 percent of jobs lost) to chemicals and petroleum (3 percent) and aerospace, metal fabrication, and plastics, glass, and rubber (all 1 percent to 2 percent).[6]

[TABLE 2 ABOUT HERE]

As mentioned earlier, the other aspect of what makes Massachusetts different is that Massachusetts firms are much less likely to be in manufacturing and much more likely to be in non-manufacturing industries than firms shifting production nationwide. As described in Table 2,

10

15 percent of Massachusetts firms shifting production out of the country were in communications and IT and 15 percent were in finance, insurance and real estate. The number of shifts in communications and IT was comparable to the national average (14 percent) while the percentage of jobs lost in that industry was lower (4 percent for Massachusetts compared to 9 percent nationally). As with our national research we estimate that media tracking captures only a fraction of the job losses in this industry, since outsourcing in communications and IT tends to be a two-stage process where first work is outsourced to a US based outsourcing firm prior to being outsourced overseas, so it is virtually impossible to get an accurate count of the total number of jobs lost (Bronfenbrenner and Luce 2004). Also, unlike manufacturing sector production shifts, workers in these industries are much less likely to be covered under TAA or the WARN Act, so it is much more difficult to obtain initial information about or confirmation that a production shift actually occurred. Thus, based on our experience with the national data, we would assume that in a state like Massachusetts, which has a high level of employment in the communications and IT industry, the actual number of job losses in this industry is at least triple the number we found through our media tracking research.

In contrast we found a higher percentage of firms shifting jobs in the finance sector in Massachusetts than nationally. Fifteen percent of all firms shifting jobs and 8 percent of jobs lost were in the finance industry in Massachusetts.

compared to only 2 percent of all firms and 1 percent of jobs lost nationwide.[7] We believe that this is because Boston is a financial center in the US, so the media tends to cover the industry much more heavily. In addition, unlike many financial sector job losses which tend to be in large anonymous firms in large cities, the job losses in Massachusetts occurred in small communities such as Quincy, Everett, and Malden, where the layoff of even thirty workers is considered a major local news story and the potential

11

loss of 300 jobs at Mellon Financial Services would be all but impossible to keep out of the press.

Production shifts, unionization, and TAA claims: Massachusetts vs the national data

One dramatic consequence of the very different kinds of industries shifting jobs out of Massachusetts versus those shifting jobs nationwide is that the state lost many fewer union jobs than did the country as a whole. In our national sample, we found that 39 percent of all jobs being shifted overseas were union jobs. In contrast, only 8 percent of Massachusetts jobs lost were in unionized firms. This is likely due to a combination of factors. First, many of the unionized manufacturing jobs had already left the state in decades before when heavily unionized jobs in textiles, machine tooling, auto, metal fabrication, and the previous generation of the electronics industry (the old GE) left the state. Second, in the national data the industries with the highest percentage of union job losses were in metal fabrication, appliances, auto parts, food processing, household goods, and wood and paper products, all industries that were not present in Massachusetts. In contrast, the kinds of manufacturing firms now leaving Massachusetts tended to be newer high tech electronics companies, which unions have found extremely difficult to break into (Interview with Carney 2005). Massachusetts also includes a much higher percentage of non-manufacturing firms than the national study, including communications and IT, which, with the exception of the formerly unionized AT&T and Lucent Technologies, have remained extremely difficult turf for unions to break into, or the financial, insurance, and real estate sector, which continues to be the one industry which, outside of organizing janitors and security guards, no union has taken on as its primary jurisdiction or organizing target.

12

One of our most striking findings was that Massachusetts firms were twice as likely to file TAA petitions than the national average. In our national study we found TAA claims were filed in only 31 percent of all production shifts out of the US, and were much more common in unionized firms than in non-union firms. Three quarters of the TAA petitions nationally were in manufacturing, and while 99 percent of manufacturing petitions were certified, none of the petitions in non-manufacturing industries such as call centers or research and design IT companies were certified on the grounds that they were not producing a product and therefore were not covered under the TAA.

Yet in Massachusetts, we found TAA claims were filed cases filed in 74 percent of all cases. If there was no union, then the company or the workers themselves filed the claim instead. Eighty-four percent were filed in manufacturing firms and 100 percent of these were certified. In non-manufacturing industries, two cases were certified, one is still pending, and one, a software design firm, was denied, consistent with the national pattern. As for the reasons that workers and firms are much more likely to file TAA claims in Massachusetts than other states, this may in part reflect Massachusetts long experience with capital flight and the active community involvement in supporting and educating workers who have experienced job loss as a result of capital mobility, and holding employers accountable for that job loss. It is also true that in a state where the local media is so filled with stories about workers getting TAA benefits, even unorganized workers become familiar with their rights to these benefits and so are much more likely to put pressure on the employer and the state to ensure that they get access to whatever financial and training benefits are available to them. Yet, the most likely reason that a higher number of TAA claims are filed in Massachusetts than in other states is the active role played by the State AFL-CIO and local labor councils in Workforce Investment Boards educating workers,

13

community groups, local government officials, and employers about their rights and responsibilities in the workforce retraining process, thereby making it much less likely that a major manufacturing employer would get away with laying off significant numbers of employees without having a TAA claim being filed.

Destination of jobs being outsourced by Massachusetts firms

Table 3 shows the breakdown of shifts and jobs leaving Massachusetts by destination region and country. The thirty-four firms shifted work to seventeen countries, on four continents. In total, there were 4,520 jobs that were shifted overseas. Asia, as a region, remained the primary target for US production shifts. Fifty-two percent of all shifts and 56 percent of all jobs moved to Asian countries, and nearly a quarter (24 percent) of all production shifts from Massachusetts moved to China. Despite the attention that China and India have received in the media regarding the outsourcing, Mexico continues to be the largest single destination for global relocation of jobs leaving the state, with a total of 29 percent of the total jobs leaving Massachusetts going to Mexico. This is consistent with our national data, which found Mexico to be the primary destination for jobs leaving the US both in our 2001 and 2004 studies. The difference between Massachusetts and the national data is that, nationally, 41 percent of production shifts went near shore to either Mexico or Latin American, with 27 percent of all production shifts going to Mexico and 14 percent going to Latin America. In contrast, in Massachusetts there was only one production shift to a Latin American country (Costa Rica), and 20 percent of the shifts went to Mexico, while a much higher percentage shifted to European countries, particularly the 15 percent that went to the UK.[8] The higher percentage of jobs moving to Mexico than other countries occured in part because the average job loss in shifts to Mexico was much higher than

14

that in other countries, averaging 143 compared to an average of 105 for Asian countries, 119 for Canada, and only 37 for European countries.

[TABLE 3 ABOUT HERE]

Because Massachusetts is dominated by the electronics, communications, and finance industries, we know from our previous research that those are the industries that have been more likely to shift work to Asia rather than Latin America, while shifts in the auto parts, appliance, food processing, and metal fabrication industries have continued to be more concentrated in Mexico. For example, in our national data 71 percent of shifts out of the US in electronics and electrical equipment industries, 62 percent of shifts in communications and IT, and 100 percent of shifts in finance, insurance and real estate went to Asia. In contrast, only 18 percent of shifts in electronics and electrical equipment went to Mexico (and none to other Latin American countries), 32 percent of shifts in communications and IT went to Latin America, and none of the shifts in the finance, insurance or real estate industry went to either Mexico or Latin America.

While production shifts out of Massachusetts are dominated by the electronics, communications and IT, and finance industries, unlike the national data many of the shifts in these sectors are not simply Asia-focused. In fact in the electronics industry, following a trend we found in the national data, many of the employers tended to be simultaneously shifting some jobs near shore to Mexico or Canada (or in one case to Costa Rica) at the same time they were shifting other jobs to Europe or Asia. As we suggested in our national study, the primary reason for this simultaneous shifting to multiple global destinations was most likely to keep some production cross border, so it can still be quickly and cheaply accessed through ground transportation, while shifting other production to lower wage markets or to be closer to other links in a company's global supply chain.

15

One example of this in our Massachusetts data is electronics component manufacturer Vishay BLH in Canton, MA. Vishay is a subsidiary of Vishay Intertechnology, which for the last two years has been in the throes of major global restructuring, shifting production from higher cost areas to China, Israel, Mexico, India, and the Czech Republic. In its October 2003 conference call, Vishay referred to several moves, including transducers from France

to the Czech Republic, PTC resistor finishing and film capacitors from Belgium to China, and finishing operations from Taiwan to China (Fair Disclosure Wire 2003). In subsequent calls, the company announced further job shifts to various countries, along with plant closures in the US and Europe (Fair Disclosure Wire 2004a; 2004b; French News Digest 2004).

The Canton, Massachusetts plant became part of this global restructuring story in August, 2002 when Vishay Intertechnology purchased the fifty year old facility from Thermo Electron Corp. (Goodison 2002). Five months later Vishay announced that seventy employees would lose their jobs by March 2003. In fact the process took much longer, and the final fifty workers would not lose their jobs until 2004. But as part of the TAA investigation, what did become apparent is that those seventy jobs (only fifty of which we count in the 2004 data) went far and wide to Vishay facilities in Costa Rica, Israel, and India (TAA 53985). This reflects a pattern in the Massachusetts electronics and electrical equipment industry production shifts, where seven out of the thirteen production shifts in the industry involved multiple destinations. We found only one other firm with multiple destinations, Bird Machine Company, an industrial equipment and machinery company based in South Walpole, shifting production out of the country from Massachusetts in 2004. This contrasts dramatically with the national database where 48 percent of all production shifts had multiple destination countries, a trend that crossed all industries.

16

Regional impact of global outsourcing within Massachusetts

While production shifts in 2004 were spread throughout the state we found them to be particularly clustered in certain communities and regions. In total, twenty-six cities and towns in Massachusetts had jobs shift out of the country in 2004. As we can see from Figure 1 below, certain communities were particularly hard hit such as Wilmington, where three major employers combined, Ametek Aerospace, Sanmina SCI, and Agfa Corporation, had 613 job losses in 2004. Nearby Mellon Financial Services in Everett lost 12 jobs in 2004 and announced that another 300 jobs would be going in 2005. Similarly Attleboro lost 1,180 jobs from it major employer, Texas instruments alone.

[FIGURE 1 HERE]

The impact on these communities had ripple effects that went well beyond the individual workers who lost the jobs in the plant. Texas Instruments had been in operation in Attleboro since the 1920s, manufacturing leadframes, sensors and controls – including the control panel switches for Apollo 11 in 1965. In April 2003, when the company announced it would be laying off more than 1,0000 workers at the plant the company said it had made the decision to send work to China, Malaysia, South Korea and Mexico where it already had established plants, "to take advantage of lower labor costs and proximity to customers" (McPherson 2004). According to the Boston Business Journal, at its peak in 2000 the company employed over 4,000 people in Massachusetts. However, as part of a national restructuring plan, the company had already begun to outsource work in the 1990s (Rankin 2005). In Attleboro, work was contracted out in 2000, through a spin-off company, Engineered Materials Solutions, Inc. By early 2005, just over 1,000 employees remain at Texas Instruments (Boston Business Journal 2005).

17

After laying off many of its workers, the company decided to sell its property. Although state economic development officials said that they hoped to develop the biotechnology manufacturing industry in the area, the site was eventually sold to Preferred Real Estate Investments, Inc., of Conshohocken, Pennsylvania, to redevelop into a "mixed use community of retail, residential, manufacturing and office spaces" (Patriot Ledger 2005). Texas Instruments leased back some of the property in a 20-year lease, with plans to consolidate and shift from manufacturing into marketing and research work (Blanton 2004). While it is a promising sign that the site won't be empty, it is likely that the kinds of jobs that Attleboro-area residents will have access to will change significantly, from the higher-wage Texas Instruments jobs to primarily low-wage retail.

Despite the succession of layoffs at Attleboro and other plants across the country over the previous four years, in April 2005 Texas Instruments was named to the "100 Best Corporate Citizens" list produced by Business Ethics magazine. The list "recognizes companies with a commitment to higher standards and best practices in corporate social responsibility," and rates companies on how they "serve stakeholder groups including employees." According to the company's vice president and Director of Ethics and Compliance, "To be recognized at this level is validation of our basic tenet of good corporate citizenship. For TI, strong ethics are not just an afterthought, they are part of our every day business strategy" (Texas Instruments Incorporated 2005).

Although an entirely different industry and workforce, the departure of Mellon Financial from Everett will have a similar impact. Mellon Financial describes itself as "one of the world's leading providers of financial services for corporations, institutions and affluent individuals around the globe" (www.mellon.com). In 1999, the company chose Everett, Massachusetts as the

18

site for a new transactions processing center. It redeveloped and expanded an existing manufacturing site in Everett, and moved in 1,350 jobs from nearby Medford. The company also promised to create one hundred new jobs and bring in $50 million in private investment to build the new building. In exchange, the city and state granted Mellon a nine-year tax increment financing (TIF) incentive (Boston Office of Business Development 2004).[9] At the building opening, US Representative Edward Markey remarked, "These are exciting times for the City of Everett and Mayor David Ragucci and his economic team. Without question, this new facility will be a beacon for the people of Everett and neighboring communities—providing hundreds of job opportunities and cutting-edge amenities to make the workplace efficient, productive, and pleasant" (Mellon Financial Bank 1999).

Unfortunately for the city, Mellon Financial decided to start outsourcing information technology jobs to India and the Philippines in 2002 (News India-Times 2002). According to company officials, outsourcing its IT work would allow the company to reduce costs, control the number of workers it had employed at any one time, and obtain "supplemental business skills," although it did not clarify just what those skills would entail (News India-Times 2002). Mellon announced that it planned to have 20 percent to 25 percent of its development functions done offshore by the end of 2004. In 2003-2004, the company sent twenty-four jobs from Everett to India, and in March 2004 it informed Mayor Ragucci that it would offshore another 300 jobs in 2005.

Currently, city residents are exploring options to pursue legal action against Mellon Financial. Although the terms of the TIF do not prevent the company from outsourcing jobs, the Mayor says the agreement does "stipulate that Mellon employ 'a pretty good percentage' of residents from Everett, Malden, and Medford" (Santoro 2004). One proposal on the table is to

19

charge Mellon Financial a $1 million assessment to be used for retraining Mellon employees who lose their jobs to outsourcing. City leaders asked the company to send a representative to meet with the Board of Alders. James Palermo, president of Mellon's New England operations, wrote back saying that he was unable to come to a meeting and defending the company's decision. "We recognize the value of our staff," wrote Palermo. "But as a global company, we also recognize the changes that accompany economic globalization. Every day we face the competitive pressures that have induced 80 percent of the Fortune 500 to transfer some work to lower-cost providers in such places as India, China, and Russia. Our employees understand this and they know that unless Mellon remains a strong and profitable company, there ultimately will be fewer jobs to go around" (Santoro 2004). Although city leaders continue to pursue options to hold Mellon Financial to the spirit of its agreements, the mayor acknowledged that he has few options. "I tread very carefully with a place like Mellon, because you want to encourage businesses to locate here to generate tax revenue and employ our residents, yet at the same time you have to respect the fact that they have a business to run," said Ragucci. "If they can't run the business profitably, there won't be a business" (Santoro 2004).

Conclusion

There has been considerable debate in the business and economics community about the real force behind global outsourcing and true costs and benefits to American workers and consumers. Much of the discussion has focused on the need to be closer to global markets or meet the needs of supply chains that have become stretched thin. There has also been endless talk that globalization is creating just as many good new jobs as it is taking away dirty old jobs. But in the course of doing our research, we had the opportunity to get at the heart of the decision

20

making of the CEOs, investors, and board of directors who are making the global restructuring decisions that result in the shifting of work out of one country and into another. In reading the quarterly conference call reports, strategic plans, and interviews with top corporate leaders, key phrases repeated themselves over and over again: global restructuring to shift production from high cost to low cost countries both near shore and off shore. In Massachusetts it may be a story being told in new industries with new kinds of workers, but it also is a story that continues to be told in industries that helped build the Commonwealth a century ago. And so we end not with the high tech companies on Route 128 but with Danaher Tool, yet another Massachusetts story of a profitable unionized plant that helped build a town but at the end of 2004 announced that it would be leaving the state and devastating the community it had built.

The Danaher Tool facility has been located in the Springfield area for over 100 years. It once produced parts for Henry Ford, but today makes hand tools for sale at Sears. In 1991 the company – then Easco Hand Tools—was bought out by Danaher Tool Group. Easco had already decided to move much of the work to the US South in 1986. The local workforce was cut from 2000 to 150 people. Over time, some of the work was sent back up north, and the company was on the upswing—reaching 350 employees by 2004. George Sexton, president of one of the unions that represents the employees, said that by late 2004, he felt the economy was on the upswing. But on December 16, the company announced that it would be closing its doors and sending the work to Texas. Management told the union that they could save $7 million a year by moving the work–and even though the company was already quite profitable, it could not pass up the chance to make more money. Some of the Danaher employees were sent to Texas to train their replacements, and discovered that the average wage there was $6.50 an hour, with no

21

benefits. In Springfield, the average wage was $14 an hour, plus another $7 an hour in benefits (Interview with Sexton, 2005).

The union negotiated with the company and came up with $6.5 million in concessions in wages and benefits. Sexton says that the company negotiated with the union because they are required to by law, but he feels that they already had their minds made up. They said the concessions were not enough, and the plant would close permanently by June 24, 2005.

Sexton doesn't think the move was done to break the union: the union and company had got along well, and worked together. He thinks the reason behind the move is that it is a stepping stone to move production to China, since the company already has a plant there. In fact, the TAA certified the case in early 2005, finding that the company was already shifting production to China. Sexton says now that K-Mart has bought out Sears, perhaps the quality of the tool and the "Made in the USA" stamp they carry is no longer important.

Layoffs began in March. Not surprisingly, the closure is very hard on the employees. Sexton says that since the company has been part of the community for so long, some workers are third and fourth generation Danaher employees. Others are new immigrants–Sexton notes that the workforce includes recent Latino and Russian immigrants who have worked for the company five to six years, and had hoped to retire from there some day. Others came to work straight out of high school or the service, so this is the only work they have done. Some of them say they won't leave no matter what–even if the company closes. Others are leaving now: even some with seniority that

have the right to bump those lower down the list are volunteering to leave now, since it is too depressing for them to stay. Sexton says there are huge holes in the shop–the machines are being moved out rapidly as the layoffs occur.

22

The plant closing will impact others beyond the 350 workers. The union estimates that 2500 people are directly affected (workers and their families), but other local businesses and their employees will feel the impact as well. This includes local businesses that supply uniforms, food and beverage vendors, belt vendors, and other tool companies that do work for Danaher (Interview with Dondley 2005).

What will happen to the workers who lose their jobs? Sexton says that there are about 60 employees who have 35 to 40 plus years seniority and can retire. The others are nervous about going into another manufacturing job, since they think there is no job security. Many will use TAA benefits to go to school or be retrained. A number are looking into truck driving, and others are looking into getting an advanced degree. Still, most are concerned about their finances. The average pay at Danaher Tool had been about $40,000 a year (including overtime), and some had even earned up to $60,000 or $70,000. This allowed them to buy a house–but with unemployment checks, they are not sure they will be able to cover their mortgage.

Sexton says the workers were shocked, then disappointed, and now bitter. Danaher Tool is a profitable company – the CEO earns about $57 million a year, and Sexton points out that the difference the union needed to come up with in concessions was not even 1 percent of that salary. The company was also successful in other ways. Danaher Tool regularly won the Sears Achievement Award for quality. The company had lots of work: it had been running 12 hour shifts, seven days a week almost consistently for the past fourteen years. Even now, as people are being laid off, there is plenty of work. Sexton says there wasn't anything else the workers could have done to keep the plant, even with the help they got from politicians. "Manufacturing will be a thing of the past for this country, especially in the Northeast," he said.

23

Overall, the number of Massachusetts jobs lost to overseas outsourcing is not large: many more jobs are lost for other reasons. But given that Massachusetts only created 24,000 jobs in 2004, 4,520 jobs lost is noteworthy. If we are right that our media-tracking only captured a third of the jobs, and if we assume the pace of outsourcing has been steady over the past several years, then outsourcing would actually account for over one-quarter of the total jobs lost in the state since the recession began.[10] Perhaps even more significant is the impact of globalization on workers' sense of security. Union organizers tell stories of how employers use the threat of offshoring to squelch union drives or to win concessions in bargaining (Interview with Cohen 2005; Interview with Carney 2005). In this sense, there is nothing new in these trends that we see in the Commonwealth: employers have long used threats of relocation to keep workers insecure. The impact is the same, whether you are a banker or a toolmaker—the threat of relocation creates economic insecurity, and real job loss can have devastating impacts on workers, families, and communities.

In our national data we estimated that the media tracking greatly underestimated the actual number of jobs lost, particularly in non-manufacturing industries, and in firms shifting to China and India, because these were the industries where there had been the most public outcry against outsourcing of jobs and so companies had gone to the greatest lengths to keep stories regarding the outsourcing of jobs in white collar occupations or to Asian countries out of the media. We also found it harder to find media stories on production shifts in firms shifting to Asia and India because firms shifting to those countries were more likely to be in industries that were non-union and so less likely to file TAA claims.

In Massachusetts we also believe that media tracking greatly underestimates the number of jobs lost through outsourcing, but for different reasons. While TAA claims were much more

24

common than in other states, Massachusetts is a state where increasing numbers of workers are in industries such as business services, communications and IT, and finance, insurance and real estate. These are the industries that are at the center of the new wave of outsourcing, about which so much has been written in general terms, but which is nearly impossible to track on a firm by firm basis. Call center workers, claims adjusters in one of hundreds of small insurance companies in the John Hancock or Prudential Towers, software designers in any one of the IT firms outside of Boston, these are the workers whose jobs might very well have been shifted out of Massachusetts in 2004, but they were not represented by any union, not covered by TAA, and did not have their story told in any newspaper.

We also must not forget that 2004 was marked by a presidential election. This may have led employers to hold off on global outsourcing decisions, or to keep them especially quiet so as not to become an election story. Despite a slightly more stable state economy in 2004, projections for 2005 are not strong. Already a number of companies have announced large layoffs or plant closings that will result in production shifts out of the country in the next year, announcement that they might have been delaying until the election returns were in.

Without question, these data confirm that Massachusetts is part of a global phenomenon. First, multinational companies in almost every sector of the economy are engaged in an international race to the bottom, shifting jobs from high wage countries to low wage countries, and second, as the topic of outsourcing becomes more politically sensitive, these same multinational companies are taking greater pains to keep data on these production shifts out of the media and out of the public record. We found numerous cases in our research for this report where the company would deny to the media that they were shifting production out of the

25

country but then the TAA investigation would prove that indeed the work was being shifted overseas.

In our national study we argued that there needed to be government mandated reporting requirements for companies shifting production out of the country so that we could better track the impact of these production shifts on wages, employment, social services, and tax revenues, in the US and around the world. But Massachusetts need not wait for the US government. As the state that has been first in so many economic trends, it could be the first to set up a tracking system that would require all companies shifting jobs out of the state to report to the government how many jobs were being lost, and exactly where those jobs were going. It could also be the first state to come up with a tax policy that would penalize companies that would benefit from tax waivers, only to abandon communities when they move overseas. These would be important first steps in breaking the endless chain of devastation that has become an inevitable consequence of the ever more rapid and complex shifting of capital and jobs from Massachusetts and other communities in the US and around the globe.

26

References

Blanton, Kimberly. 2004. "Offshoring accelerating; US study puts number of jobs sent overseas in 2004 at 406,000, double the estimates," The Boston Globe, November 17, p. D1.

Bluestone, Barry, Bennett Harrison and Lawrence Baker. 1981. Corporate Flight: The Causes and Consequences of Economic Dislocation. Washington, DC: The Progressive Alliance.

Boston Business Journal. 2005. "Staubach Co. caps sale of Attleborough campus," January 13. http://boston.bizjournals.com/boston/stories/2005/01/10/daily62.html . Accessed April 8, 2005.

Boston Office of Business Development. 2004. Economic Development Incentive Program, "Certified Projects Since Inception list."

Bronfenbrenner, Kate and James Burke et al. 2001. "Impact of US-China Trade Relations on Workers, Wages,

and Employment: Pilot Study Report." Commissioned research paper and supplement to <u>Report to Congress of the US-China Security Review Commission: The National Security Implications of the Economic Relationship Between the United States and China</u>. Washington, D.C.: US-China Security Review Commission.

Bronfenbrenner, Kate and Stephanie Luce. 2004. "The Changing Nature of Corporate Global Restructuring: The Impact of Production Shifts on Jobs in the US, China, and around the Globe." Commissioned research paper. Washington, D.C.: US-China Security Review Commission.

Carney, Maureen. 2005. Interview with the authors. April 14.

Cohen, David. 2004. Interview with the authors. April 14.

Dondley, Steve. 2005. Interview with the authors. April 8.

27

Fair Disclosure Wire. 2003. "Q3 2003 Vishay Intertechnology, Inc. earnings conference call- final." October 29, Transcript 102903aa.796.

Fair Disclosure Wire. 2004a. "Q4 2003 Vishay Intertechnology Inc earnings conference call- final." February 6, Transcript 020604al.782.

Fair Disclosure Wire. 2004b. "Q1 2004 Vishay earnings conference call – final." May 4, Transcript 050404ap.787.

French News Digest. 2004. "US Vishay to transfer activity of French plant to China, Hungary," August 30.

Gavin, Robert. 2004a. "Job losses mount in Bay State." <u>The Boston Globe</u>, March 20, p. A1.

Gavin, Robert. 2004d. "Region's consumer confidence dives." <u>The Boston Globe</u>, December 16, p. E1.

Goodison, Donna. 2002. "Bad timing: Companies cut 348 jobs." <u>The Boston Herald,</u> December 17, p. 36.

Healy, Beth. 2004. "Market pressures nudge company to speed growth of its offshore expansion." <u>The Boston Globe</u>, October 8, p. D1.

Hilsenrath, Jon E. 2004. "Forrester revises loss estimates to overseas jobs." <u>Wall Street Journal</u>, May 17, p. A8.

Juravich, Tom. 2005. "Understanding the New Wave of Plant Closings in the US : The Closing of Jones Beloit." Paper presented at the United Association of Labor Educators Conference. Philadelphia, PA.

Kroll, Cynthia. 2004. "Background on Business Services Outsourcing and the California Economy." Testimony to the Joint Hearing of the Senate Business and Professions

28

Committee and the Senate Select committee on International Trade Policy and State Legislation, Sacramento, March 9.

McPherson, David. 2004. "Firm hired to plan Attleboro  redevelopment." <u>The Providence Journal</u>, February 18, p. E01.

Mellon Financial Bank, 1999. "Mellon opens 385,000 sq. ft. office building in Everett." PR Newswire. February 8.

Mellon Financial website, http://www.mellon.com/ . Accessed April 9, 2005.

New England Economic Partnership. 2004. "Massachusetts economy continues modest expansion." Press Release, November 10.

News India-Times. 2002. "Mellon Financial to outsource tech work," May 3.

Patriot Ledger Staff and News Services. 2005. "Consulting group relocates offices." The Patriot Ledger (Quincy, MA), March 3, p. 27.

Rankin, Celia F. 2005. "Lessons in outsourcing: The Texas Instruments experience." Current Legal Developments, Faegre & Benson LLP, http://www.faegre.com/articles/article_print.aspx?id=1310 . Accessed April 9, 2005

Santoro, Phil. 2004. "Mellon defends cutback in jobs." The Boston Globe, March 28, p. 1.

Sexton, George. 2005. Interview with the authors. April 11.

Texas Instruments Incorporated. 2005. "Texas Instruments named to 100 best corporate citizens list." PR Newswire, April 7.

Trade Adjustment Assistance (TAA) and North American Free Trade Agreement- Transitional Adjustment Assistance (NAFTA-TAA), State by State Performance Outcomes, Fiscal Year 2004.

29

Zielenziger, David. 2003. " US firms keeping mum about moving tech jobs offshore." San Diego Tribune, December 24, p. C4.

[1] The Trade Adjustment Assistance Reform Act of 2002 (107 P.L. 210) reauthorizes and amends the Trade Adjustment Assistance (TAA) program through fiscal year 2007. It is administered by the Employment and Training Administration of the US Department of Labor. For determinations on petitions filed see http://www.doleta.gov/tradeact/determinations.cfm.

[2] Each job shift to a country was entered as a single record. In cases where companies shifted to more than one country we entered a separate record-one for each shift to a country. If it was not possible to confirm the actual number of jobs moving to each country, we simply took an average. While this may result in an overestimation or underestimation of the jobs moving to a specific country in a specific shift, in the aggregate these estimations should balance out and ensure that we accurately account for no more than the reported job loss for an individual company for all destination countries combined.

[3] See Bronfenbrenner and Luce (2004) for more discussion about the challenges of media-tracking.

[4] We are using the national data to compare the nature production shifts between the Massachusetts and national data rather than the actual number of cases, since for all tables, US data covers only the first quarter of 2004 while Massachusetts's data covers the entire year of 2004.

[5] Those that are foreign-owned had parent companies based in Austria, Belgium, Canada and the UK.

30

[6] It is also worth noting the manufacturing industries that are entirely missing from the Massachusetts landscape. As shown in Table 2 under the national data 26 percent of firms with production shifts out of the country and 29 percent of jobs lost were listed under other manufacturing industries that were not even covered in the Massachusetts data but made up a significant portion of the job losses nationally such as auto and auto parts (12 percent of firms and 11 percent of job losses), food processing (3 percent of firms and 11 percent of job losses), appliances (4 percent of firms and 9 percent of job losses).

[7] The job loss percentage for the finance sector actually undercounts jobs lost in that industry since for one of the Massachusetts firms we were only able to confirm that the company moved jobs overseas but were never able to ascertain how many jobs were actually shifted out of the country.

[8] However, it is worth noting that unlike in our national research, where because of a large number of states and the short time frame allotted, we concentrated our research focus on Asian and Latin American destination countries, with a small state such as Massachusetts we were able to open our search string to look for all production shifts out of the state and therefore may have captured more of the shifts to Europe than we would have in the national data.

[9] A TIF allows a company to continue paying a base property tax rate even after redevelopment increases the assessed value. Mellon Financial was given a 100 percent TIF for nine years. According to Middlesex County property records, the building and land went up in value from $2,376,600 when it was purchased to $9,990,600 in 2004. This means that the company was not required to pay taxes on the increased value of $7,614,000 for nine years.

31

[10] This comes from 4,520 multiplied by three to account for undercounting, and multiplied by four years (2001-2004), which accounts for 54,240 jobs. This is approximately 27 percent of the estimated 200,000 jobs lost in this period.

32

UNITED STATED DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

-------------------------------------------------------------x

BEVERLY A. GEORGE,

                Plaintiff,

     v.                                 Civil Action No. 05 11079 (DPW)

AT&T CORP.,

                Defendant.

-------------------------------------------------------------x

### **AFFIDAVIT OF COUNSEL VERIFYING EXHIBITS**

The undersigned is an attorney for the Plaintiff Beverly A. George ("Plaintiff"), and makes the following affidavit to verify the documents and exhibits filed in support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment:

1. Page 82 is a true and accurate copy of a certified mail receipt showing the date upon which Plaintiff mailed the last piece of her retirement package to Defendant.

2. Page 83 is a true and accurate copy of a UPS Shipment receipt.

3. Pages 84-85 are a true and accurate copy of a boston.internet.com article discussing members of AT&T's management.

4. Page 86 is a true and accurate copy of a "Look Smart" article.

6. Pages 87-101 are true and accurate copies of an article written by Stephanie Luce and Kate Bronfenbrenner.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 7 DAY OF JUNE, 2006.

DAVID A. CONTI, ESQ.