UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

BEVERLY A. GEORGE,                )
        Plaintiff,                )
                                  )
                                  )      CIVIL ACTION NO.
            v.                    )      05-11079-DPW
                                  )
AT&T CORP.,                       )
        Defendant.                )


MEMORANDUM AND ORDER
June 23, 2006

Effective August 1, 2004, Plaintiff Beverly A. George
retired as an employee of Defendant AT&T Corp. ("AT&T"), after 30
years of service.  On September 13, 2004, AT&T announced a
workforce reduction of 140 employees.  If Plaintiff had remained
in Defendant's employ through September 13, 2004, she would have
been eligible to receive 100 weeks of severance pay as part of
Defendant's Voluntary Termination Pay ("VTP") offer; having
retired on August 1, 2004, she was not eligible.  Plaintiff
brings this action alleging that she was falsely induced to
retire by the intentional (Count I) and negligent (Count II)
misrepresentations of Defendant.  Defendant moves for summary
judgment.

**I. BACKGROUND**

The following facts are presented in the light most
favorable to the non-moving party, here the plaintiff.  See
Pacific Ins. Co., Ltd. v. Eaton Vance Management, 369 F.3d 584
(1st Cir. 2004).

In 1970, when she was a senior in high school, Plaintiff began working for AT&T part-time in the Operator Services Department of its Walpole, Massachusetts facility.  Following a two-year maternity leave, she resumed her job in the Operator Services Department in Brockton, Massachusetts in 1977.  Over the next twenty years, she was transferred to AT&T facilities in Taunton, Worcester, Peabody, and Providence, Rhode Island.[1]  In 1997, she was transferred to the Fairhaven Call Center in Fairhaven, Massachusetts ("Fairhaven Facility"), where she worked as a Customer Sales and Service Representative until her retirement in 2004.

During her employment with AT&T, Plaintiff was a member of the Communication Workers of America ("CWA").  The terms and conditions of her employment were governed by a collective bargaining agreement ("CBA") between AT&T and the CWA.

## A.  Retirement Planning

Sometime in 2000 or 2001, Plaintiff began to contemplate retirement.  However, her pension benefit was subject to reduction if she retired prior to completing 30 years of service.  Her beginning net credited service date ("NCS") was July 28, 1974, so she was eligible for a full pension as of July 28, 2004.

With that date in mind, Plaintiff scheduled her 2004 vacation for the last two weeks of July with the possibility of

---

[1] Plaintiff was transferred from Brockton, Worcester and Peabody as a result of the closings of those offices.  The Providence center closed after Plaintiff had moved to Fairhaven.

retirement at the conclusion of her vacation.  A number of factors contributed to her decision to retire, including her own health issues and those of her son.  The pivotal factor in Plaintiff's retirement decision, however, was the possible closing or downsizing of the Fairhaven facility.  This issue was important to Plaintiff because the CBA provided that employees who volunteered for layoff were to receive a termination payment depending on their years of service.[2]  For an employee with 30 years of net credited service, the termination payment would equal 100 weeks of pay.

Plaintiff closely followed AT&T business developments looking for signs that the Fairhaven facility might downsize or close.  From December 2003 through June 2004, AT&T published announcements warning employees that the expiration of various Federal Communications Commission ("FCC") regulations may negatively affect AT&T's ability to continue its operations in the consumer sector.  Following a Supreme Court ruling allowing the FCC rules to expire,[3] AT&T announced the closing of its

---

[2] Article 25, ¶ 1 provides:
A termination payment, plus compensation for any vacation to which the employee is entitled at the time of leaving the Company, shall be paid to a regular employee who is laid off or may be offered by the Company to an employee as an inducement to voluntarily leave the Company.

[3] In response to an emergency request by AT&T, MCI, and state utility regulators, Chief Justice Rehnquist without comment declined, as Circuit Justice, to stay the DC Circuit decision allowing the FCC regulations to expire.  See U.S. Telecom Ass'n v. FCC, 359 F.3d 554 (D.C. Cir. 2004).

residential business in Ohio, Missouri, Washington, Tennessee, Louisiana, Arkansas, and New Hampshire in June 2004. AT&T's Annual Report to Stockholders for 2003 anticipated further workforce reductions.

The Fairhaven service center opened in 1997. At its peak in the early part of 2000, it housed over 1,000 employees. By early 2004, the number had dropped to 430. Rumors of further downsizing at Fairhaven had been circulating as early as 2001. Fairhaven Consumer Sales and Services Group Manager Joan Gallagher Cappuccio wrote to all Fairhaven employees in 2001, October 2002, and April 2003, dispelling the rumors and asking employees to help quell them.[4]

In May 2004, Plaintiff began experiencing increased waiting time between calls. Concerned that the slowdown might signal a workforce reduction, Plaintiff asked her direct supervisor, Mary Eustace, "where are the calls?" Eustace replied that it was

---

[4] The memos explicitly denied the truth of the rumors. The 2001 memo reported that Nancy Pryor, consumer Long Distance Vice President, "reassur[ed] us that there are no plans to close the center." The 2002 memo stated,

> **RUMOR:** THE CHANNEL WILL ANNOUNCE THE CLOSING OF THIS CENTER AS OF OCTOBER 2002. IS THIS TRUE?
> **RESPONSE:** NO! There are currently no plans to close the center.

In an email sent to all employees on April 24, 2003, Cappuccio wrote, "The rumors in regards to Fairhaven closing are NOT TRUE!... There will be NO closing announcements. If you have any information concerning the origin of this rumor please share with your managers so we can put a stop to this falsehood."

"just slow."  Through May and June 2004, the waiting period
between calls grew to about 30 minutes.[5]  On a number of
occasions, as Eustace passed by Plaintiff's workstation,
Plaintiff inquired about a workforce reduction or closing.  Each
time Eustace replied in the negative.  At one point, Plaintiff
suggested that Eustace "may want to warm up [her] resume."
Eustace responded, "I feel pretty confident that I'll be okay."

In May or early June 2004, Eustace asked Plaintiff about her
retirement plans and reminded her of the need to get her
paperwork in on time.  Plaintiff responded that if all went well,
she would retire on August 1, 2004.  Eustace also asked Plaintiff
to be interviewed for the Fairhaven Flyer, the company
newsletter, about her retirement.  Plaintiff initially declined
because she had not made up her mind to retire, but she
acquiesced after repeated requests.

Plaintiff requested her retirement package from AT&T's
pension center on June 18, 2004, but she had still not finalized
her decision to retire.  Plaintiff continued to question managers
about the possibility of a workforce reduction in Fairhaven.  At
one point in June 2004, managers from other AT&T centers arrived
at Fairhaven for a sales meeting.  Plaintiff thought it was odd
that so many managers were there, and asked one of them if he was
under disguise, trying to figure out which offices to close.  He

_____

[5] The volume of calls had dropped approximately 33% between
April and August 2004.

responded, "No."

In early July, Plaintiff stopped Cappuccio in the hallway. She expressed her concern about the Supreme Court decision lifting the caps on the former Baby Bells and asked if she should stay and possibly avail herself of a severance package. Cappuccio replied, "No, Bev. We're still going to be here." Cappuccio reassured Plaintiff that they were not going to close or downsize and explained that AT&T had just sold the Fairhaven building and secured a five-year lease.[6]

After this conversation, Plaintiff decided to fill out her retirement paperwork. She submitted the documents on July 10, 2004, and the service center received them three days later. Her last day of work was July 16, 2004. She was given a luncheon that day and left on a two week paid vacation, with her retirement effective August 1, 2004.

On September 13, 2004, AT&T announced a workforce reduction of 140 employees at the Fairhaven facility and offered to provide Voluntary Termination Pay ("VTP") to those employees who volunteered to leave work. The downsizing was reported in the Standard Times, a local Fairhaven paper. Plaintiff, who is not a Fairhaven resident, learned about the downsizing sometime between

---

[6] When the Fairhaven facility was established in 1997, AT&T owned the building and occupied three floors on one side and two floors on the other. By 2003, AT&T occupied only one third of the building. For this reason and because of difficulties with tenants, AT&T sold the building in September 2004. As part of the sale, AT&T leased back a portion of the building under a five-year lease.

August and October 2004, after speaking with former colleagues.[7]
If Plaintiff had waited one month and a half to terminate her
employment she would have been eligible for 100 weeks of
severance pay.  The VTP offer did not extend to recently retired
employees.

Neither Cappuccio nor anyone else at the Fairhaven site was
asked for any input into the downsizing decision.  Cappuccio
learned of the downsizing through a phone call on September 10,
2004.  In fact, she was scheduled to meet with other employees on
September 15 -- two days after the downsizing announcement -- to
work on the plan to build out the newly leased space for 430
employees.[8]  She never contacted her supervisors with respect to
Plaintiff's questions about the status of the Fairhaven facility.
She claims that downsizing is not something that she ever
"considered, talked about, thought would happen."

Eustace, for her part, states that she learned of the
downsizing on Monday, September 13, 2004.  She testified that she
knew beforehand that there would be a general restructuring
announcement in September that included a reduction in management
levels, but did not know any more detail.

_____

[7] It is not clear when Plaintiff actually learned of the
downsizing.  In her deposition, she states first that she learned
of it through conversations with friends and a Wall Street
Journal article in the summer of 2004.  At a later point in her
deposition and in her Affidavit she claims she did not hear about
it until October 2004.

[8] This meeting actually occurred, but the focus shifted from
planning for 430 employees to accommodating a smaller workforce.

## B.  Grievance Process

The collective bargaining agreement between AT&T and the CWA requires employees to submit grievances to the union within 60 days of the alleged incident.  On November 16, 2004, Plaintiff wrote to Linda Teoli, President of CWA Local 1051, alleging that Defendant cheated her out of the opportunity to avail herself of a VTP package under Article 25 and requesting that the union file a grievance on her behalf.  On December 9, 2004, Local 1051 filed a grievance claiming that AT&T violated Article 25, §6(a), the provision of the CBA that exempts from VTP employees who leave on their own volition, without inducement by the company.

On December 14, AT&T rejected Plaintiff's grievance on the grounds that (1) it was filed after the 60-day limit and (2) the company generally does not accept grievances from retirees. Teoli wrote Plaintiff three days later, confirming that well over 60 days had passed between July 16, 2004, Plaintiff's last day of work and the incident date reported on the grievance, and the November 16 filing date.

On December 19, 2004, Plaintiff wrote CWA Representative Bill Bates seeking to appeal the decision.  She argued that she had filed a timely grievance on July 8, 2004, regarding the incorrect calculation of her pension, and because that grievance was related to her retirement, it should serve as a "spring board" to the second.  On January 19, 2005, Bates replied that Plaintiff's November 16, 2004, grievance was untimely, and AT&T was correct not to accept it.

On January 24, 2005, Plaintiff wrote to CWA President Morton Bahr seeking further review.  The appeal was referred to Frederick W. Cory, Headquarters Counsel.  On February 14, 2005, Cory wrote that Plaintiff's November 16, 2004, grievance was untimely, and that if she wanted to pursue the separate question of an alleged incorrect pension calculation, she could do so by filing an appeal to the company's Benefits Committee and thereafter by filing an ERISA action.

Plaintiff filed this suit on April 21, 2005, in Massachusetts Superior Court, and Defendant removed the case to federal court on the basis of diversity jurisdiction.  I held a hearing on the instant motion for summary judgment on June 7, 2006.[9]

## II. STANDARD OF REVIEW

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

---

[9] At the hearing, Plaintiff provided her counsel with several documents which she believed relevant to questions that I had raised.  After a brief colloquy concerning the documents, I provided Plaintiff with the opportunity to submit the documents by way of supplemental filing no later than Friday, June 9, 2006. She did so, and on June 12, 2006, she submitted a belated second supplemental filing with two additional documents.

Once the moving party shows that there is no genuine issue of material fact, the nonmovant must produce evidence to show that a trialworthy dispute exists. <u>Rathburn v. Autozone, Inc.</u>, 361 F.3d 62, 66 (1st Cir. 2004).  A fact is "material" if it has the "potential to affect the outcome of the suit under the applicable law." <u>Santiago-Ramos v. Centennial P.R. Wireless Corp.</u>, 217 F.3d 46, 52 (1st Cir. 2000).  A "genuine" issue is one supported by such evidence that "a 'reasonable jury, drawing favorable inferences,' could resolve it in favor of the nonmoving party." <u>Triangle Trading Co., Inc. v. Robroy Indus., Inc.</u>, 200 F.3d 1, 2 (1st Cir. 1999) (quoting <u>Smith v. F.W. Morse & Co.</u>, 76 F.3d 413, 428 (1st Cir. 1996)).  "[C]onclusory allegations, improbable inferences, and unsupported speculation," are insufficient to establish a genuine dispute of fact. <u>Velez-Rivera v. Agosto-Alicea</u>, 437 F.3d 145, 154 (1st Cir. 2006).

In ruling on a motion for summary judgment, a court must view "the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." <u>Pacific Ins. Co., Ltd. v. Eaton Vance Management</u>, 369 F.3d 584 (1st Cir. 2004).

### III. DISCUSSION

Defendant argues two alternative grounds for summary judgment: first, that this action is preempted by federal law governing collective bargaining agreements; and second, that the misrepresentation claims fail on the merits.  Recognizing that these alternatives provide separate and independent grounds for

10

awarding judgment to the Defendant, I will discuss both although success on either would be sufficient to grant Defendant's motion.

**A.    Preemption**

AT&T contends that Plaintiff's claims are preempted by §301 of the Labor Management Relations Act of 1947 (LMRA), 29 U.S.C. §185.

Section 301 confers federal jurisdiction on "suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce." 29 U.S.C. §185(a). The Supreme Court has interpreted this language as "authoriz[ing] federal courts to fashion a body of federal law for the enforcement of ... collective bargaining agreements." Martin v. Shaw's Supermarkets, Inc., 105 F.3d 40, 42 (1st Cir. 1997) (quoting Textile Workers v. Lincoln Mills, 353 U.S. 448, 451 (1957)). This authority forms the basis for a jurisprudence of labor-law preemption, a body of law that "casts a relatively wide net." Filbotte v. Pennsylvania Truck Lines, Inc., 131 F.3d 21, 26 (1st Cir. 1997).

Section 301 preempts a state-law claim "if the resolution of [that] claim depends on the meaning of a collective bargaining agreement." Id. (quoting Lingle v. Norge Div. of Magic Chef, Inc., 486 U.S. 399, 405-406 (1988)). Accordingly, purely factual questions about an employee's conduct or an employer's motives escape preemption. Id. So too litigation that refers to a collective bargaining agreement merely in passing. Martin, 105

11

F.3d at 42.  In practice, the test for preemption under §301 "boils down to whether a state-law claim plausibly can be said to depend upon the meaning of one or more provisions within the collective bargaining agreement."  <u>Filbotte</u>, 131 F.3d at 26.

The First Circuit has identified two ways in which a state-law claim can "depend" on a collective bargaining agreement for preemption purposes.  <u>Id.</u>  First, it can allege the violation of a duty that arises from the collective bargaining agreement itself.  <u>Id.</u> (citing <u>United Steelworkers v. Rawson</u>, 495 U.S. 362, 369 (1990)).  A claim can survive this "<u>Rawson</u>-based" preemption, only if the defendant acted "in a way that might violate the duty of reasonable care owed to every person in society."  <u>Rawson</u>, 495 U.S. at 371.  Second, it can qualify for preemption if it requires a court to interpret a specific provision of the collective bargaining agreement.  <u>Id.</u> (citing <u>Allis-Chalmers Corp. v. Lueck</u>, 471 U.S. 202, 220 (1985)).  "This means a <u>real</u> interpretive dispute and not merely a pretended dispute."  <u>Martin</u>, 105 F.3d at 42 (emphasis in original).  Put differently, "the bare fact that a collective-bargaining agreement will be consulted in the course of state-law litigation plainly does not require the claim to be extinguished."  <u>Lydon v. Boston Sand & Gravel Co.</u>, 175 F.3d 6, 10 (1st Cir. 1999) (quoting <u>Livadas v. Bradshaw</u>, 512 U.S. 107, 124 (1994).

Plaintiff brings this suit based on the state-law theories of intentional and negligent misrepresentation.  She has alleged that AT&T managers, specifically Eustace and Cappuccio,

12

misrepresented the status of the Fairhaven facility when they told Plaintiff in June and July 2004 that there were no plans to downsize or close.  Plaintiff contends that resolution of these claims does not depend on the CBA because (1) no provision of the CBA directly applies and (2) there is no dispute as to the interpretation Article 25, the only relevant provision of the CBA.  She claims that the parties agree that Article 25, ¶ 1 would have entitled Plaintiff to 100 weeks of VTP, if she had been employed in September 2004.

AT&T, for its part, contends that Article 25 is indeed in dispute.  It styles the debate as a question of interpretation, not of ¶ 1, but of ¶ 6(a), which excludes from VTP eligibility employees who leave the company "voluntarily without inducement." In Defendant's view, Plaintiff is claiming that she did not leave the company voluntarily, but rather was wrongfully induced to leave by Defendant's alleged misrepresentations.  And this, AT&T claims, is a matter to be resolved through the CBA's grievance and arbitration procedure.

This case presents an analytical challenge because it falls in the middle of the §301 preemption spectrum.  See Paradis v. United Technologies, Pratt & Whitney Division, 672 F. Supp. 67, 69 (D. Conn. 1987).  At one end of this spectrum are those claims, such as unjust termination of an employee covered by a just termination clause, that are closely linked to a collective bargaining agreement.  Id.  At the other end are claims, such as physical assault by an employer, that are wholly unrelated to the

collective bargaining agreement.  Id.  In between is a
significant gray area.

To illustrate, consider Lueck, 471 U.S. 202, the case in
which the Supreme Court first held that §301 preemption extended
beyond breach of contract to tort actions.  In Lueck, the
plaintiff suffered a back injury and filed a disability claim
with Aetna in accordance with the collective bargaining agreement
between his employer, Allis-Chalmers, and his union.  The
plaintiff alleged that Allis-Chalmers was harassing him by
failing to pay his benefits on time and requiring multiple doctor
visits.  Instead of using the grievance process outlined in the
collective bargaining agreement, he filed suit under Wisconsin
tort law for the bad-faith handling of an insurance claim.

The Supreme Court held that Lueck's claim was preempted by
§301 because it could not be resolved without interpreting the
scope of the right to disability payments under the collective
bargaining agreement.  Id. at 215.  Writing for a unanimous
court,[10] Justice Blackmun explained that the "interests in
interpretive uniformity and predictability" required that labor-
contract disputes be resolved by reference to federal law.  Id.
at 211.  Thus, the Court concluded that

> questions relating to what the parties to a labor agreement
> agreed, and what legal consequence were intended to flow
> from breaches of that agreement, must be resolved by
> reference to uniform federal law, whether such questions
> arise in the context of a suit for breach of contract or in

---

[10] The Lueck court consisted of eight justices; Justice
Powell did not participate.

14

a suit alleging liability in tort. Any other result would
elevate form over substance and allow parties to evade the
requirements of §301 by relabeling their contract claims as
claims for tortuous breach of contract.

Id.

Whereas <u>Lueck</u> cast the net of §301 preemption broadly, <u>Rand
v. Bath Iron Works Corp.</u>, 2001 WL 127655 (D. Me. Feb. 15, 2001),
relied upon by Plaintiff, identifies its limits. In <u>Rand</u>, Bath
Iron Works ("BIW"), a union shop, wanted to hire approximately
100 skilled pipe fitters and electricians for a short term
project and then discharge them once the project was completed.
<u>Id.</u> at *2. Anticipating that it would be difficult to attract
short term workers, BIW advertised the positions as long term
with no risk of lay off in the near future. <u>Id.</u> Because new
workers were not covered by the collective bargaining agreement's
"no layoff" clause, BIW recruiters gave new hires repeated
assurances of job security. <u>Id.</u> at *3. BIW successfully
concealed the nature of the job, hired over 100 employees, and
discharged them with one day's notice once the project had been
completed. <u>Id.</u>

The discharged employees brought suit asserting state-law
claims of fraud, negligent misrepresentation, and breach of
contract. In a Report and Recommendation, Magistrate Judge Cohen
recommended against preemption. He rejected BIW's arguments that
the no-layoff provision provided the basis for plaintiff's claim
and that the wage and benefit provisions of the CBA were
essential to showing damages, finding instead that plaintiffs
were asserting rights independent of the contract. <u>Id.</u> at *6.

15

He concluded that the conflict in the case arose "not from the prospect of differential interpretation of CBA terms but from the nullifying conduct of [BIW's] own agents in the hiring process, a type of conflict that section 301 preemption was not designed to avoid."  <u>Id.</u> at *7.[11]

This case is similar to <u>Lueck</u> in that the VTP benefit that Plaintiff would have had but for AT&T's allegedly fraudulent conduct derived from the CBA and was regulated by the CBA.  On the other hand, this case also has features similar to <u>Rand</u> in that the claim of misrepresentation is, at least in theory, independent of the underlying contract; the tort is the deception itself -- here, the alleged misrepresentations by Eustace and Cappuccio that AT&T had no plans to close or downsize the Fairhaven facility.  See <u>Anderson v. Ford Motor Co.</u>, 803 F.2d

---

[11] As Magistrate Judge Cohen noted, <u>Rand v. Bath Iron Works, Corp.</u>, 2001 WL 127655, *4 (D.Me. Feb. 15, 2001), plaintiffs in <u>Rand</u> earlier brought a separate action under the name "BIW Deceived" against the union arising from the same nucleus of operative facts.  <u>BIW Deceived v. Local S6, Indus. Union of Marine and Shipbuilding Workers of Am.</u>, 132 F.3d 824 (1st Cir. 1997).  In that case, the First Circuit affirmed the district court's denial of the plaintiff's motion to remand in part on the ground that §301 "arguably preempted" the plaintiff's negligence claim against the union, thus presenting a colorable federal question.  <u>Id.</u> at 833.  The First Circuit in <u>BIW Deceived</u>, however, did not finally determine the question of preemption in the context of this BIW dispute.

Judge Carter adopted Magistrate Judge Cohen's Report and Recommendation, and ultimately remanded the case to state court. See <u>Rand v. Bath Iron Works</u>, Civ. Action No. 99-00227, Order Affirming Recommended Decision of Magistrate Judge Cohen (April 2, 2001); Order Remanding Case to the Maine Superior Court (June 5, 2001).

953, 957 (8th Cir. 1986) (distinguishing <u>Lueck</u> and finding
plaintiff's claims of fraudulent misrepresentation not preempted
by §301).

Cases within this gray area have fallen on both sides of the
preemption line with respect to misrepresentation claims.  One
distinction that can be drawn, however, is that courts finding
against preemption tend to do so in situations in which the
alleged misrepresentations took place before the plaintiffs had
been hired.  <u>See e.g.</u>, <u>Rand</u>, 2001 WL 127655 at *6; <u>Anderson</u>, 803
F.2d at 957-58; <u>Belknap, Inc. v. Hale</u>, 463 U.S. 491, 494-97
(1983); <u>but see</u> <u>Bale v. General Telephone Co.</u>, 795 F.2d 775, 779-
80 (9th Cir. 1986).  That is not the circumstance here, where
Plaintiff was employed and covered by the CBA at the time of the
alleged wrongdoing.

<u>Gibson v. AT&T Technologies, Inc.</u>, 782 F.2d 686 (7th Cir.
1986) presents a factual situation very similar to the present
case, and I find it instructive.  The plaintiffs in <u>Gibson</u>
voluntarily left their jobs and agreed to accept benefits from an
income protection program provided for by the collective
bargaining agreement.  <u>Id.</u> at 687.  Several months after they
resigned, AT&T laid off employees at plaintiffs' plant and
provided them with severance pay.  <u>Id.</u>  The severance pay
significantly exceeded the benefits under the income protection
plan.[12]  <u>Id.</u> at 688.  Plaintiffs alleged that at the time of

---

[12] For example, one plaintiff's income protection benefit
was $3,375, but his termination pay would have been over $54,000.

their resignation, AT&T wrongfully withheld information from them
about plans to close the plant, and had they known of those
plans, they would have continued working until the plant closed
and their jobs were terminated.  Id.

The Seventh Circuit held that §301 preempted plaintiffs'
state law fraud claims.  The court determined that the claims
arose from the layoff benefits created by a collective bargaining
agreement and, therefore, were controlled by federal law.  Id. at
688.  In rejecting plaintiffs' argument that the state has an
interest in controlling and remedying allegedly fraudulent
conduct, the court referred to the settled principles expressed
in Lueck that allowing such a tort claim to proceed would thwart
Congress' intention that federal law govern labor contract
disputes.  Id. at 689.

Gibson did not analyze in detail the relationship between
the tort claim and the collective bargaining agreement, but the
key factors are that the plaintiffs were covered by the
collective bargaining agreement at the time the alleged deception
occurred, and the dispute stemmed from the allegedly fraudulent
deprivation of benefits deriving from that agreement.

Following the direction provided by Gibson, I agree with
Defendant that whether Plaintiff was defrauded out of VTP
benefits is an issue arising from and governed by the CBA, and
thus, preempted by federal law.  Article 25 creates the VTP

_____

Gibson v. AT&T Technologies, Inc., 782 F.2d 686, 688 (7th Cir.
1986).

18

program, and ¶ 6 places restrictions on eligibility.  Plaintiff
herself in the grievance she filed on November 16, 2004, argued
that Article 25, ¶ 6(a) does not apply to her because she was
"wantonly deceived" into retiring before the downsizing.  The
scope of ¶ 6(a) must be determined by the grievance and
arbitration process outlined in Article 9 of the CBA.  Although
Plaintiff's claim can also be recharacterized as the tort of
misrepresentation, a decision from this court on that state-law
claim would necessarily inform the meaning of Article 25, ¶6 (a);
and that is the precise situation that <u>Lueck</u> sought to channel
exclusively into federal labor law.

Having established that Plaintiff's claims are preempted by
federal law, I turn to the implications of that decision.
Generally, employees who are union members and covered by a
collective bargaining agreement must exhaust the remedies under
that agreement before bringing suit under §301.  <u>Vaca v. Snipes</u>,
386 U.S. 171, 184 (1967).  Exhaustion is not required where it
would be futile, where the union breaches its duty of fair
representation, or where union remedies are otherwise inadequate.
<u>Id</u>. at 184-85.  Defendant bears the burden of proving "not only
the existence of an adequate intra-union remedy, but also
[Plaintiff's] failure to pursue that remedy."  <u>Doty v. Sewall</u>,
908 F.2d 1053, 1061 (1st Cir. 1990).

Article 9 of the CBA requires employees to file grievances
within 60 days of the incident giving rise to the complaint.
Plaintiff filed a grievance on December 9, 2004, more than 60

19

days after any conceivable relevant date, e.g., the alleged misrepresentations in June and July 2004; July 16, 2004, her last day of work before her final vacation; August 1, 2004, her retirement date; and September 13, 2004, the day of the downsizing announcement. For this reason, AT&T denied the grievance and the CWA twice rejected Plaintiff's appeals. Clearly, the CBA presented Plaintiff with a remedy; she, however, failed to pursue it within the permitted time period.

Plaintiff offers several arguments attempting to show that she had no remedy under the CBA. First, Plaintiff contends that she could not have brought her grievance in a timely fashion because she would have had to file it before September 13, 2004. It is not clear whether the 60-day time limitation is triggered on the day of the alleged wrongdoing or when Plaintiff first learned of the wrongdoing.[13] The issue of timeliness itself is a question of interpretation of the CBA through the CBA. Plaintiff never argued this point in her grievance or the subsequent appeal process.

Second, Plaintiff contends that the grievance procedure was not available to retirees. That is by no means undisputed and appears immaterial to the resolution of the grievance and the union's decision not to pursue it. AT&T's letter rejecting Plaintiff's grievance stated, in its entirety:

---

[13] Plaintiff has presented conflicting testimony as to when she actually learned of the downsizing. See note 7, supra. To the degree some sort of discovery rule is implicated, however, that also is an interpretive matter for the grievance procedure.

20

> The above mentioned grievance was filed beyond the 60-day timeline as per the Contract Article 9. Therefore, it will not be accepted by the company. Generally, grievances are also not accepted from retired employees, however, this also did not meet the agreed upon timeline.

Pl. Appendix at 42. This letter makes clear that the grievance was rejected for untimeliness. Plaintiff's retiree status was a secondary consideration. More importantly, the use of the modifier "generally" suggests that the grievance process was not completely foreclosed to retirees.[14]

Finally, Plaintiff argues that her failure to exhaust was excusable. She claims that filing a grievance would have been futile because her November 16, 2004, grievance had been denied by AT&T and rejected twice by the union on appeal, and the union refused to take any more action on her behalf. Futility arises when grievance procedures are unsatisfactory or unworkable, such as where the "conduct of the employer amounts to a repudiation of the [collective bargaining agreement]" or when the union has wrongfully refused to process a grievance. Vaca, 386 U.S. at 185. AT&T and the CWA denied Plaintiff's grievance for untimeliness. This might be an unsatisfactory result for Plaintiff, but it does not render the grievance process futile. To the degree she remained dissatisfied, Plaintiff's remedy was

---

[14] Local 1051 President Linda Teoli told Plaintiff that AT&T rejected the grievance inter alia because "[g]rievances are not accepted from retired employees." Pl. Appendix at 43. This appears to overstate AT&T's reliance on a retiree ground to reject the grievance. For its part, the union, through Bill Bates and Frederick Cory, relied only on lack of timeliness in rejecting Plaintiff's appeals. Id. at 46, 48-49.

to bring an action under § 301 against either or both the union or the employer.  See DelCostello v. Teamsters, 462 U.S. 151, 164-65 (1983) (establishing the right of an employee to bring a hybrid § 301/ fair representation claim).[15]  This she has failed to do.

Plaintiff filed this suit in state court on April 21, 2005. A §301 hybrid claim may be brought in state court, Charles Dowd Box Co. v. Courtney, 368 U.S. 502, 505-514 (1962), and Plaintiff's complaint would have been timely had it alleged a hybrid claim.  The statute of limitations for a hybrid claim is six months from the date the employee "knew or reasonably should have known of the alleged wrongful acts." Adorno v. Crowley Towing and Transportation, 443 F.3d 122, 126 (1st Cir. 2006). Here, Plaintiff knew or should have known of AT&T's alleged breach of the CBA on September 13, 2004, or shortly thereafter, and the union's alleged breach of its duty of representation on February 14, 2005, the date of the CWA's final refusal to prosecute her appeal.

The reason for Plaintiff's failure to bring a proper § 301 claim is not the statute of limitations, but the nature of the

---

[15] A hybrid suit combines two causes of action: (1) a claim against the employer under §301 for breach of the collective bargaining agreement and (2) a claim against the union for breach of its duty of fair representation, which is implied under the National Labor Relations Act, 29 U.S.C. §151.  DelCostello v. Teamsters, 462 U.S. 151, 164-65 (1983).  An employee may choose to sue one or both defendants, but she must prove both claims. Id. at 165.

claims themselves.  In a supplemental filing timely submitted after the hearing on the motion, see note 9 supra, Plaintiff attempted to recharacterize her claims as a § 301 hybrid.  The complaint, however, raised only two state law counts of misrepresentation, which I have held preempted by §301.  It made no allegations against the union for breach of the duty of fair representation.  Because Plaintiff's complaint lacked this essential component, it could not be considered a hybrid claim.  Nor has Plaintiff sought properly to amend her complaint.

In sum, there is no genuine dispute of material fact that the CBA grievance process offered a meaningful remedy to Plaintiff and she failed to avail herself of it in a timely fashion, either at the grievance level or through the mechanism for judicial review provided by a §301 action.

I conclude that federal labor law preempts Plaintiff's claims and that the time period within which she may pursue her federal claims has passed without the Plaintiff having properly framed a § 301 case.  Recognizing that this case has been argued to fall outside preemption, I will also address the merits of the claims as state law matters as an alternative grounds for disposition.  My disposition of these alternative grounds demonstrates the futility of Plaintiff's pursuit of a § 301 claim even were she permitted belatedly to raise it.

**B.    Misrepresentation**

Plaintiff alleges in the alternative that AT&T

23

misrepresented either intentionally or negligently its plans to downsize the Fairhaven facility.  Because the two torts differ only in the scienter required, I discuss them together here.  See Rodowicz v. Massachusetts Mutual Life Ins. Co., 279 F.3d 36, 42 (1st Cir. 2002).

In order to succeed on a claim for misrepresentation under Massachusetts law, the plaintiff must show "a false statement of material fact made to induce the plaintiff to act, together with reliance on the false statement by the plaintiff to the plaintiff's detriment."  Rodowicz, 279 F.3d at 42.  The speaker need not know that the statement is false if "the truth is reasonably susceptible of actual knowledge," or accurate facts are available to the speaker through "a modicum of diligence." Id.  Massachusetts treats negligent misrepresentation claims "more as negligence actions than deceit actions, focusing on the degree of care exercised by the speaker in making the statement." Id.

Plaintiff alleges that Eustace and Cappuccio made false statements when they told her in June and July 2004 that AT&T had no plans to close or downsize the Fairhaven facility.  Although Plaintiff has offered evidence to show that she relied on these statements to her detriment, she has not produced evidence sufficient for a jury to find that those statements were false when made.

In support of her argument, Plaintiff points out that between December 2003 and June 2004, AT&T sent notices to

24

employees warning that the expiration of FCC regulations could lead to a cutback in its residential business.  When the FCC regulations expired, AT&T announced that it was pulling out of the consumer business in seven states.  Plaintiff contends that AT&T's 2003 Annual Report suggested that union jobs would be lost as a result of the expiration of the FCC regulations.

What connection, if any, the statements regarding the general state of AT&T's business in the first half of 2004 have to the downsizing in Fairhaven in September 2004 is unclear.  Massachusetts was not one of the states in which AT&T announced cutbacks in residential service.  Moreover, the notice announcing the residential pull-out emphasized that AT&T would continue to serve its existing residential customers in the affected states and that its enterprise, government, business, and DSL clients would not be affected.  If anything can be inferred from this announcement with respect to AT&T's workforce, it is that the number of employees in the affected states was unlikely to grow.  It cannot reasonably be inferred that a downsizing in Fairhaven had been planned or even contemplated.

The 2003 Annual Report is similarly unhelpful in divining Fairhaven's future.  To be sure, it reported the layoff of thousands of employees in 2002 and 2003 and anticipated further workforce reductions in 2004.  However, of the approximately 6,800 employees terminated in 2002 and 2003, nearly 2/3 were

management.[16]  Moreover, the report provides no details about the terminated employees and no forecast of which business groups or geographic regions were targeted for further cutbacks.  The Report does state that the majority of the employee terminations resulted from improved processes and automation in providing services for business customers, suggesting that future workforce reductions might occur in the area of business services, not the residential sector in which Plaintiff worked.

Plaintiff contends that Cappuccio was a director with regional responsibilities and, therefore, she should have known that AT&T's trend away from residential business signaled a downsizing for Fairhaven.  In addition to making the unsupported connection between AT&T's national business trends and Fairhaven, this argument misreads the record.  Cappuccio's responsibilities were local, not regional,[17] and Cappuccio's uncontroverted testimony is that she was not aware of Fairhaven's fate until

---

[16] In a timely supplemental filing submitted after the hearing on this motion, see note 9, supra, Plaintiff offered a 2003 article from LookSmart.com that puts the number of employee terminations at 3,500, slightly over half of whom were management.

[17] Between approximately 1990 and 1995, Cappuccio held a position as region staff manager, supporting call centers in Massachusetts, Maine, New Hampshire, Vermont, Connecticut, and Rhode Island.  She then switched her focus to training and development for that region.  During the relevant time period, however, Cappuccio was the group manager for customer sales and services for the Fairhaven call center.  Her job was national in the sense that Fairhaven received calls from all over the country, but her responsibilities were centered primarily on operations within the Fairhaven center.

three days before the September 13, 2004, announcement.[18]

Plaintiff also alleges that AT&T had a "past practice" of making decisions to close a facility several months in advance. In support, she points to two decisions to close similar facilities: one in September 1994 that was made in May of that year, and one in December 1997 that was made in the fall of that year.[19] Plaintiff has not shown how these decisions made five months and one to three months in advance, respectively, have any bearing on the veracity of Cappuccio's and Eustace's statements about Fairhaven in June and July 2004.[20]

---

[18] In a timely supplemental filing, see note 9 supra, Plaintiff produced documents that she believes indicated that AT&T outsourced to India the jobs that it had cut from the Fairhaven facility in 2004. She cites a paper from an Assistant Professor at the University of Massachusetts indicating that the union had obtained a January 2004 internal memo from an Indian consulting firm showing that the jobs would be moved to India. Stephanie Luce, "Capital Mobility and Job Loss in Massachusetts: A Look at Corporate Restructuring, Production Shifts, and Outsourcing," 7 (Apr. 28, 2005).

Assuming this paper and the internal memo could somehow overcome authentication and hearsay objections, they plainly fail to prove that Cappuccio or Eustace could have or should have known about the downsizing. There is no evidence to suggest that Cappuccio or Eustace were aware of or had access to the memo. Indeed, the precise contents of the memo, its author, its distribution list, and circulation are unknown. Thus, any inferences as to who was aware of it and what reference, if any, it made to Fairhaven downsizing are pure speculation.

[19] Plaintiff raised the 1997 closing in her first post-hearing supplemental filing. See note 9 supra.

[20] Plaintiff cites two cases for its "past practice" theory, neither of which provide support. See White v. Bell Atlantic Yellow Pages, 2004 WL 594957 (D. Mass. March 23, 2004) (Woodlock, J.) (finding that even if defendant had a particular past practice, plaintiffs presented no evidence that the practice was intended for the future); Waterman Steamship Corp. v. 350 Bundles

Plaintiff further argues that the decision in 2003 to sell the Fairhaven building and move into smaller quarters indicated in June and July 2004 that a downsizing was imminent. Cappuccio, however, testified that the decision to move to smaller quarters was unrelated to anticipated downsizing; the Fairhaven workforce had already shrunk from approximately 1000 to 430 and the company was experiencing difficulties with tenants. Indeed, Cappuccio had expected to discuss a plan to build out the Fairhaven facility with 430 employees on September 15, 2004. Plaintiff has offered no contrary evidence.

Finally, Plaintiff points to Eustace's deposition testimony in which she states that she "knew there was going to be an announcement of some kind." Eustace testified that she expected an announcement in September 2004, relating to reorganization in general. She knew that "they were reducing management levels," but had no further details. This testimony fails to establish that Eustace, Cappuccio, or anyone else at Fairhaven knew in June or July 2004, that Fairhaven would be downsizing in September of that year. Not only did Eustace state clearly that she believed the announcement concerned a general reorganization with management reductions, but there is no evidence that she expected the announcement at the time she made the allegedly false

---

of Hardwood, 603 F. Supp. 490, 493 (D. Mass. 1984) (finding that a consignee's allegations regarding past practice of carrier in computing charges on net volume raised a genuine issue of material fact, precluding summary judgment on issue of estoppel by course of conduct).

statements.[21]

In sum, Plaintiff has not produced evidence sufficient for a reasonable fact finder to conclude that the statements made by Eustance, Cappuccio, or any other AT&T manager regarding the downsizing of the Fairhaven facility in June and July 2004, were false when made.  Thus, Plaintiff's claim of negligent misrepresentation cannot survive summary judgment.  It follows that her claim for intentional misrepresentation, which requires a more substantial showing of scienter, also fails.[22]

## IV. CONCLUSION

---

[21] After the deadline for post-hearing supplemental filings, Plaintiff submitted a second supplemental memorandum, see note 9 supra, in which she offered what appears to be transcripts from Local 1051's "information tape" that she claims refute Cappuccio's and Eustace's testimony that they did not know a downsizing announcement was going to be made in September 2004. Putting aside their belated submission, these documents raise concerns of authenticity, personal knowledge, and relevancy, and tend to support, not refute, Cappuccio's and Eustace's testimony. The speakers on the tapes are unidentified and the source of their knowledge is unknown.  The statements regarding worker surpluses that Plaintiff points out refer to the year 2006, well beyond the events in question here.  The tape that purports to be a transcript of a conversation with Local 1051 President Linda Teoli on July 22 (the year is not specified), mentions possible workforce reductions, but states that the impact on Fairhaven is unknown and "Joan Cappuccio has stated it is Business as Usual." In sum, these documents, even if admissible, lend no support to Plaintiff's case.

[22] Plaintiff contends that Cappuccio could have inquired of other managers, such as John Polumbu, Director of the Consumer Division, as to whether AT&T had plans to downsize or close Fairhaven.  Whether she could have made such inquiries is beside the point.  The issue is whether a downsizing had been planned for September 2004, and if so, whether she should have known about it in June or July 2004.  For the reasons discussed above, neither issue can be decided in Plaintiff's favor.

For the reasons set forth more fully above, I GRANT
Defendant's motion for summary judgment.


/s/ Douglas P. Woodlock

_____
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE